# 20-1458(L)

## 20-1575(XAP), 20-1611(XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

KPFF INVESTMENT, INC., WHITE OAK FUND LP, individually and
on behalf of all others similarly situated, LARRY HOLLIN,

*Plaintiffs-Appellants-Cross-Appellees,*

MODERN SETTINGS LLC, a New York Limited Liability Company, MODERN
SETTINGS LLC, a Florida Limited Liability Company, on behalf of themselves and
all others similarly situated, CRAIG R. COOKSLEY, Individually and on behalf of
all those similarly situated, NORMAN BAILEY, THOMAS GALLIGHER, KEN PETERS,

*Plaintiffs,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS-CROSS-APPELLEES

MERRILL G. DAVIDOFF
MARTIN I. TWERSKY
BERGER MONTAGUE P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

JAY L. HIMES
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

—against—

BASF Metals Limited, ICBC Standard Bank PLC,

*Defendants-Appellees-Cross-Appellants,*

Goldman Sachs International, HSBC Bank USA, N.A.,
Standard Bank Plc, UBS AG, UBS Securities LLC, The London
Platinum and Palladium Fixing Company Ltd., BASF Corporation,

*Defendants-Appellees.*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiffs-Appellants-Cross-Appellees KPFF Investment, Inc. and White Oak Fund LP have no parent corporations. No publicly company owns or holds 10% or more of their stock.

Plaintiff-Appellant-Cross-Appellee Larry Hollin is a natural person.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

TABLE OF ABBREVIATIONS ........................................................... ix

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................4

STATEMENT OF THE CASE ...............................................................6

      A.    Defendants' Price-Fixing Conspiracy ...................................7

      B.    Injury to Plaintiffs in the Physical and NYMEX Markets .................11

      C.    Defendants' Motions to Dismiss .........................................12

SUMMARY OF ARGUMENT ............................................................14

STANDARD OF REVIEW .................................................................18

ARGUMENT ......................................................................................19

I.    THE NYMEX AND OTC PLAINTIFFS ARE EACH AN EFFICIENT
ENFORCER OF THE ANTITRUST LAWS ..........................................19

      A.    The NYMEX Plaintiffs Traded Directly with The Exchange ............20

      B.    Plaintiffs Who Transact in Physical and Exchange-Traded
Products Are Efficient Enforcers Under *AGC*. ..................22

      C.    The District Court Erroneously Considered and Then
Misapplied a "Market Dominance" Inquiry.......................27

           1.    The Court Below Erred by Importing *Gelboim's*
Disproportionality Discussion .................................28

2. Adding a "Proportionality/Dominance" Factor Was Unsupported in this *Per Se* Case..................................................30

3. "Umbrella" Standing Concerns Similarly Do Not Apply. .......34

4. The District Court Erred in Weighing Fact Allegations On Defendants' Rule 12(b)(6) Motion. ..........................................35

D. The NYMEX Plaintiffs Satisfy the Four *AGC* Factors......................37

1. Factors 1 and 2: NYMEX Plaintiffs are Direct Victims of Defendants' Conspiracy.............................................................38

2. Factors 3 and 4: Damages are not speculative, nor susceptible to complex apportionment or duplicative recovery. .................41

(i) Damages are not speculative. .........................................41

(ii) No duplication or complex apportionment.....................42

3. The OTC Plaintiff Is an Efficient Enforcer ..............................43

II. THE DISTRICT COURT ERRED BY DISMISSING PLAINTIFFS' CEA CLAIMS AS EXTRATERRITORIAL ......................................................................47

A. Defendants' Domestic Conduct Establishes U.S. Jurisdiction ..........48

B. The District Court Misapplied the "Predominance" Analysis and Erroneously Construed the TAC Allegations Against Plaintiffs. ..........................................................................................53

III. THE DISTRICT COURT ERRED IN DISMISSING LPPFC FOR LACK OF PERSONAL JURISDICTION ......................................................................55

IV. THE DISTRICT COURT ERRED IN DISMISSING BASF CORP. ..........................58

CONCLUSION ..........................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
771 F. App'x 498 (2d Cir. 2019), *cert. denied*,
140 S. Ct. 71 (2019)..........................................................29, 38, 42, 46

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...............................................43

*Allianz Global Investors GmbH v. Bank of Am. Corp.*,
2020 WL 2765693 (S.D.NY. May 28, 2020) ....................................26

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ...........................................................45

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013) ...........................................................22

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .....................................................*passim*

*Apple, Inc. v. Pepper*,
139 S. Ct. 1514 (2019)....................................................................32

*Associated General Contractors of California, Inc. v. California State
Council of Carpenters*,
459 U.S. 519 (1983)................................................................*passim*

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)..................................................................33, 41

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982).......................................................................44

*Cal. v. Am. Stores Co.*,
495 U.S. 271 (1990).......................................................................31

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) .............................................................18

iv

*In re Commodity Exch. Inc., Gold Futures & Options Antitrust Litig.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016) ..............................................26, 33, 42, 56

*Cooper Tire & Rubber Company Europe Ltd & Ors*
    *v. Dow Deutschland Inc & Ors*,
    [2010] EWCA Civ 864 ...........................................................................57

*D Klein & Son, Inc. v. Good Decision, Inc.*,
    147 F. App'x 195 (2d Cir. 2005) ...........................................................55

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ................................................32, 33, 40

*Eastman Kodak Co. v. Henry Bath LLC*,
    936 F.3d 86 (2d Cir. 2019) ..............................................................*passim*

*In re Foreign Exch. Rates Benchmark Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 9, 2016) .............................................26, 30

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)............................................................................36

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) .................................................................38

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016) ...........................................................*passim*

*Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018) .................................................................53

*Grosser v. Commodity Exch., Inc.*,
    639 F. Supp. 1293 (S.D.N.Y. 1986), *aff'd without opinion*,
    859 F.2d 148 (2d Cir. 1988) ................................................25, 39, 42

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) .............................................................25

*Knopf v. Esposito*,
    803 F. App'x 448 (2d Cir. 2020) ........................................................37

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) ................................................20, 21, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..................................................................38, 42

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002), *cert. denied*, 539 U.S. 903 (2003) ..............*passim*

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016) ........................................26, 42

*Marine Midland Bank, N.A. v. Miller*,
664 F.2d 899 (2d Cir. 1981) ...............................................58

*Media-Saturn Holding GmbH v. Toshiba Information Sys. (UK) Ltd*,
[2019] EWHC 1095 ..............................................................57

*Merced Irrigation Dist. v. Barclays Bank PLC*,
220 F. Supp. 3d 412 (S.D.N.Y. 2016) ............................................29

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
381 U.S. 311 (1965)...............................................................31

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
468 U.S. 85 (1984)...............................................................30

*Nypl v. JPMorgan Chase & Co.*,
2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017)....................................42

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019) ....................................................18

*Parkcentral, Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) ................................... 17, 51, 52-54

*Prime International Trading, Ltd. v. BP PLC*,
937 F.3d 94 (2d Cir. 2019), *cert. denied*,
2020 WL 3146710 (U.S. June 15, 2020).........................1, 14, 17, 47-49, 51-53

*Reading Indus. Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980) ....................................................45

*Roche Prods. Ltd. v. Provimi Ltd.*,
[2003] EWHC 961 ..............................................................57

vi

*S. New England Tel. Co. v. Global NAPs Inc.*,
 624 F.3d 123 (2d Cir. 2010) ...............................................55

*Sanner v. Board of Trade of the City of Chicago*,
 62 F.3d 918 (7th Cir. 1995) .......................................*passim*

*Sitts v. Dairy Farmers of Am., Inc.*,
 276 F. Supp. 3d 195 (D. Vt. 2017) ....................................42

*Sonterra Capital Master Fund v. Credit Suisse AG*,
 277 F. Supp. 3d 521 (S.D.N.Y. 2017) ...............................30

*Strax v. Commodity Exch., Inc.*,
 524 F. Supp. 936 (S.D.N.Y. 1981) ....................................26

*Sullivan v. Barclays PLC*,
 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ....................30

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001) .............................................30

*United States v. Barclays, PLC*,
 No. 15-cr-77, ECF No. 6 (D. Conn. May 19, 2015)........31

*United States v. BNP Paribas USA, Inc.*,
 18-cr-00061, ECF No. 4 (S.D.N.Y. Feb. 2, 2018)..........31

*United States v. Peters*,
 732 F.3d 93 (2d Cir. 2013) ...............................................55

*Vattenfall v Prysmian & NKT*,
 [2018] EWHC 1694 ...........................................................57

*Wacker v. JP Morgan Chase & Co.*,
 678 F. App'x 27 (2d Cir. 2017) ........................................37

**Statutes**

7 U.S.C. §§ 1, *et seq.*, Commodity Exchange Act........................ *passiim*

7 U.S.C. § 25 ......................................................................................4

15 U.S.C. § 1, Sherman Act § 1 ..................................................7, 30

15 U.S.C. § 15, Clayton Act § 4 ...................................................................32, 44

15 U.S.C. § 15(a) .............................................................................................4

15 U.S.C. § 26 ..................................................................................................4

28 U.S.C. § 1291 ..............................................................................................4

28 U.S.C. § 1331 ..............................................................................................4

28 U.S.C. § 1337(a) ..........................................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(2)...................................................................................18

Fed. R. Civ. P. 12(b)(6)...................................................................18, 35, 36

**Other Authorities**

LPPM, Good Delivery, https://www.lppm.com/good-delivery/ ..............................7

U.S. Dep't of Justice, ANTITRUST DIV. MANUAL (5th ed. last updated
    Jan. 13, 2020) https://www.justice.gov/atr/file/761166/download ...................31

# TABLE OF ABBREVIATIONS

*Plaintiffs:*

| | |
|---|---|
| OTC Plaintiff | KPFF Investment, Inc. |
| NYMEX Plaintiffs | Larry Hollin and White Oak Fund LP |

*Defendants:*

| | |
|---|---|
| BASF Corp. | BASF Corporation |
| BASF Metals | BASF Metals Limited |
| Goldman | Goldman Sachs International |
| HSBC | HSBC Bank USA, N.A. |
| ICBC | ICBC Standard Bank plc |
| LPPFC | The London Platinum and Palladium Fixing Company Ltd. |

*Other Entities:*

| | |
|---|---|
| CME | Chicago Mercantile Exchange |
| LPPM | The London Platinum and Palladium Market |
| NYMEX | The New York Mercantile Exchange |

*Papers:*

| | |
|---|---|
| JA | Joint Appendix |
| SPA | Special Appendix |
| SAC | Second Amended Complaint (ECF 102) (JA-67) |
| TAC | Third Amended Complaint (ECF 183) (JA-345) |
| *Platinum I* | March 28, 2017 Memorandum Opinion and Order (ECF 179) (JA-239; SPA-1) |

*Platinum II*   March 29, 2020 Memorandum Opinion and Order (ECF 239)
      (JA-829; SPA-107)

# PRELIMINARY STATEMENT[1]

For years, Defendants—"traders and holders of significant, enormous amounts of physical palladium and platinum" (JA-52)—fixed platinum and palladium prices through a private, twice-a-day conference call, known as the "Fixing." JA-352-53, 354-55, 373) (TAC ¶¶ 3-4, 8-9, 56-57). Working together in the time leading up to, during, and after the Fixing, Defendants artificially suppressed the prices of physical platinum and palladium and of futures and options traded on the NYMEX. JA-355 (TAC ¶ 10).

The district court (Woods, J.) upheld Plaintiffs' conspiracy and antitrust injury allegations, but nonetheless dismissed Plaintiffs' antitrust claim. The court held that Plaintiffs—sellers of the physical product and NYMEX contracts—were not efficient antitrust enforcers, and thus lacked standing to sue. Further, although the district court originally upheld Plaintiffs' Commodity Exchange Act ("CEA") claims, finding them to be well-pleaded, on reconsideration it dismissed them as impermissibly extraterritorial under this Court's ruling in *Prime International Trading, Ltd. v. BP PLC,* 937 F.3d 94 (2d Cir. 2019), *cert. denied*, 2020 WL 3146710 (U.S. June 15, 2020).

The district court erred in dismissing Plaintiffs' claims.

---

[1] The Table of Abbreviations details the abbreviations used.

On Plaintiffs' antitrust claim, the court below misapplied the efficient enforcer analysis, derived from *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and informed by *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), a case arising from various banks' corruption of LIBOR. The lower court focused on *Gelboim*'s concern that damages **there** could be disproportionate to the banks' ill-gotten gains, inasmuch as LIBOR's corruption affected countless business transactions globally and implicated hundreds of trillions of dollars.

But the LIBOR case was "like no other" because it involved "nothing less than the market for money." *Gelboim*, 823 F.3d at 778, 782. By comparison, this one is a price-fixing and commodity manipulation case—the sort of action the federal courts have encountered and upheld time and again. Damages in a case like this one are "hardly beyond the ken of the federal courts." *Sanner v. Board of Trade of the City of Chicago*, 62 F.3d 918, 930 (7th Cir. 1995).

The efficient enforcer analysis is designed to identify those who may pursue antitrust claims—not to give antitrust violators an exit strategy for their intentional wrong-doing. Yet, importing *Gelboim*'s "disproportionality" concerns here would immunize Defendants' conspiracy from civil liability for price fixing identifiable products, traded in identifiable spot and exchange markets.

The district court similarly erred in dismissing Plaintiffs' CEA claims. While Defendants' twice-daily Fixing conference calls were typically held among their London-based precious metals traders, Defendants' conspiracy included plenty of conduct in the United States. Specifically, Defendants' U.S.-based traders were in "constant communication[]" with their London counterparts, and they traded on the NYMEX, including before, during, and after the Fixing. JA-358-59, 365, 367-68, 376) (TAC ¶¶ 19, 38, 44, 68). "This is, to be sure, an allegation ***of domestic activity***," the court below wrote. JA-882; SPA-53. The U.S.-London communications facilitated trading on NYMEX in furtherance of the conspiracy, which included corrupting in the Fixing process itself. JA-457 (TAC ¶ 190). These allegations of domestic conduct are sufficient under *Prime International*.

Finally, besides erroneously dismissing Plaintiffs' substantive claims, the court below also erred: (1) in declining to exercise jurisdiction over LPPFC, a shell company that Defendants ran to implement their conspiracy, and (2) in finding legally insufficient Plaintiffs' allegations against BASF Corp., the U.S. affiliate of BASF Metals, one of the "fixers" in London. Plaintiffs' allegations established that LPPFC was the Defendants' alter ego and therefore subject to personal jurisdiction. They further established that BASF Corp. was integrated with BASF Metals and a co-conspirator in the price fixing.

Accordingly, the judgment appealed from should be reversed, and the case remanded for further proceedings.

## JURISDICTIONAL STATEMENT

This appeal arises from the district court's final judgment. The district court had subject matter jurisdiction under 15 U.S.C. §§ 15(a), 26, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

A.   As to the NYMEX Plaintiffs: Were Plaintiffs an efficient enforcer of the U.S. antitrust laws where they alleged, among other things, that:

1.   Defendants participated in a twice-daily London-based teleconference to establish the prices of physical platinum and palladium (the "Fixing");

2.   The NYMEX, located in New York City, is the largest and leading exchange for platinum and palladium futures and options in the world;

3.   The Fixing prices directly impacted prices for and targeted NYMEX platinum and palladium;

4.   The Defendants engaged in significant trading of NYMEX platinum and palladium during the conspiracy;

5.   The Defendants conspired to manipulate the prices of NYMEX platinum and palladium during the time around the Fixing and to influence the Fixing; and

6. Plaintiffs transacted in NYMEX platinum and palladium during the conspiracy?

B. As to the OTC Plaintiff: Was the Plaintiff—which transacted in physical platinum and palladium during the conspiracy, but did not trade directly with any Defendant—an efficient enforcer of the U.S. antitrust laws?

C. Did Plaintiffs allege sufficient domestic conduct by the Defendants to state a CEA claim where they alleged, among other things, that:

1. The New York City-based NYMEX is the preeminent exchange for platinum and palladium futures and options;

2. The Defendants had U.S.-based precious metals traders who were in constant communication with Defendants' Fixing participants in London, and who participated in the conspiracy by, among other things, communicating confidential client and proprietary trading information to the Defendants and actively trading NYMEX platinum and palladium before, during, and after the Fixing to facilitate and profit from the conspiracy; and

3. The Defendants drove down prices of physical and NYMEX platinum and palladium during and in advance of the Fixing, including to manipulate the Opening Price?

D.     Was Defendant LPPFC, a foreign entity, subject to the specific personal jurisdiction of the court below, and did Plaintiffs plead sufficient facts to state a claim against LPPFC, where:

1.     LPPFC was formed and operated solely to implement the operations of the Fixing and to further the conspiracy to manipulate the prices of physical and NYMEX platinum and palladium and

2.     LPPFC was controlled by the other Defendants throughout the conspiracy?

E.     Did Plaintiffs plead sufficient facts to state a claim against Defendant BASF Corp., a U.S.-based corporate affiliate of BASF Metals?

## STATEMENT OF THE CASE

Defendants' London-based precious metals traders collectively fixed the prices of platinum and palladium through private, twice-daily conference calls that they dubbed the "Fixing." JA-352-53, 354-55, 373 (TAC ¶¶ 3-4, 8-9, 56-57). Working with their U.S. counterparts before, during, and after the Fixing, Defendants' precious metals traders manipulated prices of not only physical platinum and palladium, but also their futures and options contracts traded on the NYMEX. JA-355-57, 466 (TAC ¶¶ 10-14, 207). Defendants' U.S.-based precious metals traders traded NYMEX contracts around the Fixing, including in advance of the Fixing to manipulate the process itself. JA-375, 391 (TAC ¶¶ 64, 96). The

district court upheld Plaintiffs' conspiracy allegations, finding that they had pleaded price fixing. JA-836; SPA-114.

Plaintiffs are investors in physical and NYMEX-traded platinum and palladium. They allege claims under the Sherman Act, 15 U.S.C. § 1, and the CEA, 7 U.S.C. § 1, *et seq*. JA-361-62, 491-95 (TAC ¶¶ 28-32, 273-92), arising from Defendants' collusion during the period 2008 through November 2014, when the Fixing that Defendants controlled ended. Plaintiffs sue individually and on behalf of a class of persons who (1) sold platinum and palladium (99.95% or greater purity, or otherwise good delivery), (2) sold futures on NYMEX, or (3) traded specified NYMEX options. JA-361-62, 489 (TAC ¶¶ 28-32, 265). ("Good delivery" product is at least 99.95% pure. *See* LPPM, Good Delivery, https://www.lppm.com/good-delivery/.)

Defendants include: (1) the four participants in the Fixing—BASF Metals, Goldman, HSBC, and ICBC; (2) LPPFC, a shell entity that Defendants used to implement their conspiracy; and (3) BASF Corp. a U.S. conspirator-affiliate of BASF Metals. JA-85-89, 90-91 (SAC ¶¶ 30-40, 45-47).

## A. Defendants' Price-Fixing Conspiracy

Platinum and palladium have traditionally traded internationally as precious metals and are held primarily for their exchange value. JA-372-73 (TAC ¶¶ 54-55). For many years, Defendants' precious metals traders used the Fixing to set the

leading benchmark prices for these metals by participating in closed-door morning and afternoon conference calls, referred to as the "AM Fixing" and "PM Fixing." JA-354, 373, 485-86 (TAC ¶¶ 8, 57, 250-53).

During the calls, the "Chair"—selected from and by the Defendants—announced an "Opening Price," which purportedly reflected the spot price for "good delivery" platinum and palladium. JA- 352, 373-74, 484 (TAC ¶¶ 3, 57-59, 245). The Defendants then declared themselves as "a net buyer or a net seller, or as having no interest at the starting price." JA-373-74 (TAC ¶ 59). Each Defendants' interest was purportedly based on its customers' orders and its own proprietary orders from its trading desks. JA-373, 485 (TAC ¶¶ 58, 248). By combining expressions of interest, Defendants generated an aggregate buy or sell position for the auction. At the call's end, the Fixing prices were established and publicly disclosed via LPPFC. JA-371-72, 373-74, 375 (TAC ¶¶ 53, 59-61, 64).

As the preeminent benchmark for platinum and palladium, the Fixing's influence is widespread. JA-353 (TAC ¶ 5). And as Fixing prices move, so too do the magnitude and direction of prices for not only physical platinum and palladium, but also their corresponding NYMEX futures and options. For example, when physical platinum and palladium prices decrease $1, NYMEX platinum and palladium futures contracts generally do as well. The near perfect correlation between the physical prices and those of NYMEX contracts is well-documented

and confirmed by Plaintiffs' analyses. JA-353, 386-96 (TAC ¶¶ 5 & 90-103, Charts 5-9).

Through their control of the Fixing and their manipulative trading strategies before, during, and after the Fixing calls, Defendants conspired to suppress the prices of platinum and palladium, including on the domestic NYMEX. JA-471-72 (TAC ¶ 218). The TAC describes how prices for these metals acted differently around the time of the Fixing than they did at any other time of day. JA-375, 402-03 (TAC ¶¶ 64, 114). No matter how the trading data is analyzed, statistically significant deviations are observed around the Fixings. JA-354-55, 397-439 (TAC ¶¶ 9, 105-148).

Defendants "not only use[d] the Fix price to manipulate NYMEX futures prices," but also used "NYMEX futures trading . . . [to] manipulate the Fix price" itself JA-391 (TAC ¶ 96). For example, Defendants compiled confidential client orders and then shared the information with the other Fixing members, thereby coordinating the execution of transactions in the spot or NYMEX markets, or both, immediately prior to, during, and after the Fixing. Through such collective action, Defendants misrepresented actual market supply and demand and induced clients to change their trading instructions to Defendants.[2]

_____

[2] Strictly speaking, platinum and palladium each trade in their own individual physical and exchange markets. However, nothing on this appeal turns on this fact. For simplicity, we refer to the platinum and palladium "market."

Based on Plaintiffs' analyses, the only credible explanation for the observed price movements is that Defendants shared confidential client order information and their own proprietary positions, thereby allowing coordinated execution of NYMEX transactions during the time around the Fixing. JA-355, 434, 449-51, 452, 473-74, 478-79, 485 (TAC ¶¶ 10, 143, 175, 177, 182, 223, 233, 248-49). Transactions that moved the market in the desired direction—such as large sell orders on days platinum or palladium were to be driven down—were grouped and timed for maximum effect around the Fixing so as to, for example, manipulate the Opening Price and the eventual public price that emerged from the Fixing. JA-485 (TAC ¶¶ 248-50). Throughout the class period, Defendants were particularly motivated to suppress the Fixing price in order to profit from large net "short" positions they held in NYMEX platinum and palladium contracts. JA-460-62 (TAC ¶¶ 197-99).

Defendants used various strategies to profit from their manipulation:

*First*, Defendants exploited their foreknowledge of downward swings in the platinum and palladium Fixing price to make advantageous trades in physical and NYMEX markets. JA-357-58 (TAC ¶¶ 14-18). Relatedly, Defendants also reduced their risk in derivative instruments with market-based triggers, such as "stop loss" orders and "margin calls." JA-465, 466-67 (TAC ¶¶ 203-04, 208).

*Second*, the Fixing both shrouded Defendants' conduct in secrecy and provided a veneer of legitimacy, enabling them to use other price manipulative tactics in trading physical and NYMEX platinum and palladium, such as:

- "Front running"—"trading in their own positions in advance of customer orders to take advantage of the market's resulting move when the client's orders were placed."

- "Spoofing"—placing large orders that were never executed.

- "Wash sales"—placing large orders that were quickly executed, but then reversed.

- "Painting the screen"—placing orders that were subsequently cancelled to give the illusion of activity.

- "Jamming"—used to "trigger a stop-loss order or to avoid a bank's having to pay on an option or similar contract."

JA-73-74; 355, 356, 358-59, 451, 456-57, 485, 495 (SAC n.2; TAC n.4, ¶¶ 10, 13, 19, 179, 188, 249, 292).

### B.    Injury to Plaintiffs in the Physical and NYMEX Markets

The OTC Plaintiff sold physical platinum and/or palladium during Defendants' conspiracy in the "spot" or OTC market. While the OTC Plaintiff did not trade directly with any Defendant, it was injured because Defendants' conspiracy depressed the price received on its sales of "good delivery" platinum

and palladium—the very commodities whose prices the Fixing "fixed." The NYMEX Plaintiffs traded platinum and palladium futures and options on the NYMEX during Defendants' conspiracy and were similarly injured by Defendants' price suppression.

### C. Defendants' Motions to Dismiss

**First Round (*Platinum I*):** Defendants moved to dismiss Plaintiffs' SAC for failure to state a claim, while the foreign defendants (BASF Metals, ICBC, and LPPFC) also sought dismissal for lack of personal jurisdiction. JA-241-42, 273; SPA-3-4, 35. The district court granted the motions in part and denied them in part. JA-257; SPA-19.

On the antitrust claim, the district court held that Plaintiffs had Article III standing and had adequately alleged antitrust injury. JA-270-272, JA-273-289; SPA-32-34; SPA-35-51. The court further held that the SAC plausibly alleged a price-fixing conspiracy among Defendants. JA-258-261; SPA-20-31. However, in its efficient enforcer analysis, the court expressed particular concern with the size and complexity of the proposed class, which, in addition to sellers of "good delivery" physical product and NYMEX traders, also included sellers of non-"good delivery" physical product and of ETF shares, plus all OTC forward contract and options investors. *See* JA-284-88; SPA-46-50; JA-199 (SAC ¶ 271). Thus, the

district court ruled that Plaintiffs were not efficient enforcers and dismissed their antitrust claim. JA-284-88; SPA-46-50.

The district court upheld Plaintiffs' CEA claims (with one immaterial exception), ruling they were not impermissibly extraterritorial. JA-295; SPA-56.

The district court dismissed the foreign defendants for lack of personal jurisdiction, while also denying Plaintiffs' request for jurisdictional discovery JA-335-37; SPA-97-99. (The court stayed discovery generally early in and throughout the case. JA-255-56; SPA-17-18.) Finally, the court dismissed the claim against BASF Corp. as legally insufficient. JA-341-42; SPA-103-04.

**Second Round (*Platinum II*):** In response to the *Platinum I* ruling, Plaintiffs filed their TAC. Plaintiffs narrowed the proposed class to only those who sold 99.95% or greater purity, or otherwise good delivery, physical platinum and palladium or NYMEX futures, and who traded certain NYMEX options. JA-489 (TAC ¶ 265). Plaintiffs also pleaded additional facts pertaining to trading on NYMEX and to jurisdiction over BASF Metals and ICBC. *See* JA-349-51 (TAC ¶ 1 (detailing in chart form the various edits in the TAC and their subject matter, mapped to TAC page and paragraph number)).

Defendants again moved to dismiss for failure to state a claim and for lack of personal jurisdiction as to BASF Metals and ICBC.[3] While the motions were *sub judice*, this Court issued its decision in *Prime International Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), concerning extraterritoriality under the CEA. Thereafter, Defendants moved for reconsideration, seeking reversal of the ruling in *Platinum I* that upheld the CEA claims. JA-875; SPA-153.

Ruling on the motions, the district court now upheld jurisdiction over the foreign defendants, BASF Metals and ICBC. JA-884; SPA-162. However, despite Plaintiffs' substantially narrowed class definition, the court reaffirmed its *Platinum I* ruling that Plaintiffs were not efficient enforcers, dismissing their antitrust claim. JA-850-52; SPA-128-30. Finally, the district court granted Defendants' motion to reconsider, concluding that under *Prime International*, Plaintiffs' CEA claims were "predominantly foreign." JA-880; SPA-158. The court therefore dismissed the CEA claims. JA-875-83; SPA-153-61.

This appeal followed. JA-886. BASF Metals and ICBC have cross-appealed from the ruling on personal jurisdiction. JA-887-89.

## SUMMARY OF ARGUMENT

The district court erred in its dismissal ruling.

---

[3] Although named as a co-conspirator in the TAC, LPPFC was not joined as a defendant. Plaintiffs' contend that LPPFC's dismissal in *Platinum I* was erroneous. *See* Section III, *infra*.

**Efficient Enforcer Dismissal (Point I):** Extensive authority recognizes the antitrust standing of persons, such as the Plaintiffs, who traded a physical commodity or its exchange contracts that antitrust violators manipulated or corrupted. Holding otherwise, the district court relied principally on this Court's proportionality concerns, expressed in *Gelboim*. The court massaged proportionality into a "dominance" requirement, imposing on Plaintiffs the burden of showing that Defendants dominated the OTC and NYMEX platinum and palladium markets. Finding that showing lacking, the court rejected efficient enforcer status. This was error.

*First*, *Gelboim*'s proportionality concerns arose in the context of LIBOR—a benchmark affecting "nothing less than the market for money," which includes countless financial products and business dealings, implicating hundreds of trillions of dollars. *Gelboim*, 823 F.3d at 782. This case—involving two commodities and their NYMEX contracts that traded based on a corrupted benchmark—is like many similar actions where courts have upheld standing. Limiting antitrust standing only to those who can satisfy a dominance showing, or who transacted directly with a price-fixer, would dis-serve the compensatory and deterrent purposes of private antitrust litigation, effectively gutting private enforcement in benchmark manipulation cases.

*Second*, accepting for argument's sake that a dominance requirement were warranted, the NYMEX Plaintiffs met it (as did the OTC Plaintiff, pp. 33, 36-37, 46, *infra*). They pleaded Defendants' significant NYMEX market positions. And Defendants themselves admitted they are "traders, and holders of significant, enormous amounts of physical platinum and palladium"—trading, for example, "long physical and short derivative [contracts]." JA-52-53; *see also*, *e.g.*, JA-353-54, 356, 357, 380, 448-49, 473, 474 ,482-87 (TAC ¶¶ 6-7, 12, 15, 77, 174, 222, 224, 241-56 (alleging Defendants' substantial collective market share in physical and NYMEX platinum and palladium). The court below erred by failing to credit Plaintiffs' well-pleaded allegations (and Defendants' admission), and instead erroneously weighed various parts of the TAC in concluding Plaintiffs' pleading fell short.

*Third*, the OTC Plaintiff sold the product whose prices Defendants manipulated via the Fixing. Settled law recognizes standing in these circumstances, even absent direct dealing with any Defendant. Market dominance plays no role in the analysis.

*Fourth*, the established *AGC* factors favor Plaintiffs. Defendants' conspiracy proximately caused Plaintiffs' injury. Damages are concrete, not speculative, and do not present risks of duplication or complex apportionment. By failing to credit

the many allegations supporting Plaintiffs' efficient enforcer status, the court below erred.

**CEA Dismissal (Point II):** Plaintiffs' CEA claims are not impermissibly extraterritorial. Plaintiffs plead domestic transactions and significant domestic conduct by Defendants in furtherance of their conspiracy to manipulate physical and NYMEX platinum and palladium. Unlike the allegations in *Prime International*, Defendants' conduct here was not "'so predominantly foreign' as to render the claims impermissibly extraterritorial." *Prime Int'l*, 937 F.3d at 107 (quoting *Parkcentral, Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)). Equally important, Plaintiffs' injury flowed directly from Defendants' Fixing manipulation and was not "attenuated" by a multi-step causal chain as in *Prime International.*

By requiring Plaintiffs' domestic conduct allegations to ***predominate*** over Defendants' foreign conduct, the court below mis-applied *Prime International*. The court compounded this error by weighing competing allegations against Plaintiffs, describing as implausible some domestic conduct allegations and ignoring others.

**LPPFC Dismissal (Point III):** Plaintiffs' undisputed allegations establish that LPPFC was a shell—an instrumentality through which Defendants' effectuated their conspiracy. As Defendants' alter ego, LPPFC is subject to the

court's jurisdiction, regardless of whether U.S. or U.K. law is applied. The district court erred in failing to credit Plaintiffs' allegations.

**BASF Corp. Dismissal (Point IV):** Leading global producers of catalytic converters used in the automotive industry, BASF corporate family members, including BASF Corp., sought to purchase physical product at lower, rather than higher, prices. An affiliate of BASF Metals (the Fixing participant), BASF Corp. employed commodities traders in New Jersey who were available and motivated to achieve the conspiracy's goal to suppress prices of physical and NYMEX platinum and palladium. Failing to credit Plaintiffs' allegations, the court erred in dismissing BASF Corp.

* * * *

As we demonstrate more fully below, this Court should reverse the district court's judgment and remand for further proceedings.

## STANDARD OF REVIEW

The Court of Appeals "review[s] a district court's grant of a motion to dismiss the complaint on the pleadings de novo and constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (internal quotation marks omitted) *See also Charles*

*Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018) (*de novo*

review applies to Rule 12(b)(2) and 12(b)(6) motions).

## ARGUMENT

I. **THE NYMEX AND OTC PLAINTIFFS ARE EACH AN EFFICIENT ENFORCER OF THE ANTITRUST LAWS**

The district court correctly held that Plaintiffs pleaded sufficient facts

demonstrating (1) the existence of Defendants' conspiracy to fix and manipulate

the prices of physical and NYMEX platinum and palladium, and (2) that Plaintiffs

suffered antitrust injury. JA-269, 276; SPA-31, 38. The case therefore turned on

Plaintiffs' antitrust standing as efficient enforcers under *AGC*, and its Circuit

progeny.

Under Circuit law, the *AGC* analysis consists of a four-factor balancing test

that considers: "(1) the 'directness or indirectness of the asserted injury' . . . ;

(2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent

to which [plaintiffs'] damages claim is 'highly speculative;' and (4) the importance

of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger

of complex apportionment of damages on the other." *Gelboim v. Bank of Am.

Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) (quoted in JA-838-39; SPA-116-17).

The district court's analysis of Plaintiffs' antitrust standing effectively

turned on the court's importation of a brief discussion in *Gelboim,* which suggested

that on remand the district court could consider whether the LIBOR plaintiffs'

claims might subject the LIBOR defendants to damages disproportionate to their ill-gotten gains. *Gelboim*, 823 F.3d at 778-79. Having imported this new factor into its *AGC* analysis, the court massaged it into an inquiry centering on whether Defendants "dominated" the physical and NYMEX platinum and palladium market. JA-853-59; SPA-131-37. Finding Plaintiffs had failed adequately to allege Defendants' "dominance," the Court held they were not efficient enforcers.

This was error in several respects. We first discuss the nature of trading in physical metals and on the NYMEX. Then, we detail the body of law recognizing the antitrust standing of plaintiffs who trade in physical products or their exchange futures and options. We next address the district court's "market dominance" analysis, which is rife with error, as well as its importation of a "disproportionality" factor generally. After that, we demonstrate that under the recognized four-factor *AGC* analysis, the Plaintiffs are each an efficient enforcer. Thus, this Court should reverse the district court's judgment of dismissal.

## A.     The NYMEX Plaintiffs Traded Directly with The Exchange

Each NYMEX futures and option contract is standardized in terms of quantity, settlement procedure, and method of delivery. JA-381 (TAC ¶ 79). Standardization assures liquidity through trading on the exchange where only price varies. *See Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980). Thus, contrary to the

district court's suggestion, the parties to a NYMEX futures or options contract do not chose their terms. JA-850-52; SPA-128-30.

However, the district court correctly recognized—as has this Court—that traders on NYMEX transact directly with exchange's clearing entity, which "is the counterparty to all transactions on the exchange (i.e., the buyer or seller to a NYMEX contract does not have any identified counterparty other than NYMEX)." JA-834, 851; SPA-112, 129 (quoting TAC ¶¶ 80-81, JA-381-82). Since NYMEX acts as the counterparty to each buyer and seller, exchange traders do not bear the risk of non-performance, which is, instead, assumed by NYMEX's clearing members. JA-381-82 (TAC ¶ 80). Accordingly, the NYMEX Plaintiffs traded, and could only trade, directly with the exchange.

The exchange structure is well-recognized. In *Leist*, 638 F.2d at 287, this Court stated that "[t]he clearinghouse, a key link in the futures trading system, operates as the seller to all buyers and the buyer from all sellers, thus facilitating the interchangeability of the contracts and the cancelling of positions." Years later, this Court described the NYMEX's operation similarly:

> All trades on NYMEX must go through the exchange's clearinghouse. To finalize, or "clear" a trade, traders must transact with a NYMEX clearing member— a firm approved as a member of the clearinghouse. The seller's clearing firm will sell the contract to the clearinghouse, which then sells the contract to the buyer's clearing firm. Through this act of simultaneously buying and selling the contract, the clearinghouse guarantees both sides of the trade and ensures that neither buyer nor seller is exposed to any counterparty

credit risk. The clearing firms, in turn, guarantee their clients'
performance to the clearinghouse.

*In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 174 (2d Cir. 2013).

Further, by its very mechanics, trading on the NYMEX is a "zero-sum
game." *Leist*, 638 F.2d at 286. For each contract, one side is obligated to make
delivery, and the other is obligated to take delivery and pay for the commodity
underlying the futures or option. Rather than taking delivery of the physical
product, most transactions are cash-settled, with profits and losses realized based
on the difference in price between the original contract and the off-setting contract.
"[E]very gain can be matched with a corresponding loss." *Id.* at 286-87 & n.2.

### B. Plaintiffs Who Transact in Physical and Exchange-Traded Products Are Efficient Enforcers Under *AGC.*

This Court has not ruled on whether traders of a physical product and those
transacting on an organized exchange are both "efficient enforcers" for *AGC*
purposes. Nonetheless, *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86 (2d
Cir. 2019), is instructive. There, the plaintiffs, purchasers of physical aluminum,
alleged that the defendants artificially inflated aluminum prices by restraining
delivery of aluminum from warehouses they owned. The district court granted
defendants summary judgment on the ground that the plaintiffs did not participate
in the aluminum warehousing market. *Id.* at 96.

This Court reversed, noting that "the defendants' alleged anticompetitive purpose was not to add delays and costs to warehouse customers," but rather "to inflate the prices of the metal, so that the defendants' large stocks of aluminum would be re-sold at artificially inflated prices . . ." *Id*. Thus, the defendants' warehousing restraints were "merely the means to accomplish the defendants' anticompetitive objective." *Id*. Continuing, this Court wrote: "There is no rule in antitrust law that defendants who undertake to restrain markets by concerted anticompetitive actions can be liable to victims in ***only*** one market, much less that they can be liable ***only*** in the market that is the first locus of restraint, regardless of the identity of the market that motivated the restraint." *Id.* (emphasis added).

While *Kodak* involved antitrust injury, the Court's analysis applies equally to an efficient enforcer inquiry. As in *Kodak*, Plaintiffs allege that Defendants suppressed the Fixing as a means to suppress the prices of physical and NYMEX platinum and palladium, thereby injuring Plaintiffs. Defendants also traded on the NYMEX to manipulate the Fixing price. *See* JA-391, 482-87 (TAC ¶¶ 96, 241-56). Thus, Defendants' conspiracy targeted and caused injury in both markets.

A long line of decisions have upheld the standing of persons trading physical commodities and their related futures and options to enforce the antitrust laws when anticompetitive conduct affects either the physical market, the exchange market, or both. They apply with strongest force here because the Fixing for

physical platinum and palladium translates directly into the NYMEX price. *See* JA-386-91 (TAC ¶¶ 91-94, Charts 5-9).

The Seventh Circuit, for example, has repeatedly upheld the antitrust standing of victims alleging anticompetitive behavior in commodities markets even if the plaintiffs did not deal directly with the defendant or participate in the manipulated trading market. In *Sanner v. Chicago Board of Trade of the City of Chicago*, 62 F.3d 918 (7th Cir. 1995), the plaintiffs, sellers of physical soybeans, alleged that defendants artificially suppressed the price of soybeans futures. The Seventh Circuit held the plaintiffs' injury was "sufficiently direct" to afford antitrust standing because "[w]hen the futures market experiences a significant price change, the prices of that commodity in the cash market will usually experience a similar movement." *Id.* at 928-29 (quotes omitted). The Seventh Circuit continued:

> The reason for this is obvious: both markets involve the same commodities to be delivered currently or in the future. Since one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market. The futures market and the cash market . . . are thus "so closely related" that the distinction between them is ***of no consequence*** to antitrust standing analysis.

*Id*. at 929 (emphasis added).

Likewise, in *Loeb Industries, Inc. v. Sumitomo Corp*., 306 F.3d 469 (7th Cir. 2002), *cert. denied*, 539 U.S. 903 (2003), defendants manipulated the copper

futures market in an attempt to corner the physical market. The Seventh Circuit

held that physical copper cathode purchasers were efficient enforcers even though

they did not transact directly with defendants:

> Here . . . we have a conspiracy to rig prices for the entire physical
> market, accomplished through manipulation of the . . . futures market.
> A[] possible analogy might be to rigging product standards, which
> affects everyone who tries to participate in a particular product
> market. In [such a] case, the defendants who manipulated the
> standards cannot be heard to complain that they should be immune
> from damages for a product they did not sell.

*Id*. at 484. *See also Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979,

987-89 (9th Cir. 2000) (milk sellers had standing to assert claims against

defendants who conspired to manipulate bulk cheese auction prices, which in turn

affected the mandated minimum price for milk, despite no direct dealing).

In this Circuit, many district court rulings are similar to this Court's analysis

in *Kodak*. In a pair of decisions, Judge Lasker recognized that futures traders

alleging manipulation of both physical silver and silver futures pleaded a legally

sufficient antitrust claim. In the first decision, the Court held:

> [T]hat futures contracts trading is a "zero sum game" (i.e., every gain
> can be matched with a corresponding loss) . . . leads the Court to
> conclude that the plaintiffs were well within the 'target area' of the
> defendants' alleged anticompetitive behavior; that is, their
> anticompetitive behavior was "aimed" at the plaintiff. Stated another
> way, the Court finds that there is a legally significant causal
> relationship between the (defendants') alleged violation and the
> (plaintiffs') alleged injury.

*Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 939-40 (S.D.N.Y. 1981) (quoting *Pollock,* 512 F. Supp. at 719).

A few years later, Judge Lasker again upheld the standing of a silver futures trader: "the magnitude of plaintiff's losses, if not the very potential for those losses, was directly determined . . . to boost the price of silver futures." *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1319 (S.D.N.Y. 1986), *aff'd without opinion*, 859 F.2d 148 (2d Cir. 1988).

Similarly, in recent actions arising from price-fixing foreign exchange ("FX") benchmarks, Judge Schofield held that investors in exchange-traded FX futures and options were sufficiently direct. Like here, the FX investors alleged how "currency futures . . . prices move in virtual lockstep to the spot price." *In re Foreign Exch. Rates Benchmark Antitrust Litig.*, 2016 WL 5108131 at *9 (S.D.N.Y. Sept. 9, 2016); *Allianz Global Investors GmbH v. Bank of Am. Corp.*, 2020 WL 2765693, at *8 (S.D.NY. May 28, 2020). *Compare* JA-386-91 (TAC ¶¶ 91-94, Charts 5-9).[4]

---

[4] *See also In re Commodity Exch. Inc., Gold Futures & Options Antitrust Litig.*, 213 F. Supp. 3d 631, 651-59 (S.D.N.Y. 2016) ("*Gold*"), and *In re London Silver Fixing, Ltd., Antitrust Litig.,* 213 F. Supp. 3d 530, 553-59 (S.D.N.Y. 2016) ("*Silver*") (upholding standing of physical gold and silver and exchange-traders to sue "Fixing" defendants). *Compare Silver*, 332 F. Supp. 3d 885, 904-12 (S.D.N.Y. 2018) (dismissing class claims by "every participant in a silver or silver-denominated transaction on a U.S.-based exchange" against "Non-Fixing" defendants for manipulation unrelated to the Fixing).

Accordingly, the OTC and NYMEX plaintiffs here are efficient enforcers under *AGC*.

**C.    The District Court Erroneously Considered and Then Misapplied a "Market Dominance" Inquiry.**

In *Gelboim*, this Court upheld the sufficiency of plaintiffs' LIBOR-based conspiracy claim and confirmed that the plaintiffs, who purchased LIBOR-linked financial instruments, suffered antitrust injury. *See* 823 F.3d at 764-65. In remanding to allow the district court to undertake an efficient enforcer analysis, two members of the panel discussed the *AGC* factors. *Id.* at 777-80, & n.17. Part of the discussion posited that, if defendants "control[led] only a small percentage of the ultimate identified market," damages might be "disproportionate to [their] wrongdoing," potentially "bankrupt[ing] 16 of the world's most important financial institutions," while also "vastly extend[ing] the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated." *Id.* at 779.

The court below morphed this *Gelboim* discussion into a new *AGC* factor that required the NYMEX Plaintiffs to show, at the pleading stage, Defendants' domination of the NYMEX platinum and palladium market. *See* JA-851-59; SPA-129-37. In doing so, the court erred in several respects.

*First*, because the facts here are unlike those in *Gelboim,* this Court's disproportionality concerns lack persuasive force.

*Second*, in applying its gloss on the *AGC* analysis, the court below required the NYMEX Plaintiffs to plead market dominance in a *per se* antitrust case—a burden unsupported by case law and inconsistent with antitrust policy encouraging private enforcement.

*Third*, "umbrella standing" concerns, expressed in both *Gelboim* and the court below, lack persuasive force in this case.

*Fourth*, as the district court acknowledged, the TAC pleaded that Defendants held sufficiently significant physical and NYMEX platinum and palladium positions to warrant discovery. But the court construed other allegations against the NYMEX Plaintiffs. By weighing various TAC allegations and drawing inferences to support dismissal as a matter of law, the court mis-applied Circuit precedent.

### 1. The Court Below Erred by Importing *Gelboim's* Disproportionality Discussion

The facts here are different from those in *Gelboim*. As "a component or benchmark used in countless business dealings," LIBOR "has been called the world's most important number." *Gelboim*, 823 F.3d at 765 (internal quotation marks omitted). Because LIBOR reflects the "nothing less than the market for money," the *Gelboim* plaintiffs' case "was like no other." *Id*. at 778, 782-783 (emphasis added). This Court continued:

> The disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR. And the market for money is worldwide, with

competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all.

823 F.3d at 780.

A ubiquitous benchmark, LIBOR affects "hundreds of trillions of dollars[']" worth of loans, bonds, derivative instruments, and countless contracts calling for monetary payment. *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 771 F. App'x 498, 502 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 71 (2019) ("*W. 57th St.*"). Further, parties "negotiated" whether to include it in their dealings. *Gelboim*¸ 823 F.3d at 780.

By contrast, NYMEX platinum and palladium is an ascertainable market, where standardized instruments, derived from an identified grade of the metals, trade based on price. The volume of NYMEX platinum and palladium trading— less than that of gold or silver (JA-384 (TAC ¶ 88, Chart 2))—is orders of magnitude smaller than that of LIBOR. While proportionality considerations may have been appropriate in *Gelboim*, importing them into this case—and permitting them to trump *AGC's* other factors—was not. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 220 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (distinguishing *Gelboim* where "the plaintiff's [electricity manipulation] action was limited to

contracts which settled against the indexes at four . . . trading hubs") (internal quotation marks omitted).[5]

### 2. Adding a "Proportionality/Dominance" Factor Was Unsupported in this *Per Se* Case.

The NYMEX Plaintiffs pleaded a horizontal conspiracy—a *per se* violation that does not require market power, much less market domination. As the Supreme Court has reminded: "As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output. . . . We have never required proof of market power in such a case." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109-10 (1984). It flies in the face of settled law to impose a market domination requirement, under the rubric of an efficient enforcer analysis, in this *per se* conspiracy case. *See also Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) ("a threshold showing of market share is not a prerequisite for bringing a § 1 claim.").

Indeed, this case is particularly unsuitable for proportionality analysis. Where NYMEX prices are manipulated, there simply is no more direct purchaser,

---

[5] Three other district court rulings, cited by the court below, have adopted a similar proportionality factor in efficient enforcer analyses. Two involved LIBOR "variants" that implicated a similarly huge volume of negotiated transactions. *Sonterra Capital Master Fund v. Credit Suisse AG*, 277 F. Supp. 3d 521, 562 (S.D.N.Y. 2017) (Swiss franc LIBOR); *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) (Euribor). The third involved foreign exchange trading, another vast array of financial instruments, which far exceeds the scope of the action here. *FX*, 2016 WL 5108131, at *10.

nor any more efficient enforcer than those who, like the NYMEX Plaintiffs, traded on the exchange during the conspiracy. Thus, applying disproportionality to an exchange market would immunize antitrust violators from civil liability for injuring exchange participants. There would be disproportionality for sure: the violators' ill-gotten gains would far exceed their civil liability exposure—zero—for committing a federal felony that injures traders and corrupts the integrity of the exchange's operations.

Private antitrust enforcement "was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). "Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965). The Antitrust Division routinely cites parallel private enforcement to compensate victims, instead of exercising its own statutory authority to seek court-ordered restitution from convicted criminal defendants.[6]

---

[6] *See, e.g.*, Plea Agreement ¶9(b), *United States v. BNP Paribas USA, Inc.*, 18-cr-00061, ECF No. 4 (S.D.N.Y. Feb. 2, 2018) (FX trading; "In light of the availability of civil causes of action [in pending civil cases], . . . the Recommended Sentence does not include a restitution order for the offense charged in the Information"); Plea Agreement ¶12(b), *United States v. Barclays, PLC*, No. 15-cr-77, ECF No. 6 (D. Conn. May 19, 2015) (same); U.S. Dep't of Justice, ANTITRUST DIV. MANUAL, at IV-89 (5th ed. last updated Jan. 13, 2020) ("Restitution has not been ordered . . . in many cases brought by the Division . . . : in many of our criminal matters, civil cases have already been filed on behalf of

To paraphrase the Supreme Court's most recent private enforcement decision: "The broad text of § 4—'any person' who has been 'injured' by an antitrust violator may sue—readily covers [exchange traders] who [sell financial products] at [lower]-than-competitive prices" on an exchange market that Defendants suppressed. *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). Thus, *AGC*'s efficient enforcer analysis should not be used "to evade antitrust claims by [exchange traders] and thereby thwart effective antitrust enforcement." *Id*. at 1523.

After all, the point of efficient enforcer analysis is ***to identify*** efficient private antitrust enforcers, ***not*** to protect antitrust violators ***from*** private enforcement. This system "never operates entirely to preclude market recovery for an injury." *Loeb*, 306 F.3d at 483.

Holding antitrust violators accountable for the harm their conspiracy inflicts on victims is at the core of "efficient" private enforcement. And as this Court has emphasized, efficient enforcer analysis "simply looks for a class of persons naturally motivated to enforce the antitrust laws," not for "*the* entity most motivated by self-interest." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688-89 (2d Cir. 2009) (emphasis in original). Accordingly, an indisputably injured and motivated plaintiff should not be denied standing by positing that a hypothetical "more" efficient enforcer could be imagined—one who

---

the victims at the time of sentencing"), https://www.justice.gov/atr/file/761166/download.

has not sued during the six years in which this case has been pending, and who, in all likelihood, may never sue.

Resting the viability of private enforcement on this sort of hypothetical plaintiff is inconsistent not only with *DDAVP*, but also with the Supreme Court's reminder that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

The court below itself recognized that neither "outright market dominance" nor even "a substantial market share" is in fact needed to corrupt a market that trades based on a benchmark, such as the Fixing. JA-847; SPA-125. Instead, the price-fixers "need only manipulate that tiny fraction of market activity" on which the benchmark is based. *Id*. By controlling the Fixing, Defendants could suppress NYMEX platinum and palladium prices. *See*, *e.g.*, JA-376, 391 (TAC ¶¶ 68, 96). *See also Gold*, 213 F. Supp. 3d at 655 ("Plaintiffs do not allege that Defendants suppressed the price of a particular bar of gold that was later sold through a distribution chain to Plaintiffs but rather that Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of their Gold Investments.").

In consequence, it was error to require the NYMEX Plaintiffs to establish Defendants' NYMEX market domination. But regardless, Defendants' control of the Fixing enabled them to suppress NYMEX prices. That shows dominance.

### 3. "Umbrella" Standing Concerns Similarly Do Not Apply.

Discussing disproportionality, the district court also cited "umbrella standing" concerns as a basis for dismissal. JA-846-48; SPA-124-26. As the *Gelboim* court noted:

> Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole.
>
> * * *
>
> [I]f the Banks control only a small percentage of the ultimate identified market, *see LIBOR I*, 935 F.Supp.2d at 679 (observing that "LIBOR affects the pricing of trillions of dollars' worth of financial transactions"), this case may raise the very concern of damages disproportionate to wrongdoing noted in *Mid-West Paper*, 596 F.2d at 580-87 [an umbrella standing decision].

823 F.3d at 778 (citing authorities), 779. *See also* JA-846-47; SPA-124-25.

However, as the authorities cited in *Gelboim* recognize, umbrella standing concerns arise where a plaintiff asserts injury from purchasing a non-price-fixed product from a non-member of the conspiracy, which the non-member decided to offer under the (typically) inflated price level caused by the conspiracy. In contrast, here: (1) each NYMEX Plaintiff sold the same standardized instrument, (2) whose price Defendants' conspiracy directly suppressed, and (3) each NYMEX Plaintiff transacted with the exchange—because that's how exchange trading works.

Consequently, umbrella standing concerns are absent here. Defendants are responsible for the injury their own conduct caused when their corrupted Fixing

directly affected the NYMEX price, as they knew and intended it would—not for injury from a non-conspirator's independent pricing decision for a different product. Were the rule otherwise, civil antitrust liability for manipulating prices on an exchange market would be illusory: efficient enforcer analysis would produce *no* enforcement.

The court below erroneously imported *Gelboim's* proportionality considerations into a fact setting where it simply does not belong.

### 4.    The District Court Erred in Weighing Fact Allegations On Defendants' Rule 12(b)(6) Motion.

The court below compounded its error by undertaking a factual analysis on Defendants' Rule 12(b)(6) motion. The court failed to credit the TAC's allegations in Plaintiffs' favor, as required on a motion to dismiss. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (reversing dismissal).   The TAC pleads the Defendants' substantial collective market share in NYMEX platinum and palladium, as well as the extensive nature of the Defendants' own trading operations.[7] As the district court recognized, the TAC alleged Defendants each "h[eld] substantial market share in Physical and NYMEX platinum and

---

[7] *See* JA-353-54, 356, 357, 380, 448-49, 473, 474, 482-87 (TAC ¶¶ 6-7, 12, 15, 77, 174, 222, 224, 241-56 (Defendants' substantial collective market share in physical and NYMEX platinum and palladium)), JA-363, 365-66, 457-58, 464-65 (TAC ¶¶ 35, 38, 191, 202 (BASF Metals)), JA-366, 458, 480-81(TAC ¶¶ 40, 192, 236 (Goldman Sachs)), JA-367, 458-59 (TAC ¶¶ 42, 193 (HSBC)), JA-367-69, 459 (TAC ¶¶ 44-45, 194 (ICBC)), JA-459-60 (TAC ¶ 196 & Chart 79 (Defendants' commodities derivatives balances)).

palladium," and "[s]tanding alone, these allegations might have been sufficient to allege that Defendants dominated the exchange market, requiring further factual development to resolve that question." JA-856-857; SPA-134-136. Moreover, Defendants admitted they "are traders and holders of significant, enormous amounts of physical palladium and platinum" trading "long physical and short derivative." JA-52-53.

Insofar as market dominance were a relevant efficient enforcer consideration, these allegations and the reasonable inferences from them, along with Defendants' admission, should have ended the Rule 12(b)(6) inquiry. Besides, market share is simply indirect evidence that can be probative—albeit not necessarily determinative—of market power. *See*, *e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986).

Here, by controlling the Fixing, Defendants controlled NYMEX market prices—***direct evidence*** of market power. Nevertheless, the court below used other TAC allegations—covering such subjects as "open interest" positions, trading by co-conspirator UBS, and CFTC data on short positions—to chip away at the dominance that the court acknowledged was sufficiently alleged. JA-856-59; SPA-134-37.

The court below thus ran afoul of *Anderson News*:

The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule

> 12(b)(6) motion. . . . A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds ***a different version*** more plausible.

680 F.3d at 185 (emphasis added); *Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020) ("On a motion to dismiss, district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants."). Furthermore, the fact intensive nature of any market power inquiry exacerbated the district court's error in weighing the TAC's allegations on Defendants' dismissal motion. *Cf. Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30–31 (2d Cir. 2017) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

Accordingly, the court below erred in using a market dominance factor to reject the NYMEX Plaintiffs as efficient enforcers.

### D. The NYMEX Plaintiffs Satisfy the Four *AGC* Factors

Turning to the four *AGC* factors, the district court incorrectly found that none individually, nor all collectively, clearly supported the NYMEX Plaintiffs' standing. The court's analysis not only failed to credit the TAC's allegations establishing the direct linkage between Defendants' manipulation and the NYMEX Plaintiffs' injury, but also overstated damages concerns.

1. **Factors 1 and 2: NYMEX Plaintiffs are Direct Victims of Defendants' Conspiracy.**

The court below recognized that a clearinghouse eliminates direct dealings between exchange buyers and sellers. But from there, the court concluded that the directness prong favored neither Plaintiffs nor Defendants. JA-851-52; SPA-129-30. This was error.

For *AGC* purposes, directness follows "familiar principles of proximate causation." *W. 57th St.*, 771 F. App'x at 502 (internal quotation marks omitted). The inquiry asks "whether there exists a chain of causation between a defendant's action and a plaintiff's injury or (in contrast) if the connection is based instead only on 'somewhat vaguely defined links.'" *Loeb*, 306 F.3d at 486-87 (quoting *AGC*, 459 U.S. at 540). *See also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) (directness "means close in the chain of causation") (citing *AGC*, 459 U.S. at 540); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-133 (2014) (citing *AGC* and noting the Clayton Act's proximate cause element).

Here specifically, the requisite causal connection exists between the Fixing and the prices of NYMEX contracts. The products underlying the NYMEX contracts are the same as those priced by the Fixing, and the Fixing price is in a near one-to-one relationship with NYMEX prices. By suppressing the Fixing price, Defendants also suppressed the NYMEX price at which the NYMEX Plaintiffs

sold. *See* JA-352-53, 381, 386-96 (TAC ¶¶ 3, 5, 79, 90-103 & Charts 5-15). While this linkage alone establishes directness, the TAC alleges even more.

Before, during, and after the Fixing, Defendants actively traded on the NYMEX and communicated with each other in furtherance of their scheme to suppress prices. *See* JA-485-87 (TAC ¶¶ 248-56). In some instances, NYMEX prices dropped before the start of the Fixing call, thereby putting downward pressure on the Fixing's Opening Price. *See* JA-435-38 (TAC, Charts 63-68, ¶ 144). Moreover, there was substantially increased NYMEX trading activity during the Fixing itself, and prices on NYMEX moved in the direction of the Fixing levels even *before* Defendants "fixed" the ultimate price. *See* JA-391-96, 426-31, 455-56 (TAC ¶¶ 97-102, Charts 10-15, ¶¶ 135-138, Charts 53-60, ¶ 188, Charts 75-78).

Thus, "the Defendants frequently manipulated the Fixing so that Fix prices would be set at lower levels than competitive market forces would have dictated. . . . [T]he Defendants' suppression of the . . . Fixing benchmark directly affected the price of Physical and NYMEX Platinum and Palladium, causing [the NYMEX Plaintiffs and] the Class to sell these investments at artificially low prices." JA-396; 485-486 (TAC ¶ 102; *see also id.* at ¶¶ 251-53). *See Grosser*, 639 F. Supp. at 1319 (manipulation "was the very essence of the alleged . . . conspiracy and it was certainly foreseeable that some innocent traders would" liquidate their positions at manipulated prices).

As these allegations show, Defendants used the Fixing to manipulate and suppress prices in both the physical and NYMEX platinum and palladium markets. The Defendants' conspiracy directly affected the NYMEX Plaintiffs' sales.

All traders on the NYMEX transact at the same level, so there are no more direct victims. JA-382 (TAC ¶ 81). Sellers of physical platinum and palladium are not more direct. They are a different group of victims, injured in a different market that is intertwined with the NYMEX market. *See Kodak,* 936 F.3d at 96; *Sanner*, 62 F.3d at 629; and authorities cited *supra* pp. 25-27; *see also* JA-854-55 & n.18; SPA-132-33 & n.18.

The district court nevertheless held that "directness" did not favor the NYMEX Plaintiffs, writing that if "all sellers of NYMEX futures are equally positioned to enforce the antitrust laws," it would "effectively eliminate[] the efficient enforcer requirement altogether in this case." JA-861; SPA-129 (internal quotations and marks omitted). This misapplied the directness factor, however.

When—as here—the Defendants' conspiracy proximately causes injury to all similarly-situated NYMEX victims, then they are "a class of persons naturally motivated to enforce the antitrust laws." *DDAVP*, 585 F.3d at 689. Directness, therefore, favors the NYMEX Plaintiffs.

## 2. Factors 3 and 4: Damages are not speculative, nor susceptible to complex apportionment or duplicative recovery.

Although the speculativeness of damages and the risks of complex apportionment or duplicative recovery are part of *AGC*'s four-factor analysis, the district court's market dominance analysis overshadowed its consideration of these two factors. JA-853-59; SPA-131-37. These additional *AGC* damages factors, too, favor the NYMEX Plaintiffs.

### (i) Damages are not speculative.

The NYMEX Plaintiffs' damages are ascertainable, not speculative. By collusively suppressing the Fixing, Defendants caused NYMEX prices to be suppressed. In consequence, the NYMEX Plaintiffs received less money when they sold their standardized instruments than they otherwise would have received. JA-486 (TAC ¶ 255). *See Bigelow*, 327 U.S. at 264 (antitrust damages compare "profits, prices and values as affected by the conspiracy, with what they would have been in its absence").

"A damages calculation for a market manipulation scheme," such as Plaintiffs allege here, "though it may require expert testimony, is hardly beyond the ken of the federal courts." *Sanner*, 62 F.3d at 930. Further, the "potential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has

proximately injured an interest of the plaintiff's that the statute protects." *Lexmark*, 572 U.S. at 135 (emphasis added). *Cf. Gelboim*, 823 F.3d at 779 (defendants bear the risk uncertainty of damages) (quoting *Bigelow*, 327 U.S. at 265).

District courts in this Circuit have routinely rejected arguments at the pleading stage that damages in commodity manipulation cases are speculative. *See, e.g.*, *Gold*, 213 F. Supp. 3d at 658 and *Silver*, 213 F. Supp. 3d at 557 ("duplication and apportionment appear to be hypothetical or minimal"); *Nypl v. JPMorgan Chase & Co.*, 2017 WL 3309759, at *6 (S.D.N.Y. Aug. 3, 2017) (foreign exchange damages and their modeling "are for a later stage of the litigation"); *Sitts v. Dairy Farmers of Am., Inc.*, 276 F. Supp. 3d 195, 211 (D. Vt. 2017) (damages were not speculative although they "may present considerable challenges"); *Grosser*, 639 F. Supp. at 1319 (silver futures manipulation damages were not "too speculative"). Calculating damages here would not require guesswork the way it might in, for example, a LIBOR case. *See W. 57th St.*, 771 F. App'x at 498 (damages "would require speculation about how each of the 16 LIBOR panel banks would have answered the LIBOR question," and the plaintiff's bonds had to be priced in an "illiquid and opaque" market).

### (ii) No duplication or complex apportionment.

The district court addressed the duplication and apportionment factors for the NYMEX Plaintiffs in a single sentence: "And damage apportionment may be

complex given Plaintiffs' choice to incorporate the Fix price independently of any action by Defendants." JA-850; SPA-128. But the NYMEX Plaintiffs made no "choice" whether to "incorporate the Fix price" in their sales. The interconnection of the physical and NYMEX markets does that on its own. *See* JA-388-91 (TAC ¶¶ 92-94 & Charts 7-9 (alleging the near one-to-one price correlation)).

Because NYMEX trading does not involve any distribution chain, and because the NYMEX Plaintiffs damages "are tied to particular transactions and contracts," there is no risk of duplicative recovery. *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 61 (S.D.N.Y. 2016). The NYMEX Plaintiffs' damages are distinct from those asserted by the OTC Plaintiff arising from physical platinum and palladium sales. *See Sanner,* 62 F.3d 928-929; JA-854-55 & n.18; SPA-132-33 & n.18 (recognizing the distinct, but related, injuries of the two groups).

### 3.     The OTC Plaintiff Is an Efficient Enforcer

The district court also erroneously rejected the OTC Plaintiff's status as an efficient enforcer. The court distinguished physical purchasers who dealt directly with Defendants—and thus, in the court's view, were efficient enforcers—from those such as the OTC Plaintiff who did not—and thus were not. JA-849-50; SPA-127-28. The court's ruling again turned largely on importation and application of *Gelboim*'s proportionality considerations, with added concerns about directness of

injury (causation) and umbrella standing. These considerations, the court wrote, were "inherent in the application of the first and fourth efficient enforcer factors in benchmark manipulation cases." JA-849; SPA-127.

The district court's ruling tilts too far in favor of insulating antitrust violators from accountability at their victims' expense. Nothing in Clayton Act § 4's language distinguishes the injury suffered by victims who trade with an antitrust violator from those who do not where both transact in the same product whose price is corrupted through a manipulated benchmark process, such as the Fixing. To the contrary, as the Supreme Court has emphasized:

> [T]he lack of restrictive language reflects Congress' "expansive remedial purpose" in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations . . . "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."

*Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U. S. 219, 236 (1948) (authorities omitted)); *see also* pp. 30-33, *supra*.

The district court recognized that a plaintiff's injury can be sufficiently "direct" for *AGC* purposes even though the plaintiff did not transact in the price-fixed product with one of the price-fixers. JA-840-43; SPA-118-21. However, the court further posited that, where the plaintiff deals with a third-party, there could

be "intervening causative factors" that "may attenuate the chain of causation between defendants' actions and a plaintiff's injury." JA-841; SPA-119. Here, however, while the OTC Plaintiff did not transact with a Defendant, it sold the same "good delivery" platinum and palladium whose price Defendants manipulated. *See* JA-361-62 (TAC ¶ 31).

On these facts, "attenuated" causation is not an appropriate basis to deny efficient enforcer status as a matter of law. The OTC Plaintiff is akin to the aluminum purchasers in *Kodak* and the copper cathode purchasers in *Loeb*, whose standing was upheld even though they did not deal directly with the defendants who inflated the benchmark prices. *See Kodak*, 936 F.3d at 95; *Loeb*, 306 F.3d at 487-88; *see also* pp. 22-26, *supra* (citing authorities rejecting the line the court below drew between those who deal with a defendant and those who do not).

Because the OTC Plaintiff sold the same product whose benchmark the Defendants rigged, attenuated causation is hypothetical, not real. The product the OTC Plaintiff sold was not altered or incorporated into another product while moving along a distribution chain.[8] Nor is the product here only remotely related to the product the Fixing manipulated.[9]

_____

[8] *See, e.g., In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016) (no standing for end-purchasers of semi-fabricated and fabricated aluminum); *Reading Indus. Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) (scrap copper purchaser who alleged a conspiracy at the refined copper level lacked standing where the "causal chain" for the purchaser's injury "depends

Similarly, any notion of possible damage "disproportionality" is mitigated by taking account of the OTC Plaintiff's transacting in the same product subject to the Fixing—not in an array of other products that use platinum or palladium of varying grades, or in varying amounts, or for varying purposes. Mindful of this concern, which the district court expressed in *Platinum I*, Plaintiffs' significantly narrowed the proposed class of injured OTC sellers. *See* JA-278-79; SPA-40-41; JA-489 (TAC ¶ 265); *see also* p. 13, *supra*. And, while we submit that "market dominance" is not an element of proportionality, in all events by controlling the Fixing, Defendants controlled prices in, and thereby dominated, the OTC market. *See* JA-52 (admitting that Defendants are "traders and holders of significant, enormous amounts of physical palladium and platinum."); pp. 33, 36-37, *supra*.

Likewise, umbrella pricing concerns are absent where, as here, the plaintiff transacts in the price-fixed product traded by the Defendants themselves, and not another one offered by a non-conspirator who independently decided to exploit the artificial price the conspiracy caused. JA-846-48; SPA-124-27; *see also* pp. 34-35, *supra*.

---

upon a complicated series of market interactions between the two sources of copper" involving "the actions of innumerable individual decision-makers").

[9] *See, e.g.*, *West 57th St.*, 771 F. App'x at 502 (no standing where plaintiff's "municipal bonds were not actually LIBOR denominated, [and] any diminution in value was necessarily directly caused by the independent judgments of participants in the secondary municipal bond market.").

Finally, the district court stated that the person to whom the OTC Plaintiff sold received a "windfall" because the buyer paid the price Defendants suppressed. JA-848; SPA-121. This "windfall" suggested to the court that Defendants' damages exposure would be disproportionate to their ill-gotten gains. However, Defendants—not the "windfall-receiving" buyers—caused the OTC Plaintiff's injury. The many decisions discussed earlier recognize that antitrust violators who rig a benchmark may properly be held accountable even absent direct dealings with their victim.

Accordingly, this Court should decline to extend *Gelboim*'s disproportionality concerns beyond the unique circumstances of that case—one that was "like no other." 823 F.3d at 778. Insulating Defendants from accountability here would undermine private antitrust enforcement.

## II. THE DISTRICT COURT ERRED BY DISMISSING PLAINTIFFS' CEA CLAIMS AS EXTRATERRITORIAL

Plaintiffs allege multiple CEA violations arising from Defendants' conspiracy to manipulate the Fixing and trading in NYMEX platinum and palladium contracts. In *Platinum I*, the district court held these claims were not impermissibly extraterritorial. JA-287-309; SPA-49-71. But after this Court's decision two years later in *Prime International Trading, Ltd. v. BP PLC*, 937 F.3d 94 (2d Cir. 2019), Defendants moved for reconsideration. Granting the motion, the court acknowledged that Plaintiffs—unlike the plaintiffs in *Prime International*—

had pleaded ***both*** domestic transactions ***and*** domestic conduct by the Defendants.

JA-877-78; SPA-155-56. Nonetheless, the court reversed its prior ruling,

dismissing the claims as "predominantly foreign." JA-882; SPA-160.

The fundamental error in the district court's ruling is best captured by these

remarks, finding many of Plaintiffs' domestic allegations implausible:

> The suggestion that Defendants (and, perhaps, their non-defendant co-
> conspirators) traded to further depress the price of platinum and
> palladium when they had—according to Plaintiffs' allegations—a
> tailor-made opportunity to manipulate that price via the Fixing does
> not make sense and is inconsistent with the allegations in the TAC.

JA-882; SPA-160. But the very point of Plaintiffs' case was that Defendants'

scheme did not begin and end with the Fixing. Defendants' control of the Fixing

enabled them to trade at times and in directions for their own benefit at the expense

of physical and NYMEX market participants who were not in the know. *See*, *e.g.*,

JA-355, 375, 391 (TAC ¶¶ 10, 64, 96).

In using an incorrect legal standard and disregarding the TAC's many

allegations of Defendants' domestic conduct, while deciding which narrative to

credit, the district court erred. The court's dismissal of Plaintiffs' CEA claims

should be reversed.

### A.    Defendants' Domestic Conduct Establishes U.S. Jurisdiction

Under *Prime International*, "[p]laintiffs must allege not only a domestic

transaction, but also domestic—not extraterritorial—***conduct*** by Defendants" that

violates the CEA. 937 F.3d at 105 (emphasis in original). The TAC satisfies these elements by alleging Defendants' domestic conduct, including manipulative trading on the NYMEX and "constant communications" between U.S. traders and Fixing participants in furtherance of the conspiracy:

- New York City's NYMEX is the preeminent exchange for trading platinum and palladium futures and options, and Defendants are among the NYMEX's largest traders of platinum and palladium. JA-356, 357, 360, 381 (TAC ¶¶ 12, 14, 25, 79).

- The Fixing prices moved in tandem with NYMEX prices in a near one-to-one relationship. JA-373, 386-96 (TAC ¶¶ 59, 90-103, Charts 5-9).

- This relationship between the Fixing and NYMEX prices enabled defendants to drive "downward [price] movements [at the Fixing] first by moving . . . NYMEX Platinum and Palladium prices in advance of and even during the Fixing." JA-355 (TAC ¶ 10).

- By trading on the NYMEX ahead of the Fixing, Defendants conspired to manipulate the Fixing's Opening Price. JA-438, 452, 453, 456-77 (TAC ¶¶ 144, 182, 184, 188).

- Such pre-Fixing trading, integral to Defendants' scheme, depressed NYMEX prices and the Opening Price. JA-438, 452, 453, 456-77 (TAC ¶¶ 144, 182, 184, 188).

- Defendants had precious metals traders in the U.S. who received information from the Fixing, transmitted information to Fixing participants, and provided internal commentary to other metals traders on the Fixing's status. JA-365-66, 367-68, 375, 457-59 (TAC ¶¶ 38, 44, 64, 190-94). These traders also actively traded on NYMEX before, during, and after the Fixing, executing proprietary trades, and using real time, non-public information from Fixing participants. JA-375, 457-59 (TAC ¶¶ 64, 190-94).

- During the Fixing itself, Defendants' precious metals traders in the U.S. were in "constant communications" with the Fixing's participants and "were simultaneously executing trades" on the NYMEX. JA-376, 457 (TAC ¶¶ 68, 190).

The court below acknowledged that Plaintiffs pleaded Defendants' domestic conduct:

> Defendants' precious metals traders in the United States were in constant communication with Defendants' precious metals desk employees in London, who were directly involved in the twice-a-day Fixings.

JA-881-82; SPA-159-60 (internal quotation marks omitted). "This is, to be sure, ***an allegation of domestic activity***." *Id*. (emphasis added). Indeed, throughout its opinion, the court quoted or expressly referred to allegations of domestic conduct:

- BASF Metals' and ICBC's "continuous presence in the United States" included "conduct directed at the NYMEX," and their disseminating "information from the Fixing . . . to and traded on by traders in New York and New Jersey, including on the NYMEX." JA-835-38; SPA-113-14.

- "United States based traders . . . provided non-public client order information directly to Fixing participants." JA-872; SPA-150.

- "Defendants were particularly motivated to suppress the Fix Price in order to profit from large net "short" positions that they allegedly held in the platinum and palladium futures market, including NYMEX, throughout the Class Period." JA-832; SPA-110; *see also* JA-304; SPA-66.

By contrast, the *Prime International* plaintiffs alleged only domestic transactions, not defendants' domestic conduct: They did "not assert that Defendants engaged in any manipulative trading on NYMEX," nor did they allege "manipulative conduct or statements made in the United States." *Prime International*, 937 F.3d at 100, 108. Here, however, Plaintiffs' allege significant domestic conduct. That the Fixing involved foreign components, such as communication among the Defendants' London-based precious metals traders, does not negate the TAC's domestic conduct allegations, nor render Plaintiffs'

claim "so predominantly foreign as to be extraterritorial." *Parkcentral*, 763 F.3d at 216.

Equally important, in *Prime International*, the defendants' conduct abroad had a strained causal connection to the alleged injury in the United States:

> [1] Defendants engaged in artificial trades of physical Brent crude in foreign markets; [2] Defendants systematically reported the artificial trade data to Platts; [3] Platts reviewed and incorporated the fraudulent data into its calculation of the Dated Brent Assessment; [4] ICE Futures Europe in turn incorporated the manipulated Dated Brent Assessment into the ICE Brent Index; [5] the manipulated ICE Brent Index was used to settle Brent Futures that were traded on both the London-based ICE Futures Europe and the U.S.-based NYMEX; as a result, [6] Brent Futures traded and settled at artificial prices, causing economic loss to traders such as Plaintiffs.

937 F.3d at 100 (bracketed numbering added).

Here, however, there is a direct causal link between Defendants' conduct and injury in both the OTC and the NYMEX markets. The Fixing set the benchmark price for physical platinum and palladium, and there is a near one-to-one link between the Fixing and NYMEX platinum and palladium prices. *See* JA-386-396 (TAC ¶¶ 90-103) & Section I(D)(1), *supra*. The link is all the more direct because Defendants themselves traded on the NYMEX to implement their scheme. *See*, *e.g.*, JA-355, 375, 391 (TAC ¶¶ 10, 64, 96). Thus, the court below erroneously found the causal linkage here "attenuated" and incorrectly held that there was "no meaningful distinction between the theory of harm rejected in *Prime International Trading* and Plaintiffs' theory of harm in this case." JA-881; SPA-159.

**B.    The District Court Misapplied the "Predominance" Analysis and Erroneously Construed the TAC Allegations Against Plaintiffs.**

In ruling that Plaintiffs' CEA claims were extraterritorial—despite the numerous allegations of domestic activity, the court below misapplied *Parkcentral* and *Prime International* in two respects:

*The "Predominance" Error.* An impermissibly extraterritorial claim is one that is "overwhelmingly" foreign—one "dominat[ed]" by its foreign elements— with only "minor" domestic elements. *Parkcentral*, 763 F.3d at 216-17; *Prime International*, 937 F.3d at 105. Where, on the other hand, a complaint "alleges substantial domestic contacts," a plaintiff's CEA claim is not "impermissibly extraterritorial." *Giunta v. Dingman*, 893 F.3d 73, 82 (2d Cir. 2018). Accordingly, the test is whether the claim's foreign elements so substantially outweigh its domestic elements as to render the claims impermissibly extraterritorial. *See Prime Int'l*, 937 F.3d at 106 (quoting *Parkcentral*, 763 F.3d at 216). The district court flipped the analysis, erroneously finding instead that Plaintiffs' allegations of Defendants' domestic activities "do not predominate over their allegations of foreign misconduct." JA-882; SPA-160 (citation omitted). This is simply backwards. The allegations summarized above show Defendants' substantial domestic activity, and that Defendants' activity abroad did not "dominate" Plaintiffs' CEA claims.

***Failing to Credit Plaintiffs' Allegations.*** The district court did not give weight to allegations of Defendants' manipulative physical and NYMEX trading, while ignoring other allegations of Defendants' domestic conduct altogether. *See* pp. 47-52, *supra*. But on a dismissal motion, a court must "accept[] all of the complaint's factual allegations as true and draw[] all reasonable inferences in the plaintiffs' favor," *Parkcentral*, 763 F.3d at 208. The court "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News*, 680 F.3d at 185.

The court below, however, decided that all conspiratorial activity could or should have taken place during the Fixing itself, and, on that basis, the court simply ignored the TAC's copious allegations of NYMEX trading in furtherance of the conspiracy and around the time of the Fixing. JA-882-83; SPA-160-61 (rejecting as "not mak[ing] sense" and "implausible" Plaintiffs' allegations that "Defendants . . . traded to further depress the price of platinum and palladium when they had . . . a tailor-made opportunity to manipulate that price via the Fixing"). This was error.

## III.   THE DISTRICT COURT ERRED IN DISMISSING LPPFC FOR LACK OF PERSONAL JURISDICTION

Plaintiffs alleged that LPPFC—the instrumentality of Defendants' conspiracy—was Defendants' alter ego, and thus subject to personal jurisdiction in the district court. The court below erred in declining jurisdiction. JA-329; SPA-91.

Because Plaintiffs' case invokes "federal question jurisdiction and involves a federal statute that 'demands national uniformity,' federal common law . . . controls" the alter ego analysis. *United States v. Peters*, 732 F.3d 93, 103 n.4 (2d Cir. 2013). To satisfy alter ego jurisdiction, Plaintiffs need show only that Defendants dominated LPPFC and that exercising jurisdiction over LPPFC comports with due process. *See S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138-139 (2d Cir. 2010); *D Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (noting that the pleading burden is relaxed).

In dismissing LPPFC on jurisdictional grounds, the court below recognized Plaintiffs' allegation that LPPFC was "100% owned and controlled" by Defendants to act as "an instrumentality in Defendants' conspiracy." JA-332; SPA-94. The court, however, failed to credit the following specific allegations, which LPPFC did not dispute:

- Defendants selected LPPFC's board members.

- Since LPPFC's directors were Defendants' own employees, Defendants conducted LPPFC's day-to-day operations.

- LPPFC was financially dependent on Defendants.

- LPPFC had no function other than to implement the Fixing.

JA-90-91 (SAC ¶¶ 46-47).

In sum, LPPFC, a shell, existed solely to further Defendants' conspiracy. Nevertheless, the court below found that Plaintiffs failed to "address whether the LPPFC observed corporate formalities, whether the LPPFC's funds were intermingled with those of the Fixing Members, and whether the Fixing Members shared any office space or addresses with the LPPFC." JA-332; SPA-94. But the undisputed facts that Plaintiffs did allege establish alter ego jurisdiction. It is immaterial that other facts, which the court itself said were not "determinative," could have bolstered the showing. JA-332; SPA-94. Thus, the court below erred. *See Anderson News*, 680 F.3d at 185. *See also Gold*, 213 F. Supp. 3d at 679-82 (plaintiffs "adequately pled that LGMF [the gold Fixing entity] is the alter ego of the Fixing Banks").

On its motion below, LPPFC argued that UK law controls and that, when applied, Plaintiffs could not establish jurisdiction. While we submit that UK law does not apply, even if it did, LPPFC is still subject to U.S. jurisdiction. *See Gold*, 213 F. Supp. 3d at 681 n.43 (noting no conflict between New York and English law).

In the context of European competition law, UK courts have repeatedly held that an entity 100% owned or controlled by a cartel member is itself subject to jurisdiction and can be liable for the damages caused by the cartel. So, where one corporate family member ("Undertaking A") conspires with other independent companies, "then if another corporate entity which is part of *Undertaking A* then implements that infringing agreement, it is also infringing." *Roche Prods. Ltd. v. Provimi Ltd.*, [2003] EWHC 961 ¶31 (Comm) (italics in original) (upholding UK jurisdiction over subsidiaries that implemented a price-fixing conspiracy entered into by a corporate affiliate).

Similarly, in *Cooper Tire & Rubber Company Europe Ltd & Ors v. Dow Deutschland Inc & Ors,* [2010] EWCA Civ 864 ¶¶ 42-46, the Court of Appeal held that UK jurisdiction over UK subsidiaries involved in a cartel also subjected the non-UK parent and other cartel members to UK jurisdiction. And in *Media-Saturn Holding GmbH v. Toshiba Information Sys. (UK) Ltd*, [2019] EWHC 1095 (Ch) ¶ 152, the High Court upheld jurisdiction over non-UK companies that were part of the corporate family committing the price-fixing violation. Where "both parent and subsidiary . . . by their conduct contributed" to a price-fixing violation, "liability . . . was attributable to both, even if the subsidiary had no knowledge of the parent's actions and its own contribution was made "in a subordinate, accessory or passive manner." *See also Vattenfall v Prysmian & NKT,* [2018] EWHC 1694 (Ch) ¶¶ 53-

61 (discussing case law) & 62-88 (upholding jurisdiction over non-UK corporate family members based on subsidiary's implementation of conspiracy).

Accordingly, Plaintiffs have established jurisdiction over LPPFC. This Court should reverse the dismissal or, alternatively, vacate dismissal and remand for appropriate jurisdictional discovery, which the court below denied. JA-335-37; SPA-97-99; *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery).[10]

## IV. THE DISTRICT COURT ERRED IN DISMISSING BASF CORP.

The district court dismissed BASF Corp., finding that Plaintiffs' allegations said "nothing about BASF Corp.'s involvement—direct or indirect—in the alleged price manipulation, BASF Corp.'s role in executing the scheme, or BASF Corp's motive in artificially suppressing the Fix Price." JA-341-42; SPA-103-04. This was error. The court again failed to credit Plaintiffs' allegations concerning BASF Corp.'s common motive with its Fixing affiliate, BASF Metals, and the other Defendants, as well as its conduct in furtherance of the conspiracy. *See Anderson News*, 680 F.3d at 185.

BASF Corp. and BASF Metals are parts of the Catalyst Division, through which BASF's "Precious Metals Services" are transacted, offering "24/7 access to

---

[10] Although lacking discovery, Plaintiffs alleged additional facts in the TAC, where LPPFC is a co-conspirator. LPPFC: (1) had no employees of its own; (2) had no office space but only an address for correspondence at a law firm; and (3) "claimed a 'total exemption' from audit" throughout its existence. JA-371 (TAC ¶ 52).

world metals exchanges . . . via trading offices in [among other places] Iselin, New Jersey." JA-85-86 (SAC ¶ 30) (internal quotation marks omitted). *See also* JA-87-88 (SAC ¶ 37).

The BASF corporate family is a global leader in producing automotive catalytic converters, which use platinum and palladium as an input. JA-85-86, 97-99 (SAC ¶¶ 29-30, 73). Thus, BASF Corp. had a common interest with BASF Metals and the other Defendants in achieving the conspiracy's aim: to suppress platinum and palladium prices. A purchaser of these metals, BASF Corp. benefitted from the lower prices the conspiracy produced, while BASF Corp.'s New Jersey precious metals traders could help BASF Metals achieve its announced "main objective": "to grow profit through precious metals trading activities." JA-86 (SAC ¶ 31) (internal quotations omitted).

Thus, through its New Jersey operations, BASF Corp. had every incentive and opportunity to work closely with BASF Metals and the Fixing's participants generally to further the conspiracy. Plaintiffs' allegations against BASF Corp. and the reasonable inferences from them plausibly demonstrate its participation in the price fixing conspiracy.

## CONCLUSION

Accordingly, this Court should reverse the judgment of the court below and remand for further proceedings.

DATED:     August 6, 2020                    Respectfully submitted,

                                             */s/ Jay L. Himes*
                                             Jay L. Himes
                                             Matthew J. Perez
                                             Ethan H. Kaminsky
                                             LABATON SUCHAROW LLP
                                             140 Broadway
                                             New York, NY 10005
                                             (212) 907-0700

                                             Merrill G. Davidoff
                                             Martin I. Twersky
                                             Zachary D. Caplan
                                             BERGER MONTAGUE PC
                                             1818 Market Street, Suite 3600
                                             Philadelphia, PA 19103
                                             Tel: (215) 875-3000

                                             *Attorneys for Plaintiffs-*
                                             *Appellants-Cross-Appellees*

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Federal

Rule of Appellate Procedure 32(a)(7)(B)—as modified by Local Rule

32.1(a)(4)(A)—in that the brief, according to the word-count feature in Microsoft

Word, contains 12,921 words.


*/s/ Jay L. Himes*
Jay L. Himes

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing brief and accompanying

Joint and Special Appendices on all parties on August 6, 2020, through the Court's

CM/ECF system.

*/s/ Jay L. Himes*
Jay L. Himes

# SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Memorandum Opinion and Order of the Honorable
    Gregory H. Woods, dated March 28, 2017 ....................... SPA-1

Memorandum Opinion and Order of the
    Honorable Gregory H. Woods, dated March 29, 2020 ........... SPA-107

Judgment, dated April 15, 2020 .................................... SPA-163

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

:

:

IN RE PLATINUM AND PALLADIUM     :
ANTITRUST LITIGATION     :

:

:

:
----------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:  03/28/2017

Lead Case 1:14-cv-9391-GHW

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

<u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ............................................................................................................................3

II.     BACKGROUND ............................................................................................................................4

   A.     Facts ...........................................................................................................................................4

      1.     The London Platinum and Palladium Market ..............................................................4

      2.     Platinum and Palladium Fixing Process .......................................................................6

      3.     The Impact of the Fixing on Other Platinum and Palladium Investments ...........7

      4.     Defendants' Alleged Platinum and Palladium Price Manipulation .....................10

         a.     How Defendants Manipulated the Fix Price .................................................11

         b.     Defendants' Alleged Price Manipulation Caused Price Distortions of Platinum and Palladium Investments Around the Fixing ...........................................13

         c.     Defendants Profited from Manipulating the Fix Price ...............................15

         d.     Related Regulatory Investigations .................................................................17

   B.     Procedural History ...............................................................................................................19

III.     DISCUSSION .............................................................................................................................20

   A.     Legal Standard .......................................................................................................................20

   B.     Sherman Act Claim ...............................................................................................................21

      1.     Sherman Act Violation.....................................................................................................21

         a.     Parallel Conduct ...............................................................................................23

         b.     Plus Factors .......................................................................................................25

      2.     Standing...............................................................................................................................32

         a.     Constitutional Standing ...................................................................................32

         b.     Antitrust Standing ............................................................................................35

    i. Antitrust Injury ........................................................................................... 36

    ii. Efficient Enforcers ..................................................................................... 39

  C. Commodities Exchange Act ("CEA") Claims ........................................................ 51

   1. Extraterritoriality ................................................................................................ 51

   2. Standing Under the CEA .................................................................................... 56

   3. CEA Violations ................................................................................................... 58

    a. Legal Standard ........................................................................................... 58

    b. Price Manipulation Claim .......................................................................... 61

    c. Manipulative Device Claims ...................................................................... 67

    d. Secondary Liability .................................................................................... 71

     i. Aiding and Abetting ............................................................................ 71

     ii. Principal-Agent Liability ..................................................................... 73

  D. Unjust Enrichment ................................................................................................... 75

  E. Personal Jurisdiction Over Foreign Defendants ...................................................... 76

   1. Rule 12(b)(2) Legal Standard ............................................................................ 77

    a. Standard for Exercising Personal Jurisdiction ........................................... 78

   2. Statutory Bases for Personal Jurisdiction .......................................................... 84

    a. BASF Metals ............................................................................................. 86

    b. ICBC .......................................................................................................... 87

    c. LPPFC ....................................................................................................... 89

     i. Alter Ego Theory of Personal Jurisdiction ......................................... 90

   3. Conspiracy Jurisdiction ...................................................................................... 95

   4. Jurisdictional Discovery ..................................................................................... 97

  F. UBS's Motion to Dismiss for Failure to State a Claim ........................................... 99

  G. BASF Corp.'s Motion to Dismiss for Failure to State a Claim ............................. 103

  H. Leave to Amend .................................................................................................... 104

IV. CONCLUSION ............................................................................................................ 105

# SPA-3

## I.   INTRODUCTION

In this case, platinum and palladium join several of their fellow elements in the periodic table as the objects of an alleged massive price manipulation scheme.[1]  Plaintiffs, a group of entities and individuals who sold physical platinum and palladium or platinum and palladium futures, allege that defendants BASF Corporation ("BASF Corp."), BASF Metals Limited ("BASF Metals" and, together with BASF Corp., "BASF"), Goldman Sachs International ("Goldman Sachs"), HSBC Bank USA, N.A. ("HSBC"), ICBC Standard Bank Plc ("ICBC"), UBS AG, UBS Securities LLC ("UBS Securities" and, together with UBS AG, "UBS"), and the London Platinum and Palladium Fixing Company Ltd. ("LPPFC") (collectively, "Defendants") manipulated and artificially suppressed the price of physical platinum and palladium.  To recover financial losses incurred as a result of Defendants' alleged price manipulation, Plaintiffs brought this putative class action claiming violations of the Sherman Act, 15 U.S.C. § 1, and the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, and for unjust enrichment.

Because the Court finds that Plaintiffs are not efficient enforcers of the antitrust laws, Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED.  Defendants' motion to dismiss Plaintiffs' CEA claims is GRANTED IN PART and DENIED IN PART.  The Court finds that the alleged conduct does not require an impermissible extraterritorial application of the CEA and that Plaintiffs have stated a CEA claim and have standing to sue under the Act.  However, because CFTC Rule 180.1 did not come into effect until August 15, 2011, Defendants' motion to dismiss is granted as to Plaintiffs' CEA manipulative device claims that are based on transactions

---

[1] *See, e.g.* (listed in the order of the corresponding elements appearance in the table, *see* Periodic Table of Elements: International Union of Pure and Applied Chemistry, *available at* https://iupac.org/what-we-do/periodic-table-of-elements/ (last accessed on March 28, 2017)), *In re Aluminum Warehousing Antitrust Litig.,* 95 F. Supp. 3d 419 (S.D.N.Y. 2015); *In re Copper Antitrust Litig.,* No. 99-C-621-C, 2000 WL 34230131 (W.D. Wis. Jul. 12, 2000); *In re Zinc Antitrust Litig.,* No. 14-CV-3728 (KBF), 2016 WL 3167192 (S.D.N.Y. June 6, 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.,* No. 14-MD-2573 (VEC), 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016); *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.,* No. 14-MD-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016).

effected prior to that date.  Because Plaintiffs have not alleged that they had any direct dealings with Defendants and that Defendants' were unjustly enriched at their expense, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is GRANTED.

In addition, because Plaintiffs have failed to make a *prima facie* showing that Defendants ICBC, BASF Metals, and the LPPFC have sufficient suit-related contacts in the United States, those Defendants' motions to dismiss for lack of personal jurisdiction are GRANTED.  Finally, because Plaintiffs have not alleged that UBS and BASF Corp. had any involvement in the alleged price manipulation conspiracy, those defendants' motions to dismiss for failure to state a claim are GRANTED.

## II.   BACKGROUND

### A.  Facts[2]

#### 1.   The London Platinum and Palladium Market

Platinum and palladium are precious metals.  SAC ¶ 99.  They are used decoratively in jewelry, but also have significant commercial and industrial uses.  SAC ¶ 82.  We all breathe a little easier thanks to the two metals.  As essential components of catalytic converters, platinum and its "sister metal" palladium are responsible for reducing toxic air pollutants from vehicle exhaust emissions.  SAC ¶ 73 & n.31.  In addition to the automobile industry, both metals are used in a variety of industrial and commercial applications, including in electrical, laboratory, and dentistry equipment.  SAC ¶ 73 & n.31.

Platinum and palladium have traditionally been traded internationally as precious metals, and have been held primarily for their exchange value rather than their industrial use.  SAC ¶ 73 (internal quotation marks and citations omitted).  Physical platinum and palladium trade in "opaque," "over-

---

[2] Unless otherwise noted, the facts are taken from the second consolidated amended class action complaint ("SAC"), Dkt. No. 102, and are accepted as true for the purposes of this Rule 12(b)(6) motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

the-counter" ("OTC") markets that operate "24-hours a day." SAC ¶¶ 78-81. Major players in the global physical platinum and palladium markets include Defendants as well as platinum and palladium producers (*e.g.*, miners and refiners), consumers (*e.g.*, jewelers and industrials), and investors (*e.g.*, pension funds, hedge funds, and individuals). SAC ¶¶ 81-82. Since the 1970s, London has been the center for physical platinum and palladium trading. SAC ¶ 74.

London's physical platinum and palladium trading similarly takes place in an OTC market and involves a number of activities by various market participants, including Defendants. SAC ¶ 75. The London Platinum and Palladium Market ("LPPM") is at the center of the London market for those metals. Established in 1987, the LPPM is a trade association that coordinates the activities conducted on behalf of LPPM members and other participants in the platinum and palladium market. SAC ¶ 65. Among other things, the LPPM sets standards for the "London Good Delivery," a set of rules prescribing the physical characteristics and attributes of platinum and palladium bars used in settlement in LPPM transactions. SAC ¶ 65. As of July 2015, the LPPM had fifty-two members, including thirteen market-making full members, six ordinary full members, and thirty-three associate members. SAC ¶ 67. The market-making members form the core of the LPPM; they quote buying and selling prices for spot delivery and provide liquidity to the market. SAC ¶ 71.

During the relevant time period, Defendants BASF Metals, Goldman Sachs, HSBC, ICBC, and UBS were five of the thirteen LPPM market-making members. SAC ¶¶ 31, 33, 35, 37, 44, 67. Four out of the five LPPM market-making members—BASF Metals, Goldman Sachs, HSBC and ICBC (the "Fixing Members")—were also members of the London Platinum and Palladium Fixing Company Ltd. ("LPPFC"), a private company wholly owned and controlled by its four members. SAC ¶ 45. As the body responsible for setting global benchmark prices for platinum and palladium, the LPPFC is "an integral part of the market for London platinum and palladium as well as global

markets—including U.S. markets—for platinum and palladium" and investments in securities based on physical platinum and palladium prices. SAC ¶ 77; *see also* SAC ¶¶ 1, 22.

### 2. Platinum and Palladium Fixing Process

Throughout the period between January 1, 2008 and November 30, 2014 (the "Class Period"), the Fixing Members participated in morning and afternoon conference calls to set the daily market prices of platinum and palladium (the "AM Fixing" and "PM Fixing," and, collectively, the "Fixing" or "Fixing Calls"). SAC ¶¶ 1, 62, 271. The Fixing was conducted through a "Walrasian" auction among the Fixing Members. SAC ¶ 51. The LPPFC's Chair (selected annually from and by LPPFC members) announced a starting price (known as the "Opening Price"). SAC ¶¶ 50, 52. The Opening Price typically reflected the "spot price"[3] for platinum and palladium, which, in turn, reflected the values of those metals at the time of the quote. SAC ¶¶ 2, 52 & n.1. The remaining Fixing Members would then declare themselves as "a net buyer or a net seller, or as having no interest at the starting price." SAC ¶ 52. Each Fixing Member's interest was based on its customers' orders, as well as proprietary orders from its trading desks. SAC ¶ 51. By combining those orders, the Fixing Members generated an aggregate buy or sell position for the auction. *See* SAC ¶ 51.

In conducting the auction, the Chair's goal was to reach an equilibrium between platinum and palladium supply and demand orders. SAC ¶¶ 52-53. If the Opening Price did not generate any buying or selling, the Chair announced the Opening Price as the price as fixed (the "Fix" or the "Fix Price"). SAC ¶ 52. If the Opening Price generated only selling or buying interest, however, the Chair solicited figures from the Fixing Members and then adjusted the Opening Price upward or downward until buying and selling reached an equilibrium or were within 4,000 troy ounces. SAC ¶¶ 53, 55. If the Chair was unable to match supply and demand exactly, and had instead declared the price as fixed when the difference between buying and selling was 4,000 troy ounces or

---

[3] The "spot price" refers to the current market price of the underlying physical commodity.

less, the Chair pro-rated the difference between supply and demand between the participating firms. SAC ¶ 59.  When the Chair reached an equilibrium between buy and sell orders, the Chair declared the Fix Prices and stated the time at which they had been fixed and the final prices in U.S. dollars. SAC ¶ 57.  Once the Chair declared the Fix Price, the Fixing Members were not able to alter or withdraw buy and sell orders based on that price.  SAC ¶ 57.

Operating through the LPPFC, the Fixing Members conducted the Fixing throughout most of the Class Period.  SAC ¶ 63.  On October 16, 2014, in response to the LPPFC's earlier solicitation for an independent party to assume responsibility for administering the Fixing, the LPPFC announced that, starting December 1, 2014, the London Metal Exchange ("LME") would administer the Fixing.  SAC ¶ 63.  The LME replaced the LPPFC's Fixing process with the LMEbullion, which relies on "a fully automated price-discovery process, holding two daily auctions."  SAC ¶ 63.  The LMEbullion auctions allow authorized "traders [to] participate through a secure web interface, where they can view the auction price and each submit their interest until a final price is set."  SAC ¶ 63.

### 3.   The Impact of the Fixing on Other Platinum and Palladium Investments

As noted above, the Fixing was used to set global benchmark prices for platinum and palladium, which were used in numerous transactions for platinum and palladium worldwide. SAC ¶ 2.  Plaintiffs explain that "[t]he prices of palladium move the value of, and determine the cash flow for, many different kinds of transactions."  SAC ¶ 12.  The effect of the Fixing was widespread. For example, as alleged in the SAC, many physical supply contracts—such as contracts for the sale of raw platinum or palladium—expressly incorporate prices from the Fixing.  SAC ¶ 91.

The relevance and impact of the Fixing extends beyond the markets for physical platinum and palladium.  Many market participants trade in platinum and palladium derivatives, including futures, forwards, and options.  SAC ¶ 91.  Such derivatives are financial instruments whose value is

derived from the underlying price of physical platinum and palladium on the spot market. SAC ¶ 84.  The Fixing affects trades in such financial instruments because, as Plaintiffs explain, exchange prices closely track the price of spot platinum or palladium.  SAC ¶ 91.  Consequently, changes in the price of one will be almost immediately reflected in the other.  As alleged in the SAC, "[t]he spot, Fix, and [New York Mercantile Exchange ("NYMEX")] settlement prices exhibit an almost perfect correlation."  SAC ¶ 91; *see also* SAC ¶¶ 3-4.  The relationship, Plaintiffs assert, is undeniable, and is thoroughly documented by studies conducted by independent academics and Plaintiffs.  SAC ¶ 3.  Many derivatives' cash flows are calculated by reference to the Fix benchmark prices on a given day.  SAC ¶ 3.  The SAC does not allege the total market size for platinum and palladium derivatives.  But Plaintiffs assert that, since 2011, the markets for platinum and palladium futures alone have surpassed annual values of $100 billion and $40 billion, respectively.  SAC ¶ 83. The alleged impact of the Fixing on the platinum and palladium market could therefore be immense.

A brief description of the financial instruments described above may be helpful to illustrate the relationship between the Fix Price for physical platinum and palladium and the value of the derivatives.  A future "is a bilateral agreement for the purchase or sale of an agreed amount of" the underlying commodity at a specified time in the future.  SAC ¶ 84.  A futures contract buyer takes a "long" position on platinum or palladium, thereby agreeing to pay for a specified amount of the commodity at the expiry of the contract.  SAC ¶ 85.  A futures contract seller takes a "short" position, thereby agreeing to deliver and receive payment for the commodity at the specified amount and time.  SAC ¶ 85.  Most market participants do not settle their futures contracts at the expiry date; rather, instead of taking physical delivery of the commodity, traders generally offset their futures position prior to maturation.  SAC ¶ 85.

Traders who hold a "long" position, and who are obligated to purchase the commodity at the agreed-upon price in the future, can profit when the price of the commodity increases by selling

an offsetting futures contract at the higher price.  *See* SAC ¶ 86.  By contrast, traders who hold a

"short" position, and who are obligated to sell the underlying commodity at an agreed-upon price in

the future, can profit when the price of the commodity decreases by selling an offsetting futures

contract at the lower price.  *See* SAC ¶ 86.  Forwards are virtually identical to futures, but, unlike

futures that are traded on an exchange, forwards are traded over the counter.  SAC ¶ 84.

Like futures, platinum and palladium options contracts—"puts" or "calls"—can be traded

over-the-counter or on an exchange.  SAC ¶ 87.  A put involves two parties:  the put seller and the

put buyer.  SAC ¶ 87.  By entering into a put, the put buyer obtains the right, but not the obligation,

to force the put seller to buy the underlying futures contract, or the underlying metal itself, within an

agreed-upon time frame at a specified, predetermined price —the "strike" price.  SAC ¶ 87.  In

exchange for committing to buy, the put seller receives a fee—the premium.  SAC ¶ 87.  Conversely,

a call gives the holder of the underlying platinum and palladium option the right, but not the

obligation, to buy the underlying platinum or palladium futures contract, or the underlying metal

itself, at a specified, predetermined price—the strike price—during a specified time period.  SAC

¶ 87.  The call seller is obligated to sell those futures contracts or the underlying metal to the call

option buyer if the buyer exercises the right to do so before the expiry date.  SAC ¶ 87.  To retain

the right to do so, the call buyer pays a premium to the call seller.  SAC ¶ 87.  As described in the

SAC, "[a]n investor that buys a put option generally expects the price of platinum or palladium to

fall . . . and an investor that buys a call option generally expects the price of the relevant metal to

rise."  SAC ¶ 87.  If the price of the option contract falls below the strike price, the put buyer is

likely to exercise the put option, and the put seller will likely have to purchase shares from the put

buyer when the option is exercised.  A call option buyer is more likely to exercise the right to "call

in" the underlying futures contract if the price goes above the strike price.  SAC ¶ 88.  At that point,

the buyer can execute the purchase at the lower price and make a profit by selling the futures

contract at the higher market price.  SAC ¶ 88.

Finally, platinum and palladium exchange-trade funds ("ETFs") invest only in those

commodities and issue shares of stock that are directly linked to platinum and palladium spot prices.

SAC ¶¶ 89-90.  Plaintiffs assert that the price of shares issued by such ETFs "correlates very closely

to the spot price of platinum and palladium itself."  SAC ¶ 90.  The correlation between the spot

price and the derivative is not unique to ETFs.  As alleged and illustrated in the SAC, the correlation

coefficient of platinum and palladium spot prices and corresponding derivatives range between 0.96

to 1.00 (where a coefficient of 1 represents a perfect correlation).  SAC ¶ 95 & figs. on pp. 33-38.

Plaintiffs maintain that the relationship "make[s] sense" because "the various instruments . . . have a

common underlying economic good, be it platinum or palladium" and "[a]ny price changes in one

instrument are very quickly transmitted and imputed in the others."  SAC ¶ 96.[4]

### 4.  Defendants' Alleged Platinum and Palladium Price Manipulation

The crux of Plaintiffs' allegations giving rise to this action is that Defendants took advantage

of the Fixing Calls to set the Fix Price at lower levels than competitive market forces would

otherwise have dictated.  SAC ¶ 97.  Put simply, Plaintiffs claim that the Fixing Members fixed the

Fix.  Plaintiffs allege that the Fixing Calls provided Defendants with "a ready-made process for *daily*

coordination of their activities," and that Defendants took advantage of that opportunity to move

the Fix Price downward at their discretion and for their own benefit.  SAC ¶ 9; *see also* SAC ¶ 4.

Because they move in lockstep with the price for physical platinum and palladium, Defendants'

coordinated suppression of the Fix Price had the effect of artificially lowering the prices of platinum

and palladium futures and options traded on NYMEX, platinum and palladium ETFs, and other

---

[4] As in the SAC, this opinion will refer to platinum and palladium bullion and platinum and palladium bullion coins, platinum and palladium futures traded on NYMEX and other U.S. exchanges, shares of platinum and palladium ETFs, OTC platinum and palladium, and platinum and palladium spot or forward transactions and options, or any of the foregoing, as "Platinum and Palladium Investments."  SAC ¶ 22 n.13.

Platinum and Palladium Investments.  SAC ¶ 97.  Consequently, in addition to creating numerous

opportunities for Defendants to profit, Plaintiffs assert that during the Class Period, they, and other

similarly situated members of the proposed class, were forced to sell their Platinum and Palladium

Investments at artificially low prices as a result of Defendants' alleged price manipulation.  SAC ¶ 97.

### a.  How Defendants Manipulated the Fix Price

Plaintiffs allege that Defendants manipulated the Fix Price in at least two ways.  First,

Defendants conspired to manipulate the Opening Price that the Chair announced at the beginning

of the Fixing Calls.  SAC ¶ 253.  Second, Defendants misrepresented actual market supply and

demand in order to move the AM and PM Fix Price to the level at which it was ultimately fixed.

SAC ¶ 253.  In advance of the AM and PM Fixing Calls, for example, Defendants allegedly compiled

confidential client order information and then shared the information with the other Fixing

Members in order to coordinate the execution of transactions immediately prior to and during the

Fixing.  SAC ¶ 8.  To achieve "maximum effect," Defendants allegedly grouped and timed

particularly large sell orders around the Fixing on the days when they intended to drive down the

price of platinum or palladium.  SAC ¶ 8.  Plaintiffs allege that this practice was intended to, and in

fact did, alter the Opening Price, inducing clients to change their interest in buying or selling at that

price, and removing suspicion from an auction price that otherwise would have stood out.  SAC

¶¶ 8, 172-173.

The Fixing Calls, Plaintiffs allege, provided the perfect cloak of secrecy and veneer of

legitimacy to Defendants' conduct, and enabled them to employ other price manipulation tactics.

For example, Defendants are alleged to have engaged in "front running," which Plaintiffs describe

as "trading in their own positions in advance of customer orders to take advantage of the market's

resulting move when the client's orders are placed."  SAC ¶ 8 n.2.  Defendants also allegedly placed

large orders that were never executed (a practice known as "spoofing"), placed large orders that were

quickly executed but then reversed (a practice known as "wash sales"), placed orders that were subsequently cancelled to "give the illusion of activity" (a practice known as "painting the screen"), and used such techniques to "trigger a stop-loss order or to avoid a bank's having to pay on an option or similar contract" (generally referred to as "jamming").  SAC ¶¶ 8, 175 & n.2.[5]

As alleged in the SAC, Defendants' price manipulation continued into and during the Fixing itself.  For example, Plaintiffs assert that to ensure that the auction produced their desired Fix Price, the Fixing Members placed auction bids and quotes irrespective of the actual aggregate demand reflected in their order books.  SAC ¶ 177.  By submitting aggregate auction bids that understated their clients' demand, the Fixing Members were able to suppress the Fix Price to benefit themselves, even if doing so was detrimental to their clients' interests.  SAC ¶ 177.

While the Fixing Calls themselves furnished a convenient forum for sharing information, it was not the only one Defendants are alleged to have utilized.  Plaintiffs claim that Defendants used chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and emails to coordinate among themselves to ensure members that attempts to move the market in one way or the other were not undermined by contrary efforts of other members or other large banks.  SAC ¶ 171.  By arming each other with pertinent information and deciding "to move in a particular direction, the colluding banks would equip each other with the tools to do so."  SAC ¶ 172.

---

[5] Although the Court must accept all facts alleged in the SAC as true, *see infra* Part III.A, the Court observes that, in connection with their allegations that Defendants engaged in such practices, Plaintiffs point to statements in HSBC's and UBS's settlements with the U.S. Commodity Futures Trading Commission ("CFTC") and the U.K. Financial Conduct Authority ("FCA") to impute HSBC's and UBS's conduct leading up to the settlements to the Defendants in this action.  While the Court accepts as true the allegations that these statements were made, as noted above, it does not accept as true the implicit suggestion that all Defendants engaged in such conduct.  *Iqbal*, 556 U.S. at 678.

### b. Defendants' Alleged Price Manipulation Caused Price Distortions of Platinum and Palladium Investments Around the Fixing

In support of their price manipulation allegations, Plaintiffs point to economic data analyses, which they claim demonstrate large "anomalous" downward spikes in both spot prices and NYMEX prices around the time of the Fixing. SAC ¶ 92; *see also* SAC ¶¶ 101-144. Plaintiffs maintain that downward spikes are inconsistent with results driven entirely by market forces, which would have resulted in a random pattern exhibiting equal upward and downward shifts of the Fix Price. SAC ¶ 104. According to Plaintiffs, the data are indicative of Defendants' collusion and price manipulation in a number of ways. For example, Plaintiffs' allege that in every year during the Class Period, the platinum Fix Price moved downward around the AM and PM Fixing on approximately 60% to 70% of trading days. SAC ¶ 106-107 & figs. on pp. 44-45. Similarly, Plaintiffs allege that in every year during the Class Period, the palladium Fix Price moved downward around the AM Fixing on approximately 40% to 60% of trading days, although the corresponding PM Fixing does not exhibit the same trends. SAC ¶ 106 & figs. on pp. 45-46.

Plaintiffs also examined intraday-minute tick figures, which demonstrate a minute-by-minute upward or downward movement in price. SAC ¶ 116. According to Plaintiffs, the data show significant downward price spikes just before the AM and PM Fixing and until the Fixing Calls ended. SAC ¶ 117 & fig. on p. 53; *see also* SAC ¶ 118 & figs. on p. 54. Plaintiffs also evaluated average price changes (referred to as "average returns") throughout the Class Period, examining the data in five- and fifteen-minute intervals throughout the trading day. SAC ¶¶ 126-130. As Plaintiffs explain, the data show consistent statistically significant downward price movements only around the AM and PM Fixing, with the largest negative returns taking place immediately before and after the Fixing Calls began. SAC ¶ 130 & figs. on pp. 68-69; *see also* SAC ¶¶ 119-121 & figs. on pp. 56-57 (explaining that the greatest price drops for both platinum and palladium occurred around the PM Fixing window with far greater frequency than would be expected by normal statistical probability).

In addition to the frequency of the downward price spikes around the time of the Fixing, Plaintiffs assert that the downward price spikes were significantly more intense during those time windows than price spikes observed at any other time of the trading day.  SAC ¶ 117 & figs. on p. 53; *see also* SAC ¶¶ 135-137 & figs. on pp. 76-77 (pointing to data demonstrating that the Fix Prices were not only more likely to drop at the time of the Fixing as compared to any other time during the trading day, but also that the magnitude of the decrease is significantly larger than when prices increased during the Fixing).

In support of their allegations that Defendants were responsible for the anomalous downward price spikes, Plaintiffs compared Defendants' platinum and palladium price quotes immediately before the Fixing with simultaneous quotes from other market participants.  According to Plaintiffs, the resulting data show that, on the days when the market price declined shortly before the PM Fixing, other market participants were quoting significantly higher prices for the commodities as compared to the Fixing Members.  SAC ¶¶ 178-79 & fig. on p. 96.  Plaintiffs contend that the comparison demonstrates that on trading days when the prices of platinum and palladium decreased in the window leading up to and including the PM Fixing, the decrease was caused at least in part by the Fixing Members' offering lower quotes for the commodities than other market participants.  SAC ¶ 180.

Plaintiffs maintain that limited and incomplete data of the Fixing Members' specific quotes on specific trading days confirms that Defendants were "driving movements in prices before and around the Fixing window."  SAC ¶ 181.  For example, Plaintiffs allege that they have identified several days during the Class Period when Defendants' quotes appear to have caused, or at a minimum, correlated with, downward spikes in the PM Fixing.  SAC ¶¶ 182-185 & figs. on pp. 97-99.  Plaintiffs maintain that their analysis shows "numerous days throughout the Class Period on

which Defendants conspired to and did manipulate the Fixing, and thereby set the price of platinum and palladium at artificially low levels." SAC ¶ 141 & apps. A, B.

Plaintiffs allege that the downward spikes in the Fix Price caused a corresponding decline in platinum and palladium spot prices and futures markets. SAC ¶¶ 138-139. Pointing to three days during the Class Period, Plaintiffs contend that the downward movements coincide with the time period immediately preceding and including the Fixing. SAC ¶ 140 & figs. on pp. 79-80. According to Plaintiffs, the data show a consistent average downward bias in the price of platinum and palladium futures during the window immediately before and during the AM and PM Fixing. SAC ¶¶ 131-134 & figs. on pp. 70-75.

Plaintiffs claim that the frequency, magnitude, and timing of the downward price spikes represented in the data, coupled with the fact that (1) Defendants' own quotes correlate with those trends, and (2) platinum and palladium prices during the Class Period moved downward during the Fixing even against the upward trends, support an inference that Defendants manipulated those downward price movements using an intentional and coordinated scheme. SAC ¶¶ 101-104, 167-213.

### c. Defendants Profited from Manipulating the Fix Price

According to Plaintiffs, Defendants were motivated to suppress the platinum and palladium Fix Price for two reasons. First, Plaintiffs generally allege that Defendants exploited their foreknowledge of downward swings in the platinum and palladium Fix Price to make advantageous transactions in a variety of Platinum and Palladium Investments. SAC ¶¶ 13-14, 61, 217. For example, as large participants in the market for physical platinum and palladium, the downward spikes in the Fix Price allowed Defendants to buy cheaper platinum and palladium than they would have been able to, creating opportunities for themselves to profit if and when platinum and palladium prices increased as the effects of suppression abated. SAC ¶ 200. During the Class

Period, Plaintiffs assert, Defendants were also large participants in the market for platinum and palladium Fix Price-denominated derivatives.  SAC ¶ 201.  Derivative contracts, like contracts for sale of physical platinum and palladium, directly incorporate the Fix Price in order to determine cash flows between the parties.  SAC ¶ 201.  Plaintiffs allege that Defendants profited from the price manipulation in this market because suppressing the Fix Price during the Fixing enabled Defendants to influence the volume of cash flows between respective parties and members of the Class in their favor.  SAC ¶ 201.

Plaintiffs further allege Defendants' manipulation of the Fixing gave them an unfair advantage over counterparties that were not also members of the LPPFC by reducing their risk in "digital options" and other contracts with market-based triggers, such as "stop loss" orders and "margin" calls.  SAC ¶ 202.  As described in the SAC, "[t]hese contracts in various forms require the Defendants to act, or not act, based on whether the price of platinum and palladium crosses a specific threshold.  By accepting these orders, the banks agreed to transact with the client at a specified price if the platinum and palladium benchmark reached that price."  SAC ¶ 202.  Through price manipulation of the Fix, Defendants frequently were able to trigger (or avoid triggering) such orders, avoiding much of the risk in such obligations.  SAC ¶ 202.

Plaintiffs also maintain that Defendants were particularly motivated to suppress the Fix Price in order to profit from large net "short" positions that they allegedly held in the platinum and palladium futures market, including NYMEX, throughout the Class Period.  SAC ¶¶ 12, 170.  According to the SAC, since at least 2008 and until at least 2014—*i.e.*, for most of the Class Period—Defendants and their co-conspirators manipulated the AM and PM Fixing in order to profit from their short positions on the platinum and palladium futures market.  SAC ¶¶ 185-203.  As discussed above, holders of short positions (who are obligated to sell platinum and palladium at an agreed-upon price in the future), profit when the underlying commodity price goes *down* because

they are able to buy an offsetting contract for a lower price. SAC ¶¶ 85-86. Plaintiffs allege that

Defendants had an interest in suppressing the platinum and palladium Fix Price for that reason.

SAC ¶ 185-203.[6] Plaintiffs assert that a comparison between Defendants' net positions and the

direction of the platinum and palladium Fixes shows that, to a statistically significant degree, the

direction of the Fix prices is much more strongly correlated with the Defendants' net position than

it is with the overall direction of the market on a given day. SAC ¶ 196.

Plaintiffs assert that, even if Defendants were using their short positions in NYMEX futures

for hedging purposes—*i.e.*, to offset the risk of large long positions elsewhere—Defendants were

still primarily motivated to cause downward spikes in the price of platinum and palladium. SAC

¶ 204-205. That is because Defendants could profit from driving the commodities' prices down by

cashing in on margin payments since futures are marked to market on a daily basis, thus requiring

daily cash margin payments as a result of changes in the value prior to the settlement date for the

future. SAC ¶ 205. As Plaintiffs explain, that structure "generates daily cash flows for the holder of

the futures contract if the market moves in favor of the holder's position." SAC ¶ 205.

### d. Related Regulatory Investigations

To buttress their claim that Defendants engaged in the alleged collusion—and were, in fact,

able to profit from their the manipulation of the platinum and palladium Fixing process—Plaintiffs

note that many of the "world's leading banks have *admitted* to manipulating the key LIBOR financial

benchmark, including by way of collusion between their respective traders." SAC ¶¶ 16, 203

(emphasis in original). Plaintiffs also point out that, in the currency-exchange markets, many leading

banks, including several of the Defendants, "*admitted* that their traders would *collude* to move the

market in advance of setting key benchmarks." SAC ¶ 203 (emphasis in original). In addition, as set

---

[6] Although Plaintiffs are unable at this stage to quantify each individual Defendant's short position in the futures and OTC markets, they rely on publicly available data in support of this claim. *See* SAC ¶ 192-193.

forth in the SAC, several investigations by various authorities around the world are currently underway.  SAC ¶ 223.  For example, Plaintiffs assert that the U.S. Department of Justice ("DOJ") and the CFTC have launched investigations into Defendants' manipulation of the price-setting mechanisms in precious metals, including in the platinum and palladium markets.  SAC ¶ 223. FINMA, the Swiss financial regulator, has recently reported that it has identified attempts to manipulate fixes in the precious metals market, including by at least one of the defendants in this action.  SAC ¶¶ 17, 168, 224-226.

According to the SAC, HSBC had recently entered into a settlement with the CFTC resulting from its manipulation of Forex benchmarks after the CFTC found that it and other banks used private chat rooms to communicate and plan their price manipulation.  SAC ¶ 243.  As alleged in the SAC, HSBC has also recently resolved charges by the U.K.'s FCA after the FCA found that HSBC attempted to manipulate foreign exchange rates through collusion with traders at other firms for HSBC's benefit and to the detriment of clients and other market participants.  SAC ¶ 244. Plaintiffs also allege that Barclays has recently settled with the FCA following an investigation into price manipulation in the precious metals context.  SAC ¶ 168.  Plaintiffs assert that the precious metals, which include platinum and palladium, and the Forex markets, their benchmarks, and the Defendants' respective trading desks "were closely related," particularly at UBS.  SAC ¶ 174.

In addition to DOJ's and CFTC's investigations of Defendants' price-setting mechanisms in precious metals markets generally, and the platinum and palladium markets specifically, the CFTC, FCA, and the German financial regulators have all launched probes into benchmark price manipulation in the context of other precious metals.  SAC ¶¶ 223-226.  Other regulators and legislative bodies, including the United States Senate, have noted concerns regarding potential "conflicts of interest" between banks and their clients with respect to platinum and palladium, as well as other precious metals.  SAC ¶¶ 19, 222, 228-231, 246.

### B.  Procedural History

Plaintiffs commenced this action on November 25, 2014.  Dkt. No. 1.  Subsequently,

plaintiffs in related actions (*see* 15-cv-0436-GHW, 15-cv-1036-GHW, 15-cv-1712-GHW, and 15-cv-

1817-GHW) filed substantively similar complaints.  On March 19, 2015, the parties filed a joint

motion to consolidate all five actions and to appoint Labaton Sucharow LLP and Berger &

Montague, P.C. as interim co-lead counsel for the proposed class, which the Court granted on

March 20, 2015.  Dkt. Nos. 22, 32.  Also on March 19, 2015, the parties also filed a joint motion to

stay discovery in the consolidated actions, which the Court granted on April 21, 2015.  Dkt. Nos. 30,

48.  On April 21, 2015, Plaintiffs filed a consolidated amended complaint, which Defendants moved

to dismiss on June 22, 2015.  Dkt. Nos. 45, 76, 79.  On July 21, 2015, Plaintiffs filed their second

consolidated class action complaint.  Dkt. No. 102.  Thereafter, Defendants moved to dismiss the

SAC, challenging Plaintiffs' ability to bring Sherman Act, CEA, and unjust enrichment claims.  Dkt.

No. 115.  BASF, ICBC, and LPPFC filed supplemental memoranda of law, arguing that the claims

against them should be dismissed for lack of personal jurisdiction.  Dkt. Nos. 117, 119-120.  UBS

filed a separate motion to dismiss for failure to state a claim, arguing that neither of the UBS entities

named as defendants in the SAC had any role in the Fixing.  Dkt. No. 113.  Plaintiffs filed their

oppositions to Defendants' motions on November 16, 2015.  Dkt. Nos. 127-129.  Defendants filed

their respective replies on December 11, 2015.  Dkt. Nos. 130-134.  Since the motions were fully

briefed, and in response to recent decisions issued by the Second Circuit and courts in this district,

the parties filed a number of supplemental letters, advising the Court regarding those decisions'

relevance to and impact on the pending motions in this action.  *See, e.g.*, Dkt. Nos. 136-141, 146,

155-158, 161, 164-166.

## III.   DISCUSSION[7]

### A.   Legal Standard[8]

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  However, a complaint that offers "labels and conclusions" or "naked assertion[s]"

---

[7] Although UBS filed a separate motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), because UBS joined the remaining Defendants' motion, *see* Dkt. No. 113 at 1 n.1, references to "Defendants" in Parts III.B-III.D of this opinion include UBS.  UBS's stand-alone motion is addressed separately below.  *See* Part III.F.

[8] Unless otherwise noted, the legal standard set forth below governs the Court's analysis of Defendants' motion to dismiss.

without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## B. Sherman Act Claim

### 1. Sherman Act Violation

Plaintiffs claim that Defendants' alleged manipulation of the Fixing constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1; *see also Twombly,* 550 U.S. at 553-63. "Notwithstanding its broad language, this provision prohibits 'only *unreasonable* restraints of trade.'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988) (emphasis added)). To run afoul of § 1, the unreasonable restraint must result from an agreement between two or more entities. *See Twombly*, 550 U.S. at 553-54. A restraint of trade resulting from unilateral or independent action does not violate Section 1. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice.") (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)). "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration omitted).

To overcome a motion to dismiss, a plaintiff must allege "'enough factual matter (taken as true) to suggest that an agreement was made.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016), *cert. denied*, No. 16-545, 137 S. Ct. 814 (2017). A plaintiff can meet this pleading requirement in one of two ways. "First, a plaintiff may, of course, assert direct evidence that the

defendants entered into an agreement in violation of the antitrust laws." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010)); *see also In re Commodity Exch., Inc.* ("*In re Gold*"), No. 14-MD-2548 (VEC), --F. Supp. 3d--, 2016 WL 5794776, at *15 (S.D.N.Y. Oct. 3, 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*In re Silver*"), No. 14-MD-2573 (VEC), --F. Supp. 3d--, 2016 WL 5794777, at *14 (S.D.N.Y. Oct. 3, 2016). In many antitrust cases, however, "this type of 'smoking gun' can be hard to come by, especially at the pleading stage. Thus a complaint may, alternatively, present circumstantial facts supporting the inference that a conspiracy existed." *Mayor & City Council of Baltimore*, 709 F.3d at 136; *see also Gelboim*, 823 F.3d at 781 ("'[C]onspiracies are rarely evidenced by explicit agreements' and 'nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'") (quoting *Anderson News*, 680 F.3d at 183). Allegations of parallel conduct alone are insufficient to support an inference that a conspiracy existed. *Mayor & City Council of Baltimore*, 709 F.3d at 136; *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("At the pleading stage, plaintiffs must allege sufficient facts to support (not 'prove' or even 'demonstrate') a plausible inference that defendants reached an agreement; a complaint merely alleging parallel conduct alone is not sustainable.") (citing *Twombly*, 550 U.S. at 556).

In the absence of direct evidence, therefore, courts can infer the existence of an agreement in restraint of trade "'on the basis of conscious parallelism when such independent conduct is accompanied by circumstantial evidence and plus factors.'" *Mayor & City Council of Baltimore*, 709 F.3d at 136 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *see also Twombly*, 550 U.S. at 557 (stating that allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement"); *Gelboim,* 823 F.3d at 781; *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("Since mere parallel behavior can be consistent with independent conduct,

courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.").  Such "plus factors" include "(1) 'a common motive to conspire'; (2) 'evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators'; and (3) 'evidence of a high level of interfirm communications.'" *Gelboim,* 823 F.3d at 781 (quoting *Mayor & City Council of Baltimore,* 709 F.3d at 136).  The list of plus factors is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement."  *Id.* (quoting *Mayor & City Council of Baltimore,* 709 F.3d at 136 n.6).

### a.  Parallel Conduct

Plaintiffs allege that Defendants' parallel conduct can be deduced from a comparison of Defendants' platinum and palladium quotes shortly before the Fixing with simultaneous quotes by other participants acting in the same market.  SAC ¶¶ 178-194.  According to Plaintiffs, the data show that on days when the price of platinum and palladium decreased in the window leading up to and during the PM Fixing, for example, the price drop was due at least in part to the Fixing Members' offering lower quotes for those metals than other participants in the platinum and palladium markets.  SAC ¶¶ 179-180 & fig. on p. 96.  Plaintiffs further allege that the Fixing Members' quotes were consistently lower than quotes of other market participants.  SAC ¶ 181. Relying on several data plots from select days within the Class Period, Plaintiffs claim that their analysis of pricing behavior indicates that spot prices moved not only during the Fixing, but also before the Fixing process commenced.  SAC ¶ 184 & figs. on pp. 97-99.  The direction of the price movement, Plaintiffs contend, was often contrary to trends occurring during the rest of the day. SAC ¶ 184.  Plaintiffs have also identified numerous days on which Defendants' alleged price manipulation generated downward movement of the PM Fixing for both platinum and palladium,

resulting in artificial suppression of the Fix Price of both metals. *See* SAC apps. A & B. Plaintiffs interpret these data as showing that Defendants quoted lower platinum and palladium prices in unison. *See* Pls.' Opp'n to Defs.' Joint Mot. to Dismiss the Second Am. Class Action Compl., ("Pls.' Opp'n"), Dkt. No. 129, at 6.

Defendants maintain the SAC does not plausibly allege that they acted in parallel because, among other things, it includes allegations of aggregated spot-market activity and does not show any instances in which two Defendants simultaneously quoted similar artificially low prices. Defs. BASF Corp. BASF Metals Ltd., Goldman Sachs, HSBC, ICBC, and the LPPFC's Joint Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Joint Br."), Dkt. No. 116, at 13-14. Therefore, Defendants argue, the allegations in the SAC are entirely consistent with lawful independent action or with rational business behavior. Defs. BASF Corp. BASF Metals Ltd., Goldman Sachs, HSBC, ICBC, and the LPPFC's Joint Reply Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Joint Reply"), Dkt. No. 132, at 3-4. Defendants are correct that Plaintiffs' parallel conduct allegations, without more, do not support an inference of the existence of a conspiracy. *See, e.g.*, *Twombly*, 550 U.S. at 553 ("While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.'") (quoting *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954)); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy."). As described below, here there is more. The Court is, therefore, satisfied that the SAC plausibly pleads conduct consistent with conscious parallelism. *See, e.g.*, *In re Silver*, 2016 WL 5794777, at *14-15 (concluding that allegations that defendants "opportunistically caus[ed] 'reversions' in spot pricing in advance of"

the silver benchmarking calls supported an inferences that they acted in parallel); *In re Gold*, 2016 WL

5794776, at *16 (concluding that the complaint sufficiently pleaded parallel conduct where plaintiffs

alleged that defendants offered spot quotes around the gold fixing calls that were clustered at prices

that were lower than those of other market participants and where plaintiffs identified select days on

which two more defendants appeared to have offered spot quotes that correlated with a downward

trend in gold prices shortly before and after the publication of the gold benchmark price).

### b.  Plus Factors

Plaintiffs point the Court to the following types of circumstantial evidence and plus factors

alleged in the SAC:  (1) Defendants engaged in direct exchange of pricing information during the

Fixing Calls; (2) the information exchange occurred among a small group of dominant market

players; (3) the communications between Defendants were private; (4) Defendants had a direct

financial interest in the outcome of the Fixing and, thus, were strongly incentivized to influence the

Fixing in their desired direction; (5) the semidiurnal Fixing Calls furnished ample opportunity for

Defendants to police conspiracy participants who "broke rank;" (6) because of the Fixing Calls'

private setting, there was a relatively low likelihood that the conspiracy would be exposed, thus

encouraging collusion; and (7) numerous regulators in the U.S. and around the world were

investigating and continue to investigate anticompetitive conduct and price manipulation in the

precious metals markets.  Pls.' Opp'n at 7-12.  Defendants maintain that these plus factors are

insufficient to salvage Plaintiffs' Section 1 claim.  Defs.' Joint Reply at 4-6.

While the Court agrees with some of Defendants' critiques, on balance, the Court is satisfied

that Plaintiffs have alleged sufficient circumstantial evidence and plus factors from which a

conspiracy in restraint of trade may plausibly be inferred.  First, Plaintiffs allege that the Fixing Calls

furnished an ideal, recurrent setting for the Fixing Members to discreetly exchange pricing

information.  Notwithstanding the negative connotation of the term "price fixing" in the legal

context, the Fixing Calls and the Fix Price were part of the platinum and palladium markets for several decades.  Absent manipulation, the process had been acknowledged and accepted by market participants as a legitimate and beneficial price-setting apparatus.  While it might be true that the Fixing Calls furnished a convenient forum and ample opportunities to conspire—and that the structure is not irrelevant—an "opportunity to collude does not translate into collusion."  *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015); *see also Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982) ("[O]ne who alleges that he is a victim of an antitrust conspiracy and seeks to impose the heavy sanctions of the Sherman Act upon the accused, must show more than the existence of a climate in which such a conspiracy may have been formed.").  Even at the pleading stage therefore, the Court finds that, in and of itself, the structure of the Fixing does not constitute a plus factor.  *See, e.g., In re Gold*, 2016 WL 5794776, at *16-17 (concluding that the "[t]he structure of the Fixing is not irrelevant because it provide a forum and opportunity for the Fixing Banks to conspire," but concluding that the structure alone did not constitute a plus factor).

That said, although the structure of the Fixing is not damning by itself, that the Fixing coincided with Defendants' alleged price manipulation constitutes sufficient circumstantial evidence of a conspiracy in restraint of trade.  Particularly important are Plaintiffs' allegations that the most significant platinum and palladium price drops were observed at the time of Fixing, during which Defendants allegedly shared confidential customer information and misrepresented their own and their customers' orders.  *See, e.g.,* SAC ¶¶ 117-118, 171 & figs. on pp. 53-54; *see also* SAC app. E, ¶¶ (a)-(k).  Coupled with Plaintiffs' allegations that the Fixing Members controlled the Fixing

process, and used various channels of communications to share information, the correlating price

drops support an inference that a conspiracy existed.  *See, e.g.*, *In re Gold*, 2016 WL 5794776, at *17.[9]

Second, the Court is not persuaded that Plaintiffs' proffered circumstantial evidence

regarding investigations of price manipulation in precious commodities markets should be

considered as circumstantial evidence suggesting a conspiracy in the platinum and palladium market

in particular.  Again, while not entirely irrelevant, those allegations do not substantiate Plaintiffs'

allegations here.  Many of the investigations and settlements referenced in the SAC are in the

context of different markets or different market players (*i.e.*, not Defendants).  *See* SAC ¶¶ 223-262.

Accordingly, the Court finds that Plaintiffs' allegations concerning past, ongoing, or future

investigations do not constitute a plus factor.  *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (concluding

that allegations of antitrust wrongdoing abroad, "absent any evidence of linkage between such

foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened

there, it could have happened here'"); *In re Gold*, 2016 WL 5794776, at *17 (concluding that ongoing

government investigations into possible manipulation of precious metals benchmarks and findings

---

[9] Defendants argue that Plaintiffs' conspiracy allegations rely almost exclusively on the opinions of unidentified experts, and that the Court may not consider those opinions at the motion to dismiss stage.  Defs.' Joint Br. at 19-24.  There is a difference between expert opinions, which the Court does not rely on, and allegations based on those opinions, which the Court may rely on—and has relied on—in analyzing whether Plaintiffs have stated a claim.  *See, e.g.*, *In re Silver*, 2016 WL 5794777, at *17 ("The Court is not, however[,] relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage.") (emphasis in original) (citations omitted).  The Second Circuit and district courts in this circuit routinely rely on expert and statistical analyses contained in pleadings.  *See, e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 750 F.3d 227, 234 n.8 (2d Cir. 2014) (relying on, among other things, plaintiff's expert economic analysis showing loss causation); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*") 935 F. Supp. 2d 666, 716-17 (S.D.N.Y. 2013) (accepting plaintiffs' proffered expert data analyses comparing LIBOR rates to other data), *vacated and remanded sub nom. on other grounds by, Gelboim*, 823 F.3d 759; *Dover v. British Airways, PLC (UK)*, No. 12-cv-5567, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) (noting that plaintiff's statistical analysis of prices "is a factual allegation that the Court must credit"); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp.2d 306, 332 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) (addressing plaintiffs' internal review of a sampled subset of loan files and valuation models at the motion to dismiss stage).

of misconduct with respect to FX and LIBOR benchmarks do not constitute circumstantial evidence of a conspiracy in the defendants' market) (citations omitted).

The Court observes, however, that in some circumstances, government and regulatory agencies' investigations, "when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).  In *Alaska Electrical Pension Fund*, for example, plaintiffs "allege[d] not only that government investigations [were] pending, but also that those investigations *ha[d] actually turned up evidence of criminal behavior relating to the [defendants'] manipulation of*" a benchmark interest rate incorporated into a broad range of financial derivatives.  *Id.* (emphasis added) (internal quotation marks and citations omitted).  The plaintiffs further alleged that defendants "abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with" the investigations, "strengthening substantially the inference that a conspiracy existed." *Id.*; *see also Starr v. Sony BMG*, 592 F.3d at 324 (acknowledging investigations by the New York State Attorney General and DOJ into the *defendants'* price fixing scheme in conjunction with other circumstantial evidence, as plausible grounds from which to infer an agreement in restraint of trade).  Such "strengthening" factors are absent here.

Third, while not expressly alleged, the SAC implies that the Fixing Members often acted against their own individual economic interests by, for example, quoting below-market prices leading up to the Fixing.  As noted above, the Second Circuit has recognized that actions against apparent individual and economic self-interest of the alleged conspirator are among the plus factors that courts must consider.  *Mayor & City of Baltimore*, 709 F.3d at 136.  The Fix Price dips alleged and illustrated in the SAC can only be explained, Plaintiffs maintain, if the Fixing Members held uniform trading positions and quoted in unison throughout the Class Period.  *See* SAC ¶¶ 178-203.  Thus, Plaintiffs allege, the data suggest that, at least on some days during this period, one or more of the

Fixing Members quoted prices that were contrary to their economic interest by, for example, agreeing to suppress the Fix Price irrespective of the fact that a given bank would have profited more from an increase in the price rather than a decrease.  On that basis, the Court finds that the SAC's allegations that Defendants acted against their own economic self-interest constitute circumstantial evidence of a conspiracy to manipulate the Fix Price.  *See, e.g.*, *In re Gold*, 2016 WL 5794776, at *20 (citations omitted); *In re Silver*, 2016 WL 5794777, at *17 (citations omitted); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 (recognizing allegations that banks conspired to manipulate ISDA benchmark rates by, among other things, trading against their own economic self-interest, sufficiently pleaded a plus factor in support of a Section 1 conspiracy claim); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period and that those positions, in turn, motivated their daily LIBOR submissions.").

Fourth, Plaintiffs assert that Defendants acted with "common motive" to manipulate the platinum and palladium Fix Price.  Pls.' Opp'n at 8-11.  "Motive to conspire may be inferred where the parallel 'action taken [by defendants] had the effect of creating a likelihood of increased profits.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968)) (alteration in *Anderson*); *cf. Ross*, 35 F. Supp. 3d at 442 (reasoning that "[c]ourts may not infer a conspiracy where the defendants have no 'rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations'") (quoting *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999)).

Plaintiffs maintain that Defendants had a "common motive" to suppress the platinum and palladium Fix Price for at least two related reasons:  (1) Defendants held net short platinum and

palladium positions on NYMEX, which allowed them to profit when the price of the underlying metals dropped (*e.g.*, SAC ¶ 193); and (2) foreknowledge of the downward platinum and palladium price swings enabled Defendants to profit from a variety of Platinum and Palladium Investments (*e.g.*, SAC ¶¶ 12-14, 199-203).

In *In re Gold*, the plaintiffs pleaded the existence of a common motive with virtually identical allegations.  Addressing the "net short" allegations, Judge Caproni found this theory "implausible," noting several internal inconsistencies within the complaint.  *In re Gold*, 2016 WL 5794776, at *18-19. For example, Judge Caproni reasoned that, even if she "were to accept Plaintiffs' claim that the Defendants (as opposed to other bullion banks) consistently held large net short positions in gold futures throughout the Class Period, Plaintiffs fail to present a plausible theory as to how Defendants profited from their short positions during a bull market in which the price of gold nearly quadrupled." *Id.* at *18 (citations omitted).  This is because, as explained above, the holder of a short position profits if the price of the underlying commodity falls, in which case the holder can eliminate its delivery obligation before expiry by purchasing a lower-priced offsetting futures contract and pocketing the difference in price.  SAC ¶¶ 85-86.  "[I]n a rising market," Judge Caproni noted,

> short futures are a losing proposition.  Because the market price of gold rose steadily throughout the Class Period, Defendants would have had to hold massive long positions in physical gold, derivatives, and over-the-counter investments in order to counter losses on any short positions, including short futures.  Thus to the extent there were discrete periods when the price of gold fell, enabling Defendants to reap profits from their short futures, those profits would have been neutralized by Defendants other long holdings, thus negating Plaintiffs' alleged profit motive.

*In re Gold*, 2016 WL 5794776, at *18.  On that basis, Judge Caproni concluded that even accepting the plaintiffs' allegations as true, the defendants in that case would still have lost money on their alleged massive net short positions.  *Id.* at *19.

That conclusion applies with equal force to Plaintiffs' claims in this action, given that palladium prices "have been in a general upward trend" since the beginning of the Class Period and platinum prices *tripled* from January 2000 through December 2013.  SAC ¶¶ 100, 125 & fig. on p. 41.  In light of the substantial similarity between the allegations in *In re Gold* and the Plaintiffs' allegations here, the Court finds Judge Caproni's analysis of this plus factor persuasive and adopts her conclusions here.  2016 WL 5794776, at *18-19.

That said, while Plaintiffs' net short theory fails the plausibility test, their allegations that the Fixing Members were incentivized to profit from their foreknowledge of the Fix Price constitutes a "common motive" for antitrust purposes.  *Id.* at *19.  As large financial institutions with significant presence in various platinum and palladium markets, the SAC plausibly pleads that Defendants had an interest in the outcome of the Fixing.  For example, as alleged in the SAC, the Fixing Members were positioned to cause platinum and palladium prices to increase or decrease:  they had the ability to buy platinum and palladium at suppressed prices and sell at higher prices, an advantage not available to other market participants.  SAC ¶ 206.  The Fixing Members could also utilize their control of the Fixing to profit from platinum and palladium derivatives that directly incorporated the Fix Price.  *See, e.g.*, SAC ¶ 201.

In sum, the Court finds that Plaintiffs have plausibly alleged conscious parallelism and sufficient circumstantial evidence and plus factors to support an inference that Defendants participated in a conspiracy in restraint of trade.  In *Gelboim*, the Second Circuit found that "the complaints contain[ed] numerous allegations [of circumstantial evidence and plus factors] that clear the bar of plausibility" and noted that "[c]lose cases abound on this issue, but [that case was] not one of them."  *Gelboim*, 823 F.3d at 781-82.  As the analysis above shows, this case *is* one of them, but it still clears the bar.

## 2. Standing

Antitrust plaintiffs must establish both constitutional standing and antitrust standing.

*Gelboim*, 823 F.3d at 770. "Antitrust standing is distinct from constitutional standing, in which a

mere showing of harm will establish the necessary injury." *Port Dock & Stone Corp. v. Oldcastle,*

*Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). As is true of constitutional standing, antitrust

standing is a threshold question resolved at the pleading stage. *Gelboim, 823 F.3d* at 770 (citing *Gatt*

*Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013)).

### a. Constitutional Standing[10]

Constitutional standing refers to the limitation on federal courts to hear a case or

controversy within the meaning of Article III of the U.S. Constitution. *Carter v. HealthPort Techs.,*

*LLC*, 822 F.3d 47, 55 (2d Cir. 2016). "Constitutional standing 'is the threshold question in every

federal case, determining the power of the court to entertain the suit.'" *Leibovitz v. New York City*

*Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

"'If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim,'"

and the claim must be dismissed. *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting

---

[10] Although Defendants do not appear to contest Plaintiffs' constitutional standing to bring a Sherman Act claim, their arguments concerning Plaintiffs' failure adequately to plead an antitrust injury is relevant to both constitutional standing and the antitrust standing inquires. *See, e.g.*, Defs.' Joint Br. at 25 (arguing that Plaintiffs' allegations fall short of adequately pleading an antitrust injury because "Plaintiffs only assert that 'manipulation of the Fixing impacted . . . transactions and caused Plaintiffs and the Class to incur greater losses and/or realize lower prices than they would have realized in a free and open competitive market'") (quoting SAC ¶ 247); *see also id.* at 36. Accordingly, before proceeding to the parties' arguments concerning Plaintiffs' Sherman Act claim, the Court must first satisfy itself that Plaintiffs have constitutional standing to pursue this claim; the Court can raise the issue *sua sponte*. *E.g.*, *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.") (citing *United States v. Quinones*, 313 F.3d 49, 57-58 (2d Cir. 2002)); *see also Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir. 1998) (noting that because of the "Article III limitations on judicial power . . . the court can raise [an Article III issue] *sua sponte*"); *Schwartz v. HSBC Bank USA, N.A.*, No. 14 CIV. 9525 (KPF), 2017 WL 95118, at *4 (S.D.N.Y. Jan. 9, 2017) (reasoning that that the court has an "'independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte* . . . [including] whether a plaintiff has standing under Article III to pursue its claim'") (quoting *Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 607 F.3d 951, 955 (2d Cir. 2010)).

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

"To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must demonstrate (1) 'injury in fact,' (2) a 'causal connection' between that injury and the complained-of conduct, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Strubel v. Comenity Bank*, 842 F.3d 181, 187-88 (2d Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury-in-fact prong of the constitutional standing inquiry requires that the plaintiff's alleged injury be "'an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016) (quoting *Lujan*, 504 U.S. at 560) (alterations in *Montesa* omitted). In determining whether a plaintiff has standing, courts must "'accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.'" *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 191 (2d Cir. 2014) (quoting *Bigio v. CocaCola Co.,* 675 F.3d 163, 169 (2d Cir. 2012) (alterations omitted)); *see also Warth*, 422 U.S. at 501 ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

Defendants argue that allegations that they suffered "greater losses" or realized lower profits than they would have in a competitive market lack sufficient detail to show that Plaintiffs suffered any nonspeculative injuries as a result of the Fixing. Defs. Joint Br. at 25-26. Defendants also argue that, because Plaintiffs do not allege that they engaged in a transaction *at a time* that coincides with the AM or PM Fixing, when the prices were allegedly artificial, Plaintiffs have failed to allege that they suffered an injury-in-fact. Defs.' Joint Br. at 36 (emphasis in original) (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013)). But

Plaintiffs allege that they sold Platinum and Palladium Investments on days when Defendants allegedly manipulated the Fix Price.  SAC apps. C & D.  In fact, Plaintiffs have amassed a list of dates on which, they allege, one or more of Plaintiffs' sales coincided with Defendants' manipulation of the PM platinum and palladium Fix Price.  SAC apps. A-D.

Moreover, Plaintiffs allege that the effect of the Fix price's downward spike lingered beyond the Fixing window, and through the time of day when the margin payment cash flows for the Defendants' large short futures positions would be calculated.  SAC ¶ 209.  In other words, even though Plaintiffs have not alleged that they sold futures within the Fixing window, they have alleged that they sold futures within the period during which Defendants' price manipulation had an effect on the Fix Price and the platinum and palladium derivatives markets.  SAC ¶ 209.  Because Plaintiffs have alleged that they suffered losses or reduced profits from sales at artificially lower prices as a result of Fixing, Plaintiffs have sufficiently pleaded that they suffered an injury as a result of Defendants' alleged price manipulation.  Accordingly, Plaintiffs have established that they have constitutional standing to sue.  *See Gelboim*, 823 F.3d at 770 (noting that the injury component of the constitutional standing inquiry was "uncontested, and easily satisfied by [plaintiffs'] pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR"); *see also In re Gold*, 2016 WL 5794776, at *9 (finding that nearly identical allegations satisfied the constitutional standing inquiry); *In re Silver*, 2016 WL 5794777, at *7 (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015), *appeal withdrawn*, (Apr. 27, 2015) (concluding that plaintiffs have satisfied the injury-in-fact prong because they "have demonstrated that they have a concrete stake in the present action.  Each named Plaintiff claims that it was injured by having to pay supra-competitive prices as a result of Defendants' manipulation of the Fix").

### b.  Antitrust Standing

"Section 4 of the Clayton Act establishes a private right of action for violation of the federal

antitrust laws."  *Gatt*, 711 F.3d at 75.  Pursuant to Section 4,

> any person who shall be injured in his business or property by reason
> of anything forbidden in the antitrust laws may sue therefor in any
> district court of the United States in the district in which the
> defendant resides or is found or has an agent, without respect to the
> amount in controversy, and shall recover threefold the damages by
> him sustained, and the cost of suit, including a reasonable attorney's
> fee.

15 U.S.C. § 15(a).  While "[i]t is a well-established principle that . . . the United States is authorized

to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'"

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005) (citing *Cargill, Inc. v. Monfort of*

*Colo.*, 479 U.S. 104, 110 & nn.5-6 (1986).  "This standing requirement originates in the Supreme

Court's recognition that, although Section 4 of the Clayton Act appears to confer a broad private

right of action for antitrust damages, 'Congress did not intend the antitrust laws to provide a remedy

in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *Id.* at 436-37

(quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519,

534 (1983)); *see also Gatt*, 711 F.3d at 75.

"The right to pursue private actions for treble damages under § 4 has thus developed

limiting contours over the thirty years since [*AGC*] was handed down.  Those contours are

embodied in the concept of 'antitrust standing.'"  *Gatt*, 711 F.3d at 75 (citing *Daniel*, 428 F.3d at

436-38).  "'[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its

terms fails to establish this requirement [the court] must dismiss it as a matter of law.'"  *Id.* at 75-76

(quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).[11]  This limiting contour

---

[11] Although the Second Circuit has not directly addressed this issue, it has cited with approval the D.C. Circuit's
"holding that statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction."
*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 289

"'prevents private plaintiffs from recover[ing] damages under § 4 . . . merely by showing injury causally linked to an illegal presence in the market.'" *Id.* at 76 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (alterations in original)). To satisfy the antitrust standing requirement, "a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations," *i.e.*, that plaintiff is "an 'efficient enforcer' of the antitrust laws." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157-58 (2d Cir. 2016) (citing *Gatt*, 711 F.3d at 76, *Daniel*, 428 F.3d at 438).

### i.    Antitrust Injury

As noted above, the Supreme Court reasoned in *AGC* that "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" 459 U.S. at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). Rather, "[a]n antitrust injury 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *In re Aluminum Warehousing*, 833 F.3d at 158 (internal quotation marks and citations omitted).

The Second Circuit's decision in *Gelboim* provides the framework for this Court to analyze whether Plaintiffs have alleged an antitrust injury. In *Gelboim*, plaintiffs claimed that the defendant banks colluded to depress LIBOR rates through participation in the benchmarking process for LIBOR. 823 F.3d at 771. The plaintiffs maintained that they alleged an antitrust injury because they traded in LIBOR-dependent financial instruments and, consequently, incurred losses or reduced

---

F.3d 98, 107-08 (D.C. Cir. 2002) ("Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing."); *see also Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 468 (2d Cir. 2014) (reasoning that "statutory standing is not jurisdictional unless Congress says so").

profits. *Id.* at 772-75. The Second Circuit held that the plaintiffs sufficiently alleged an antitrust injury because they "claim[ed] violation (and injury in the form of higher prices) flowing from the corruption of the rate-setting process, which (allegedly) turned a process in which the Banks jointly participated into conspiracy." *Id.* at 775. Because the plaintiffs alleged that the defendant banks "warp[ed] market factors affecting the prices for LIBOR-based financial instruments," the Second Circuit held that "[n]o further showing of actual adverse effect in the market place is necessary. This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation." *Id.* at 776. By alleging a horizontal price-fixing scheme, "'perhaps the paradigm of an unreasonable restraint of trade'" and which, if proven, would be a *per se* violation of the antitrust laws, plaintiffs were not required to allege additional harm to competition writ large. *Id.* at 771, 775 (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)). Adding that pleading requirement, the Second Circuit reasoned, "'comes dangerously close to transforming a *per se* violation into a case to be judged under the rule of reason.'" *Id.* at 776 (quoting *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123-24 (3d Cir. 2000)).

Because "antitrust law is concerned with influences that corrupt market conditions, not bargaining power," that plaintiffs "remained free to negotiate the interest rates attached to particular financial instruments," was immaterial to the Second Circuit's conclusion in *Gelboim*. *Id.* at 773. In addition, although the defendant banks did not control the market, to the extent that they "raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces," and therefore engaging in an unlawful activity. *Id.* (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)). By "alleging that they paid artificially higher prices" as a result of defendants' conduct, the Second Circuit held that the plaintiffs in *Gelboim* had sustained their burden of pleading an antitrust injury. *Id.* at 777.

While, as a general rule, "only those that are participants in the defendants' market can be said to have suffered antitrust injury . . . [c]ourts have also recognized the antitrust claims of market participants other than consumers or competitors, *e.g.*, potential new market entrants, suppliers, and dealers." *In re Aluminum Warehousing*, 833 F.3d at 158 (internal quotation marks, citations, and alterations omitted). "The universe of potential [antitrust] plaintiffs is not strictly limited to participants in the defendants' market." *Id.* (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 465 (1982)). *Gelboim* observed that the injury prong of the antitrust standing requirement is satisfied when a plaintiff was injured through "'a purposefully anticompetitive scheme'" and the "'injury . . . was inextricably intertwined with the injury the conspirators sought to inflict.'" *Gelboim*, 823 F.3d at 774 (quoting *Brunswick* 429 U.S. at 483-84). Because plaintiffs claimed that they were in a "'worse position' as a consequence" of defendants' scheme to manipulate LIBOR rates, the Second Circuit held that plaintiffs' alleged injury was "one the antitrust laws were designed to prevent." *Id.* at 775 (quoting *Gatt*, 711 F.3d at 76).

Here, Plaintiffs allege that, as a result of Defendants' manipulation of the Fix Price, they were forced to sell platinum and palladium and Platinum and Palladium Investments at artificially low prices. SAC ¶¶ 260-262. Although, at the pleading stage, Plaintiffs are limited to publicly available information, they have preliminarily identified numerous dates on which one or more of Plaintiffs' sales coincided with Defendants' alleged manipulation of the platinum and palladium PM Fixing. SAC apps. C &D. Because Plaintiffs allege that their "loss[es] stem[ ] from a competition-*reducing* aspect of [D]efendants' behavior," they have sufficiently alleged an injury that the antitrust laws were designed to prevent and that flows from Defendants' allegedly unlawful conduct. *In re Gold*, 2016 WL 5794776, at *10 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990)); *see also In re Silver*, 2016 WL 5794777, at *8 (same); *In re Foreign Exch. Benchmark Rates*, 74 F. Supp. 3d at 596 (concluding that plaintiffs have sufficiently alleged  antitrust injury where plaintiffs

claimed to have paid supra-competitive prices as a result of defendants alleged horizontal price-fixing conspiracy); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 59 ("Notably, this Court and the [*In re Foreign Exch. Benchmark*] Court are not alone in concluding that collusion in the setting of a benchmark rate (or its functional equivalent) that is then used as a component of price results in antitrust injury" and "courts have long held that such collusion gives rise to a claim under the Sherman Act by purchasers of the affected products."); *7 West 57th Street Realty Co. v. Citigroup, Inc.*, No. 13-CV-981 (PGG), 2015 WL 1514539, at *15-20 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 (GBD), 2014 WL 1280464, at *7-8 (S.D.N.Y. Mar. 28, 2014).

### ii.    Efficient Enforcers

The second question the Court must address in determining whether Plaintiffs have antitrust standing is whether Plaintiffs are "efficient enforcers of the antitrust laws." *Gelboim*, 823 F.3d at 777-78 (citing *Daniel*, 428 F.3d at 443). The Second Circuit has identified four factors that bear on the efficient enforcers analysis: "(1) the 'directness or indirectness of the asserted injury'; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [plaintiffs'] damages claim is 'highly speculative;' and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Id.* at 778 (quoting *AGC*, 459 U.S. at 540-45).

> These factors are meant to guide a court in exploring the fundamental issue of "whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." After all, "[i]t is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." Indeed, "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages." In both situations, the court must draw a line beyond which a defendant will not be held responsible for harm experienced by a plaintiff. And in both situations, no black-letter rule exists; *a*

> court must "exercise [its] judgment in deciding whether the law affords a remedy
> in specific circumstances."

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11 MDL 2262 (NRB), 2016 WL

7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (citations omitted) (emphasis added) (alterations in

original).  The Court will address each factor in turn.

### (a)    Directness of Injury

The "'directness or indirectness of the asserted injury'" factor "requires evaluation of the

'chain of causation' linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing."

*Gelboim*, 823 F.3d at 778 (*quoting AGC*, 459 U.S. at 540).  "The antitrust laws do not require a

plaintiff to have purchased directly from a defendant in order to have antitrust standing."  *In re*

*Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13 CIV. 7789 (LGS), 2016 WL

5108131, at *9 (S.D.N.Y. Sept. 20, 2016) (citations omitted); *see also LIBOR VI*, 2016 WL 7378980,

at *16.  As the Supreme Court has recognized, the protection of the antitrust laws are not

"confine[d] . . . to consumers, or to purchasers, or to competitors, or to sellers. . . .  [They] are

comprehensive in . . . coverage [and] protect[ ] all who are made victims of the forbidden practices

by whomever they may be perpetrated."  *McCready*, 457 U.S. at 472 (quoting *Mandeville Island Farms,*

*Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).  A determination of standing in an individual

antitrust case is a fact-specific exercise involving a fact-intensive inquiry.  *AGC*, 459 U.S. at 536-37.

Plaintiffs bring their antitrust claim on behalf of a putative class of "[a]ll persons or entities

who," during the Class Period,

> (i) sold physical platinum or palladium; (ii) sold platinum or palladium
> futures contracts traded on NYMEX; (iii) sold shares in platinum or
> palladium ETFs; (iv) sold platinum or palladium call options traded
> on NYMEX; (v) bought platinum or palladium put options traded on
> NYMEX; (vi) sold over-the-counter platinum or palladium spot or
> forward contracts or platinum or palladium call options; or
> (vii) bought over-the-counter platinum or palladium put options.

SAC ¶ 271.  Thus, all contracts for physical platinum and palladium and all platinum and palladium futures, ETFs, options, forwards, and any other OTC or exchange-based platinum and palladium transactions could fall within the scope of this case.  In addition, because the proposed class is not limited to person who transacted directly with Defendants, this broad sweep exposes Defendants to potentially astronomical damages for transactions in which they played no direct role.

The scope and scale of Platinum and Palladium Investments that are the subject of this action "is relevant to the relationship between the defendants' actions and the 'concern of damages disproportionate to wrongdoing,' affecting 'myriad markets where derivative instruments have proliferated.'"  *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *16 (S.D.N.Y. Feb. 21, 2017) (quoting *Gelboim*, 823 F.3d at 779) (emphasis added).  Accepting the SAC's allegations as true, the universe of Platinum and Palladium Investments allegedly affected by Defendants' conduct is extraordinarily large.  As noted earlier, by Plaintiffs' own estimation, subsets of the relevant market—those limited to platinum and palladium futures—have surpassed annual values of $100 billion and $40 billion, respectively.  SAC ¶ 83.  The Court expects that the quantities of affected physical platinum and palladium trades and ETFs are also significant in magnitude.

The named Plaintiffs are a group of entities and individuals who sold physical platinum and palladium or platinum and palladium futures during the Class Period.  SAC at pp. 13-14, ¶¶ (a)-(f).  The SAC is silent with respect to whether those Plaintiffs had any direct sales to or purchases from Defendants.  Plaintiffs only allege that, as a result of Defendants' price manipulation, they were forced to sell the physical platinum and palladium and platinum and palladium futures at artificial prices, and that those artificial prices were caused by Defendants' unlawful manipulation.  SAC at pp. 13-14, ¶¶ (a)-(f).  Two appendices to the SAC identify dates on which one or more of Plaintiffs' sales coincided with Defendants' alleged manipulation of the PM Platinum and Palladium Fixing.  SAC apps. C & D.

Defendants argue that, because Plaintiffs are, at most, indirect sellers, their injury is too attenuated from the alleged unlawful conduct to satisfy the directness prong. Defs.' Joint Br. at 28-29. Plaintiffs who do not have direct dealings with the defendants, but purchased products allegedly affected by defendants' price fixing, are referred to as "umbrella purchasers." *LIBOR VI*, 2016 WL 7378980, at *15; *Sullivan v. Barclays*, 2017 WL 685570, at *17. "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823 F.3d at 778 (citations omitted). "In the typical umbrella liability case, plaintiffs' injuries arise from transactions with non-conspiring retailers who are able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy to create a pricing 'umbrella.'" *In re Gold*, 2016 WL 5794776, at *13 (citations omitted).

Some courts have found that umbrella purchasers do not have antitrust standing because "'significant intervening causative factors,' most notably, the 'independent pricing decisions of non-conspiring retailers,' attenuate the causal connection between the violation and the injury." *LIBOR VI*, 2016 WL 7378980, at *15 (quoting *In re Gold*, 2016 WL 5794776, at *13); *see also Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245-47 (S.D.N.Y. 1997) (finding that plaintiffs injury was too remote to satisfy the directness prong of the efficient enforcers inquiry, and rejecting umbrella purchasers' standing because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," including "independent pricing decisions of non-conspiring retailers"). Under such circumstances, because the defendants did not secure an illegal benefit at the plaintiffs' expense, "permitting recovery . . . 'could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally earned profits.'" *LIBOR VI*, 2016 WL 7378980, at *15 (quoting *Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 583, 586 (3d Cir. 1979)). Although *Gelboim* observed that the question of antitrust standing of umbrella purchasers

has produced a split among the circuit courts, the Second Circuit did not adopt a clear position on the issue.  823 F.3d at 778-79.  Accordingly, as Judge Caproni observed in *In re Gold*, here too, "[d]ue to the uncertainty surrounding the viability of the theory [of] umbrella liability, and the unique facts of this case, analyzing Plaintiffs' claims under an umbrella theory of liability leads to no dispositive conclusions."  *In re Gold*, 2016 WL 5794776, at *12; *see also In re Silver*, 2016 WL 5794777, at *11.

In remanding *Gelboim* to the district court to consider the efficient enforcers analysis, the Second Circuit observed that "there are features of this case that are like no other" and, "[a]t first glance . . . there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks."  *Gelboim*, 823 F.3d at 778-79.  The court cautioned, however, that "[r]equiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of a[ ] [relevant transaction] would, if [plaintiffs'] allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."  *Id.* at 779.

Mindful of the Second Circuit's concern regarding a vast extension of the potential scope of antitrust liability, and recognizing that antitrust standing determinations are fact-specific, on remand the district court "dr[ew] a line between plaintiffs who transacted directly with defendants and those who did not."  *LIBOR VI*, 2016 WL 7378980, at *16.  The court was able to draw that line in part by acknowledging that "plaintiffs who did not purchase directly from defendants continue to face the same hurdle:  they made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit."  *Id.*  "To hold defendants trebly responsible for these decisions would result in 'damages disproportionate to wrongdoing . . . .'"  *Id.* (quoting *Gelboim*, 823 F.3d at 779).  Since the Second Circuit's decision in *Gelboim* and the district court's application its instruction, at least one other

court in this district has adopted the same approach when faced with damages that could accrue in the trillions if non-direct plaintiffs were allowed to proceed. *Sullivan v. Barclays*, 2017 WL 685570, at *17-18 (concluding that plaintiffs who did not have direct dealings with defendants were not efficient enforcers of the antitrust laws).

Analyzing substantially similar allegations as those alleged here, brought by similarly situated plaintiffs as those named in the SAC, Judge Caproni determined that at least a subset of the plaintiffs in the proposed class had cleared the causation hurdle. *In re Gold*, 2016 WL 5794776, at *13; *In re Silver*, 2016 WL 5794777, at *12. Judge Caproni expressed skepticism, however, regarding whether "*all* market participants who sold gold [or sliver] or gold [or silver] instruments on alleged manipulation days will ultimately be able to move forward with their claims," but concluded that the question could be deferred to the class certification stage. *In re Gold*, 2016 WL 5794776, at *13; *see also In re Silver*, 2016 WL 5794777, at *12. The Court shares Judge Caproni's skepticism. But unlike Judge Caproni, the Court does not believe that this issue should be deferred to class certification with respect Plaintiffs' Sherman Act claim. As discussed above, satisfaction of the efficient enforcer requirement is a condition to antitrust standing, which is appropriately considered on the pleadings.[12] Examining the remaining efficient enforcers factors lends additional support to the Court's ultimate conclusion that, as in *LIBOR VI*, it is appropriate to draw a line between persons who transacted directly with Defendants and those who did not.

---

[12] Since *Gelboim*, at least one other court has found non-direct plaintiffs to be efficient enforcers. *See Merced Irrigation Dist. v. Barclays Bank PLC*, No. 15 CIV. 4878 (VM), 2016 WL 6820738, at *4 (S.D.N.Y. Nov. 10, 2016). In *Merced*, the plaintiff did not deal directly with Barclays, but instead "ended up on the wrong side of an independent" contract, the terms of which referenced the indexes allegedly manipulated by Barclays. *Id.* (citations omitted). The court recognized that it was "unclear how many entities are parties to contracts that reference the indexes at issue" and that, "if Barclays were to be held responsible for all of them, it would greatly expand Barclay's potential liability." *Id.* Nevertheless, the court concluded that "this factor is unlikely to have as much weight as it did in *Gelboim*, where innumerable financial instruments all over the world relied upon LIBOR to determine rates of return, because the scope of Merced's action is *limited to contracts which settled against the indexes at four Western United States based trading hubs.*" *Id.* (internal quotation marks and citations omitted) (emphasis added). The limited scope of the plaintiffs' transactions in *Merced* is not present here.

**(b)** **Existence of More Direct Victims**

Whether there is a more direct victim of Defendants' alleged antitrust violation turns "chiefly on whether the plaintiff is a consumer or a competitor." *Gelboim*, 823 F.3d at 779. The plaintiff's status, however, "is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the plaintiff is a consumer or a competitor." *Id.* (citing *Sunbeam Television Corp. v. Nielsen Media Research, Inc.,* 711 F.3d 1264, 1273 (11th Cir. 2013)). "'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779.

In *Gelboim*, the Second Circuit recognized that "one peculiar feature of [that] case [was] that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks." *Id.* Accordingly, the Second Circuit concluded that this factor "may have diminished weight." *Id.*; *see generally Daniel*, 428 F.3d at 443 (2d Cir. 2005) ("[T]he weight to be given the various [efficient enforcer] factors will necessarily vary with the circumstances of particular cases."). *Gelboim*'s "peculiar feature" is also present here. Those who transacted in Platinum and Palladium Investments with other market participants would be injured to the same extent and in the same way as Defendants' direct customers. Therefore, this factor carries diminished weight in this case. *See Sullivan v. Barclays*, 2017 WL 685570, at *17 (concluding that plaintiffs "who engaged in a . . . transaction as counterparty to a defendant employing the price-fixers were in the immediate impact zone of the defendant's unlawful conduct" and are sufficiently direct victims; "plaintiffs who had no such dealings with a defendant would not"); *see also LIBOR VI*, 2016 WL 7378980, at *17.

(c)       **Speculative Damages**

"[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779.  Whether damages calculations will be too speculative and, therefore, unreliable, depends on "the nature and complexity of the alleged antitrust violation." *Id.* "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *see also Gelboim*, 823 F.3d at 780 ("Impediments to reaching a reliable damages estimate often flow from the nature and complexity of the alleged antitrust violation.") (citing *DDAVP*, 585 F.3d at 689).  "At the same time, some degree of uncertainty stems from the nature of antitrust law." *Gelboim*, 823 F.3d at 779.

To prove their claim, Plaintiffs will carry the burden of coming forward with "'a just and reasonable estimate' of damages." *Id.* (quoting *Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988)).  As with most antitrust cases, to establish damages, Plaintiffs will have to offer a reliable "but-for" world.  IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust Principles & Their Application § 395d (3d ed. 2007) (explaining that, in seeking antitrust damages, the plaintiff must "prov[e] the price that is actually paid . . . [and] the price that it would have paid 'but for' the conspiracy"); *see also Sullivan v. Barclays*, 2017 WL 685570, at *18 (stating that, "[t]o prove damages in this case, plaintiffs will have to offer a reliable 'but for' [interest rate benchmark] calculation"); *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293 DLC, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("In this [antitrust] case . . . the damages will be calculated by subtracting the but-for prices of e-books from the prices paid by class members.").  At a minimum, that "but-for" world will require Plaintiffs to establish (1) what an alternative Fix Price would have been absent collusion, and (2) the behavior of Platinum and Palladium Investments absent a Fix Price affected by collusion.  As alleged in the SAC, the effect of the Fixing reverberated

worldwide, affecting numerous market participants and various OTC markets and exchanges where physical platinum and palladium and Platinum and Palladium Investments are traded.  Thus, the Court would have to assess the ripple effects of the Fixing and determine whether and how numerous market participants, many of whom had no relationship with Defendants, reacted to the allegedly artificial Fix Price.

Plaintiffs argue that computing damages in this case would be relatively straightforward because "[h]ere, there is only one benchmark, the Fixing, which affects all derivatives."  Pls.' Opp'n at 31.  That argument is far too simplistic.  First, although the Fix Price is the only "benchmark," it is not the only variable in Plaintiffs' "but-for" world.  Plaintiffs do not dispute that the platinum and palladium prices are subject to other market forces, irrespective of any alleged collusion or manipulation.  As alleged in the SAC, the platinum and palladium Fix Prices were "the globally accepted benchmark prices . . . used in a plethora of transactions for platinum and palladium worldwide."  SAC ¶ 2.  Once the Fixing Calls concluded and the Fix Price was set, that price did not remain static.  Market forces unrelated to the alleged manipulation—present and at play both before and after the Fixing—resulted in price fluctuations across each day.  *See, e.g.*, SAC, figs. on pp. 35, 53, 54, 59-65.  Although Plaintiffs allege that the effect of the Fixing "lingered far longer than economists would expect to see if a price movement was caused" by market forces not subject to manipulation, SAC ¶ 163, Plaintiffs do not dispute that the price varied throughout each day and across all days within the Class Period.  Moreover, even on days allegedly affected by the Fixing, prices varied considerably; Plaintiffs' statistical analyses show significant rebounds in the price shortly after the Fixing, suggesting that damages may be affected not only by the trade date, but also by the specific trade time.

Plaintiffs further allege that the spot, Fix Price, and NYMEX settlement prices "exhibit an almost perfect correlation," *e.g.*, SAC ¶ 91, and that there is a "correlation between the prices

reached at the Fixing and in the markets for Platinum and Palladium Investments," SAC ¶ 92.  Even when statistically significant, however, correlation does not necessarily imply causation.  Thus, while Plaintiffs maintain that the price behavior throughout the Class Period exhibited a pattern consistent with artificial price suppression, given the sheer number of market participants and exchanges that rely on the Fixing, it is not clear to the Court how Plaintiffs will be able to control for any single variable when calculating damages in the "but-for" world.  The presence of intervening factors further supports the finding that the chain of causation between Defendants' alleged price manipulation scheme and any injury Plaintiffs may prove too attenuated.  *See Laydon* 2014 WL 1280464, at \*10 ("Analysis of Plaintiff's injury would require the reconstruction of hypothetical 'but-for' Euroyen TIBOR and Yen-LIBOR benchmark rates during the period Plaintiff held his positions.  The Court cannot hypothesize the impact of these 'but-for' benchmark rates on the perceptions of the market participants whose activities would have influenced the prices of Euroyen TIBOR futures contracts."); *see also Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980) (finding damages too speculative where numerous intervening factors could have affected the market such that the "court's task of tracing [those variables] would be difficult, if not impossible"); *Sullivan v. Barclays*, 2017 WL 685570, at \*19.

Second, Plaintiffs' damages theory is that, as a result of Defendants' artificial price suppression, they were forced to sell derivatives at lower prices than those that would have resulted from market forces not subject to manipulation, and that those prices were artificially low as a result of Defendants' manipulation of the Fix Price.  Plaintiffs maintain that as result of being forced to sell derivatives at lower prices, they suffered losses and reduced profits.  That theory only accounts for one side of the equation.  Simply put, profit is the difference between a purchase price and a sale price.  Plaintiffs allege that their sale prices were depressed, but they do not account for the impact of the Fix on their purchase price.  If the effect of the Fix was constant, there may be no impact on

their profit, since both purchase and sale prices were similarly suppressed.  To prove damages, therefore, Plaintiffs will have to establish not only the price at which they sold their derivatives during the Class Period, but also the price at which they first acquired the derivatives.  Furthermore, they will have to show that their purchase price was somehow less affected by the Fixing than their sale price.

As pleaded, Plaintiffs will have to determine not only the sale price for those derivatives, but also the purchase price from a vast—and yet undetermined—number of market participants who are not defendants in this case.  This type of speculative undertaking might be mitigated if Plaintiffs had had direct dealings with Defendants, but none of the named Plaintiffs had such a relationship. *See, e.g.*, *Sullivan v. Barclays*, 2017 WL 685570, at *19 (finding that determining damages for plaintiffs who had direct dealings with the defendants "would still require the calculation of the hypothetical unaffected Euribor rate at multiple points in time.  But [those plaintiffs] ought to be able to identify specific transactions in which a remaining named defendant was a counterparty and that defendant, based upon its own records, ought to be able to intelligently respond.").

The Court does not purport to question Plaintiffs' or their experts' ability to construct some model to estimate damages despite these many complications.  But, as noted above, any damages estimate would necessarily require Plaintiffs to put forth evidence to support a just and reasonable estimate of their damages.  *Gelboim*, 823 F.3d at 779 (citing *Nat'l Football League*, 842 F.2d at 1378).  Given Plaintiffs' definition of the proposed class, "it is difficult to see how [Plaintiffs] would arrive at such an estimate, even with the aid of expert testimony."  *Gelboim*, 823 F.3d at 779.  "[T]o find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy in [a] market . . . where countless other market variables could have intervened to affect those pricing decisions."  *Reading*, 631 F.2d at 13-14.  These concerns reinforce the appropriateness of drawing a line between persons who transacted directly with Defendants and

those who did not.  The task of computing damages for persons who, for example, had direct

dealings with Defendants would not be a simple undertaking.  But at the very least, those who had

direct dealings with Defendants would be able to identify specific transactions to which Defendants

were counterparties.  Under those circumstances, damages computation would require plausible

computations rather than financial models so attenuated as to approach hopeless speculation.

(d)  **Duplicative Recovery & Complex Damages Apportionment**

The Court need not discuss the risks of duplicative recovery and complex damages

apportionment at length.  *Gelboim* observed that "[t]he transactions that are the subject of

investigation and suit are countless and the ramified consequences are beyond conception."  823

F.3d at 780.  That characterization is equally applicable to the facts of this case.  Here, Defendants

represent a subset of the fifty-two LPPM members and a subset of the LPPM market-making

members.  SAC ¶¶ 31, 33, 35, 37, 44-45, 67.  But the SAC asserts claims on behalf of all market

participants, including persons who have not transacted with Defendants.  Plaintiffs ask that these

few Defendants be held liable for the conduct of all other market participants:  The extent of their

potential liability is enormous, and the allocation of responsibility for the claimed damages will be

extremely challenging.  "In certain of these transactions, it may not even be apparent which party

profited and which party was injured by the [alleged price] manipulation; given the nature of these

transactions, there would surely be instances in which both sides would claim to have suffered

injury."  *Sullivan v. Barclays*, 2017 WL 685570, at *19.  That concern may well dissipate—at least to

some extent—if the plaintiff group is limited to those who transacted directly with Defendants.

Those plaintiffs would be better able to ascertain profits and losses in transactions to which

Defendants were counterparties.  *See id.*  The risks of duplicative recovery and complex

apportionment of damages will not be eliminated by limiting the claims in that way, but they will be

considerably mitigated.

\*       \*       \*

Although Plaintiffs have sufficiently alleged antitrust injury for the purpose of establishing antitrust standing, the Court concludes that Plaintiffs are not efficient enforcers of the antitrust laws and, therefore, are not the "proper party 'to perform the office of a private attorney general' and . . . 'vindicate the public interest in antitrust enforcement.'" *Gelboim*, 823 F.3d at 780 (quoting *Gatt*, 711 F.3d at 80). Accordingly, Defendants' motion with respect to this count is granted and Plaintiffs' Sherman Act claim is dismissed. As the Second Circuit observed, and as noted above, "not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Id.* at 779.

### C. Commodities Exchange Act ("CEA") Claims

Plaintiffs' CEA claims include: (1) market manipulation in violation of 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.2; (2) employment of a manipulative or deceptive device and delivery of false reports in violation of 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.1; (3) principal-agent liability in violation of 7 U.S.C. §§ 1 *et seq.*; and (4) aiding and abetting manipulation in violation of 7 U.S.C. §§ 1 *et seq.* Defendants move to dismiss all claims, arguing that (1) the CEA does not extend to the alleged foreign transactions and conduct; (2) Plaintiffs lack standing to assert CEA claims because they have not alleged actual damages; and (3) the SAC does not adequately plead a claim under the CEA. Defs.' Joint Br. at 30.

### 1. Extraterritoriality

Defendants argue that the CEA does not reach the alleged price manipulation here because the Fixing Calls took place abroad and the CEA does not apply to extraterritorial conduct concerning a foreign commodity. Defs.' Joint Br. at 31-34. The parties agree that *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), governs the question of whether Plaintiffs' CEA claims require an impermissible extraterritorial application of the CEA. Defs.' Joint Br. at 31; Pls.'

Opp'n at 32.  Although *Morrison* analyzed the extraterritorial reach of §§ 10(b) and 20(a) of the

Securities Exchange Act of 1934, the Second Circuit has since endorsed the application of the

*Morrison* framework to claims brought under the CEA.  *See, e.g.*, *Loginovskaya v. Batratchenko*, 936 F.

Supp. 2d 357 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 266 (2d Cir. 2014) (reviewing and affirming the district

court's application of the *Morrison* framework to CEA claims); *see also Chan Ah Wah v. HSBC N. Am.*

*Holdings Inc.*, No. 15 CIV. 8974 (LGS), 2016 WL 4367976, at *3 (S.D.N.Y. Aug. 11, 2016); *Starshinova*

*v. Batratchenko*, 931 F. Supp. 2d 478, 486 (S.D.N.Y. 2013).

     *Morrison* reaffirmed the "longstanding principle of American law 'that legislation of

Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of

the United States.'"  561 U.S. at 255 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248

(1991)).  The Supreme Court observed that "[t]his principle represents a canon of construction, or a

presumption about a statute's meaning, rather than a limit upon Congress's power to legislate," and

"rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign

matters."  *Id.* (citing *Blackmer v. United States*, 284 U.S. 421, 437 (1932), *Smith v. United States*, 507 U.S.

197, 204 n.5 (1993)).

     *Morrison* established the following framework for deciding questions regarding the

extraterritorial application of federal statutes.  First, unless Congress's intention to give a statute

extraterritorial effect is "clearly expressed," courts "must presume it is primarily concerned with

domestic conditions."  *Id.* (citations omitted).  In other words, "[w]hen a statute gives no clear

indication of an extraterritorial application, it has none."  *Id.*  Second, if a statute applies only

domestically, a court must determine which domestic conduct it regulates.  *Id.* at 266-67.  This is

because "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the

territory of the United States.  But the presumption against extraterritorial application would be a

# SPA-53

craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 266 (emphasis in original).

Addressing those questions, the Supreme Court held that § 10(b) only applies to "transactions in securities listed on domestic exchanges[ ] and domestic transactions in other securities." *Morrison*, 561 U.S. at 267. "'With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . .'" *Morrison*, 561 U.S. at 268 (emphasis in original); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012). Although *Morrison* did not further define a domestic transaction, the Second Circuit addressed that issue in *Absolute Activist*. There, the Second Circuit held that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67.

The Second Circuit has evaluated the first *Morrison* prong in the context of a CEA claim. In *Loginovskaya*, the Second Circuit held that, because "[t]he CEA as a whole . . . is silent as to extraterritorial reach," courts must "'presume it is primarily concerned with domestic conditions.'" 764 F.3d at 271-72 (quoting *Morrison*, 561 U.S. at 255). Interpreting § 22 of the CEA, which creates a private right of action under the Act, the court reasoned that "the focus of § 22 . . . [is] domestic conduct, domestic transactions, or some other phenomenon localized to the United States." *Id.* at 272. The focus of Congress's concern, therefore, was "clearly transactional." *Id.* at 272. The court concluded that "the CEA creates a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere." *Id.* at 273. Addressing the second prong of *Morrison*, the Second Circuit stated that "there is no reason why *Absolute Activist's* formulation should not apply" to CEA claims, and, therefore, that plaintiffs asserting CEA claims must "demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States." *Id.* at 274. Thus,

the Court must determine whether the transactions at issue here are "domestic" within the meaning of *Morrison* and *Absolute Activist*.

Plaintiffs assert that the "vast majority" of the derivatives contracts at issue in this action were traded on NYMEX. Pls.' Opp'n at 37. Because NYMEX is a domestic exchange, they maintain, trades on NYMEX—including platinum and palladium derivatives contracts—do not require an impermissible extraterritorial reach of their CEA claims. *Id.* at 34. With respect to OTC transactions, Plaintiffs maintain their allegations are limited to those OTC derivatives contracts where "incurrence of liability and/or the passing of an interest equivalent to 'title' happened within the U.S." *Id.* Defendants do not appear to dispute that NYMEX is a domestic exchange; in fact, Defendants described it as a "U.S.-based derivatives exchange[ ]." Defs.' Joint Br. at 33. Defendants also do not appear to take issue with the assertion that Plaintiffs' OTC transactions are limited to those that incurred liability in the U.S. or those where title passed within the U.S.

The crux of Defendants' argument is that Plaintiffs' CEA claims do not apply to "bids, asks, and trades made by *foreign* employees of mostly *foreign* corporations in a *foreign* auction for a *foreign* physical commodity." Defs.' Joint Br. at 31. That argument lacks merit. The Second Circuit's conclusion in *Absolute Activist* could not have been clearer: for the purpose of determining whether a transaction is "domestic" within the meaning of *Morrison*, "a party's residency or citizenship is irrelevant." 677 F.3d at 70. "While it may be more likely for domestic transactions to involve parties residing in the United States, '[a] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States.'" *Id.* (quoting *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010)).[13] "Rather

---

[13] Defendants' reliance on *Parkcentral Global Hub, Ltd. V. Porsche Automobile Holdings SE* is unavailing. In *Parkcentral*, the Second Circuit applied the *Morrison* and *Absolute Activist* tests to claims under § 10(b) against foreign defendants for securities transactions relating to securities-based swap agreements pegged to the foreign defendants' stock

than looking to the identity of the parties, the type of security at issue, or whether each individual

defendant *engaged in conduct within the United States*," the Second Circuit held "that a securities

transaction is domestic when the parties incur irrevocable liability to carry out the transaction within

the United States or when title is passed within the United States." *Absolute Activist*, 677 F.3d at 69.

With respect to the "vast majority" of transactions at issue in this action, the Court

concludes that, as derivatives contracts traded on NYMEX, they are "transactions in securities listed

on [a] domestic exchange[ ]." *Morrison*, 561 U.S. at 267.  With respect to any OTC platinum and

palladium derivatives, which Plaintiffs acknowledged in their opposition as limited to those where

liability was incurred or title transferred in the United States, the Court concludes that those are

domestic as defined in *Absolute Activist*.[14]  Accordingly, Plaintiffs' CEA claims do not implicate an

impermissible extraterritorial application of the statute.  *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 696

(concluding that a claim is within the "CEA's domestic application if it involves (1) commodities in

interstate commerce or (2) futures contracts traded on domestic exchanges" and concluding that

---

value.  763 F.3d 198, 201 (2d Cir. 2014) (per curiam) (emphasis added).  The court held that allowing the claims to proceed "would constitute an impermissibly extraterritorial application of the statute." *Id.*  In so holding, the court expressly stated that its "ultimate conclusion that this suit seeks impermissibly to extend § 10(b) extraterritorially *depends in some part on the particular character of the unusual security at issue.*" *Id.* at 201-02.  The court "express[ed] no view whether [it] would have reached the same result if the suit were based on different transactions." *Id.*  Courts in this district have declined to extend the *Parkcentral* analysis on that basis.  *See, e.g.*, *In re Poseidon Concepts Sec. Litig.*, No. 13-CV-1213 (DLC), 2016 WL 3017395, at *12-13 (S.D.N.Y. May 24, 2016) (concluding that purchases of OTC stock in the U.S. is a "domestic transaction in other securities" within the meaning of *Morrison* and holding that *Parkcentral* was inapposite); *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165, at *8 (S.D.N.Y. Jan. 12, 2015) ("Given the differences in the nature of the securities involved in *Parkcentral* from the Subordinated Notes at issue here, that case does not alter the Court's conclusion that Plaintiffs have adequately pled that the Exchange Act applies.").  For those reasons, the Court similarly declines to extend the *Parkcentral* holding to the transactions at issue in this action.

[14] The Court notes that, although Plaintiffs cite several paragraphs in the SAC as support for their assertion that the OTC transactions at issue are limited to transactions where liability was incurred or title was transferred in the United States, the allegations in the SAC are not so limited.  In light of the Court's conclusion, and the Second Circuit's holding in *Absolute Activist*, however, any OTC transactions that fall outside those limitations will necessarily require an impermissible extraterritorial application of the CEA.  To the extent that the SAC seeks to assert claims regarding OTC contracts where irrevocable liability to carry out the transaction occurred or where title was transferred outside the United States, such claims must be, and are, dismissed.

"plaintiffs' claims involve manipulation of the price of domestically traded futures contracts" and therefore do not implicate an impermissibly extraterritorial application of the CEA).

### 2. Standing Under the CEA

Section 22 of the CEA creates a private right of action for any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D). To have standing to sue under the Act, the plaintiff must show that he or she suffered "actual damages" as a result of the manipulation. 7 U.S.C. § 25(a)(1); *see also In re Silver*, 2016 WL 5794777, at *18 (citations omitted). To establish "actual damages" a plaintiff must show an "'actual injury caused by the violation.'" *In re Silver*, 2016 WL 5794777, at *18 (quoting *LIBOR II*, 962 F. Supp. 2d at 620); *see also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010) (finding that plaintiffs had standing to sue under the CEA because they established that they "suffered net losses . . . caused by the [defendants'] alleged [price] manipulation"). When "CEA claims are based on discrete, episodic instances of manipulation, plaintiffs must allege that they 'engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct, and that the artificiality was adverse to their position.'" *In re Silver*, 2016 WL 5794777, at *18 (quoting *LIBOR II*, 962 F. Supp. 2d at 622).

Defendants argue that Plaintiffs do not have standing under the CEA because Plaintiffs have not alleged that they sold Platinum and Palladium Investments during time periods when prices were allegedly suppressed. Defs.' Joint Br. at 35. If Plaintiffs purchased derivatives at artificially low prices, Defendants argue, they could have potentially benefited from the alleged price manipulation by selling them at slightly higher prices. *Id.*

As several courts in this district have held, however, where plaintiffs allege that they transacted "at artificial prices, injury may be presumed." *In re Amaranth*, 269 F.R.D. at 380; *see also In*

*re Silver*, 2016 WL 5794777, at *18; *In re Gold*, 2016 WL 5794776, at *21. Unlike federal securities

cases, "courts have observed that loss causation is not a statutory element of proof under the CEA."

*In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 60 (S.D.N.Y. 2012) (collecting cases). In

securities fraud actions, which require a showing of loss causation,

> a securities fraud plaintiff purchasing or selling stock before a
> corrective disclosure occurs cannot plausibly allege injury from the
> fraud. Thus, a loss causation requirement can dispose of such a
> securities fraud claim at the pleading stage. However, in the context
> of a CEA manipulation claim, there is no similar bright line indicating
> when losses begin or cease to accrue. And the period during which
> the manipulative activity occurs is not necessarily a proxy for the
> period when losses attributable to artificial prices occur. . . . The issue
> of "actual damages" thus becomes a complex factual inquiry.

*Id.* (citing *Initial Public Offering Securities Litig.*, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003)); *see also*

*Sullivan v. Barclays*, 2017 WL 685570, at *31.

Defendants point to *LIBOR II* in support of their argument that Plaintiffs lack standing

under the CEA because they fail to allege that they "'engaged in a transaction *at a time* during which

prices were artificial.'" Defs.' Joint Br. at 36 (quoting *LIBOR II*, 962 F. Supp. 2d at 622 (emphasis in

Defs.' Joint Br.). But the reference to "time" in *LIBOR II* was to *days*, not hours or minutes. In

addition, the district court expressly distinguished the "persistent suppression theory," where it did

not require plaintiffs to allege specific days on which they traded, from the "trader-based

manipulation theory," where it did impose that requirement. *Id.* For the group of plaintiffs alleging

persistent suppression, the court reasoned that because "LIBOR, and consequently Eurodollar

futures prices, was allegedly artificial throughout the Class Period," plaintiffs need not match specific

trades with days on which they alleged LIBOR manipulation. *Id.* For the trader-based allegations,

however, the court reasoned that the claims "would entail only that LIBOR was artificial for certain

discrete days during the Class Period, and thus the allegation that plaintiffs traded during the Class

Period is insufficient to show that plaintiffs suffered actual damages." *Id.*

The *LIBOR II* "persistent suppression theory" reasoning applies here.  Plaintiffs allege that they sold platinum and palladium derivatives on dates when Defendants allegedly artificially suppressed the Fix Price for those commodities.  *See, e.g.*, SAC apps. A-D.  Plaintiffs also allege that the platinum and palladium Fix Prices were artificially low throughout the Class Period as a result of Defendants' ongoing manipulation scheme.  *See, e.g.*, SAC ¶ 215.  As set forth in four appendices attached to the SAC, to the extent that Plaintiffs were able to cross-reference sale dates with artificial suppressions dates, the lists they generated are "preliminary."  *Id.*  At the pleading stage, those allegations and preliminary lists are sufficient.  Accordingly, Plaintiffs have adequately alleged that they suffered actual damages as a result of Defendants' price manipulation.  *See, e.g.*, *Sullivan v. Barclays*, 2017 WL 685570, at *31 (concluding that plaintiffs have sufficiently alleged actual damages to establish standing under the CEA and stating that "plaintiffs' allegations do not purport to be the exclusive universe of defendants' alleged manipulation.  It ultimately remains plaintiffs' burden to prove through reliable evidence that they suffered actual loss based on defendants' manipulation of the [interest rate benchmark], but at the pleading stage, they have adequately alleged that they were damaged by the [benchmark's] manipulation.").

### 3.  CEA Violations

#### a.  Legal Standard

The parties disagree regarding the pleading standard applicable to Plaintiffs' CEA claims. Defendants argue that, although Plaintiffs allege price manipulation, their allegations sound in fraud and are therefore subject to the heightened pleading standard dictated by Federal Rule of Civil Procedure 9(b).  Defs.' Joint Br. at 36.  Plaintiffs argue that Defendants mischaracterize their claims; they maintain that the SAC only alleges that Defendants took advantage of their control of the market in order to collude and suppress prices.  Pls.' Opp'n at 39.  Plaintiffs maintain that, based on those allegations, Rule 8(a) is the applicable pleading standard to their CEA allegations.  *Id.* at 37-38.

Pursuant to Federal Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* In this district, "[m]ost courts . . . apply [a] case-by-case approach to determine whether Rule 9(b) applies to claims of manipulation under the CEA." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *see also Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42, 47 (S.D.N.Y. 2016); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008); *In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007). Other courts have held that Rule 9(b) applies generally in CEA manipulation cases because "market manipulation is inherently deceptive." *In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 ("*Amaranth III*") (2d Cir. 2013).

Notwithstanding Plaintiffs' attempt to cast their claims as Defendants' abuse of market power, the allegations in the SAC plainly sound in fraud. For example, Plaintiffs allege that Defendants submitted "false, misleading, or inaccurate reports of the Fixing, *i.e.*, false reports concerning market information or conditions that affected or tended to affect both prices of platinum and palladium and prices of platinum and palladium futures and options." SAC ¶ 298; *see also id.* ("Defendants and co-conspirators did so either knowingly, intentionally, or with reckless disregard of the fact that such reports were false, misleading, or inaccurate."). Plaintiffs elsewhere allege that Defendants operated a secret cartel and utilized chat rooms, instant messages, phone calls, and proprietary trading venues and platforms with the intent to mislead market participants and profit at others' expense. *See, e.g.*, SAC ¶¶ 171, 248. Thus, Rule 9(b) is the appropriate pleading standard with which to evaluate Plaintiffs CEA allegations. *See, e.g.*, *FOREX*, 2016 WL 5108131, at *19 (concluding that Rule 9(b) applies to plaintiffs' CEA claims where they alleged collusive acts

committed in secret and where traders acted with the intent to mislead defendants' customers); *see also LIBOR I*, 935 F. Supp. 2d at 713-14 (applying Rule 9(b) to plaintiffs' market manipulation claims where the allegations "sound[ed] in fraud and thus must be pled with particularity" and where "the claim [was] that defendants, by submitting artificial LIBOR quotes, misled the market with regard to future levels of LIBOR, and by extension future prices of Eurodollar contracts, and thus caused Eurodollar contracts to trade at artificial prices").

Despite the generally rigid requirement that fraud be pleaded with particularity, the Second Circuit has recognized that "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (citing *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002)). As a result, the heightened pleading standard under 9(b) "is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Silver*, 2016 WL 5794777, at *19 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), quoting *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)); *see also Sullivan v. Barclays*, 2017 WL 685570, at *30. Here, in addition to price manipulation, Plaintiffs also allege that Defendants engaged in manipulative trading practices. The pleading standard applicable to those claims remains an open issue in this Circuit. *See In re Gold*, 2016 WL 5794776, at *22 (citations omitted). The Court need not address this issue, however, because it concludes that the SAC meets the more stringent 9(b) standard.

### b. Price Manipulation Claim

Plaintiffs bring a CEA price manipulation claim under Sections 6(c)(3) and 9(a)(2) and CFTC

Rule 180.2, which make it unlawful for "any person to manipulate or attempt to manipulate the price

of any commodity in interstate commerce, or for future delivery on or subject to the rules of any

registered entity, or of any swap . . ." and for any person to "directly or indirectly . . . manipulate or

attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for

future delivery on or subject to the rules of any registered entity."  7 U.S.C. §§ 9(3), 13(a)(2); *see also*

17 C.F.R. § 180.2 ("It shall be unlawful for any person, directly or indirectly, to manipulate or

attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for

future delivery on or subject to [CFTC rules and regulations].").  "The CEA is a 'remedial statute

that serves the crucial purpose of protecting the innocent individual investor—who may know little

about the intricacies and complexities of the commodities market—from being misled or deceived.'"

*Loginovskaya*, 764 F.3d at 270 (quoting *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.,* 310

F.3d 1321, 1329 (11th Cir. 2002)).

To state a claim for market manipulation under the CEA, Plaintiffs must allege that:  (1) the

defendant "possessed an ability to influence market prices;" (2) "an artificial price existed;" (3) the

defendant "caused the artificial price; and" (4) the defendant "specifically intended to cause the

artificial price."  *Amaranth III*, 730 F.3d at 173 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610

F.3d 239, 246-47 (5th Cir. 2010) (internal quotation marks omitted)); *see also In re Crude Oil Commodity

Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007); *In re Nat. Gas

Commodity Litig.* ("*In re Natural Gas I*"), 337 F. Supp. 2d 498, 507 (S.D.N.Y. 2004)).  "There is thus no

manipulation without intent to cause artificial prices."  *In re Amaranth III*, 730 F.3d at 183.

The SAC adequately pleads a manipulation claim under Rule 9(b).  First, Plaintiffs plausibly

allege Defendants' ability to influence market prices.  "[T]he ability to influence prices can manifest

itself in various ways, including the exercise of market power." *Parnon Energy*, 875 F. Supp. 2d at 245; *see also In re Amaranth*, 269 F.R.D. at 383 (concluding that the ability to influence prices can be evaluated by determining whether defendant held a dominant market position and whether such a market position would allow it to manipulate prices).

Defendants' sole basis for disputing the contention that they had the ability to influence market prices is that, although the SAC alleges a price manipulation claim by collective action, Plaintiffs have not adequately pleaded the existence of a conspiracy necessary to show that Defendant had the ability to influence prices. Defs.' Joint Br. at 40. Because the Court already found that the SAC adequately pleads a conspiracy, *see supra*, Part III.B(1), it need not repeat that analysis here. It is worth reiterating, however, that, according to the SAC, Defendants are five of thirteen market making-members that form "the heart of the LPPM." SAC ¶¶ 67, 71. Moreover, the four Fixing Members form and exclusively control the LPPFC, the vehicle for the alleged price manipulation. SAC ¶¶ 1, 47. Through their control of the Fixing process and their role as LPPM market makers, the Court finds that the first element of Plaintiffs' CEA manipulation claim is met.

With respect to the second element, an artificial price is "a price that 'does not reflect basic forces of supply and demand.'" *In re Term Commodities Cotton Futures Litig.*, No. 12 CIV. 5126 ALC KNF, 2013 WL 9815198, at *17 (S.D.N.Y. Dec. 20, 2013) (quoting *Parnon Energy Inc.*, 875 F. Supp. 2d at 246), *on reconsideration in part on other grounds*, No. 12 CIV. 5126, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014). "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.,* No. 11 Md. 2213(RPP), 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) (citing *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998)). The allegations in the SAC sufficiently plead the existence of artificial platinum and palladium prices throughout the Class

Period.  For example, Plaintiffs alleged a pattern of downward spikes at and around the Fixing.

SAC ¶¶ 115-118 & figs. on pp. 53-54.  Plaintiffs also allege that the AM and PM Fixing's downward

spikes stand out as against movement at any other time of day.  SAC ¶¶ 115-134 & figs. on pp.

53-54, 56-57, 59-65, 68-75.

Relying on *In re Commodity Exch., Inc., Silver Futures*, Defendants argue that the SAC does not

adequately plead this element because Plaintiffs have not alleged that the platinum and palladium

prices during the Class Period "did not . . . comport with contemporaneous prices in comparable

markets."  Defs.' Joint Br. at 38.  Because the SAC alleges a near-perfect to perfect correlation

between the spot prices and the futures platinum and palladium prices, Defendants' maintain,

Plaintiffs have in fact demonstrated that price movement in the comparable the futures market was

entirely consistent with the commodities' price movement.  *Id.*  Defendants' argument fails for at

least three reasons.

First, Defendants misread *In re Commodity Exch., Inc., Silver Futures.*  The court's reference to

other markets comparable to silver was with respect to markets for other commodities, not the

markets for silver derivatives.  2012 WL 6700236, at *13.  Second, the Court is not aware of any

cases suggesting that a "comparable market" allegation is required in order to successfully plead a

CEA manipulation claim.  In fact, *In re Commodity Exch., Inc., Silver Futures* described artificial prices

as "those prices that do not reflect the forces of supply and demand in the market *or* do not

otherwise comport with contemporaneous prices in comparable markets."  *Id.* at *12 (emphasis

added).  Third, Defendants' argument that the correlation between the spot and futures and spot

and ETF prices during the Class Period shows that the Fix Prices were not artificial misses the mark.

Plaintiffs allege that the Fixing set the global benchmark for platinum and palladium and that

exchange prices closely track the platinum and palladium spot price.  That is the essence of

Plaintiffs' claims.  Defendants have not explained why platinum and palladium spot, Fix, and

derivatives would exhibit a different correlation in the absence of the alleged price manipulation than they would if the Fix Price was artificially suppressed.

Plaintiffs also adequately plead that Defendants' conduct was the "proximate cause of the price artificiality." *In re Commodity Exch., Inc., Silver Futures*, 2012 WL 6700236, at *16. Plaintiffs have identified multiple days on which atypical downward pricing spikes occurred distinctly around the Fixing Calls and have provided ample examples showing predictable price movements in the platinum and palladium derivatives market. *See, e.g.*, SAC ¶¶ 131-134 & figs. on pp. 70-75. While Plaintiffs acknowledge that Defendants were not operating in a vacuum, and that other market participants and forces were present, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185. At the pleading stage, "[i]t is enough, for purposes of a finding of manipulation in violation of . . . the [CEA] that [the defendants'] action *contributed* to the price [movement]." *Parnon Energy*, 875 F. Supp. 2d at 248 (emphasis added) (internal quotation marks and citations omitted) (alterations in original). Thus, the Court finds that the SAC sufficiently pleads that Defendants' alleged price manipulation was at least one cause of the artificial pricing during the Class Period.

Finally, to adequately plead the specific intent element, Plaintiffs must allege that Defendants "'acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand.'" *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (quoting *Parnon*, 875 F. Supp. 2d at 249). "A generalized intent to obtain trading profits 'which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent.'" *Id.* at 532-33 (quoting *In re Crude Oil Commodity*, 2007 WL 1946553, at *8). "The specific intent to cause a market distortion, scienter, can be pled by 'alleging facts (1) showing that the defendants had

both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Amaranth I*, 587 F. Supp. 2d at 530 (quoting *ATSI*, 493 F.3d at 99).

The SAC adequately pleads scienter.  First, as discussed above, Plaintiffs allege that the Fixing Members were motivated to manipulate the Fix Price for platinum and palladium because doing so provided them with arbitrage opportunities in both the physical and derivatives platinum and palladium markets.  *See, e.g.*, SAC ¶¶ 185-186.  Plaintiffs further allege that foreknowledge of the Fixing allowed Defendants to capitalize on their price manipulation by strategically buying and selling physical platinum and palladium and platinum and palladium futures at opportune times during or around the Fixing window.  *See, e.g.*, SAC ¶¶ 200-201.  Such allegations are sufficient to establish motive because they "'entail concrete benefits that could be realized by'" Defendants' price manipulation.  *Amaranth I*, 587 F. Supp. 2d at 530 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)); *see also LIBOR I*, 935 F. Supp. 2d at 715 (concluding that plaintiffs plausibly pleaded scienter by alleging that "defendants specifically intended to manipulate the price of Eurodollar futures contracts" and identified "concrete benefits that defendants stood to gain from manipulating Eurodollar futures contract prices").  In addition, because the Fixing Members were in complete control of the Fixing Process, they were able to implement the alleged price manipulation in an ideal setting—and with the veneer of legitimacy—during the Fixing Calls and via communications between the LPPFC members.  Thus, Defendants were perfectly situated to implement and execute the alleged price manipulation scheme.  *See Laydon*, 2014 WL 1280464, at *5 (reasoning that defendants' positions in the market furnished an opportunity to engage in price manipulation); *see also In re Silver*, 2016 WL 5794777, at *21; *In re Gold*, 2016 WL 5794776, at *24.[15]

---

[15] Defendants argue that Plaintiffs' "net 'short' position" theory is insufficient to establish motive.  Defs.' Joint Br. at 43-45.  As discussed above, *see supra* Part III.B(1)(b), the Court agrees.  Regardless, even if Plaintiffs are able to establish that Defendants held large net short positions during the Class Period and profited from holding those

Plaintiffs have also alleged sufficient facts to show that Defendants engaged in conscious misbehavior or, at least, acted with recklessness in artificially suppressing the Fix Price.  The four Fixing Members were the *only* members of the LPPFC.  As such, the Fixing Member were in complete control over the Fixing process and fully aware of their ability to influence it.  Based on the facts alleged, it is improbable that Defendants somehow managed to artificially lower the platinum and palladium Fix Price over the course of seven years by sheer happenstance or chance. Rather, Plaintiffs allegations support the inference that the Fixing Members acted with conscious misbehavior or recklessness.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 470 (S.D.N.Y. 2014) (concluding that plaintiffs have adequately pleaded scienter based on a conscious misbehavior or recklessness theory where they alleged that defendants had submitted artificial LIBOR quotes and, given their positions and involvement in the markets, the danger of doing so was either known or so obvious that they must have been aware).[16]  Accordingly, because Plaintiffs have adequately alleged the elements of a price manipulation claim under the CEA, Defendants' motion to dismiss this claim is denied.

---

positions, such generalized motive allegations "could be imputed to any corporation with a large market presence in any commodity market," and are insufficient to show intent."  *In re Crude Oil Commodity*, 2007 WL 1946553, at *8.

[16] Defendants argue that Plaintiffs have not alleged "any particular communications supposedly evidencing Defendants' manipulative intent," and instead rely on references to "regulatory investigations into *other* entities that are not defendants here, into *other* financial benchmarks, and to articles describing alleged investigations into precious metals markets," all of which Defendants describe as an insufficient "hearsay" substitute for factual allegations. Defs.' Joint Br. at 45-46.  In a footnote, Defendants invite the Court, if it is so "inclined[,] to strike the offending allegations" and ask the Court to treat their motion as a motion to strike pursuant Federal Rule of Civil Procedure 12(f).  *Id.* at 46 n.32.  The Court is not so inclined.  First, those allegations do not form the basis of the Court's conclusions in this case.  Second, "'motions to strike under Rule 12(f) are rarely successful.'"  *Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*, 148 F. Supp. 3d 285, 292 (S.D.N.Y. 2015).  Unless there "is a strong reason for doing so . . . courts should not tamper with the pleadings."  *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 530 F. Supp. 3d 705, 731 (S.D.N.Y. 2014).  "'To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  *Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (quoting *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (alteration in original). Defendants have not met this standard, let alone attempted to meet it in their footnote.

### c.  Manipulative Device Claims

Plaintiffs bring two manipulative device claims under CEA Sections 6(c)(1), 9(a)(2), and

CFTC Rule 180.1.  Sections 6(c)(1) renders it unlawful for any person

> directly or indirectly, to use or employ, or attempt to use or employ,
> in connection with any swap, or a contract of sale of any
> commodity . . . or for future delivery on or subject to the rules of any
> registered entity, any manipulative or deceptive device or contrivance,
> in contravention [of CFTC rules and regulations].

7 U.S.C. § 9(1).  Section and 9(a)(2) renders it unlawful

> to manipulate or attempt to manipulate the price of any commodity
> in interstate commerce, or for future delivery on or subject to the
> rules of any registered entity, or of any swap . . . or knowingly to
> deliver or cause to be delivered for transmission through the mails or
> interstate commerce by telegraph, telephone, wireless, or other means
> of communication false or misleading or knowingly inaccurate
> reports concerning crop or market information or conditions that
> affect or tend to affect the price of any commodity . . . .

7 U.S.C. § 13(a)(2).  CFTC Rule 180.1 prohibits

> any person . . . in connection with any swap, or contract of sale of
> any commodity in interstate commerce, or contract for future
> delivery . . . to intentionally or recklessly:  (1) Use or employ, or
> attempt to use or employ, any manipulative device, scheme, or
> artifice to defraud; (2) Make, or attempt to make, any untrue or
> misleading statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made not untrue or
> misleading; (3) Engage, or attempt to engage, in any act, practice, or
> course of business, which operates or would operate as a fraud or
> deceit upon any person; or, (4) Deliver or cause to be delivered . . . a
> false or misleading or inaccurate report concerning crop or market
> information or conditions that affect or tend to affect the price of
> any commodity in interstate commerce, knowing, or acting in
> reckless disregard of the fact that such report is false, misleading or
> inaccurate.

17 C.F.R. § 180.1(a).

Although the CEA does not define the terms "manipulate device" or "contrivance," the

CFTC has provide the following guidance with respect to those terms:

> The language of CEA section 6(c)(1), particularly the operative
> phrase 'manipulative or deceptive device or contrivance,' is virtually
> identical to the terms used in section 10(b) of the Securities Exchange
> Act of 1934. . . .  Indeed, when the Commission promulgated Rule
> 180.1, the Commission observed that given the similarities between
> CEA section 6(c)(1) and Exchange Act section 10(b), the
> Commission deems it appropriate and in the public interest to model
> final Rule 180.1 on SEC Rule 10b-5.  Accordingly, case law
> developed under Section 10(b) of the Exchange Act and SEC Rule
> 10b-5 is instructive in construing CEA Section 6(c)(1) and
> Commission Regulation 180.1(a).

*In re Total Gas & Power N. Am., Inc.*, CFTC Dkt. No. 16-03, 2015 WL 8296610, at *8 (Dec. 7, 2015)

(internal quotation marks and citations omitted).  Nevertheless, the CFTC explained, because of

"the differences between the securities markets and the derivatives markets, the Commission will be

*guided, but not controlled*, by the substantial body of judicial precedent applying the comparable

language of SEC Rule 10b-5."  *Id.* (quoting 76 Fed. Reg. at 41,399) (emphasis added).

Defendants first argue that, because Rule 180.1 did not take effect until August 15, 2011,

Plaintiffs' manipulative device claims that predate August 15, 2011 must be dismissed.  Defs.' Joint

Br. at 47; Defs.' Joint Reply at 23.  Plaintiffs maintain that the statute's prohibition on "false

reporting" existed before Rule 180.1 came into effect and, therefore, their "false reporting" claims

are actionable even with respect to transactions effected prior to August 15, 2011.  Pls.' Opp'n at 46-

47.  The Court need not decided this issue, however, because it concludes that, to the extent that the

SAC alleges that Defendants delivered any false reports, those are not "reports" within the meaning

of the CEA.

Although case law on this issue is scarce, as one court in this district observed, "'[t]he term

'report' is not defined in the CEA or any CFTC regulations.'"  *FOREX*, 2016 WL 5108131, at *23

(quoting *United States v. Brooks*, 681 F.3d 678, 691 (5th Cir. 2012)).  Interpreting the meaning of the

term within the CEA, the Fifth Circuit noted that "report," is a "detailed statement of fact."  *Brooks*,

681 F.3d at 691.  In contrast to "expression of opinion, or casual conversation," the Fifth Circuit

reasoned, "the lengthy documents outlining detailed information about natural gas trades, sent to established industry publications with the intent to inform those publications about the state of natural gas markets," were within the CEA's meaning of that term. *Id.*; *see also FOREX*, 2016 WL 5108131, at *23. Adopting the Fifth Circuit's reasoning, the *FOREX* court rejected plaintiffs' argument that, by "furtively coordinating the prices they showed to customers," Defendants submitted "reports" within the meaning of the statute, despite the fact that the prices may ultimately have affected the prices of foreign exchange instruments, because "[t]hey are not lengthy written accounts describing historical fact that courts have found to be within the plain meaning of the term 'report.'" *Id.*; *see also U.S. Commodity Futures Trading Comm'n v. Atha*, 420 F. Supp. 2d 1373, 1376 (N.D. Ga. 2006) (concluding that oral conversations or information submitted by defendants to indexes fell within the meaning of "reports" under the CEA).

The Court finds the Fifth Circuit's analysis and the *FOREX* court's application of that analysis persuasive. The Court finds that the same conclusion is warranted here. The SAC contains a single reference to "false reports" allegedly submitted by Defendants. That reference appears under the manipulative device claim, where Plaintiffs allege that "Defendants and co-conspirators caused to be delivered for transmission false, misleading, or inaccurate reports of the Fixing, *i.e.*, false reports concerning market information or conditions that affected or tended to affect both prices of platinum and palladium and prices of platinum and palladium futures and options in interstate commerce." SAC ¶ 298. Beyond a recitation of the statutory language, the SAC's 136 pages, 310 paragraphs, and five appendices contain no other reference to or illustration of any false reports associated with Defendants' conduct. Plaintiffs cannot shoehorn Defendants' alleged false or misleading price quotes and orders during the Fixing into claims under the CEA provisions prohibiting the delivery of false or misleading "reports." Therefore, while the allegations plausibly

plead a price manipulation claim, they do not support a manipulative device claim based on false reports. *See FOREX*, 2016 WL 5108131, at *23.

Since Plaintiffs do not dispute that Rule 180.1 came into effect on August 15, 2011, any claims based on transactions that predate August 15, 2011 must be dismissed. *See, e.g., In re Silver*, 2016 WL 5794777, at *22 (dismissing pre-August 15, 2011 manipulative device claims alleging violations of Rule 180.1); *In re Gold*, 2016 WL 5794776, at *25 (same); *see also Amaranth III*, 730 F.3d at 173 n.1 (noting that Rule 180.1 "does not impact the present appeal . . . given the regulation's effective date of August 15, 2011" (citations omitted)); *In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC Dkt. No. 15-25, 2015 WL 2445060, at *14 (CFTC May 20, 2015) (differentiating between conduct occurring pre- and post-August 15, 2011 for purposes of Rule 180.1).

Regarding the remaining claims based on transactions that post-date August 15, 2011, Defendants argue that Plaintiffs have not sufficiently alleged scienter, loss causation, or actual reliance, and that Plaintiffs failed to identify any public misstatement that could support a fraud-on-the market presumption of reliance. Defs.' Joint Br. at 46. The Court already found that Plaintiffs have adequately alleged scienter, including through circumstantial misbehavior or recklessness, and need not address that argument again. *See supra*, Part III.C(3)(b).

With respect to reliance and loss causation, the case law addressing whether those elements must be pleaded in CEA manipulative device claims is scarce. *See In re Gold*, 2016 WL 5794776, at *26. In *In re Gold*, Judge Caproni noted that "'at least in the context of manipulation-based claims, as to which the effects of the alleged manipulation presumably dissipate over time, loss causation is not required.'" *Id.* (quoting *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 60-61 (S.D.N.Y. 2012)); *see also In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-01 (S.D.N.Y. 2011) (concluding that loss causation principles were not applicable to a CEA claim

involving a manipulative "bang the close" trading strategy).  Here, as in *In re Gold*, Plaintiffs allege

both that Defendants misrepresented bids and quotes during the Fixing and that Defendants

engaged in price manipulation of the Fix Price leading up to and during the Fixing.  Accordingly,

given the absence of Second Circuit authority directly addressing this issue, and in light of Judge

Caproni's persuasive analysis in *In re Gold* and *In re Silver*, the Court concludes that Plaintiffs have

plausibly pleaded a CEA manipulative device claim "by alleging with particularity 'the nature,

purpose, and effect of the fraudulent conduct and the roles of the defendants.'"  *In re Gold*, 2016 WL

5794776, at *26 (quoting *ATSI*, 493 F.3d at 101); *see also In re Silver*, 2016 WL 5794777, at *22 (same);

*In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d at 600-001 (distinguishing CEA claims

based on allegations that information was hidden from the market, which require a showing of loss

causation at the pleading stage, from claims based on market manipulation, which do not) (citing *In

re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003)); *cf. Laydon*, 2014 WL

1280464, at *5-6 (denying defendants' motion to dismiss plaintiff's CEA claims based on alleged

Euroyen TIBOR and Yen-LIBOR manipulation without separately addressing reliance and loss

causation).

Accordingly, Defendants' motion to dismiss Plaintiffs' CEA manipulative device claims is

granted with respect to Plaintiffs' claims based on false reports and transactions that precede the

effective date of Rule 180.1, but denied with respect to any remaining manipulative device claims in

connection with transactions that post-date August 15, 2011.

### d.  Secondary Liability

#### i.  Aiding and Abetting

Pursuant to Section 22 of the CEA, "[a]ny person . . . who violates this chapter or who

willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall

be liable for actual damages resulting from [relevant transactions] . . . and caused by such violation"

of the statute.  7 U.S.C. § 25(a)(1).  The Second Circuit has interpreted "aiding and abetting" in this context as "'requir[ing] the defendant to 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'"  *Amaranth III*, 730 F.3d at 182 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).  Consistent with the Second Circuit's holding, courts in this district have required plaintiffs alleging aiding and abetting under the CEA to plead sufficient facts showing that "the Defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *Laydon*, 2014 WL 1280464, at *4 (citing *In re Platinum and Palladium*, 828 F. Supp. 2d at 600-01); *see also FOREX*, 2016 WL 5108131, at *25.

The SAC adequately pleads those elements.  As discussed above, the SAC is replete with allegations that the Fixing Members colluded to manipulate the platinum and palladium Fix Price during the Fixing Calls.  Therefore, and as discussed more fully above, Plaintiffs plead sufficient facts showing that Defendants knowingly assisted each other and participated in the Fixing with the intent to artificially suppress the prices of platinum and palladium.  *See, e.g.*, *FOREX*, 2016 WL 5108131, at *25 (denying a motion to dismiss CEA aiding and abetting claims when plaintiffs alleged defendants knowingly associated in a venture to manipulate prices with the intent that that the venture would succeed); *see also In re Silver*, 2016 WL 5794777, at *23; *In re Gold*, 2016 WL 5794776, at *27; *Laydon*, 2014 WL 1280464, at *6 (denying defendants' motion to dismiss a CEA aiding and abetting claim based on "numerous allegations giving rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation").  Accordingly, Defendants' motion to dismiss Plaintiffs' aiding and abetting claim under the CEA is denied.

### ii.   Principal-Agent Liability

The SAC also asserts a claim for principal-agent liability under Section 2 of the CEA,

pursuant to which, "[t]he act, omission, or failure of any official, agent, or other person acting for

any individual, association, partnership, corporation, or trust within the scope of his employment or

office shall be deemed the act, omission, or failure of such individual, association, partnership,

corporation, or trust, as well as of such official, agent, or other person."  7 U.S.C. § 2(a)(1)(B).  This

section is "'a variant of the common law principle of *respondeat superior*,' which holds an employer

'strictly liable—that is to say, regardless of the presence or absence of fault on the employer's part—

for torts committed by [its] employees in the furtherance of [its] business.'"  *U.S. Commodity Futures*

*Trading Comm'n v. Byrnes*, 58 F. Supp. 3d 319, 326 (S.D.N.Y. 2014) (quoting *In re Natural Gas I*, 337 F.

Supp. 2d at 515 (S.D.N.Y. 2004)).

To state a claim for principal-agent liability under the CEA, a plaintiff must plead "that the

agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the

agent's actions were within the scope of his or her employment."  *In re Gold*, 2016 WL 5794776,

at *27 (citing *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999)); *see also FOREX*, 2016 WL 5108131,

at *24 ("'Such liability may be imposed where (1) the agent participated in the alleged unlawful

activity and (2) his actions were within the scope of his employment or office.'") (quoting *In re*

*Platinum and Palladium*, 828 F. Supp. 2d at 599.  "[I]t is enough if [the agent] was 'acting for' [the

principal] in executing the illegal trades."  *Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33,

39 (2d Cir. 1999).

Plaintiffs adequately plead principal-agent liability under the CEA.  The SAC expressly states

that whenever it refers to an "any act, deed, or transaction of any entity, the allegation means that

the corporation engaged in the act, deed, or transaction by or *through its officers, directors, agents,*

*employees, or representatives while they were engaged in the management, direction, control, or transaction of the entity's*

*business or affairs.*"  SAC ¶ 28 (emphasis added).  Elsewhere Plaintiffs allege that, around the time of

the AM and PM Fixing, Defendants quoted platinum and palladium prices that were significantly

lower than those other market participants.  *See, e.g.*, SAC ¶ 212(c).  Plaintiffs also allege that

Defendants shared customer and confidential proprietary information necessary to execute the

alleged price manipulation scheme through chat rooms, instant messages, phone calls, emails, and

other proprietary trading platforms.  SAC ¶ 171.  Those allegations necessarily implicate the

involvement of Defendants' officers, directors, agents, employees, or representatives.  As several

courts in this district have concluded based on similar allegations, in the absence of any indication

that these yet-to-be identified employees acted outside the scope of their employment, CEA

principal-agent liability claims will be allowed to proceed.  *See, e.g.*, *FOREX*, 2016 WL 5108131,

at *25 ("Nothing in the [complaint] suggests that any trader was operating outside the scope of his

employment when engaging in the alleged conduct.  To the contrary, the [complaint] alleges conduct

by traders 'acting for' the benefit of their respective employers.  Nothing more is required to plead a

claim for principal-agent liability."); *In re Platinum & Palladium*, 828 F. Supp. 2d at 599-600

(concluding that allegations that the "head of the execution desk . . . entered into entered the

manipulative orders" for defendants sufficiently pleaded a CEA principal-agent claim); *see also In re

Silver*, 2016 WL 5794777, at *23 ("There is no indication, at this stage, that these employees acted on

a lark or in any way outside the scope of their employment."); *In re Gold*, 2016 WL 5794776, at *27

(same).  To the extent the evidence shows that certain rogue employees were responsible for the

entire alleged scheme, Defendants will have the opportunity to introduce that evidence at the

summary judgement stage or at trial.

### D. Unjust Enrichment

"The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (N.Y. 2009) (citation omitted). To state a claim for unjust enrichment under New York law, a plaintiff must allege "'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (quoting *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182 (N.Y. 2011)). The "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citing *City of Syracuse v. R.A.C. Holding, Inc.,* 685 N.Y.S.2d 381, 381 (4th Dep't 1999)). "A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff." *Chevron Corp. v. Donziger,* 871 F. Supp. 2d 229, 260 (S.D.N.Y. 2012). The benefit must be both "specific" and "direct." *Kaye,* 202 F.3d at 616.

There is no requirement that the aggrieved party be in privity with the party enriched at his or her expense. *See Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 215 (N.Y. 2007). "An unjust enrichment claim, however, 'requires some type of direct dealing or actual, substantive relationship with a Defendant.'" *Laydon*, 2014 WL 1280464, at *13 (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt.,* 317 F. Supp.2d 301, 334 (S.D.N.Y. 2003)). Nevertheless, if the relationship between the parties is too attenuated, the unjust enrichment claim must be dismissed. *Sperry,* 8 N.Y.3d at 215.

Defendants argue that the unjust enrichment claim must be dismissed because Plaintiffs have not alleged that they had any direct dealings with Defendants. Defs.' Joint Br. at 48-50. Defendants are correct. That Plaintiffs "relied on the Fix as a *bona fide* benchmark in conducting their transactions," as they argue in response, Pls.' Opp'n at 49-50, says nothing about whether the

relationship between the parties was not too attenuated.  It says nothing about the relationship at all.

Moreover, because Plaintiffs do not allege that they transacted directly with Defendants, they have

not adequately pleaded that Defendants were enriched at their expense.  *See, e.g.*, *In re LIBOR-Based*

*Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) ("[I]t makes

little sense to conclude that a particular defendant bank somehow improperly obtained profits

intended for a certain plaintiff when those two parties never transacted or otherwise maintained a

business relationship at all.").  Accordingly, Plaintiffs have failed adequately to plead an unjust

enrichment claim, and Defendants' motion to dismiss that claim is granted.  *See, e.g.*, *Laydon*, 2014

WL 1280464, at *13 (dismissing an unjust enrichment claim where plaintiff's conclusory assertions

that defendants financially benefited from the unlawful manipulation and that the unlawful acts

caused plaintiff injury were insufficient to meet the pleading requirement for that claim); *Amaranth I*,

587 F. Supp. 2d at 547 (dismissing an unjust enrichment claim based on alleged market manipulation

that impacted prices of natural gas futures contracts because plaintiffs did not "allege[ ] any direct

relationship, trading or otherwise, between themselves and any [defendant]"); *see also In re Silver*, 2016

WL 5794777, at *26 (dismissing plaintiffs' unjust enrichment claim because "[t]he connection

between the named Plaintiffs and Defendants is 'too attenuated'"); *In re Gold*, 2016 WL 5794776,

at *29 (same).

### E.  Personal Jurisdiction Over Foreign Defendants

BASF Metals, ICBC, and LPPFC (the "Foreign Defendants") filed supplemental

memoranda of law arguing that they should be dismissed from this action pursuant to Federal Rule

of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  *See* BASF Metals Ltd. And BASF

Corp.'s Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. of Civ. P. 12(b)(2) and

12(b)(6) ("BASF JDX Br."), Dkt. No. 117; LPPFC Supp. Mem. of Law in Supp. of Mot. to Dismiss

Pursuant to Rule 12(b)(2) ("LPPFC JDX Br."), Dkt. No. 119; ICBC Standard Bank Plc's Mem. of

Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. 12(b)(2) and 12(b)(6) ("ICBC JDX Br."), Dkt. No. 120.

### 1.   Rule 12(b)(2) Legal Standard

It is well established that, on a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant.") (citations omitted). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a *prima facie* showing that jurisdiction exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("'In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.'") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks omitted)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81,

84 (2d Cir. 2001). "'The allegations in the complaint must be taken as true to the extent they are

uncontroverted by the defendant's affidavits.'" *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir.

2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v.

Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting

affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima

facie showing is sufficient notwithstanding the contrary presentation by the moving party."

*Seetransport Wiking*, 702 F.3d at 727 (citations omitted).

### a.  Standard for Exercising Personal Jurisdiction

Federal courts must satisfy three requirements in order to exercise personal jurisdiction over

an entity:  (1) the entity must have been properly served, (2) the court must have a statutory basis for

exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with

constitutional due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d

Cir. 2012). In a federal question case, the manner in which district courts assess whether the

exercise of personal jurisdiction comports with constitutional due process varies depending on the

asserted statutory basis.

"The constitutional analysis under the Due Process Clause consists of two separate

components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry. The 'minimum

contacts' inquiry requires [the court] to consider whether the defendant has sufficient contacts with

the forum state to justify the court's exercise of personal jurisdiction." *Id.* at 60. Although the

Second Circuit has not "has not yet decided" whether to adopt this approach, other circuits have

held that "when a civil case arises under federal law and a federal statute authorizes nationwide

service of process, the relevant contacts for determining personal jurisdiction are contacts with the

United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014)

(collecting cases). Courts in this district have followed this approach, including in cases arising

under the federal statutes at issue in this case. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.") (internal quotation marks and citations omitted); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005), *aff'd*, 332 F. App'x 643 (2d Cir. 2009) ("If a federal statute provides for nationwide service of process, the jurisdictional reach of an enforcing court is at its fullest—its analysis is limited only by the requirements of due process, and it may consider a party's contacts with the United States as a whole, rather than with the forum state."); *see also Sullivan v. Barclays PLC*, 2017 WL 685570, at *42 (examining nationwide contacts in an action alleging CEA and Sherman Act violations); *LIBOR IV*, 2015 WL 4634541, at *18 (examining nationwide contacts in an action alleging CEA violations); *Amaranth I*, 587 F. Supp. 2d at 526; *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986) ("Section 12 [of the Clayton Act] is construed as conferring nationwide personal jurisdiction over corporate antitrust defendants."), *aff'd*, 859 F.2d 148 (2d Cir. 1988). "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." *In re Libor-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11 MDL 2262 NRB, 2015 WL 4634541, at *18 (S.D.N.Y. Aug. 4, 2015), *amended on other grounds*, No. 11 MDL 2262 (NRB), 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015) (internal quotation marks, citations, and alternations omitted).

If the federal statute at issue does not provide for nationwide service, or if the claim does not arise under federal law, the personal jurisdiction analysis begins by applying the forum state's long-arm statute. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) ("In a federal

question case where a defendant resides outside the forum state, a federal court applies the forum

state's personal jurisdiction rules 'if the federal statute does not specifically provide for national

service of process.'") (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990)).  If the long-arm

statute is satisfied, the due process inquiry examines whether the foreign defendant has sufficient

minimum contacts with the forum state.  *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 370

(2d Cir. 1997).

A third means of establishing personal jurisdiction over a foreign defendant is found in

Federal Rule of Civil Procedure 4(k)(2).  Rule 4(k)(2) states:

> For a claim that arises under federal law, serving a summons or filing
> a waiver of service establishes personal jurisdiction over a defendant
> if:  (A) the defendant is not subject to jurisdiction in any state's courts
> of general jurisdiction; and (B) exercising jurisdiction is consistent
> with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  The Second Circuit has interpreted this rule as "'extend[ing] the reach of

federal courts to impose jurisdiction over the person of all defendants against whom federal law

claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the

United States.'"  *Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) (quoting Fed. R. Civ. P. 4, 1993

advisory committee's note to 1993 amendment).

Rule 4(k)(2) allows courts to exercise personal jurisdiction over a defendant on condition:

"(1) that plaintiff's cause of action arise[s] under the federal law; (2) that the defendant is not subject

to the jurisdiction of the courts of general jurisdiction of any one State; and (3) that the defendant's

total contacts with the *United States* as a whole are sufficient to confer the court with personal

jurisdiction without offending due process."  *Hartford Fire Ins. v. Co.*, No. 03 CIV. 2196 (SAS), 2003

WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (quoting *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*,

956 F. Supp. 427, 434 (S.D.N.Y. 1996)).  As the Second Circuit observed:

> Rule 4(k)(2) was specifically designed to "correct[ ] a gap" in the
> enforcement of federal law in international cases.  The gap arose

> from the general rule that a federal district court's personal
> jurisdiction extends only as far as that of a state court in the state
> where the federal court sits. . . . The pre-1993 Rules, the Advisory
> Committee noted, left a significant lacuna "when the defendant was a
> non-resident of the United States having contacts with the United
> States sufficient to justify the application of United States law and to
> satisfy federal standards of forum selection, but having insufficient
> contact with any single state to support jurisdiction under state long-
> arm legislation or meet the requirements of the Fourteenth
> Amendment limitation on state court territorial jurisdiction."

*Porina v. Marward Shipping Co.*, 521 F.3d 122, 126-27 (2d Cir. 2008) (citing Fed R. Civ. P. 4 advisory

committee's note, 1993 Amendments) (alterations in original).  As amended, Rule 4(k)(2) closes that

gap.

Whether personal jurisdiction is based on a statute containing nationwide service, a state-

long arm statute, or Rule 4(k)(2), the court must also determine that the exercise of personal

jurisdiction comports with the Due Process Clause.[17]  "[D]ue process requires a plaintiff to allege

(1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the

exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks*, 714 F.3d at 673

(citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  As discussed above, the "relevant

forum" for the purpose of the contacts analysis may be the forum state (here, New York) or the

United States as a whole.

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is

made between 'specific' and 'general' personal jurisdiction."  *Id.* (citing *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp.,* 84 F.3d 560, 567-68 (2d Cir. 1996)).  "A court may assert general jurisdiction

---

[17] Depending on the basis for personal jurisdiction, due process under either the Fifth or Fourteenth Amendment applies.  "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments.  The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered."  *Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir. 1998); *see also Straub*, 921 F. Supp. 2d at 253 ("[B]ecause the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis.").

over a foreign defendant to hear any and all claims against that defendant only when the defendant's

affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render

it essentially at home in the forum State.'" *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331

(2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)). "'Specific jurisdiction, on

the other hand, depends on an affiliation between the forum and the underlying controversy,

principally, activity or an occurrence that takes place in the forum State and therefore subject to the

State's regulation.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919

(2011)); *see also Licci,* 732 F.3d at 170 ("'Where the claim arises out of, or relates to, the defendant's

contacts with the forum—*i.e.*, specific jurisdiction [is asserted]—minimum contacts [necessary to

support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of

doing business in the forum and could foresee being haled into court there.'") (quoting *Brussels*

*Lambert,* 305 F.3d at 127).

 Specific personal jurisdiction is predicated on "an affiliation between the forum and the

underlying controversy, principally, activity or an occurrence that takes place in the forum."

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and

alteration omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined

to adjudication of issues deriving from, or connected with, the very controversy that establishes

jurisdiction." *Id.* A plaintiff must plead personal jurisdiction with respect to each claim asserted.

*Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004) (citing *SAS Group, Inc. v. Worldwide*

*Inventions, Inc.,* 245 F. Supp.2d 543, 548 (S.D.N.Y. 2003)). "[T]he relationship must arise out of

contacts that the 'defendant *himself*' creates with the forum . . . ." *Walden v. Fiore*, 134 S. Ct. 1115,

1122 (2014) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (emphasis in *Walden*).

"The activities of plaintiffs or third parties alone will not confer jurisdiction, and the court's analysis

is directed to the defendant's contacts with the forum itself and 'not the defendant's contacts with

persons who reside there.'" *Sullivan v. Barclays*, 2017 WL 685570, at *43 (quoting *Walden*, 134 S. Ct. at 1122).

Specific jurisdiction over a foreign defendant may also exist even if the relevant conduct took place entirely outside the forum. Under the so-called "effects test," personal jurisdiction is "typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts," including where on the basis of "in-state effects of out-of-state activity"). For such claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant *expressly aimed its conduct at the forum*." *Licci*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983) (emphasis added). Harmful effects alone will not establish jurisdiction: "'[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant.'" *Waldman*, 835 F.3d at 339 (quoting *In re Terrorist Attacks*, 714 F.3d at 674). "[T]he defendant must expressly aim his conduct at the United States." *Id.* at 337 (citing *Licci*, 732 F.3d at 173) (alterations omitted)); *see also LIBOR IV*, 2015 WL 4634541, at *27 (concluding that effects in forum did not support personal jurisdiction over a foreign defendant when "there [wa]s no suggestion, and it [did] not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state").

In addition, the underlying "suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121. "[I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 1122. Therefore, the analysis necessarily includes consideration of the claims' elements and where the conduct occurred. *See generally Waldman*, 835 F.3d at 335-39. The forum must be the "focal point"

or "nucleus" of plaintiff's alleged harm. *Id.* at 340. Continuous presence in the forum does not confer specific jurisdiction unless that presence involves "suit-related conduct." *Id.* at 335; *see also 7 W. 57th Realty Co.*, 2015 WL 1514539, at *10 ("Plaintiff must demonstrate that the Foreign Banks' *suit*-related conduct creates minimum contacts with New York, however, not simply that the Foreign Banks have a presence here or conduct business activities here in general.") (citations omitted).

If the contacts are not sufficient, the due process inquiry ends. *See Metro. Life Ins.*, 84 F.3d at 568-69. If the court has either general or specific jurisdiction, it must turn to the second step of the due process inquiry, and determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci*, 673 F.3d at 60 (citing *Chloe*, 616 F.3d at 164). The "reasonableness" analysis requires district courts to evaluate the following five factors:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe,* 616 F.3d at 164-65 (citing *Asahi Metal Indus., Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 109 (1987)).

### 2.  Statutory Bases for Personal Jurisdiction

Plaintiffs have asserted three statutory bases for the Court's exercise of specific personal jurisdiction over the Foreign Defendants. First, Plaintiffs point to nationwide service provisions embedded in the CEA and the Clayton Act. Pls.' Consol. Opp'n to Defs.' Mot. ("Pls.' JDX Opp'n"), Dkt. No. 128, at 19-20. Under the CEA, "[p]rocess . . . may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found." 7 U.S.C. § 25(c). Under the Clayton Act,

> Any suit, action, or proceeding under the antitrust laws against a
> corporation may be brought not only in the judicial district whereof it
> is an inhabitant, but also in any district wherein it may be found or
> transacts business; and all process in such cases may be served in the
> district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.[18]

Second, Plaintiffs assert personal jurisdiction over the Foreign Defendants is proper

pursuant to New York's long-arm statute. Pls.' JDX Opp'n at 20. Under Section 302 of the

C.P.L.R., "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or

through an agent:

> (1) transacts any business within the state or contracts anywhere to
> supply goods or services in the state; or (2) commits a tortious act
> within the state . . ; (3) commits a tortious act without the state
> causing injury to person or property within the state . . . .[19]

N.Y. C.P.L.R. 302(a). Finally, Plaintiffs have asserted Rule 4(k)(2) as another statutory basis for

exercising personal jurisdiction over the Foreign Defendants. Pls.' JDX Opp'n at 4-5.

Here, Plaintiffs have implicitly disclaimed that the Foreign Defendants are subject to general

personal jurisdiction. *See* Pls.' JDX Opp'n at 2 (stating that ICBC and BASF are "subject to *specific*

personal jurisdiction in this District"). As alleged in the SAC:

> This Court has personal jurisdiction over each Defendant, because
> each Defendant: transacted business throughout the U.S., including
> in this District; had substantial contacts with the U.S., including
> this District; and/or committed overt acts in furtherance of their
> illegal scheme and conspiracy in the U.S. In addition, the conspiracy
> was directed at, and had the intended effect of, causing injury to
> persons residing in, located in, or doing business throughout the U.S.,

---

[18] "Because the service of process provision applies only to 'such cases' described in the preceding clause, the
Second Circuit has concluded that nationwide service of process is permissible "only in cases in which its venue
provision is satisfied.'" *Sullivan v. Barclays*, 2017 WL 685570, at *42 (quoting *Daniel*, 428 F.3d at 423). Neither party
has addressed the relationship between the venue provision and the service of process provision, nor have the
Foreign Defendants contested that venue is proper in this district.

[19] Plaintiffs have not asserted any other subsections of C.P.L.R. § 302 as statutory bases for personal jurisdiction
over the Foreign Defendants.

> including in this District, and Plaintiffs' claims arise out of
> Defendants' conduct.

SAC ¶ 26.  The SAC does not distinguish between the Foreign Defendants' and the remaining

domestic Defendants' contacts with New York or the United States.

Because Plaintiffs have alleged Sherman Act and CEA claims against all Defendants in this

case, including the Foreign Defendants, the Court will first analyze whether those Defendants have

sufficient minimum contacts in the United States to satisfy the first prong of the due process

requirement.  Because the Court concludes that Plaintiffs have not made a *prima facie* showing that

the Foreign Defendants have sufficient contacts with the United States as a whole, it follows that the

Foreign Defendants do not have sufficient contacts in this forum.  Thus, the Court need not

separately analyze specific personal jurisdiction under the New York long-arm statute and whether

the Foreign Defendants have sufficient minimum contacts with New York.

### a.  BASF Metals

As alleged in the SAC, BASF Metals is "organized . . . under the laws of the United

Kingdom with its principal place of business in London, England."  SAC ¶ 31.  Plaintiffs allege that

BASF Metals is "organizationally part of and subordinate to BASF Corp," and that, during the Class

Period, BASF Metals was a Fixing Member and a market-making LPPM member.  *E.g.*, SAC ¶¶ 31,

45, 62, 271.  Plaintiffs further argue that "[v]arious BASF subsidiaries also held memberships in the

NYMEX and CME and engaged in trading on NYMEX."  Pls.' JDX Opp'n at 7.  The SAC alleges

generally that the Fixing Members used chat rooms, instant messages, phone calls, proprietary

trading venues and platforms, and emails to coordinate the alleged price manipulation.  SAC ¶ 171.

Plaintiffs do not allege sufficient minimum contacts between BASF Metals and the United

States to confer specific personal jurisdiction over this defendant.  BASF Corp.'s presence in the

U.S. is irrelevant because continuous presence in the forum does not confer specific jurisdiction

unless its presence involves "suit related conduct."  *Waldman*, 835 F.3d at 335; *7 W. 57th Realty Co.*,

2015 WL 1514539, at *10.  Plaintiffs have not alleged any such conduct with respect to BASF Corp.

The SAC's vague references to the Fixing Members' use of chat rooms and emails is also unavailing.

Indeed, even allegations that such communications "passed through and/or were stored within the

United States are [generally] insufficient" for the purpose of establishing specific jurisdiction over a

foreign defendant.  *Laydon*, 2015 WL 1515358, at *3; *see also Sullivan v. Barclays*, 2017 WL 685570, at

*44; *LIBOR VI*, 2016 WL 7378980, at *10.

Finally, the SAC does not allege that BASF Metals' conduct was aimed at the United States.

That Defendants' alleged manipulation of the Fix Price had harmful effects on U.S.-based exchanges

is insufficient.  *Waldman*, 835 F.3d at 339.  Even if the harm was foreseeable, it "is insufficient for

the purpose of establishing specific personal jurisdiction."  *Id.*  Rather, the allegations must make a

*prima facie* showing that the defendant expressly aimed its conduct at the U.S.  Plaintiffs' allegations

pertaining to BASF Metals do not.  Accordingly, the Court concludes that the SAC does not allege

sufficient minimum contacts between BASF Metals and the U.S. for the Court to exercise specific

personal jurisdiction over this defendant with respect to Plaintiffs' CEA and Sherman Act claims.

Because SAC's allegations fall far short of showing that BASF Metals had the requisite suit-related

minimum contacts with the U.S. as a whole, it necessarily follows that BASF Metals does not have

the requisite minimum contacts with New York.

### b.  ICBC

As alleged in the SAC, ICBC is "organized . . . under the laws of the United Kingdom," and

"maintains its principal place of business in London, England."  SAC ¶ 37.  Plaintiffs allege that

during the Class Period, ICBC was a Fixing Member and a market-making LPPM member.

SAC ¶ 37.  Plaintiffs further allege that ICBC is a "a member of NYMEX (COMEX)" and "executes

client trades in the physical platinum and palladium markets, on NYMEX, in platinum and

palladium derivatives, and in shares of platinum and palladium ETFs."  SAC ¶¶ 38-39.  Throughout

the Class Period, ICBC "entered directly into platinum and palladium spot, forward, option and

platinum and palladium ETF share transactions with members of the Class."  SAC ¶ 38.  As alleged

in the SAC, on at least one occasion, "the COMEX Business Conduct Committee initiated

disciplinary proceedings against [ICBC] because it had violated exchange rules."  SAC ¶ 39.

Plaintiffs further allege that ICBC's "website holds itself out as having a substantial presence

worldwide including in New York," and ICBC has "four U.S. subsidiaries . . . [e]ach . . . registered in

Delaware with corporate offices located in this District."  SAC ¶ 40.

　　　Despite the arguably more detailed allegations against ICBC as compared to BASF Metals,

the same deficiencies described above apply to Plaintiffs' jurisdictional allegations against ICBC.

That ICBC has subsidiaries in the U.S. and that its website advertises its presence in the United

States "is only relevant insofar as it has a nexus to the misconduct underlying plaintiffs' claims."

*Sullivan v. Barclays*, 2017 WL 685570, at *44 (citing *Waldman*, 835 F.3d at 340 (jurisdictional

requirement)).  Here it does not:  Plaintiffs have not alleged that ICBC's U.S. subsidiaries played any

role in the Fixing or alleged manipulation.

　　　In addition, ICBC's membership in COMEX and trades on NYMEX fall short of

establishing that it expressly aimed its conduct at the U.S.  The alleged unlawful conduct in this case

is the manipulation of the Fix Price that took place during the Fixing Calls, not manipulations of

particular transactions on NYMEX.  That the effect of the alleged manipulation of the Fix Price had

a foreseeable impact on platinum and palladium derivatives traded on NYMEX is insufficient for

the purpose of establishing personal jurisdiction over a foreign defendant.  *Waldman*, 835 F.3d at

339.  And courts in this district have held that general allegations of price manipulation abroad alone

do not establish that a foreign defendant expressly aimed its conduct at the U.S.  *See Laydon v. Mizuho

Bank, Ltd.*, No. 12 CIV. 3419 GBD, 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015); *see also

LIBOR IV*, 2015 WL 6243526, at *10 ("It is bedrock law that merely foreseeable effects of

defendants' [manipulation of the LIBOR rate] do not support personal jurisdiction."); *7 West 57th St. Realty*, 2015 WL 1514539, at *11 ("Because the Amended Complaint does not plead facts demonstrating that the LIBOR manipulation was done with the express aim of causing an effect in New York, the 'effects test' is not satisfied.").  Accordingly, and for the reasons discussed above with respect to BASF Metals, the Court concludes that the SAC does not allege sufficient minimum contacts between ICBC and the U.S. for the Court to exercise personal jurisdiction over this defendant.

### c.  LPPFC

As alleged in the SAC, the LPPFC "is a private company organized and existing under the laws of the United Kingdom with its principal place of business in London, England."  SAC ¶ 45. The LPPFC is "100% owned and controlled by" the Fixing Members and, "is indistinguishable from the Fixing [Members] for jurisdictional purposes."  SAC ¶ 46.  "The LPPFC's only function is to take and continue the promotion, administration and conduct of the [LPPM] Fixing" and, "[a]s such," Plaintiffs allege that "at all times LPPFC was an instrumentality in Defendants' conspiracy alleged in" the SAC.  SAC ¶ 47.  Plaintiffs further allege that the LPPFC served as a vehicle for the alleged conspiracy, and "was targeted and had substantial depressive effects on the platinum and palladium Fixing price and Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District."  SAC ¶ 47.  In addition, Plaintiffs allege that "[a]t all times, LPPFC and its members and directors knew that the Fixing—and the Fix prices reached thereby—had a substantial effect on Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District."  SAC ¶ 47.

Plaintiffs' jurisdictional allegations concerning the LPPFC suffer from the same defects as their jurisdictional allegations concerning BASF Metals and ICBC.  The Court need not restate that

analysis here, but notes that the LPPFC's presence on NYMEX, or any other domestic OTC market or exchanges, fails to establish that it expressly aimed its conduct at the U.S.  Absent allegations that the LPPFC—or the other Foreign Defendants—manipulated Platinum and Palladium Investments traded on NYMEX, such allegations do not rise to the level of minimum contacts necessary for personal jurisdiction.  *Compare In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 NRB, 2015 WL 6696407, at *19 (S.D.N.Y. Nov. 3, 2015) (declining to exercise personal jurisdiction over foreign defendants based on allegations that they manipulated LIBOR in London, which plaintiffs argued had a foreseeable effect on futures contract prices in the United States) *with Amaranth I*, 587 F. Supp. 2d at 536 (concluding that plaintiffs made a *prima facie* showing that personal jurisdiction existed over a foreign defendant based on allegations that defendant who manipulated NYMEX futures prices with the knowledge that "trades would affect the price of natural gas futures within the United States," thus "constitut[ing] purposeful availment of the United States") (citations omitted).[20]

### i.   Alter Ego Theory of Personal Jurisdiction

Plaintiffs argue that the Court may nevertheless exercise personal jurisdiction over the LPPFC because the LPPFC was the Fixing Members' alter ego.  Pls.' JDX Opp'n at 11-12.  The Second Circuit has recognized that, under certain conditions, "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation . . . when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."  *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (internal quotation marks and citations omitted); *cf. Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 142-43 (2d Cir. 1991) (stating that, in general, "alter egos are

---

[20] Plaintiffs' assertion that the LPPFC "is indistinguishable from the Fixing [Members] for jurisdictional purposes" SAC ¶ 46, is a legal conclusion that the Court need not—and does not—accept as true.  *Iqbal*, 556 U.S. at 678.

treated as one entity" for jurisdictional purposes). While the parties agree that courts may exercise

personal jurisdiction over foreign defendants pursuant to this theory, they disagree whether English

law, federal common law, or a less stringent variant of federal common law governs the analysis.

Because the Court concludes that the SAC's allegations fail to establish that the LPPFC was the

Fixing Member's alter ego even under the most forgiving standard, the Court need not resolve the

dispute regarding which law applies.[21]

The LPPFC argues that, under New York choice of law rules, "[w]hen courts are asked to

pierce the corporate veil against a defendant's alter ego, they look to the state where the defendant is

incorporated." LPPFC JDX Br. at 9 & n.6 (citations omitted). Because the LPPFC is incorporated

under the laws of the United Kingdom, the LPPFC asserts that English law governs the alter ego

analysis. *Id.* at 10. As the LPPFC explains, under English law, "a plaintiff must allege that the

defendant has sought deliberately to evade or frustrate an obligation or liability by interposing an

alter ego." *Id.* Pointing to a tome of English law appended to its brief, the LPPFC argues that

courts in the United Kingdom have "articulated this concept by reference to a temporal element,

namely whether the defendant had 'placed the [alleged alter ego] between himself and his victim *after*

incurring liability." *Id.* (citations omitted) (emphasis in LPPFC JDX Br.). And because, as Plaintiffs

allege, the LPPFC was formed in 2004—at least four years prior to the beginning of the Class

Period—the LPPFC argues that Plaintiffs cannot meet "this critical element." *Id.*; *see also* SAC ¶ 1.

---

[21] At least two courts in this district observed that the question whether the same standard that governs the alter ego analysis for liability purposes controls for jurisdictional purpose has not yet been addressed by the Second Circuit and that courts have taken a variety of approaches when confronted with this question. *See, e.g., Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (declining to decide whether "the choice of law for alter ego analysis for personal jurisdiction purposes is different than for liability"); *In re Lyondell Chem. Co.*, 543 B.R. 127, 139 n.38 (Bankr. S.D.N.Y. 2016) ("Some federal courts have engaged in a choice of law analysis to decide which law to apply to an alter ego theory of *jurisdiction,* usually finding that the law of the corporation's state of incorporation governs. Other courts have disagreed, distinguishing the analysis for 'alter ego' *liability* and for 'alter ego' *jurisdiction,* and finding that because 'alter ego' jurisdiction is either a construction of the statute providing jurisdiction or is part of due process (or both), for a *jurisdictional* veil piercing analysis, courts should apply either the law governing the interpretation of the jurisdictional statute or federal due process jurisprudence, or both.") (collecting cases) (citations omitted).

Plaintiffs disagree.  Because this action "arises under federal question jurisdiction and implicates antitrust law and commodities manipulation, which are governed by federal statutes and backed by strong federal interest," Plaintiffs maintain that federal common law governs the alter-ego analysis.  Pls.' JDX Opp'n at 12.  Plaintiffs argue that the "federal common law standard for alter ego requires the party seeking to attach alter-ego based jurisdiction to demonstrate only that 'it would be unfair under the circumstances not to disregard the corporate form."  *Id.* at 15 (citations omitted).  According to Plaintiffs, this standard is further relaxed when the alter ego theory is "used . . . to establish jurisdiction," and requires only that they allege that the "controlled entity was a shell for the allegedly controlling entity."  *Id.* at 15 (citations omitted).  Plaintiffs maintain that the allegations in the SAC satisfy this standard.  *Id.* at 15-18.

"Federal common law allows piercing of the corporate veil where (1) a corporation uses its alter ego to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own."  *Status Int'l S.A. v. M & D Mar. Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998) (citing *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986); *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 984-85 (2d Cir. 1980)); *see also Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001)).  However, several courts in this district have held that "this standard is relaxed where the *alter ego* theory is used not to impose liability, but merely to establish jurisdiction."  *Int'l Equity Investments*, 475 F. Supp. 2d at 459 (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981)); *see also D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (summary order) (reasoning that "the exercise of personal jurisdiction over an alleged alter ego requires application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes under New York law") (citations omitted); *Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 CIV.

13157 GEL, 2006 WL 3735657, at *13 (S.D.N.Y. Dec. 15, 2006) (citing *Marine Midland*, 664 F.2d at 904) ("Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability."); *Miramax Film Corp. v. Abraham*, No. 01 CV 5202 (GBD), 2003 WL 22832384, at *7 (S.D.N.Y. Nov. 25, 2003) ("The standard for piercing the corporate veil for liability purposes is not, however, the same standard to be used when piercing for jurisdictional purposes. The standard for piercing the corporate veil for purposes of obtain jurisdiction is a less stringent one.") (citations omitted); *In re Gold*, 2016 WL 5794776, at *32 (citing *Int'l Equity Invest.*, 475 F. Supp. 2d at 459).[22, 23]

"In such an instance, the question is only whether the allegedly controlled entity 'was a shell' for the allegedly controlling party; it is not necessary to show also 'that the shell was used to commit a fraud.'" *Int'l Equity Invs.*, 475 F. Supp. 2d at 459 (quoting *Marine Midland*, 664 F.2d at 904); *see also GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (same) (citations omitted); *Miramax*, 2003 WL 22832384, at *7 ("If a corporation is merely a shell, the corporate veil may be pierced to impute jurisdiction even without a showing that the shell was used to perpetrate a fraud.") (citations omitted).

---

[22] The cases cited in this paragraph address the alter ego analysis under New York law, but "Second Circuit's common law standard is taken directly from New York law." *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014). Accordingly, the standard is the same. *See Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 285 (S.D.N.Y. 2006) (reasoning that federal common law and New York law of veil-piercing are not "meaningfully distinct").

[23] The Court recognizes that most district courts in this circuit—and the Second Circuit itself—point to *Marine Midland* as support for the proposition the alter ego standard applicable to personal jurisdiction questions is different from the standard applicable to liability questions. The Court disagrees with that reading of the case. In *Marine Midland*, the Second Circuit analyzed the fiduciary shield doctrine, under which "it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." 664 F.2d at 902. The court held that, when determining whether it is fair to pierce the fiduciary shield, a "less onerous standard" applies, and "it is sufficient to inquire whether the corporation is a real or shell entity." *Id.* at 903-904. The Court does not read *Marine Midland* as establishing a less onerous standard applicable in all cases involving an alter ego analysis in the personal jurisdiction context. However, because Plaintiffs' allegations do not show that the LPPFC was merely a shell of the Fixing Members, the Court need not determine the scope of *Marine Midland* here.

Courts applying this "less onerous standard" have considered various factors in determining whether a corporation is a "shell," such that the corporate form should be disregarded, including, *inter alia*, "'the failure to observe corporate formality; inadequate capitalization; intermingling of personal and corporate funds; the sharing of common office space, address and telephone numbers of the alleged dominating entity and the subject corporation; an overlap of ownership, directors, officers or personnel; the use of the corporation as a means to perpetrate the wrongful act against the plaintiff.'" *In re Gold*, 2016 WL 5794776, at *33 (quoting *Miramax*, 2003 WL 22832384, at *8 (citing *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 138)).   "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative.  Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax*, 2003 WL 22832384, at *8 (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)).

Plaintiffs' allegations regarding the LPPFC do not warrant disregarding its corporate form. As noted above, Plaintiffs allege that the LPPFC is "100% owned and controlled by" the Fixing Members and, "is indistinguishable from the Fixing [Members] for jurisdictional purposes." SAC ¶ 46.  Plaintiffs also allege that "the LPPFC's only function is 'to take and continue the promotion, administration and conduct of the" Fixing and, "[a]s such, at all times LPPFC was an instrumentality in Defendants' conspiracy alleged in" the SAC.  SAC ¶ 47.  Plaintiffs further allege that the LPPFC served as a vehicle for the alleged conspiracy, and "was targeted and had substantial depressing effects on the platinum and palladium Fixing price and Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District."  SAC ¶ 47.  The SAC does not address whether the LPPFC observed corporate formalities, whether the LPPFC's funds were intermingled with those of the Fixing Members, and whether the Fixing Members shared any office space or addresses with the LPPFC.  Although no

single factor is determinative, Plaintiffs' scant allegations regarding the LPPFC's membership and

role in the alleged price manipulation do not show that the LPPFC was the Fixing Members' shell,

such that the Court may disregard its corporate form.  Plaintiffs have, therefore, failed to make a

*prima facie* showing that the Court may exercise personal jurisdiction over the LPPFC under the alter

ego theory.

### 3.   Conspiracy Jurisdiction

Plaintiffs also assert conspiracy-based jurisdiction pursuant to New York's long arm statute.

Pls.' JDX Opp'n at 20-21.  "The elements of conspiracy jurisdiction are that '(a) the defendant had

an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New

York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New

York acted at the direction or under the control or at the request of or on behalf of the out-of-state

defendant.'"  *Tarsavage v. Citic Trust Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) (quoting *Maersk, Inc.*

*v. Neewra, Inc.,* 554 F. Supp. 2d 424, 442-43 (S.D.N.Y. 2008)); *see also In re Terrorist Attacks on Sept. 11,*

*2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005), *on reconsideration in part on other grounds*, 392 F. Supp.

2d 539 (S.D.N.Y. 2005), and *aff'd*, 538 F.3d 71 (2d Cir. 2008), and *aff'd*, 714 F.3d 118 (2d Cir. 2013)

("To establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie

showing of conspiracy, allege specific facts warranting the inference that the defendant was a

member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New

York.").  "While '[t]he acts of a co-conspirator may . . . be attributed to a defendant for the purpose

of obtaining personal jurisdiction over that defendant, the bland assertion of conspiracy . . . is

insufficient to establish jurisdiction for the purposes of § 302(a)(2).'"  *Accurate Grading Quality Assur.,*

*Inc. v. Thorpe*, No. 12 CIV. 1343 ALC, 2013 WL 1234836, at *3 (S.D.N.Y. Mar. 26, 2013) (quoting

*Drucker Cornell v. Assicurazioni Generali S.p.A. Consolidated,* No. 97 CIV. 2262 (MBM), 98 CIV. 9186

(MBM), 2000 WL 284222, 5 (S.D.N.Y. Mar. 16, 2000)); *see also Universal Trading & Inv. Co. v. Tymoshenko*, No. 11 CIV. 7877 PAC, 2012 WL 6186471, at *2 n.3 (S.D.N.Y. Dec. 12, 2012) (same).

"Courts have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute." *Laydon*, 2015 WL 1515358, at *3 (citations omitted); *see also In re Aluminum Warehousing Antitrust Litig*., 13-md-2481 (KBF), 2015 WL 892255, at *5 (S.D.N.Y. Mar. 3, 2015) (rejecting the plaintiffs' argument "that Rule 4(k)(2) permits courts to exercise personal jurisdiction over a defendant on the basis of a conspiracy," and holding that "[t]he rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine"); *Tymoshenko v. Firtash,* 11-CV-2794 (KMW), 2013 WL 1234943, at *2-4 (S.D.N.Y. Mar. 27, 2013) (recognizing that conspiracy jurisdiction "has been widely criticized by courts and scholars" and declining to consider co-conspirators' contacts for the purpose of establishing personal jurisdiction over a foreign defendant).

Even if the Court were to find that exercising personal jurisdiction over the Foreign Defendants based on this theory was proper, Plaintiffs have not alleged sufficient facts to support the elements of conspiracy jurisdiction. Plaintiffs argue that the allegations in the SAC sufficiently plead the elements of a conspiracy jurisdiction because it includes allegations that (1) the Fixing process was "the central tool used to implement the conspiracy;" (2) Defendants' "involvement and knowledge that the conspiracy had effects in New York;" and (3) the Foreign Defendants' "co-conspirators . . . committed torts in New York by implementing the conspiracy via trades made at artificially deflated prices for NYMEX derivatives and futures." Pls.' JDX Opp'n at 21-22. Plaintiffs mischaracterize their own allegations. The allegations Plaintiffs' point to address (1) the domestic Defendants' businesses and involvement in various platinum and palladium markets and transactions (SAC ¶¶ 33-36); (2) the relationship between the Fix Price and the price of platinum and palladium derivatives (SAC ¶ 12); (3) the Defendants' alleged motive in manipulating the Fix

Price (SAC ¶¶ 15, 170, 193-195); and (4) general allegations about governmental investigations that do not identify any specific defendant, market, or conduct.  Nowhere in the SAC do Plaintiffs allege that any Defendant—foreign or domestic—engaged in any activity related to the Fixing process or the Fixing Calls while present in New York.  Accordingly, because Plaintiffs failed to allege that any conduct relevant to the alleged price manipulation took place in New York, they have failed to allege sufficient facts to establish personal jurisdiction on that basis.

*        *        *

For the foregoing reasons, and because Plaintiffs have failed to make a *prima facie* showing that the Court has personal jurisdiction over the Foreign Defendants, the Foreign Defendants' motions to dismiss for lack of personal jurisdiction are granted and Plaintiffs' claims against those defendants are dismissed.[24, 25]

### 4.  Jurisdictional Discovery

In the alternative, Plaintiffs argue that they are entitled to jurisdictional discovery if the Court grants the Foreign Defendants' motions to dismiss.  Pls.' JDX Opp'n at 25-26.  "It is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff

---

[24] Plaintiffs point to "[a] variety of other facts," which they assert indicate that Defendants' scheme targeted the U.S.," and which they argue demonstrate that the Court may exercise personal jurisdiction over the Foreign Defendants.  Those factors include, *inter alia*, that "[p]rices were 'fixed' at 2:00 p.m. London time each day to coordinate with the start of the U.S. trading day" and that the Fix Prices were "stated in U.S. dollars."  Pls.' JDX Opp'n at 1.  As Defendants point out, however, "[t]he U.S. dollar is the standard unit of currency in international commodities markets, including for the London and leading European markets that trade in platinum and palladium."  Def. LPPFC Reply to Pls.' Consol. Opp'n and in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("LPPFC JDX Reply"), Dkt. No. 131, at 3.  In addition, Plaintiffs have not alleged that the Fixing was conducted in a different currency prior to the beginning of the Class Period, or that the Fixing Members changed the currency in order to facilitate the alleged price manipulation.  As to the timing of the Fixing Calls, Plaintiffs do not allege that the Fixing Members changed the Fixing Calls' schedule to orchestrate their alleged scheme; in fact, as the LPPFC notes, Plaintiffs' assertion "is contradicted by [their] more specific allegation that '[f]or various reasons, such as changing daylight savings times, the Fix occurred at different times during the New York trading day, and sometime did not occur at all.'"  LPPFC JDX Reply at 3 (quoting SAC ¶ 10 n.3).

[25] In addition to its motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), ICBC also moves to dismiss the SAC against it for failure to state a claim.  *See* ICBC JDX Br. at 11-12.  Because the Court concludes that it does not have personal jurisdiction over ICBC, ICBC's Rule 12(b)(6) motion is denied as moot.

may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Ikeda v. J. Sisters 57, Inc.*, No. 14-CV-3570 ER, 2015 WL 4096255, at *8 (S.D.N.Y. July 6, 2015) (citing *Leon v. Shmukler,* 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014)); *see also In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d at 208. Where a plaintiff does not make a *prima facie* showing that personal jurisdiction exists, a district court is "well within its discretion in declining to permit [jurisdictional] discovery." *Best Van Lines*, 490 F.3d at 255 (citations omitted); *see also Jazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir. 1998) (finding that the district court did not err in denying jurisdictional discovery where the plaintiffs did not establish a *prima facie* case that the district court had jurisdiction over the defendant). And "'[d]istrict courts in this [C]ircuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction.'" *Laydon*, 2015 WL 1515358, at *7 (quoting *Stutts v. De Dietrich Grp.,* 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) (collecting cases)) (second alteration in *Laydon*).

The Court has not identified any persuasive reason to allow jurisdictional discovery at this stage, and Plaintiffs have pointed to none. The allegations in the SAC are insufficient to support Plaintiffs' application. Among other cases, Plaintiffs cite *In re Magnetic Audiotape* in support of their application for jurisdictional discovery. Pls.' JDX Opp'n at 26 n.25. That case is distinguishable. There, the complaint included an allegation which specifically cited the minutes of a meeting—which was not mentioned in the opinion denying jurisdictional discovery—that an executive of the dismissed parent company had been present at an in-person meeting at which a price-fixing conspiracy was allegedly discussed. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 208. The defendant asserted that this was simply a courtesy meeting and that no price-fixing discussion in fact took place. *Id.* The Second Circuit vacated the district court's dismissal of that defendant, holding that the plaintiffs should at the very least have been allowed to further develop this point through discovery. *Id.*

Those facts are a far cry from the facts alleged in the SAC.  The only allegations that link any of the Foreign Defendants to New York are that they transacted in Platinum and Palladium Investments traded on NYNEX and other U.S.-based exchanges and markets.  Such allegations are too generalized, too devoid of meaningful context, and too remote from the unlawful conduct alleged in the SAC—*i.e.*, the Fixing—to allow Plaintiffs to embark on a jurisdictional mining expedition.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 240 (S.D.N.Y. 2015) (declining application for jurisdiction discovery); *Laydon*, 2015 WL 1515358, at *7 (same).  Accordingly, Plaintiffs' application for jurisdictional discovery is denied.

### F.  UBS's Motion to Dismiss for Failure to State a Claim

UBS moves to dismiss all claims against it pursuant to Rule 12(b)(6).  UBS argues that it did not participate in the Fixing, was not a member of the Fixing, and played no role in the alleged price manipulation underlying Plaintiffs' Sherman Act, CEA, and unjust enrichment claims.  Mem. of Law in Supp. of Individual Mot. of UBS AG and UBS Securities LLC to Dismiss Pls.' Second Consol. Amend. Class Action Compl. ("UBS Br."), Dkt. No. 114, at 1.

The SAC does not allege that UBS participated in the Fixing and contains sparse allegations regarding UBS's presence in the platinum and palladium market.  Plaintiffs allege that UBS AG is a Swiss corporation with its principal place of business in Zurich, Switzerland.  SAC ¶ 41.  Plaintiffs allege that UBS Securities LLC is a Delaware company, a wholly owned subsidiary of UBS AG, with its principal place of business in Stamford, Connecticut.  SAC ¶ 42.  As alleged in the SAC, "since its inception UBS has operated a large precious metals business;" UBS "holds itself out as 'a leading provider of physical and derivative precious metal products to a broad range of customers around the globe."  SAC ¶ 43 (internal quotation marks and citations omitted).  Plaintiffs also allege that "UBS executes client trades in physical platinum and palladium markets, on NYMEX, in platinum and palladium derivatives, and in shares of platinum and palladium ETFs."  SAC ¶ 44.  In addition,

# SPA-100

Plaintiffs allege that "UBS operates electronic platforms for trading platinum and palladium products" and "conducts proprietary trading in the platinum and palladium markets." SAC ¶ 44. Throughout the Class Period, Plaintiffs allege, "UBS was a market-making member of the LPPM, cleared platinum and palladium transactions, and entered directly into platinum and palladium spot, forward, option, and platinum and palladium ETF share transactions with members of the Class." SAC ¶ 44.

The SAC's allegations concerning UBS fail to state a claim for violation of § 1 of the Sherman Act. As discussed above, *supra* Part III.B(1), to overcome a motion to dismiss for failure to state a claim under § 1, a plaintiff must plead facts from which the court can infer the existence of an agreement in restraint of trade. In the absence of direct evidence of an agreement, Plaintiffs must plead sufficient facts showing parallel conduct as well as circumstantial evidence and plus factors from which the Court can infer the existence of a conspiracy. *Mayor & City Council of Baltimore*, 709 F.3d at 136 *see also Twombly*, 550 U.S. at 557; *Gelboim,* 823 F.3d at 781. The allegations against UBS fall far short of meeting this standard. UBS is not alleged to have been a member of the Fixing during the Class Period, or to have participated in the Fixing, either directly or indirectly. That it is an LPPM market maker does not constitute circumstantial evidence of UBS's misconduct. If it did, the remaining forty-seven LPPM members, which Plaintiffs did not name as defendants in the SAC could have been brought into this action.

In addition, Plaintiffs' assertion that UBS, along with the Fixing Members, allegedly offered below-market platinum and palladium spot quotes during the Class Period, suggests nothing more than parallel conduct. SAC ¶ 182. "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establish[ing] agreement or itself constitut[ing] a Sherman Act offense.'" *Twombly*, 550 U.S. at 553 (internal quotation marks and citations omitted); *see also In re Elevator Antitrust Litig.*, 502 F.3d at 51

("Similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy.").

In opposition to UBS's motion, Plaintiffs argue that they have alleged sufficient plus factors and circumstantial evidence from which the Court can infer an agreement in restraint of trade.  *See* Pls.' Opp'n to UBS's Mot. to Dismiss ("Pls.' UBS Opp'n"), Dkt. No. 127, at 1-5.  Plaintiffs allege that FINMA found "serious misconduct" by UBS in precious metal trading," that "UBS has recently agreed to cooperate with the U.S. DOJ and CFTC's precious metals investigation in exchange for immunity from criminal charges, that the CFTC found that UBS "actively colluded to manipulate the price of Forex benchmarks," and that the CFTC imposed hefty fines on UBS and other market-participating banks for "actively collud[ing] to manipulate the price of Forex benchmarks." SAC ¶ 168.  As already noted above, however, *see supra* Part III.B(1)(b), allegations that regulators have been investigating price manipulation in the precious commodities markets do not constitute circumstantial evidence of a conspiracy in the platinum and palladium market in particular.  *See In re Gold*, 2016 WL 5794776, at *17 (concluding that ongoing government investigations into possible manipulation of precious metals benchmarks and findings of misconduct with respect to FX and LIBOR benchmarks do not constitute circumstantial evidence of a conspiracy in the defendants' market) (citations omitted); *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (concluding that allegations of antitrust wrongdoing abroad, "absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here'").  In the absence of additional circumstantial evidence or plus factors, Plaintiffs' allegations do not plausibly support an inference that UBS was part of the alleged conspiracy.  *See In re Gold*, 2016 WL 5794776, at *30 (dismissing Sherman Act claim against UBS where plaintiffs failed to allege that UBS participated in the gold benchmark price setting and the allegations in the

complaint did not plausibly support an inference that a conspiracy existed); *see also In re Silver*, 2016 WL 5794777, at *26 (same).[26]

Plaintiffs' CEA claims against UBS fail for substantially the same reasons. Both CEA price manipulation and manipulative device claims require that Plaintiffs plausibly plead that (1) UBS "possessed an ability to influence market prices;" (2) "an artificial price existed;" (3) UBS "caused the artificial price; and" (4) UBS "specifically intended to cause the artificial price." *Amaranth III*, 730 F.3d at 173 (internal quotation marks and citations omitted). Here, Plaintiffs did not allege that UBS played a role in the conspiracy to manipulate and suppress the platinum and palladium Fix Prices. Therefore, Plaintiffs fail adequately to plead that UBS caused the artificial price, that it had the ability to suppress the platinum and palladium Fix Prices, or that UBS intended to cause the alleged price manipulation during the Class Period. Plaintiffs' conclusory allegations also fail to show that, beyond its status as an LPPM market maker, UBS played any role in the Fixing or associated itself with the Fixing Members. Therefore, Plaintiffs have also failed adequately to plead CEA aiding and abetting and principal-agent liability claims. *See, e.g., id.* (stating that proof of unlawful intent is required for aiding and abetting liability under the CEA). Plaintiffs' unjust enrichment claim against UBS is likewise dismissed for the same reasons articulated above with respect to the Fixing Members. *See supra* Part III.D; *see also In re Gold*, 2016 WL 5794776, at *30 (dismissing CEA claim against UBS where Plaintiffs failed to allege that UBS caused the alleged

---

[26] Plaintiffs cite *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) and *In re Foreign Exch. Benchmark Rates*, 74 F. Supp. at 588-89, in support of their argument that the Court may rely on allegations concerning regulatory investigations as showing that UBS participated in the alleged manipulation of the platinum and palladium Fix Prices. *See* Pls.' UBS Opp'n at 7-8. Those cases are inapposite. For example, in *In re Foreign Exch. Benchmark Rates*, the court took "judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and *for the very conduct alleged in the Complaint.*" 74 F. Supp. 3d at 592 (emphasis added). On that basis, the court found that "[t]he penalties provide[d] non-speculative support for the inference of a conspiracy." *Id.* Plaintiffs' references to foreign and domestic investigations and settlements do not involve "the very same conduct conducted alleged in the" SAC. Plaintiffs' reliance on *Anderson News* is similarly unavailing. Pls.' UBS Opp'n at 9 (citing *Anderson News*, 680 F.3d at 184 ("The choice between . . . plausible inferences . . . is one for the factfinder.")). While Plaintiffs are correct that it is the factfinder's role to choose between plausible inferences, it nevertheless remains the Court's role to distinguish between plausible and conclusory allegations.

price manipulation or participated in the gold benchmark price setting, and the allegations in the complaint did not plausibly support an inference that UBS was a member of the alleged conspiracy); *In re Silver*, 2016 WL 5794777, at *26 (same).  Accordingly, UBS's motion to dismiss the SAC is granted, and Plaintiffs' claims against UBS are dismissed.

### G.   BASF Corp.'s Motion to Dismiss for Failure to State a Claim

In addition to moving to dismiss BASF Metals for lack of personal jurisdiction, BASF moves to dismiss all claims against BASF Corp. pursuant to Rule 12(b)(6).  *See* BASF JDX Br. at 11-12.

Plaintiffs allege that BASF Corp. "is a Delaware-registered company," which is the "parent of BASF Catalysts LLC," and that BASF Catalysts LLC "holds itself out as the global leader in catalysts."  SAC ¶ 30.  Plaintiffs also allege that "BASF Precious Metals Services," an entity not named as a defendant in the SAC, "is a full service provider of precious metals and products and services that leverages BASF's unparalleled market insight and decades of precious metals sourcing, trading, and hedging expertise to create a tangible competitive advantage for BASF and BASF's industrial customers."  SAC ¶ 30 (internal quotation marks, alterations, and citations omitted).  In addition, according to Plaintiffs, "BASF Corp. serves as approved carrier, assayer, and refiner of platinum and palladium for CME Group in the U.S." and "provides CME Group approved platinum and palladium brands."  SAC ¶ 30.  "This branded physical platinum and palladium," Plaintiffs explain, "is deliverable against NYMEX platinum and palladium futures contracts."  SAC ¶ 30.  Plaintiffs further allege that BASF Metals, a defendant and one of the Fixing Members, "is organizationally part of and subordinate to BASF Corp."  SAC ¶ 31.

Much like Plaintiffs' allegations against UBS, the SAC's exiguous allegations against BASF Corp. do not meet even the most liberal pleading standard, let alone the heightened pleading standard applicable to their CEA claims.  In response to BASF's motion to dismiss, Plaintiffs maintain that they "provided a meaningful connection between BASF Metals, the Fixing [M]ember,

and BASF Corp.," and claim that "[i]t is immaterial that Plaintiffs do not allege that BASF Corp. (i) participated in the daily Fixing calls; (ii) served as a member of the LPPFC; or (iii) maintained a net short position during the Class Period." Pls.' JDX Opp'n at 26-27. According to Plaintiffs, their allegations that "BASF Corp. engaged in acts in furtherance of the conspiracy and shared common interest with BASF Metals and the other Defendants in achieving the conspiracy's aims" are "sufficient to defeat a Rule 12(b)(6) motion." They are not. Other than educating the Court about the BASF corporate structure, the SAC says nothing about BASF Corp.'s involvement—direct or indirect—in the alleged price manipulation, BASF Corp.'s role in executing the scheme, or BASF Corp.'s motive in artificially suppressing the Fix Price. Plaintiffs' vacuous claims to the contrary cannot salvage their failure adequately to plead any claim against BASF Corp. Accordingly, BASF's motion to dismiss the SAC against BASF Corp. is granted, and Plaintiffs' claims against BASF Corp. are dismissed.

### H. Leave to Amend

Although Plaintiffs have already once amended their complaint in response to Defendants' motion to dismiss, in this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). The Court will, therefore, grant Plaintiffs leave to amend once again. However, Plaintiffs should not expect any additional opportunities to amend their complaint. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough.") (citations omitted).

Any amended complaint must be filed no later than **May 2, 2017**.  If Plaintiffs file an amended complaint, Defendants must answer or otherwise respond to the amended complaint no later than **June 5, 2017**.  If Plaintiffs choose not to amend the SAC, the remaining Defendants must file an answer with respect to claims not dismissed in this opinion and order no later than **June 5, 2017**.

As noted above, *see supra* II.B, discovery in this action is stayed pursuant to the Court's April 21, 2015, order.  Dkt. No. 48.  Discovery in this action will remain stayed until the deadline for Defendants to answer or otherwise respond.  If Plaintiffs amend the SAC, and Defendants move to dismiss Plaintiffs' amended complaint, the parties may file a new motion for a stay of discovery no later than **June 5, 2017**.

If Plaintiffs do not amend the SAC, or if Defendants do not file a motion to stay by the deadlines specified above, the Court will schedule a Rule 16 conference promptly thereafter.

## IV.   CONCLUSION

For the foregoing reasons:

Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED.

Defendants' motion to dismiss Plaintiffs' Commodities Exchange Act claims is GRANTED IN PART AND DENIED IN PART.

Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is GRANTED.

Defendants' motion to strike portions of the SAC is DENIED.

ICBC's, BASF Metals', and the LPPFC's motions to dismiss for lack of personal jurisdiction are GRANTED.

ICBC's motion to dismiss for failure to state a claim is DENIED as moot.

Plaintiffs' application for jurisdictional discovery is DENIED.

BASF Corp.'s and UBS's motions to dismiss for failure to state a claim are GRANTED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 113 and 115.

SO ORDERED.

Dated:  March 28, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge

# SPA-107

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
                                    :

IN RE PLATINUM AND PALLADIUM     :
ANTITRUST LITIGATION                   :

                                    :

--------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 3/29/2020

Lead Case 1:14-cv-9391-GHW

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

      Platinum and palladium are precious metals. Plaintiffs in this case allege that Defendants conspired to manipulate the price of these metals by "fixing the Fix." *In re Platinum and Palladium Antitrust Litig.* ("*Platinum I*"), 1:14-CV-9391-GHW, 2017 WL 1169626, at *5 (S.D.N.Y. Mar. 28, 2017). The Fix was supposed to be a process by which Defendants determined the worldwide benchmark price of platinum and palladium according to the laws of supply and demand. But Plaintiffs allege that Defendants colluded to push the benchmark price below the price that would have prevailed in a competitive market, which allegedly caused Plaintiffs to receive lower prices for their platinum and palladium investments than they otherwise would have.

      The Court reaffirms the conclusion it reached in *Platinum I* that Plaintiffs are not efficient enforcers of the antitrust laws because Plaintiffs have not adequately alleged that they traded directly with any Defendant or that Defendants dominated the market for platinum and palladium derivatives. However, the Court has personal jurisdiction over the foreign defendants because Plaintiffs have amended their complaint to plausibly allege conduct by their co-conspirators in the United States in furtherance of the conspiracy to manipulate the Fix price. Finally, because Plaintiffs' Commodities Exchange Act ("CEA") claims are predominately foreign, those claims are impermissibly extraterritorial. Accordingly, Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED, the foreign defendants' motion to dismiss for lack of personal jurisdiction is DENIED, and Defendants' motion for reconsideration is GRANTED.

# I. BACKGROUND[1]

## A. Facts[2]

Platinum and palladium are "closely related precious metals." TAC ¶ 104. "While platinum and palladium—like gold and silver—have industrial uses, all four have traditionally been traded internationally . . . [and] held primarily for their exchange value rather than industrial use." *Id.* ¶ 54 (citation omitted). The allegations in this case center on the "London Platinum and Palladium Price Fixing (the 'Fixing' or 'Fix')." *Id.* ¶ 3. The Fix was a "private conference call twice each London business day" that "set global benchmark prices for platinum and palladium." *Id.* The Fix set this benchmark by establishing the price for physical platinum and palladium; the physical platinum and palladium was housed in London or Zurich. *Id.* ¶ 59.

The London Platinum and Palladium Fixing Company Ltd. ("LPPFC") operated as the "vehicle" for the Fix from 2004 to 2014. *Id.* ¶ 3. Throughout the period between January 1, 2008 and November 30, 2014 (the "Proposed Class Period"), there were four "members" of LPPFC that participated in the Fix. *Id.* Those members are the defendants in this case: BASF Metals Limited ("BASF Metals"), Goldman Sachs International ("Goldman Sachs"), HSBC Bank USA, N.A. ("HSBC"), and ICBC Standard Bank Plc ("ICBC Standard"). *Id.*

In theory, the Fix price was determined through a bona fide Walrasian auction among Defendants. *Id.* ¶ 58. One Fixing member, known as the Chair, would announce an opening price. *Id.* ¶ 59. Then, each Defendant would announce whether they were interested in buying or selling platinum and palladium at that price. *Id.* The Chair would then adjust the Fix price until the market

---

[1] The Court has issued a prior opinion in this case that provides further background. *See Platinum I*, 2017 WL 1169626, at *2-9.

[2] These facts are drawn from the Third Consolidated Amended Class Action Complaint ("TAC"), Dkt No. 183, and are accepted as true for the purposes of the Rule 12(b)(6) motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

reached an equilibrium at which supply equaled demand for platinum and palladium at the Fix price. *Id.* ¶ 62; *see Platinum I*, 2017 WL 1169626, at *3.

Platinum and palladium trade in at least two markets. First, "[t]he market for physical platinum and palladium operates on an over-the-counter ('OTC,' *i.e.*, between private parties) basis." TAC ¶ 74; *see Platinum I*, 2017 WL 1169626, at *4-5. Second, platinum and palladium futures and options contracts trade either OTC or on an "exchange." TAC ¶ 79; *see Platinum I*, 2017 WL 1169626, at *4-5 (defining the terms "futures contract" and "options contract"). The New York Mercantile Exchange ("NYMEX") is the "leading centralized exchange for platinum and palladium futures and options worldwide." TAC ¶ 79. Plaintiffs also allege that "NYMEX Platinum and Palladium prices move virtually in tandem with Fix prices." *Id.* ¶ 82; *see id.* ¶ 94 (alleging a correlation coefficient of 1.00 for physical platinum prices to futures prices and 0.99 for physical palladium prices to futures prices).

Plaintiffs Norman Bailey, Thomas Galligher, and Larry Hollin are individuals who "sold NYMEX platinum and palladium futures contracts at artificial[ly low] prices." *Id.* ¶ 28-30. Plaintiff White Oak Fund is a "private placement fund" also alleged to have transacted in NYMEX platinum futures contracts. *Id.* ¶ 32. Collectively, this opinion refers to these plaintiffs as the "Exchange Plaintiffs." The TAC alleges that Plaintiff KPFF Investment, Inc. "sold physical platinum and palladium" at artificially low prices. *Id.* ¶ 31. This opinion refers to KPFF as the "OTC Plaintiff."

The crux of Plaintiffs' allegations giving rise to this action is that Defendants took advantage of the Fixing Calls to set the Fix Price at lower levels than competitive market forces would otherwise have dictated. *Id.* ¶ 102; *see Platinum I*, 2017 WL 1169626, at *5. Plaintiffs allege that Defendants manipulated the Fix Price in two ways. First, Plaintiffs allege that Defendants "conspired to manipulate the Opening Price announced by the Chair at the beginning of the Fixing Calls." TAC ¶ 247; *see Platinum I*, 2017 WL 1169626, at *5. Second, Plaintiffs allege that

"Defendants misrepresented actual market supply and demand in order to move the AM and PM Fix Price to the level at which it was ultimately fixed."  TAC ¶ 247; *see Platinum I*, 2017 WL 1169626, at *5.

Plaintiffs allege that Defendants employed different strategies to profit from this manipulation.  First, Plaintiffs generally allege that Defendants exploited their foreknowledge of downward swings in the platinum and palladium Fix Price to make advantageous transactions in a variety of Platinum and Palladium Investments.  TAC ¶¶ 15-16; *see Platinum I*, 2017 WL 1169626, at *8.  Relatedly, Defendants also benefited from reducing their risk in digital options and other contracts with market-based triggers, such as "stop loss" orders and "margin calls."  TAC ¶ 208; *see Platinum I*, 2017 WL 1169626, at *8.  Second, the TAC alleges that Defendants were particularly motivated to suppress the Fix Price in order to profit from large net "short" positions that they allegedly held in the platinum and palladium futures market, including NYMEX, throughout the Proposed Class Period.  TAC ¶ 174; *see Platinum I*, 2017 WL 1169626, at *8.  In addition to these methods of profiting directly from manipulating the Fix, Plaintiffs allege that the Fixing calls enabled Defendants to employ other price manipulation tactics, including "front running," "spoofing," "wash sales," "painting the screen," and "jamming."  TAC ¶¶ 10, 179 & n.4; *see Platinum I*, 2017 WL 1169626, at *6 (defining these terms).

Plaintiffs present economic data in support of their claims that there were "artificial downward spikes around the time of the Fixing" for which "there is no innocent explanation."  TAC at 49, 91 (capitalization altered).  Plaintiffs also highlight government investigations into Defendants, which they claim "corroborate" their allegations.  *Id.* at 128 (capitalization altered).

## B. Procedural History

Plaintiffs commenced this action on November 25, 2014.  Dkt No. 1.  The parties filed a joint motion to consolidate five substantively similar complaints and to appoint Labaton Sucharow

LLP and Berger & Montague, P.C. as interim co-lead counsel for the proposed class, which the

Court granted.  Dkt No. 32.  Plaintiffs subsequently filed a consolidated amended complaint, and

Defendants moved to dismiss.  Dkt Nos. 45, 76, 79.  Plaintiffs then filed a second consolidated

amended class action complaint ("SAC"), and Defendants again moved to dismiss for failure to state

a claim and for lack of personal jurisdiction over certain foreign defendants.  Dkt Nos. 102, 115,

117, 119-20.

The Court granted those motions in part and denied them in part.  *Platinum I*, 2017 WL

1169626, at *53.  The Court held that Plaintiffs had plausibly alleged a conspiracy among

Defendants to violate the Sherman Act based on Plaintiffs' allegations of Defendants' "parallel

conduct" and other circumstantial evidence including that "the Fixing coincided with Defendants'

alleged price manipulation[,]" that Defendants allegedly acted against their own economic self-

interest, and that Defendants had a "common motive" to "profit from their foreknowledge of the

Fix Price[.]"  *Id.* at *10-16.  The Court also concluded that Plaintiffs had Article III standing.  *Id.* at

*16-17.  The Court then considered whether Plaintiffs had antitrust standing.  *See id.* at *18-25.  The

Court held that Plaintiffs had adequately alleged an antitrust injury.  *Id.* at *19-20.

However, the Court concluded that Plaintiffs were not "efficient enforcers" of the antitrust

laws.  *Id.* at *20-25.  Examining all four efficient enforcer factors, the Court determined that "it is

appropriate to draw a line between persons who transacted directly with Defendants and those who

did not."  *Id.* at *22.  Because Plaintiffs did not allege that they transacted directly with Defendants,

the Court held that Plaintiffs were not efficient enforcers of the antitrust laws.

The Court also concluded that Plaintiffs had plausibly alleged Commodities Exchange Act

("CEA") violations.  *Id.* at *25-37. [3]  The Court held that Plaintiffs' CEA claims were not

_____

[3] The Court also dismissed Plaintiffs' unjust enrichment claim.  *Id.* at *38.  Plaintiffs have chosen not to replead this claim.  *See* TAC ¶ 1.

impermissibly extraterritorial. *Id.* at *26-28. Those claims are the subject of Defendants' motion for reconsideration. In addition, the Court held that it did not have personal jurisdiction over Foreign Defendants BASF Metals, ICBC Standard, and LPPFC and denied Plaintiffs' request for jurisdictional discovery.[4] *Id.* at *39-49. Finally, the Court granted Plaintiffs leave to amend. *Id.* at *53.

### C. New Allegations in the TAC

In response to the Court's decision in *Platinum I*, Plaintiffs have added new allegations to the TAC. With respect to Plaintiffs' claim that they are "efficient enforcers" of the antitrust laws, Plaintiffs' new allegations can be grouped into four buckets. *See* TAC at 2-3. First, Plaintiffs present new allegations related to exchange trading on NYMEX. Plaintiffs allege that NYMEX is "owned and operated by CME [Chicago Mercantile Exchange] Group." *Id.* ¶ 4 n.3. The TAC alleges that "NYMEX—through its clearinghouse, CME Clearing—is the counterparty to all transactions on the exchange (*i.e.*, the buyer or seller to a NYMEX contract does not have any identified counterparty other than NYMEX)." *Id.* ¶ 80 (emphasis omitted); *see also id.* ¶ 81. Second, Plaintiffs allege that there is a close relationship between the Fix and NYMEX futures prices. *See id.* ¶¶ 5, 14, 79-103, 134, 143. Third, Plaintiffs allege that Defendants have substantial market share in both the OTC and NYMEX platinum and palladium markets. *See id.* ¶¶ 6, 38, 40, 42, 44, 64, 71, 73, 77, 191, 194, 199. Fourth, Plaintiffs allege that NYMEX is the leading centralized exchange for trading platinum and palladium derivatives. *See id.* ¶¶ 4, 79, 89.

Plaintiffs have also substantially narrowed the scope of the Class and the scope of the transactions covered by the Class definition. Plaintiffs "bring this action on behalf of themselves

---

[4] Plaintiffs have chosen not to replead their claim against LPPFC. *See* TAC ¶ 1. The Court also granted motions to dismiss filed by UBS and BASF Corporation ("BASF Corp.") for failure to state a claim. *Platinum I*, 2017 WL 1169626, at *50-52. Plaintiffs have chosen not to replead these claims. *See* TAC ¶ 1.

and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure,

seeking relief on behalf of" a class including "[a]ll persons or entities who during the period from

January 1, 2008 through November 30, 2014 . . . : (i) sold physical platinum or palladium (99.95% or

greater purity, or otherwise good delivery); (ii) sold platinum or palladium futures contracts traded

on NYMEX; (iii) sold platinum or palladium call options traded on NYMEX; or (iv) bought

platinum or palladium put options traded on NYMEX." TAC ¶ 265; *cf.* SAC ¶ 271 (including in the

proposed class those who "sold shares in platinum or palladium [exchange traded funds,]" those

who "sold over-the-counter platinum or palladium spot or forward contracts or platinum or

palladium call options[,]" and those who "bought over-the-counter platinum or palladium put

options.").

Additionally, Plaintiffs have added new allegations to the TAC with respect to BASF Metals

and ICBC Standard's alleged continuous presence in the United States and their allegedly suit-related

conduct in this country. *See* TAC ¶¶ 14, 34-38, 43-46, 64, 68, 72, 190-191, 194, 202. Plaintiffs allege

that both BASF Metals and ICBC Standard engaged in conduct directed at the NYMEX and that

information from the Fixing was disseminated to and traded on by traders in New York and New

Jersey, including on the NYMEX. *See id.* Specifically, Plaintiffs allege that United States-based

"precious metals traders" employed by a BASF Metals' affiliate "would update order information

during the Fixing and provide this updated order information to BASF [Metals'] participant in the

Fixing as the Fixing was conducted." *Id.* ¶ 38. Similarly, the TAC alleges that "New York-based

precious metals traders [employed by a United States affiliate of ICBC Standard] would update order

information during the Fixing and provide this updated order information to [ICBC Standard]'s

participant in the Fixing as the Fixing was conducted." *Id.* ¶ 44. Furthermore, the TAC alleges that

the participants in the Fixing on behalf of Defendants BASF Metals and ICBC Standard were in

"constant communication" with traders employed by United States-based affiliates. *Id.* ¶ 38 (BASF Metals); *id.* ¶ 44 (ICBC Standard).

The TAC asserts five claims for relief. First, the TAC alleges that Defendants made an agreement to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. §§ 1 *et seq.* TAC ¶¶ 273-79. Second, the TAC alleges a claim for manipulation in violation of the CEA, 7 U.S.C. §§ 1 *et seq.*, including Commodity Futures Trading Commission ("CFTC") Rule 180.2. TAC ¶¶ 280-84. Third, the TAC asserts that Defendants employed a manipulative device in violation of the CEA including CTFC Rule 180.1. *Id.* ¶¶ 285-89. Fourth, the TAC asserts a claim for principal agent liability in violation of the CEA. *Id.* ¶¶ 290-92. Finally, the TAC asserts a claim for aiding and abetting liability in violation of the CEA. *Id.* ¶¶ 293-95.

Defendants have again moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) as to all Defendants and for lack of personal jurisdiction as to the foreign defendants BASF Metals and ICBC Standard under Federal Rule of Civil Procedure 12(b)(2). Dkt Nos. 207-11.[5] Plaintiffs filed an opposition to both motions, Dkt Nos. 214-16, and Defendants filed their replies. Dkt Nos. 218-21. After those motions were fully briefed, Defendants also filed a motion for reconsideration of the Court's prior holding that Plaintiffs' CEA claims were not impermissibly extraterritorial. Dkt Nos. 235-36. Plaintiffs filed an additional opposition to that motion, Dkt No. 237, and Defendants filed an additional reply. Dkt No. 238.

---

[5] Defendants also ask the Court to take a "fresh look at the lack of particularity" in Plaintiffs' allegations. Joint Memorandum of Law in Support of Defendants' Motion To Dismiss Plaintiffs' Third Amended Complaint ("Mem."), Dkt No. 208, at 20. Having considered this argument, the Court declines to disturb its prior rulings holding that Plaintiffs have sufficiently alleged a conspiracy among Defendants.

## II. DISCUSSION

### A. Rule 12(b)(6) Motion[6]

#### 1. Legal Standard

Under Federal Rule of Civil Procedure 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   A defendant may nonetheless move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008)

---

[6] "Although a court should 'traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues.'" *Sullivan v. Barclays PLC*, 13-CV-2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013)).  "[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiffs['] cause of action, [a court] may address first the facial challenge to the underlying cause of action[.]" *Id.* (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012)).  Accordingly, the Court considers Defendants' Rule 12(b)(6) motion first.

(per curiam).  However, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

### 2. Application

Plaintiffs have not adequately alleged that they are efficient enforcers of the antitrust laws. As discussed in *Platinum I*, "[w]hile 'it is a well-established principle that the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate standing.'"  2017 WL 1169626, at *18 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005)) (alterations and some quotation marks omitted).  "Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement, the court must dismiss it as a matter of law."  *Id.* (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-76 (2d Cir. 2013)) (brackets omitted).

"To satisfy the antitrust standing requirement, 'a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations,' *i.e.*, that plaintiff is 'an "efficient enforcer" of the antitrust laws."  *Id.* (quoting *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum II*"), 833 F.3d 151, 157-58 (2d Cir. 2016)).  The Court concluded in *Platinum I* that Plaintiffs have adequately alleged an antitrust injury, *id.* at *19-20, and it does not disturb that conclusion here.

Thus, the question before the Court is whether Plaintiffs are "efficient enforcers of the antitrust laws."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777-78 (2d Cir. 2016) (citation omitted).  The efficient enforcer inquiry focuses on four factors:  "(1) the 'directness or indirectness of the asserted injury' . . . ; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [plaintiffs'] damages claim is 'highly speculative;' and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of

damages on the other.'"  *Id.* at 778 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-44 (1983)).

"The efficient enforcer inquiry is a general balancing test in which the importance assigned to each factor 'will necessarily vary with the circumstances of particular cases.'"  *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 332 (S.D.N.Y. 2018) (quoting *Gatt*, 711 F.3d at 78).  The factors are meant to determine "whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement[.]'"  *Gatt*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542).  Because the efficient enforcer inquiry presents somewhat different considerations for the OTC Plaintiff and the Exchange Plaintiff, the Court conducts the inquiry for each in turn.

### a. OTC Plaintiff

The OTC Plaintiff is not an efficient enforcer of the antitrust laws because Plaintiffs have not alleged that it transacted directly with any Defendant.  The TAC alleges that the OTC Plaintiff "sold physical platinum and palladium[.]"  TAC ¶ 31.  Plaintiffs also allege that "[d]uring the [Proposed] Class Period," each Defendant "entered directly into platinum and palladium transactions with members of the Class."  *Id.* ¶ 38 (BASF Metals); *id.* ¶ 40 (Goldman Sachs); *id.* ¶ 42 (HSBC); *id.* ¶ 44 (ICBC Standard).  In addition, the TAC alleges a number of "dates on which one or more of Plaintiffs['] sales coincided with Defendants['] manipulation of the PM Platinum fixing" and makes similar allegations for the PM Palladium Fixing.  *Id.*, apps. C & D (capitalization altered).[7]  However, Plaintiffs do not allege that the OTC Plaintiff transacted directly with any Defendant.

Accordingly, the analysis of the four efficient enforcer factors as applied to the OTC Plaintiff focuses on whether it qualifies as an efficient enforcer, even though it did not transact

---

[7] Plaintiffs made similar allegations in the SAC, *see, e.g.*, SAC ¶ 34; apps. C & D, which the Court found to be insufficient to plausibly alleged that OTC plaintiffs were efficient enforcers.  *Platinum I*, 2017 WL 1169626, at *21-25.

directly with Defendants.  Plaintiffs allege that the Fix "set global benchmark prices for platinum

and palladium," *id.* ¶ 3, and that Defendants conspired to rig the Fix.  *See, e.g., id.* ¶ 102.  Thus,

Plaintiffs allege that Defendants manipulated the global benchmark price of platinum and palladium.

As discussed below, the application of the efficient enforcer factors where plaintiffs allege

manipulation of a benchmark is not straightforward.  Ultimately, with respect to the OTC Plaintiff,

the Court adheres to its decision in *Platinum I* to "dr[a]w a line between plaintiffs who transacted

directly with defendants and those who did not."  2017 WL 1169626, at *22 (quoting *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), 11 MDL 2262 (NRB), 2016 WL 7378980, at *16

(S.D.N.Y. Dec. 20, 2016)) (brackets omitted).  Because the TAC does not allege that the OTC

Plaintiff transacted directly with any defendant, it is not an efficient enforcer.

### i. Directness of Injury

The first efficient enforcer factor is "the 'directness or indirectness of the asserted injury.'"

*Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540).  This factor "requires evaluation of the

'chain of causation' linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing."  *Id.*

(quoting *AGC*, 459 U.S. at 540); *see also In re Commodity Exch., Inc.* ("*Gold*"), 213 F. Supp. 3d 631, 653

(S.D.N.Y. 2016) (holding that this factor "requir[es] proximate causation" between the antitrust

injury alleged by plaintiff and defendants' allegedly anticompetitive conduct) (citing *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014); *DNAML PTY, Ltd. v. Apple Inc.*, 25

F.Supp.3d 422, 430 (S.D.N.Y. 2014); *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver I*"), 213 F.

Supp. 3d 530, 552 (S.D.N.Y. 2016)) (capitalization altered).

The first factor is problematic for Plaintiffs' argument that the OTC Plaintiff is an efficient

enforcer in this case.  Plaintiffs allege that the Fixing set the "globally accepted benchmark prices"

for platinum and palladium.  TAC ¶ 4.  In similar circumstances, some courts have held that

plaintiffs alleging injury via manipulation of a benchmark price satisfy the proximate causation

requirement because their allegation is that they are directly injured by defendants' manipulation of the benchmark, regardless of whether they have transacted directly with defendants. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 165 (S.D.N.Y. 2018) (describing the first efficient enforcer factor as requiring plaintiffs to "demonstrate[] a sufficiently direct injury" and concluding that the plaintiffs had met that standard because they "allege[d] that they engaged in transactions for" derivatives linked to a financial benchmark "and that their returns were lower because of defendants' anticompetitive conduct"); *Gold*, 213 F. Supp. 3d at 653-54 (concluding that the plaintiffs "ha[d] demonstrated a sufficiently direct injury" in similar factual circumstances).[8]  On this view, Plaintiffs have sufficiently alleged that Defendants proximately caused the OTC Plaintiff to receive lower prices than it otherwise would have when it sold its platinum and palladium.

On the other hand, where a plaintiff does not purchase directly from defendant, there are "significant intervening causative factors," which may "attenuate the causal connection between the violation and the injury." *LIBOR VI*, 2016 WL 7378980 at *15.  When "[a] plaintiff and a third party" choose to "incorporate [a benchmark] into a financial transaction without any action by defendants whatsoever," the "independent decision to do so" may attenuate "the chain of causation between defendants' actions and a plaintiff's injury." *Id.* at *16.[9]  Thus, although the causation

---

[8] *See also* Sharon E. Foster, *Antitrust Efficient Enforcer and the Financial Products Benchmark Manipulation Litigation* ("*Benchmark Manipulation Litigation*"), 13 Ohio St. Bus. L.J. 99, 137 (2019) (opining "that there is no intervening cause or persons between plaintiffs' damages and defendants' conduct" in benchmark manipulation cases); *cf. Gelboim*, 823 F.3d at 779 ("At first glance, here there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with [the defendants].").
[9] *See also Sullivan*, 2017 WL 685570, at *17 ("A defendant may have had no knowledge of the existence of a particular transaction, and the plaintiff may have had no dealings with the defendant, but, provided the derivative product incorporated [the benchmark] as a price term, it would fall within the scope of plaintiffs' claims."); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG* ("*CHF LIBOR*"), 277 F. Supp. 3d 521, 560-61 (S.D.N.Y. 2017). *But see* Foster, *Benchmark Manipulation Litigation* at 138-39 (challenging this analysis because "it assumes, incorrectly, that plaintiffs had a choice, and the bargaining power to affect that choice, regarding what benchmark to select as part of the price equation. . . . The economic reality was that LIBOR benchmarks controlled approximately 75% of the global market for interest rate financial products during the relevant time period.  Further, as a practical matter, some benchmark had to be used to estimate price. . . .  Leading benchmarks, such as LIBOR, were used as a matter of course[,] not as a matter of choice.") (footnote and citations omitted).

analysis does not itself preclude Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer, the problems of proving causation in this case is a significant factor in the efficient enforcer analysis.

### ii. Existence of More Direct Victims

The second efficient enforcer factor is "the 'existence of more direct victims of the alleged conspiracy[.]'" *Gelboim*, 823 F.3d at 779 (quoting *AGC*, 459 U.S. at 542). Generally, "[w]hether there is a more direct victim of Defendants' alleged antitrust violation turns 'chiefly on whether the plaintiff is a consumer or a competitor.'" *Platinum I*, 2017 WL 1169626, at *23 (quoting *Gelboim*, 823 F.3d at 779). However, a plaintiff's status "is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the plaintiff is a consumer or a competitor." *Id.* (quoting *Gelboim*, 823 F.3d at 779). "'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779.

The existence of more direct victims of Defendants' alleged conspiracy does not weigh clearly in favor of or against the conclusion that Plaintiffs have sufficiently pleaded that the OTC Plaintiff is an efficient enforcer. On the one hand, those who transacted directly with Defendants may be conceived of as more direct victims of Defendants' alleged conspiracy than those who did not.

On the other hand, *Gelboim* held that this factor may have "diminished weight" in benchmark manipulation cases. 823 F.3d at 779. "In *Gelboim*, the Second Circuit recognized that 'one peculiar feature of that case was that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks.'" *Platinum I*, 2017 WL 1169626, at *23 (quoting *Gelboim*,

823 F.3d at 779) (other citations and brackets omitted).  What *Gelboim* labeled a "peculiar feature" is

present in any benchmark manipulation case, and *Platinum I* concluded that it is "also present here.

Those who transacted in [p]latinum and [p]alladium [i]nvestments with other market participants

would be injured to the same extent and in the same way as Defendants' direct customers."  *Id.*

(quoting *Gelboim*, 823 F.3d at 779) (other citations omitted); *see also* Foster, *Benchmark Manipulation*

*Litigation* at 140-41 (arguing that so long as the price a purchaser paid was tied to the relevant

benchmark, it does not matter whether a plaintiff transacted directly with a defendant).  It was for

this reason that *Gelboim* held that whether there were more direct victims of the alleged conspiracy

should receive "diminished weight" in cases like this one.  823 F.3d at 779.  Consequently, both

because *Gelboim* indicated that this factor carries diminished weight in benchmark manipulation cases

and because it does not clearly cut for or against the OTC Plaintiff's efficient enforcer status, the

second factor does not carry much weight in the Court's analysis.

### iii. Speculative Damages

The third efficient enforcer factor is "whether the damages would necessarily be 'highly

speculative[.]'"  *Gelboim*, 823 F.3d at 780 (quoting *AGC*, 459 U.S. at 542).  "'Some degree of

uncertainty stems from the nature of antitrust law' and 'the wrongdoer shall bear the risk of the

uncertainty which his own wrong has created.'  At the same time, 'highly speculative damages is a

sign that a given plaintiff is an inefficient engine of enforcement.'"  *CHF LIBOR*, 277 F. Supp. 3d at

563 (first quoting *Gelboim*, 823 F.3d at 780; then quoting *DDAVP*, 585 F.3d at 689; and then

quoting *Gelboim*, 823 F.3d at 779).  "Damages claims may . . . be too speculative where:  (1) 'the

damages claim is conclusory'; (2) 'the injury is so far down the chain of causation from defendants'

actions that it would be impossible to untangle the impact of the fixed price from the impact of

intervening market decisions'; or (3) 'due to external market factors, there is no relationship between

the fixed price and the price that the plaintiffs ultimately paid.'" *Id.* (quoting *LIBOR VI*, 2016 WL 7378980, at *17-18).

This factor also does not cut clearly in favor of or against Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer. On the one hand, the OTC Plaintiff's damages claim is not conclusory; if, as Plaintiffs allege, Defendants suppressed the price of platinum and palladium, the OTC Plaintiff's theory of damages flows directly from that suppression. Moreover, Plaintiffs have alleged that the OTC Plaintiff suffered a direct injury as a result of Defendants' manipulation of the benchmark price for platinum and palladium, so the OTC Plaintiff's injury is arguably not causally attenuated from Defendants' alleged manipulation. And, although the price of platinum and palladium is undoubtedly influenced by market forces independent of Defendants' alleged manipulation, the same is true to some extent in any Sherman Act case. *Cf. Gelboim*, 823 F.3d at 780 ("Some degree of uncertainty stems from the nature of antitrust law.").

On the other hand, as in *Gelboim*, damages calculations in this case "present[] some unusual challenges." *Id.* at 781. In *Platinum I*, the Court expressed concern about Plaintiffs' ability to "untangle the impact" of Defendants' alleged conspiracy "from the impact of intervening market decisions." *LIBOR VI*, 2016 WL 7378980, at *17; *see Platinum I*, 2017 WL 1169626, at *23-25 (discussing the difficulties calculating damages would present in this case). Those concerns have not entirely abated. Accordingly, this factor also does not carry much weight in the Court's analysis of whether the OTC Plaintiff is an efficient enforcer of the antitrust laws.[10]

---

[10] The Court observes that the third efficient enforcer factor may be in tension with traditional principles of notice pleading. In most areas of law, concerns about damage calculations are deferred until after the pleading stage. *See* Foster, *Benchmark Manipulation Litigation* at 142 (opining that the concern about speculative damages "is not an efficient enforcer issue; rather, it is a problem of proof").

### iv. Duplicative Recovery & Complex Damages Apportionment

The fourth efficient enforcer factor is "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 544). This factor "reflects a 'strong interest in keeping the scope of complex antitrust trials within judicially manageable limits.'" *LIBOR VI*, 2016 WL 7378980 (quoting *AGC*, 459 U.S. at 543) (ellipsis omitted). It is arguably the most important factor in the efficient enforcer analysis. *See* Foster, *Benchmark Rate Manipulation* at 140 ("Efficient enforcer factors focus on duplicative recovery and complex apportionment.") (citations omitted).

Like the first efficient enforcer factor, this factor does not preclude Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer, but it does present significant challenges. On the one hand, if every seller of platinum and palladium collects damages from Defendants, it would not present a risk of duplicative recoveries. That is because every seller can only recover from Defendants once. *See ISDAFix*, 175 F. Supp. 3d at 61 ("[T]he damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery."). And, at first blush, the apportionment of damages may not seem complex. If Plaintiffs prove that Defendants manipulated the price of platinum and palladium by $X, then each seller should be able to recover $X. On this view, there is nothing more complex about damages apportionment in this case than in any price-fixing case.

Damages apportionment may not be so simple in this case, however. As noted above with respect to factor one, decisions by non-defendant buyers to incorporate the Fix into transactions over which Defendants have no control may create difficult questions of causation that bear on the damages analysis. In other words, where non-defendant parties decided to incorporate the Fix price into transactions without Defendants' knowledge, those decisions may make apportioning damages particularly complex. The complexity of damages apportionment is a significant factor in the

Court's analysis of whether plaintiffs who are not alleged to have transacted directly with Defendants are efficient enforcers in this case.[11]

### v. Conclusion

The Court concludes that plaintiffs who sold physical platinum and palladium and did not transact directly with Defendants are not efficient enforcers of the antitrust laws. As discussed above, the first and fourth factors raise serious concerns about the OTC Plaintiff's efficient enforcer status. Thus, after balancing the efficient enforcer factors with a focus on determining whether the OTC Plaintiff "is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement'" *Gatt*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542), the Court has concluded that plaintiffs who did not transact directly with defendants are not efficient enforcers.

This conclusion is reinforced by the possibility of disproportionate damages in benchmark manipulation cases. As noted above, benchmark manipulation cases present unique challenges for application of the efficient enforcer factors. *Gelboim* noted that one difficult issue arises with respect to so-called "umbrella" standing. "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823

---

[11] The allegation that there are government investigations into Defendants' manipulation of the Fix price does not carry significant weight in the Court's analysis. *Gelboim* noted that there were government investigations related to the transactions at issue in that case "ongoing in at least several countries." 823 F.3d at 780. The Second Circuit observed that "[s]ome of those government initiatives may seek damages on behalf of victims, and for apportionment among them" but did not elaborate on how this should factor into its analysis beyond stating that it was "wholly unclear on this record how issues of duplicate recovery and damage apportionment can be assessed." *Id.* Plaintiffs have made similar allegations of government investigations into Defendants' conduct in this case. TAC ¶¶ 229-40. The importance of related government investigations in similar cases is unsettled in this district. *Compare Sullivan*, 2017 WL 685570, at *20 ("[A]ctions of government regulators lessen the need for plaintiffs to function as private attorneys general and vindicators of the public interest.") *with In re For. Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), 13 CIV. 7789 (LGS), 2016 WL 5108131, at *8 (S.D.N.Y. Sept. 20, 2016) ("Because public enforcement does not provide redress to victims of the conspiracy, the OTC Class is an efficient and necessary enforcer."). In this case, the allegations that there are government investigations into the alleged manipulation of the Fix is not a significant factor in the Court's analysis.

F.3d at 778; *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 n.4 (7th Cir. 2002) ("If . . . cartel members A and B sell to customers X and Y, and then non-cartel member firm C makes sales at or near the enhanced cartel price to customer Z, the question arises whether A and B are liable to Z for the overcharges it paid."). Here, plaintiffs who did not transact directly with defendants are "umbrella" purchasers.

Benchmark manipulation cases present particularly difficult questions regarding umbrella standing because alleged manipulators can affect prices without dominating the market. In a standard (*i.e.*, non-benchmark) manipulation case, alleged manipulators must have at least a substantial market share—if not outright market dominance—to maintain a non-competitive price. That is because a cartel must have a large enough fraction of the market to exert control over the market price. In other words, if a would-be cartel is only a tiny fraction of the market, it cannot exert market power and thus is no cartel at all. This premise has led to a "scholarly consensus" that is "skeptical" about whether it is possible for private actors to manipulate large commodity markets. *See* Andrew Verstein, *Benchmark Manipulation*, 56 B.C. L. Rev. 215, 216 (2015).[12]

Benchmark manipulation cases are different. All that a would-be cartel must do is manipulate a benchmark. Where, as here, the benchmark is calculated based on a tiny fraction of market activity, a manipulator need only manipulate that tiny fraction of market activity.[13] And "[o]nce the benchmark is hardwired into legal relationships, manipulating the proxy pays off just as much as manipulating the underlying reality." *Id.* at 217; *see also id.* ("If the manipulator has agreed to

---

[12] *See also id.* at 216-17 ("To drive up the global price of an asset—such as silver—you have to buy a truly enormous amount. But you haven't gotten rich unless you can sell at the inflated price, and whatever forces raised the price while you bought will reverse when you try to sell. In theory, the plummeting price should precisely evaporate your profits. And in the meantime, you had to pay to transport and store a quarter of the world's silver.").

[13] *See also id.* at 218 ("By their nature, benchmarks describe a market based on some small slice of it. Careful manipulators can bias that slice. It is daunting to corner the world currency market, but it is less daunting to corner the two percent of the market whose price is considered by the leading benchmark. By shrinking the domain over which the manipulator must exercise influence, benchmarks directly circumvent the principal challenges to manipulation identified by scholars.") (footnote omitted).

sell oil at the benchmark price, tampering with the benchmark has the same effect as moving the worldwide supply of oil.") (citation omitted). As noted above, because the benchmark is then widely disseminated, any party that transacted based on the benchmark can reasonably complain that their damages were caused by defendants' manipulation. But allowing parties who did not transact directly with defendants to recover also leads to the causal attenuation and complex damages apportionment noted in the Court's discussion of the first and fourth efficient enforcer factors.

Thus, benchmark manipulation cases generate the *Gelboim* court's concern that "if the [defendants] control only a small percentage of the ultimate identified market," the defendants may be liable for "damages disproportionate to wrongdoing[.]" 823 F.3d at 779 (citation omitted); *see also id.* ("Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."). As noted above, absent a benchmark, it would be difficult—if not impossible—for defendants who "control[led] only a small percentage of the ultimate identified market" to exert meaningful control over the market price. *Id.* Thus, although the concern about disproportionate damages may arise where a plaintiff alleges market manipulation by means other than the manipulation of a benchmark, it generally will not do so as forcefully as in a benchmark manipulation case—at least where, as here, the benchmark is calculated based on a small slice of market activity or information submitted by a small number of market participants. Either the would-be cartel is too small (and fails in its attempt to manipulate the market) or the cartel has substantial market share (and market-wide damages are more proportional to the harm caused by defendants). Hence, *Gelboim*'s concern about disproportionate damages is particularly relevant in benchmark manipulation cases.

There is another distinct, though conceptually overlapping, issue that results from the problems identified in the Court's discussion of the first and fourth efficient enforcer factors. This concern is that, taking the facts as alleged in the TAC as true, every non-defendant buyer received a benefit from the lower prices that prevailed in the market as a result of Defendants' illegal conduct. That is, assuming that Defendants successfully downwardly manipulated the prices of platinum and palladium, non-defendant buyers received a windfall as a result of Defendants' manipulation. But there is no mechanism for non-defendant buyers to compensate Plaintiffs for this windfall.

This is another way of characterizing *Gelboim*'s concern about disproportionate damages. Plaintiffs' damages may be disproportionate to defendants' wrongdoing because Plaintiffs' damages are not proportional to defendants' ill-gotten gains. Some (even most) of plaintiffs' damages—the difference between the lower price that allegedly prevailed because of Defendants' manipulation and the price that allegedly would have prevailed absent Defendants' manipulation—flowed to non-defendants. Although this concern applies to "umbrella" plaintiffs generally and not only in benchmark manipulation cases, it is particularly vexing where defendants control only a small percentage of the identified market, as is more likely to be the case in benchmark manipulation cases.[14]

These concerns, which flow from the problems inherent in the application of the first and fourth efficient enforcer factors in benchmark manipulation cases, reinforce the Court's conclusion that it should adhere to its decision in *Platinum I* to "dr[a]w a line between platinum and palladium

---

[14] The question is not, as one commentator has argued, whether defendants are subject to "ruinous liability" or whether particular defendants are systemically important financial institutions. Foster, *Benchmark Manipulation Litigation* at 139-40. The Court agrees that there would be a "serious rule of law problem" if the efficient enforcer inquiry turned on whether a particular defendant was "too big to fail." *Id.* at 140; *cf.* Sharon E. Foster, *Too Big to Prosecute: Collateral Consequences, Systemic Institutions and the Rule of Law*, 34 Rev. Banking & Fin. L. 655, 674-85 (2015). Rather, the problem is whether defendants—no matter their size—are subject to liability that is *disproportionate* to their allegedly ill-gotten gains. This problem arises because of the structure of benchmark manipulation litigation and, more specifically, the problems of causal attenuation and complex damages apportionment noted above.

purchasers who transacted directly with Defendants and those who did not."  2017 WL 1169626, at

*22 (quoting *LIBOR VI*, 2016 WL 7378980, at *16).  In addition to addressing the problems

associated with the first and fourth efficient enforcer factors identified above, this approach has the

further advantage of rendering Plaintiffs' recovery essentially proportional to Defendants' allegedly

ill-gotten gains.  For similar reasons, "a critical mass of judges within this district" addressing similar

concerns in benchmark manipulation cases "have concluded that plaintiffs who are not direct

purchasers are not efficient enforcers in a benchmark manipulation case."  *In re London Silver Fixing,*

*Ltd., Antitrust Litig.* ("*Silver II*"), 332 F. Supp. 3d 885, 905 (S.D.N.Y. 2018) (citing *LIBOR VI*, 2016

WL 7378980, at *16; *Sullivan*, 2017 WL 685570, at *15; *Platinum I*, 2017 WL 1169626, at *22; *CHF*

*LIBOR*, 277 F. Supp. 3d at 558).  Hence, the Court reaffirms its conclusion in *Platinum I* that the

OTC Plaintiff is not an efficient enforcer because Plaintiffs have not alleged that the OTC Plaintiff

transacted directly with Defendants.

### b. Exchange Plaintiffs

The Exchange Plaintiffs are not efficient enforcers of the antitrust laws because Plaintiffs

have not adequately alleged that Defendants dominated the market for platinum and palladium

derivatives.  As an initial matter, the same concerns noted above with respect to causation and

complex damages apportionment also apply to the Exchange Plaintiffs.  Exchange Plaintiffs' choice

to incorporate the Fix price into their platinum and palladium derivative transactions arguably

attenuates the causal connection between Defendants' actions and their injury.  And damage

apportionment may be complex given Plaintiffs' choice to incorporate the Fix price independently

of any action by Defendants.  Hence, the same problems that flow from the application of the

efficient enforcer factors to the OTC Plaintiff's claim also arise in the exchange context.

The solution to those problems that the Court has adopted with respect to the OTC Plaintiff

is not readily transferrable to the exchange market, however.  As explained above, parties transact

directly in the OTC market. Therefore, an OTC plaintiff's counterparty is reasonably ascertainable. But "[t]he framework of dividing plaintiffs between those who transacted with defendants and those who did not in OTC transactions 'is not readily transferable to the futures market,' because a clearinghouse such as the CME, rather than any identifiable third party, serves essentially as the counterparty." *CHF LIBOR*, 277 F. Supp 3d at 561 (quoting *LIBOR VI*, 2016 WL 7378980, at *16); *see also LIBOR VI*, 2016 WL 7378980, at *16 ("[W]here a plaintiff's counterparty is *reasonably ascertainable* and is not a defendant . . . a plaintiff is not an efficient enforcer.") (emphasis added). For plaintiffs who sold on an exchange, "there is simply no way to tailor the standing analysis to those who dealt directly with defendants." *CHF LIBOR*, 277 F. Supp. 3d at 561. In this case, the Plaintiffs have amended their complaint to allege that CME Clearing "is the counterparty to *all* transactions on the exchange (*i.e.*, the buyer or seller to a NYMEX contract does not have any identified counterparty other than NYMEX)." TAC ¶ 80. In light of the Plaintiffs' amendments, the Court is persuaded that it cannot draw a line between those who transacted directly with defendants and those who did not in the exchange context.

Because the Exchange Plaintiffs' counterparties are not reasonably ascertainable, the Court is caught on the horns of a dilemma. Defendants argue that a necessary corollary of the Exchange Plaintiffs' argument that all NYMEX sellers should be able to collect damages is that "all sellers of NYMEX futures are equally positioned to enforce the antitrust laws" and that accepting their arguments would "effectively eliminate[] the efficient enforcer requirement altogether" in this case. Mem. at 17. On the other hand, Plaintiffs argue that "to allow only those who directly contracted with Defendants to state a claim would leave wide swaths of their victims—including the *entirety* of the futures and options traders—without a remedy." Plaintiffs' Letter to Court, Dkt No. 195, at 2 n.3. Both Plaintiffs and Defendants are correct. Because the Court cannot enforce the line between those who transacted directly with Defendants and those who did not on an exchange, either *no*

seller or *every* seller will be an efficient enforcer.  As Judge Stein observed with respect to exchange plaintiffs, "there is simply no way to tailor the standing analysis to those who dealt directly with defendants."  *CHF LIBOR*, 277 F. Supp. 3d at 561.  Therefore, it is difficult to "render[] plaintiffs' recovery essentially proportional to defendants' ill-gotten gains" and "the choice is between under-enforcement and over-enforcement[.]"  *Id.*

One way to resolve this dilemma is for plaintiffs to allege that defendants dominated the relevant exchange market.  Recognizing that counterparties to exchange plaintiffs are not reasonably ascertainable, judges in this district have adopted a test that "depends primarily on the extent of defendants' control of the market for the product traded on the exchange."  *CHF LIBOR*, 277 F. Supp. 3d at 561 (citations omitted).

*FOREX* was the first case to adopt this standard.  2016 WL 5108131, at *10.  In that case, Judge Schofield noted the *Gelboim* court's observation that "'at first glance there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks'" but also observed that *Gelboim* "expressed concern . . . with the possibility of damages disproportionate to wrongdoing 'if the Banks control only a small percentage of the ultimate identified market.'"  *Id.* (quoting *Gelboim*, 823 F.3d at 779) (ellipsis omitted).  She then concluded that this concern was inapplicable because the plaintiffs alleged that the defendants in that case "dominated the FX market with a combined market share of over 90% as significant participants in both OTC and exchange transactions."  *Id.* In other words, *Gelboim*'s concern about damages disproportionate to wrongdoing applied much less forcefully on the facts of *FOREX* because where defendants had over 90% market share, they would also be responsible for over 90% of the damages.  Three other judges in this district have followed Judge Schofield's lead, reasoning that "control of an exchange-based market 'may be viewed as a . . . way of ensuring that damages would not be greatly disproportionate to wrongdoing."

*CHF LIBOR*, 277 F.Supp.3d at 561 (quoting *LIBOR VI*, 2016 WL 7378980, at *16); *see also Silver II*, 332 F. Supp. 3d at 909.

The Court likewise adopts this test as one method by which plaintiffs can allege that an exchange plaintiff is an efficient enforcer.[15] The market domination test helps to resolve the causation and complex apportionment issues described above. Indeed, the market domination test may be thought to serve as a proxy for whether a plaintiff transacted directly with a defendant; in a market in which defendants dominate, it is far more likely that a plaintiff who bought on an exchange will have transacted directly with a defendant.

The question presented by the Exchange Plaintiffs on this motion is thus whether the Plaintiffs have adequately alleged that Defendants have dominated the platinum and palladium exchange market. The Court's inquiry consists of three steps. First, the Court must define the relevant market. Second, the Court must examine what share of that market Defendants are alleged to have controlled. Finally, the Court must determine whether Defendants controlled a sufficiently large percentage of the relevant market that they "dominated" it.

### i. Market Definition

The first step of the Court's inquiry is to define the relevant market. The "guiding precedent leaves room for debate as to how the 'market' should be defined" in cases like this one. *Gold*, 213 F. Supp. 3d at 653. Plaintiffs argue that they have alleged "a single market for platinum and palladium physical, futures and options transactions[.]" Opposition to Joint Motion to Dismiss for Failure to State a Claim ("Opp."), Dkt No. 216, at 15 n.4; *see, e.g.*, TAC ¶ 254 ("Plaintiffs were sellers in the market for Physical and NYMEX Platinum and Palladium[.]"). However, "[w]hile the Court is

---

[15] The Court does not hold that an allegation of market domination is the only method by which an exchange plaintiff can adequately plead antitrust standing in this context. For example, Defendants correctly note that the Exchange Plaintiffs have not "allege[d] that they traded *through* a clearing member affiliated with any Defendant." Mem. at 12. The Court does not take a position on whether allegations of this type plausibly plead that a plaintiff is an efficient enforcer.

bound by the factual allegations in the Complaint[]," the "definition of the relevant market is a legal

conclusion, not a factual one." *In re N. Sea Brent Crude Oil Futures Litig.* ("*Oil*"), 256 F. Supp. 3d 298,

312 (S.D.N.Y. 2017), *aff'd sub nom.*, *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir.

2019). Therefore, "[t]he Court must examine the facts alleged in the [TAC] to determine what

market or markets allegedly were restrained based on Plaintiffs' theory of the case." *Id.*

The TAC alleges harm in two different markets: The physical platinum and palladium

market and the NYMEX platinum and palladium market. The markets for physical commodities

and derivatives based on the price of those commodities are distinct.[16] *See Prime Int'l Trading*, 784 F.

App'x at 7 (holding that the "physical market for Brent crude oil" and the market for "derivatives

that were linked to, or otherwise tracked" a benchmark oil price were two separate markets); *Oil*, 256

F. Supp. 3d at 313.[17] This conclusion is consistent with other decisions in this district that have

concluded that OTC and exchange plaintiffs are "victims in . . . different markets." *Nypl v. JPMorgan*

---

[16] The TAC is inconsistent with respect to whether platinum and palladium derivatives traded on NYMEX are directly pegged to, or merely strongly correlated with, the price of physical platinum and palladium. *Compare* TAC ¶ 207 ("The Defendants were also large participants in NYMEX futures and options. These contracts, like those for physical sales of platinum and palladium, *directly incorporate or reference* the Fix price in order to determine the cash flows between the parties.") *with id.* ¶ 91 ("The Fixing also directly impacts the price of NYMEX Platinum and Palladium. This is because exchange prices *closely track* the price of spot platinum or palladium.") (emphases added). Therefore, the Court interprets the TAC as alleging that some NYMEX derivatives directly reference the Fix price while others do not. With respect to derivatives that directly incorporate the Fix price, the antitrust injury inquiry is straightforward because "[c]ourts in this Circuit consider manipulation of a price benchmark to constitute restraint of the market which that benchmark guides." *Oil*, 256 F. Supp. 3d at 313 (citing *Gelboim*, 823 F.3d at 776-77; *FOREX*, 2016 WL 5108131, at *6; *Alaska Elec. Pension Fund v. Bank of Am. Corp.* ("*ISDAFix*"), 175 F. Supp. 3d 44, 59 (S.D.N.Y. 2016)). With respect to derivatives that do not directly incorporate—but closely track—the Fix price, Plaintiffs have adequately alleged that Defendants' manipulation of the NYMEX market is "inextricably intertwined" with their manipulation of the price for physical platinum and palladium. *Aluminum II*, 833 F.3d at 161. Plaintiffs have adequately alleged that Defendants profited by trading in the NYMEX market and that the manipulation of the physical prices of platinum and palladium—*i.e.*, the prevailing price in the OTC market—was "the very means" by which Defendants profited in the NYMEX market. *Id.* at 162. Hence, the Exchange Plaintiffs have pleaded antitrust injury regardless of whether the derivatives they traded were directly linked to the Fix price. *Gold* reached a similar conclusion. 213 F. Supp. at 653 (holding that allegations that exchange plaintiffs suffered antitrust injury were "inextricably intertwined" with the Defendants' alleged manipulation of the Fix Price for antitrust standing purposes).

[17] The *Prime International Trading* and *Oil* courts conducted their analyses of the markets in which the plaintiffs had alleged injury in the context of the antitrust injury prong of the antitrust standing analysis, rather than (as here) in the context of the efficient enforcer factors. But because the analysis of which market or markets in which the plaintiffs have alleged injury must be consistent across both prongs of the antitrust standing inquiry, both are persuasive for the Court's analysis.

*Chase & Co.*, 15 CIV. 9300 (LGS), 2017 WL 3309759, at *6 (S.D.N.Y. Aug. 3, 2017) (citations

omitted); *see also FOREX*, 2016 WL 5108131, at *11 (holding that OTC plaintiffs and exchange

plaintiffs suffered injury in two different markets); *cf. CHF LIBOR*, 277 F. Supp. 3d at 562

(observing that both OTC and exchange plaintiffs could be efficient enforcers if the OTC plaintiffs

pleaded that they transacted directly with the defendants and the exchange plaintiffs pleaded that the

defendants dominated the market, implying that the OTC and exchange markets are distinct).[18]

    Moreover, Plaintiffs allege different theories of competitive harm in the OTC and exchange

markets.  For example, the TAC alleges that BASF Metals was "motivated by its desire to keep

prices of platinum and palladium low because both metals are used as raw materials in products

---

[18] This analysis shows why Defendants' argument that the OTC Plaintiffs are "more direct victim[s] of any alleged conspiracy to manipulate the" Fixing than are the Exchange Plaintiffs is unconvincing.  Mem. at 15.  Plaintiffs have sufficiently pleaded antitrust injury in two different markets, so the OTC Plaintiffs are not more direct victims than the Exchange Plaintiffs; they are victims in a different market.  Other judges in this district have also rejected the argument that participants in an OTC market are more direct victims of an alleged conspiracy than participants in an exchange market.  *See Nypl*, 2017 WL 3309759, at *6 ("Contrary to Defendants' argument, FX spot market participants who transacted directly at spot trading prices are not more direct victims, but rather victims in a different market.") (citations omitted); *FOREX*, 2016 WL 5108131, at *11; *cf. CHF LIBOR*, 277 F. Supp. 3d at 561-62 (noting that "[o]ne could . . . conceive of the Direct Transaction Plaintiffs as a 'more direct' victim than" an exchange plaintiff but also observing that exchange plaintiffs' claim could proceed if they plausibly alleged market domination by defendants).  Consequently, this argument is unconvincing.

The Court observes a tension in both parties' arguments with respect to this issue.  Plaintiffs assert that they have alleged "a single market for platinum and palladium physical, futures and options transactions[.]"  Opp. at 15.  This seems surprising because it supports Defendants' argument that the OTC plaintiff is a victim in the same market as the Exchange Plaintiffs.  For their part, Defendants argue that Plaintiffs are "asking the Court to hold Defendants trebly liable for transactions in '*two* extraordinarily large' markets (futures and physical)[.]"  Mem. at 6 (quoting *Platinum I*, 2017 WL 1169626, at *21) (emphasis added).  This also seems surprising because it supports Plaintiffs' arguments that OTC plaintiffs are not efficient enforcers with respect to the NYMEX market.  Hence, Plaintiffs and Defendants both appear to be arguing on the wrong side of the one-vs.-two markets question.

This odd configuration likely arises because both Plaintiffs and Defendants had incentives to argue the opposite side of this question on the antitrust injury prong of the antitrust standing analysis.  It is easier for Plaintiffs to show antitrust injury if they need only show such injury in one market; thus, Plaintiffs argued that physical and NYMEX platinum and palladium were traded in one market and Defendants argued that each set of Plaintiffs must demonstrate a distinct antitrust injury.  Plaintiffs now argue that "[w]hether physical and futures transactions represent one market or two markets is of no moment at this stage because the Court already ruled that Plaintiffs suffered antitrust injury."  Opp. at 15 (citing *Platinum I*, 2017 WL 1169626, at *19-20).  It is true that courts have generally addressed this issue on the antitrust injury prong of the antitrust standing analysis.  *See, e.g., Prime Int'l Trading*, 784 F. App'x at 7.  But as the above demonstrates, it is also relevant to the application of the efficient enforcer factors, including whether there are more direct victims of the alleged conspiracy under the second efficient enforcer factor.  Furthermore, a definition of the relevant market is a prerequisite to the inquiry into whether defendants dominated a market.

manufactured by BASF (and its related corporate entities) . . . in addition to its motive as a proprietary trader in platinum and palladium[.]" TAC ¶ 202. This is distinct from the TAC's allegations that all Defendants profited from manipulating the Fix downward by virtue of their short positions in NYMEX platinum and palladium. *See, e.g.*, *id.* ¶ 207.

These are distinct theories of anticompetitive harm, which reinforces the conclusion that Plaintiffs have alleged antitrust injury in two separate markets. *See Oil*, 256 F. Supp. 3d at 312-13 (concluding that where "Plaintiffs posit that Defendants engaged in . . . anticompetitive behavior for two, potentially conflicting, reasons[,]" one of which was to drive the price of Brent crude oil "downward where related entities are both producers and refiners, so as to increase the margin, making the refining business more profitable" and the second of which was to make increased profits on "futures and derivatives products traded on NYMEX" linked to a Brent oil benchmark, the plaintiffs had alleged harm in two markets). Thus, Plaintiffs have alleged harms in both the OTC and NYMEX markets. Accordingly, the relevant market for purposes of the Court's inquiry into whether the Exchange Plaintiffs have plausibly alleged efficient enforcer status is the NYMEX market.

### ii. Defendants' Market Share

The second step of the Court's inquiry is to ascertain what share of the market Defendants allegedly controlled. Plaintiffs allege that Defendants each "h[eld] substantial market share in Physical and NYMEX Platinum and Palladium." TAC ¶ 38 (BASF Metals); *id.* ¶ 40 (Goldman Sachs); *id.* ¶ 42 (HSBC); *id.* ¶ 44 (ICBC Standard); *see also id.* ¶ 191 ("BASF[ Metals] engages in a large amount of Physical and NYMEX Platinum and Palladium trading."); *id.* ¶ 192 ("Defendant Goldman Sachs has a precious metals trading desk and engages in millions of dollars of platinum and palladium physical and derivatives trades each year."); *id.* ¶ 193 ("HSBC engages in millions of dollars of platinum and palladium physical and derivatives trades each year."); *id.* ¶ 207 ("The

Defendants were also large participants in NYMEX futures and options.").  Standing alone, these allegations might have been sufficient to allege that Defendants dominated the exchange market, requiring further factual development to resolve that question.  *Cf. LIBOR VI*, 2016 WL 7378980, at *17 (denying motion to dismiss because further factual development was necessary to determine if defendants dominated the market); *CHF LIBOR*, 277 F. Supp. 3d at 562.  However, as explained below, the Court does not decide whether the above allegations would have been sufficient to plausibly allege that Defendants dominated the market.

The TAC contains additional allegations that are relevant to the market-domination inquiry. The TAC alleges that all banks held between 20 and 50 percent of the "overall open interest" in platinum and palladium over the class period.  TAC at 113, Charts 81 & 82.  The TAC does not allege that the three Defendant Banks[19] were the only banks trading in the platinum and palladium futures market.  In fact, the TAC also alleges that UBS, which is no longer a defendant and was not a member of the Fixing, "engages in millions of dollars of platinum and palladium trades each year." *Id.* ¶ 195.  Therefore, the Defendant Banks' market share must represent some fraction of this overall open interest.  The TAC also notes that "BASF is not included in" the 20 to 50 percent figure "because it is not a bank."  *Id.* ¶ 197 n.60.  However, the TAC alleges that BASF Metals had very small holdings in the platinum and palladium derivatives market.  *Id.* at 112, Chart 79. Therefore, it is implausible that adding BASF Metals' market share to the other Defendants would have a meaningful impact on the inquiry into whether Defendants dominated the exchange market.

The TAC further alleges that "data obtained from the CFTC . . . shows that NYMEX short positions were heavily concentrated among the top 4 and top 8 traders.  Despite the presence of other traders in the market, the top 4 and top 8 traders accounted for approximately 30 to 45% and

---

[19] This opinion refers to Goldman Sachs, HSBC, and ICBC Standard collectively as the "Defendant Banks" because BASF Metals "is not a bank."  TAC ¶ 197 n.60.

45 to 65%, respectively, of platinum and palladium short positions during the Class Period." *Id.*

¶ 199; *see also id.* ¶ 114-15, charts 83 & 85.[20]  Plaintiffs' theory is that Defendants "were holders of

massive short positions in NYMEX platinum and palladium futures and options" during the

Proposed Class Period. *Id.* ¶ 14.  Consequently, on Plaintiffs' theory, the four Defendants would

have been among the largest NYMEX short traders.  As the Court must draw all inferences in favor

of the plaintiffs on a motion to dismiss, the Court assumes that the four Defendants were the largest

NYMEX short traders in the market.  But even granting that assumption, Defendants' combined

market share would have been "approximately 30[%]" of the platinum NYMEX market and

"approximately 45[%]" of the palladium NYMEX market. *Id.* ¶ 199.[21]

### iii. Market Domination

The final step in the Court's inquiry is whether Defendants controlled a sufficiently large

share of the market to "dominate" it.  As noted above, *Gelboim* expressed concern that "if the

[defendants] control only a small percentage of the ultimate identified market," they may be held

liable for "damages disproportionate to wrongdoing."  823 F.3d at 779.  Here, Plaintiffs have alleged

that Defendants control more than a small percentage of the relevant market.  On the other hand,

*FOREX* concluded that an allegation that defendants had "a combined market share of over 90%"

was sufficient to allege market domination.  2016 WL 5108131, at *9.  Plaintiffs have not alleged that

Defendants controlled 90% of the NYMEX platinum or palladium markets.

*LIBOR VI* presented a closer question.  There, the plaintiffs alleged that the sixteen

defendant banks or their affiliates were "large traders" and that "large traders comprised 70 to 90

---

[20] The TAC alleges that there were approximately 40 to 100 traders with short positions on the exchange market that reported data to the CFTC during the Proposed Class Period.  *See id.* at 114-15, Charts 82 & 84.
[21] Defendants point to the TAC's allegation that "'the autocatalyst and jewelry segments of the platinum market' are 'the two largest sources of demand'" as further undercutting any suggestion that Defendants dominated the platinum and palladium market.  Mem. at 13-14 (quoting TAC ¶ 78).  However, as noted above, the Court has concluded that the OTC market and the exchange market are distinct, and this allegation pertains to the OTC market.

percent of [the exchange] market." *LIBOR VI*, 2016 WL 7378980, at *17. However, the *LIBOR VI*

court noted that the sixteen defendants were "dwarfed by the total population of over 2,900 large

traders in that market during the same time period." *Id.* Pronouncing itself "skeptical that the

Exchange-Based plaintiffs can ultimately show that the defendants controlled the market," the court

nonetheless allowed the plaintiffs to proceed because "it remains possible that the panel banks,

which included some of the world's largest financial institutions, together controlled a large

percentage of the market, measured by number of trades or by dollar amount." *Id.* There was

"simply not a sufficient record on the issue of market control" for Judge Buchwald to conclude as a

matter of law that the plaintiffs had failed to state a claim. *Id.*

Likewise, the *CHF LIBOR* court concluded that "[i]f plaintiffs had adequately alleged an

antitrust conspiracy involving all or nearly all of defendants" in that case, "the extent of defendants'

control of the exchange markets for Swiss franc currency futures would require factual development

and would not be a basis for dismissal." 277 F. Supp. 3d at 562. But because the plaintiffs had

failed to plausibly allege a conspiracy, Judge Stein dismissed the claims brought by exchange

plaintiffs. *Id.*; *see also Silver II*, 332 F. Supp. 3d at 908-09 (concluding that plaintiffs lacked antitrust

standing because they had not plausibly alleged domination of the relevant exchange market by

certain defendants).

The Court concludes that on the facts alleged in the TAC, Plaintiffs have not adequately

pleaded that Defendants dominated the NYMEX market for platinum and palladium derivatives.

Plaintiffs have alleged that Defendants' market share was at most 45% of the relevant market, and

Plaintiffs' allegations suggest that Defendants' market share was likely far less than that. The Court

need not and does not adopt a bright line rule for the market share that a defendant or group of

defendants must control to meet the "market domination" standard. Rather, the Court holds only

that Plaintiffs have not adequately pleaded market domination in the TAC.

### c. Conclusion

As in *Platinum I*, the Court concludes that Plaintiffs are not efficient enforcers of the antitrust laws and, therefore, are not the "proper party 'to perform the office of a private attorney general' and . . . 'vindicate the public interest in antitrust enforcement.'" *Gelboim*, 823 F.3d at 780 (quoting *Gatt*, 711 F.3d at 80). Accordingly, Plaintiffs' Sherman Act claim is dismissed without prejudice.

### B. Rule 12(b)(2) Motion

#### 1. Legal Standard

A defendant may move to dismiss a plaintiff's claims against it for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citations omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a prima facie showing that jurisdiction exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation marks omitted)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 702 F.3d at 727 (citations omitted).

### 2. Application

Plaintiffs have adequately pleaded that BASF Metals and ICBC Standard are subject to personal jurisdiction in the United States under a conspiracy theory. In its prior opinion, the Court explained at length the requirements for a federal court to exercise personal jurisdiction. *See Platinum I*, 2017 WL 1169626, at *39-44. The Court does not rehash that analysis here and provides only a summary of the law necessary for the disposition of the motions currently before the Court.

As in *Platinum I*, Plaintiffs have "disclaimed that the Foreign Defendants are subject to general personal jurisdiction." *Id.* at *43; *see* Plaintiffs' Letter to the Court, Dkt No. 196, at 1 ("Plaintiffs do not assert that Defendants are subject to general jurisdiction[.]"). Therefore, the Court will confine its analysis to specific jurisdiction. Among other requirements, "the exercise of

personal jurisdiction must comport with constitutional due process." *Platinum I*, 2017 WL 1169626,

at *39 (citing *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)).  The

> due process analysis proceeds in two steps.  First, courts evaluate the quality and nature
> of the defendant's contacts with the forum state under a totality of the circumstances
> test.  Where the claim arises out of, or relates to, the defendant's contacts with the
> forum—*i.e.*, specific jurisdiction is asserted—minimum contacts necessary to support
> such jurisdiction exist where the defendant purposefully availed the of the privilege
> of doing business in the forum and could foresee being haled into court there.  Second,
> once minimum contacts are established, a court considers those contacts in light of
> other factors to determine whether the assertion of personal jurisdiction would
> comport with fair play and substantial justice.

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quotations omitted).

There are two "independent, if conceptually overlapping, methods of demonstrating

minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007).  "The first is

through purposeful availment,' in which 'the defendant purposefully availed itself of the privilege of

doing business in the forum and could foresee being haled into court there.'" *CHF LIBOR*, 277 F.

Supp. 3d at 589 (quoting *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir.

2013)).  "The second is through 'purposeful direction,' in which 'the defendant took intentional, and

allegedly tortious, actions expressly aimed at the forum.'" *Id.* (quoting *In re Terrorist Attacks*, 714 F.3d

at 674).  "The 'purposeful direction' test is also referred to as the 'effects test,' which is a 'theory of

personal jurisdiction typically invoked where . . . the conduct that forms the basis for the

controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the

forum are therefore in-forum effects harmful to the plaintiff.'" *Id.* (quoting *Licci*, 732 F.3d at 173).

"In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if

the defendant expressly aimed its conduct at the forum." *Id.* (quoting *Licci*, 732 F.3d at 173).

Plaintiffs have alleged Sherman Act and CEA claims against all Defendants in this case,

including the Foreign Defendants.  *See* TAC ¶¶ 273-95; *see also Platinum I*, 2017 WL 1169626, at *43.

Both of these statutes provide for nationwide service of process.  *See CHF LIBOR*, 277 F. Supp. 3d

at 589 (citing 15 U.S.C. § 22 (Sherman Act); 7 U.S.C. § 25(c) (CEA)).  District courts in this circuit,

and courts of appeals other than the Second Circuit, have concluded that "when a civil case arises

under federal law and a federal statute authorizes nationwide service of process, the relevant

contacts for determining personal jurisdiction are contacts with the United States as a whole."

*Platinum I*, 2017 WL 1169626, at *40 (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21

(2d Cir. 2014) (collecting cases)); *see, e.g.*, *CHF LIBOR*, 277 F. Supp. 3d at 589-90 (concluding the

relevant forum is the United States as a whole).[22]  Therefore, the Court analyzes whether Plaintiffs

have made a prima facie showing of minimum contacts with the United States with respect to BASF

Metals and ICBC Standard.[23]

### a. BASF Metals

### i. Purposeful Availment

Plaintiffs have not made a prima facie showing that BASF Metals purposefully availed itself

of the privilege of doing business in the United States.  The TAC alleges that BASF Metals "is a

company organized and existing under the laws of the United Kingdom with its principal place of

business in London, England."  TAC ¶ 34.  The TAC alleges that

> [i]n 2006, BASF [Metals]'s ultimate parent company, BASF Societas Europaea ('BASF
> SE') . . . acquired Engelhard Corporation of New Jersey. . . .  As part of the acquisition
> of Engelhard Corporation, BASF SE also acquired Engelhard Metals Limited, which
> was a Fixing member[.]  . . .  Through its acquisition of Engelhard Metals Limited,
> BASF became a Fixing member[.]  . . .  In 2012, BASF SE changed the name of
> Engelhard Metals Limited to BASF Metals Limited.

*Id.*  Plaintiffs also allege that BASF Corporation ("BASF Corp.") is a subsidiary of BASF SE and "is

based in New Jersey (and a Delaware-registered company)."  *Id.* ¶ 36.  Thus, the TAC alleges that

---

[22] "[T]he Second Circuit 'has not yet decided' whether to adopt this approach[.]"  *Platinum I*, 2017 WL 1169626, at *40 (quoting *Gucci*, 768 F.3d at 142 n.21).

[23] Because the Court concludes that Plaintiffs have made such a showing, it does not reach the question of whether personal jurisdiction is proper under New York law or Federal Rule of Civil Procedure 4(k)(2).  *See Platinum I*, 2017 WL 1169626, at *40-41.

BASF SE is the parent corporation of both BASF Metals and BASF Corp. *See id.* ¶¶ 34-36. BASF

Metals "does not have offices, operations, or employees in New York, New Jersey, or anywhere else

in the United States." Declaration of Dr. Vasileios Vergopouls in Support of BASF Metals

Limited's Motion to Dismiss Pursuant to Fed R. Civ. P. 12(b)(2) and 12(b)(6) ("Vergopouls Decl."),

Dkt No. 209-1, ¶ 2.

Plaintiffs' fundamental difficulty can be summarized as follows. They have alleged that

employees of BASF *Metals* manipulated the Fix as part of a conspiracy. And they have alleged that

United States-based traders employed by BASF *Corp.* executed platinum and palladium trades,

allegedly to profit from the conspiracy. However, for the Court to exercise personal jurisdiction

over Defendant BASF Metals, Plaintiffs' allegations must somehow connect BASF Metals to the

United States, such that BASF Metals can be said to have "purposefully availed itself of the privilege

of doing business in the [United States] and could foresee being haled into court there." *Licci*, 732

F.3d at 173

Plaintiffs attempt to bridge this gap by arguing that employees of BASF Metals were agents

of BASF Corp. or, perhaps, of BASF SE. *See, e.g.*, Plaintiffs' Consolidated Opposition to Motions

To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(2) ("Rule 12(b)(2) Opp."), Dkt No. 215, at 10

("Regardless of whether or not these individuals were employees of BASF Metals . . . a time-

honored principle of agency law is *qui facit per alium facit per se*—he who acts through another acts

himself."). In support of this argument, Plaintiffs argue that yet a fourth BASF entity, BASF

Precious Metals Services, holds BASF out as "global and vertically integrated" and as providing

"24/7 access to world metals exchanges & key bullion centres via trading offices in among other

places Iselin, New Jersey." Rule 12(b)(2) Opp. at 12 (quoting TAC ¶ 36). In addition, the TAC

alleges "BASF Corporation has shared employees and directors with BASF Metals Limited." TAC

¶ 37.

The Second Circuit recently observed that it "ha[s] not clearly delineated the showing necessary before an agent's contacts will be imputed to its principal for purposes of personal jurisdiction under the Due Process Clause[.]" *Schwab*, 883 F.3d at 84. However, the Circuit's "caselaw concerning the New York long-arm statute is . . . instructive" because "[a]lthough the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have purposefully availed itself of the privilege of doing business in the forum." *Id.*

Thus, the Court takes guidance from *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181 (2d Cir. 1998), which applied the New York long-arm statute. The *Jazini* court held that "[t]o establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which the parent corporation could do were it here by its own officials.'" *Id.* at 184 (quoting *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (N.Y. 1967)). Prior to *Jazini*, "the key Second Circuit case regarding the propriety of a court's exercise of personal jurisdiction over a foreign parent company based on the conduct of its subsidiary was" *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir. 1984). *In re Aluminum Warehousing Antitrust Litigation* ("*Aluminum I*"), 90 F. Supp. 3d 219, 228 (S.D.N.Y. 2015). "*Beech Aircraft* established a four-factor test for evaluating whether [a court's exercise of] personal jurisdiction [over a defendant is proper] in such a scenario: (1) common ownership, (2) financial dependency, (3) the degree to which the parent interferes with the selection and assignment of executive personnel and fails to observe corporate formalities, and (4) the parent's degree of control over the marketing and operational policies of the subsidiary." *Id.* (citing *Jazini*, 148 F.3d at 184).

Plaintiffs have failed to make a prima facie showing as to any of these factors. In addition, the Supreme Court has observed that "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its

subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted).  Plaintiffs' attempt

to circumvent this well-entrenched principle via an appeal to agency law is unconvincing.  *See Schwab*,

883 F.3d at 84 (finding that the requirements for personal jurisdiction were not met where a

complaint impermissibly "collapses . . . two distinct Defendants—a parent and a wholly owned

subsidiary—. . . into one"); *Aluminum I*, 90 F. Supp. 3d at 238 ("It is commonplace for executives to

hold several roles at several affiliated companies.  But so long as separate corporate formalities are

maintained, the mere fact that some employees of a parent are also officers of a subsidiary does not

imply that the subsidiary is an agent of the parent."); *id.* at 232 (website touting "global reach of a

family of companies" insufficient where corporate formalities observed).

Plaintiffs also argue in support of their agency theory that "BASF Metals . . . advertised for

precious metals trading positions in New Jersey."  Rule 12(b)(2) Opp. at 9 (citing Ex. 1 to

Declaration of Jay L. Himes in Support of Plaintiffs' Consolidated Opposition to Motions to

Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("Himes Decl."), Dkt No. 214).  This allegation is also

insufficient to establish purposeful availment.  Even assuming that BASF Metals' employment of a

United-States-based trader would be sufficient to make a prima facie showing of purposeful

availment with the United States (which the Court does not decide), the reference to BASF Metals in

the job posting was "inadvertent" and the posting "was not filled."  Declaration of Rachel Crowley,

Dkt No. 221; *see also id.* ("If an individual had been hired to fill the position described in the Job

Posting, the individual would have been an employee of BASF Corporation, not BASF Metals

Ltd.").  Similarly, Plaintiffs' attempt to point to LinkedIn profiles for "individuals who traded

precious metals for BASF's U.S.-based affiliates during the class period" is unavailing.  Rule 12(b)(2)

Opp. at 9 (citing Exs. 2-3 to Himes Decl.).  These traders did not work for BASF Metals because

BASF Metals "does not have . . . employees in . . . the United States."  Vergopouls Decl. ¶ 2.

Hence, neither the job advertisement nor the LinkedIn profiles provide support for Plaintiffs' agency theory.

Accordingly, Plaintiffs have failed to make a prima facie showing that employees of Defendant BASF Metals were agents of BASF Corp. or BASF SE, and they have therefore failed to show that Defendant BASF Metals "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there." *Licci*, 732 F.3d at 173.

### ii. Effects Test

Plaintiffs arguments that BASF Metals should be subject to personal jurisdiction under the effects test is similarly flawed. Under the effects test, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). "The fact that harm in the forum is foreseeable is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Platinum I*, 2017 WL 1169626, at *42 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016)) (alterations and quotation marks omitted).

Plaintiffs are unable to show any conduct by BASF Metals that was expressly aimed at the United States. Again, Plaintiffs have pleaded that BASF Metals conspired to manipulate the Fix and that BASF Corp. engaged in trading to profit from that illegal conduct in the United States. But Plaintiffs have not alleged that BASF Metals took any action that was expressly aimed at the United States. Plaintiffs argue that BASF Metals' "conduct was aimed directly *at* the U.S." because the conspiracy allegedly targeted NYMEX. Rule 12(b)(2) Opp. at 15. But that characterization is inaccurate: BASF Metals' conduct allegedly targeted the Fix, which occurred in London. Although it may have been foreseeable that this conduct would cause harm in the United States, "[m]ere foreseeability" is insufficient under the effects test. *Schwab*, 883 F.3d at 87. Hence, Plaintiffs have

failed to make a prima facie showing of personal jurisdiction as to BASF Metals under the effects test.

### b. ICBC Standard

The TAC fails to make a prima facie showing of personal jurisdiction as to ICBC Standard under the purposeful availment or effects test for much the same reasons as it failed to do so with respect to BASF Metals. The TAC alleges that ICBC Standard "is a banking and financial services company organized and existing under the laws of the United Kingdom." TAC ¶ 43. Plaintiffs allege that a different corporate entity, Standard Bank Group Limited, is "licensed by the New York Department of Financial Services with" headquarters located in New York City. *Id.* The TAC further alleges that a third entity, "ICBC"—which is the "corporate majority owner" of ICBC Standard, Declaration of Karen Florencio in Support of ICBC Standard Bank Plc's Motion to Dismiss the Third Consolidated Amended Class Action Complaint ("Florencio Decl."), Dkt No. 211, ¶ 11—"is also licensed by the New York Department of Financial Services" with headquarters located in New York City. TAC ¶ 43. However, much like BASF Metals, ICBC Standard has no employees in the United States. Florencio Decl. ¶ 9. The Court construes the TAC to allege that there were New-York-based platinum and palladium traders in both the physical and derivatives markets for affiliates or subsidiaries of ICBC Standard, although the TAC is not clear on this point.

Plaintiffs raise the same agency argument with respect to employees of ICBC Standard's affiliates and subsidiaries as they do with BASF Metals, and the result is the same. Plaintiffs have not alleged sufficient reason for the Court to disregard distinctions between distinct corporate entities. The Court need not repeat its analysis here. One allegation Plaintiffs raise that is specific to ICBC Standard is that Ludmila Fabianova, a "Senior Vice President" of "Precious Metals Sales" at ICBC Standard was listed as a "'USA'-based delegate" for a conference in Rome. Rule 12(b)(2) Opp. at 10 (citing Exs. 4 & 5 to Himes Decl.). But this listing is insufficient to support the inference

that Ms. Fabianova did anything to contribute to the alleged conspiracy to manipulate the Fix price

while in the United States.  Accordingly, Plaintiffs have failed to make a prima facie showing of

personal jurisdiction with respect to ICBC under the minimum contacts or effects test.

### c. Conspiracy Jurisdiction

Plaintiffs have plausibly alleged that BASF Metals and ICBC Standard are subject to

conspiracy jurisdiction.  The Second Circuit has recently clarified that to "alleg[e] a conspiracy theory

of jurisdiction:  the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated

in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had

sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Schwab*,

883 F.3d at 87 (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).[24]

The Court concluded in its earlier opinion that Plaintiffs had plausibly alleged a conspiracy

among Defendants.  *See Platinum I*, 2017 WL 1169626, at *10-16.  There is also no question that

---

[24] Because Plaintiffs argued that conspiracy jurisdiction was proper under the New York long-arm statute, the Court offers an observation about the relationship between the requirements for conspiracy jurisdiction under that statute and the standard announced in *Schwab*.  In its prior opinion, the Court held that "[t]he elements of conspiracy jurisdiction [under the New York long-arm statute] are that '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant.'"  *Platinum I*, 2017 WL 1169626, at *48 (quoting *Tarsavage v. Citic Trust Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014)).  Although a defendant need not demonstrate a "formal agency relationship . . . between co-conspirators," the third prong of this test is designed to capture "the traditional indicia of an agency relationship." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 n.2, 293 (S.D.N.Y. 2019).  However, the Court recognizes that the requirements for conspiracy jurisdiction under New York law are unsettled.  *See id.* at 292 n.2 (noting that "an out-of-state defendant can be subject to personal jurisdiction in New York even without the traditional indicia of an agency relationship when that defendant 'has knowledge of his co-conspirators.'" (quoting CPLR § 302 Practice Commentary C302:4 (2013) and citing *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 8 (1st Dep't 2013)).  Still, the requirements for conspiracy jurisdiction announced in *Schwab* appear to be less demanding than those established under the New York long-arm statute.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VIII*"), 11 MDL 2262 (NRB), 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019), at *11 (observing that "any discussion of conspiracy jurisdiction must be approached with caution" because "the state[] in which . . . the FDIC bring[s] state law claim[] [*i.e.*, New York] . . . impose[s] more stringent requirements than the ones adopted by *Schwab*").  Conspiracy jurisdiction may thus be the rare issue where "the jurisdictional analysis under the New York long-arm statute" does not "closely resemble the analysis under the Due Process Clause of the Fourteenth Amendment." *Licci*, 673 F.3d at 61 n.11 (citation omitted).  As noted above, because the Court concludes that Plaintiffs have adequately alleged the prerequisites for conspiracy jurisdiction with respect to the United States as a whole, it need not decide the relationship between the due process requirements for conspiracy jurisdiction and the requirements for conspiracy jurisdiction under the New York long-arm statute.

# SPA-148

BASF Metals and ICBC Standard participated in the conspiracy as alleged. Thus, the contested issue is whether any United-States-based co-conspirators acted "in furtherance of the conspiracy[.]" *Schwab*, 883 F.3d at 87.

Schwab guides the Court's analysis of conspiracy jurisdiction. The *Schwab* court considered whether the court had personal jurisdiction over three categories of defendants. Most relevant here, *Schwab* considered claims of "non-seller defendants." *Id.* at 86 (capitalization altered). The only forum-related contact in which these defendants had engaged was the sale of securities in California. *Id.* at 86-87.[25] The *Schwab* court concluded that it could not exercise personal jurisdiction because the plaintiff's "pleading does not permit an inference that certain Defendants' sales in California were in furtherance of the conspiracy." *Id.* at 87. Although the plaintiff argued that "Defendants conspired not only to manipulate LIBOR, but also to earn profits from that manipulation," the Second Circuit held that "financial self-interest is not the same as furthering a conspiracy through California-directed sales, and nowhere in Schwab's complaint are there allegations that Defendants undertook such sales as part of the alleged conspiracy." *Id.* (quotation omitted). Thus, the teaching of *Schwab* is that the mere sale of financial instruments by a co-conspirator in a forum is insufficient to confer conspiracy jurisdiction in that forum, at least on the facts presented in that case.[26]

---

[25] California was "the relevant forum for jurisdictional purposes" in *Schwab*. 883 F.3d at 82 n.4.

[26] There is disagreement among district courts in this circuit over the precise holding of *Schwab*. The root of the disagreement centers on the motive of the conspiracy alleged in *Schwab*. In *Gelboim*—which involved the same conspiracy—the Second Circuit held that the allegations in that case "evince[d] a common motive to conspire" consisting of "increased profits and the projection of financial soundness[.]" 823 F.3d at 781-82 (quotation omitted). On remand, Judge Buchwald concluded that "[i]t is far from clear that *Gelboim* should be read to mean that plaintiffs have sufficiently alleged 'increased profits' as a goal independent of a conspiracy to 'project[] . . . financial soundness.'" *LIBOR VI*, 2016 WL 7378980, at *2 (citation omitted). Therefore, the *LIBOR VI* court concluded that United States-based trading was not within the scope of the "reputation-motivated," as opposed to a "profit-motivated," conspiracy. *Id.* at *8-9. This conclusion rested on the court's reasoning that a profit-motivated conspiracy was implausible because the *LIBOR VI* plaintiffs had alleged that the panel banks had colluded to suppress the LIBOR rate, but banks act as both borrowers and lenders. *See id.* at *2-6. *Gelboim* itself noted that "common sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR . . . It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender" before concluding that it could not come to a firm conclusion on the question because "the record is undeveloped." 823 F.3d at 783. Judge Buchwald found the record sufficiently developed to dismiss the claims of a profit-motivated conspiracy as implausible. *LIBOR VI*, 2016 WL 7378980, at *3. Thus, Judge Buchwald concluded in

Here, however, Plaintiffs have alleged more than that co-conspirators sold platinum and palladium or platinum and palladium derivatives on an exchange. Plaintiffs allege that BASF Corp.'s "precious metals traders would update order information during the Fixing and provide this updated order information to BASF [Metals'] participant in the Fixing as the Fixing was conducted." TAC ¶ 38. Similarly, the TAC alleges that "New York-based precious metals traders [employed by a United States affiliate of ICBC Standard] would update order information during the Fixing and provide this updated order information to [ICBC Standard]'s participant in the Fixing as the Fixing was conducted." *Id.* ¶ 44.[27] Furthermore, the TAC alleges that the participants in the Fixing on behalf

---

*LIBOR VIII* that the allegation that Defendants had sold LIBOR-influenced securities in a forum was not an act "in furtherance of the conspiracy" because the sale of securities in the forum did not advance a reputation-motivated conspiracy. *See* 2019 WL 1331830, at *4 ("[T]he conspiracy to manipulate LIBOR had nothing to do with' defendants' transactions with plaintiffs, because the sale of LIBOR-based instruments motivated by defendants' 'financial self-interest' could not have furthered their conspiracy to manipulate LIBOR." (quotation omitted)). The upshot of this reasoning is that *if* plaintiffs plausibly allege a profit-motivated conspiracy, then the mere sale of securities in a forum *can* constitute an act in furtherance of the conspiracy sufficient to confer jurisdiction. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263, 2018 WL 4830087, at *8 (S.D.N.Y. Oct. 4, 2018) (concluding that "where the complaint plausibly alleges a profit-motive, as here, the U.S.-based trading is properly alleged to have been a part of the conspiracy and to be related to the overseas . . . jurisdiction").

At least one court disagrees with this interpretation of *Schwab*, however. In *Dennis*, the plaintiffs argued that certain "defendants marketed and sold BBSW-Based Derivatives in the United States." 343 F. Supp. 3d at 203 (cleaned up). The plaintiffs contended that "[t]hese transactions are sufficiently related to [their] claims . . . because they are the machinery through which Defendants committed a domestic per se antitrust violation by reaching into the forum to contract for price-fixed BBSW-Based Derivatives with U.S. investors." *Id.* (cleaned up). The plaintiffs argued that "the 'reputation-based' conspiracy alleged in *Charles Schwab* should be distinguished from the 'profit-motivated' conspiracy alleged here." *Id.* at 205. However, Judge Kaplan noted that in *Schwab* "the alleged conspiracy was undertaken both because 'by understating their true borrowing costs, Defendants were able to project an image of financial stability to investors who were sensitive to risks associated with major banks following the financial crisis that began in 2007' *and* because 'suppressing LIBOR . . . had the immediate effect of lowering Defendants' interest payment obligations on financial instruments tied to LIBOR." *Id.* (quoting *Schwab*, 883 F.3d at 78) (emphasis in *Dennis*) (alterations omitted). "Accordingly," the *Dennis* Court held, "the conspiracy to manipulate LIBOR alleged in *Charles Schwab* was indeed motivated in part by financial incentives." *Id.* And thus, Judge Kaplan held that *Schwab* "controls here and precludes a finding of personal jurisdiction—whether through the Foreign Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs or through a conspiracy theory of jurisdiction—over plaintiffs' federal claims on the basis of the Foreign Defendants' transactions in BBSW-Based Derivatives in the United States." *Id.* at 205-06. Ultimately, as described at greater length below, the Court need not reach the issue of the precise holding of *Schwab* because the Court concludes that even if it defines Plaintiffs' alleged conspiracy narrowly—*i.e.*, as a conspiracy to manipulate the Fix price—Plaintiffs have sufficiently alleged in-forum conduct in furtherance of the conspiracy.

[27] The TAC names BASF Corporation as a co-conspirator but not as a defendant. It does not name ICBC's U.S. based affiliate as a co-conspirator. However, because the complaint alleges that Defendant ICBC has "New York-based precious metals traders," TAC ¶ 44, but ICBC has "[n]o employees . . . permanently located in the United States," Florencio Decl. ¶ 9, the Court construes the TAC to allege that employees of a United-States-based affiliate of ICBC Standard employed precious metals traders.

of Defendants BASF Metals and ICBC Standard were in "constant communication" with traders

employed by United-States-based affiliates.  *Id.* ¶ 38 (BASF Metals); *id.* ¶ 44 (ICBC Standard).

Hence, Plaintiffs plausibly plead actions by co-conspirators in the United States in

furtherance of the conspiracy to manipulate the Fix price.  The TAC alleges United-States based

traders for affiliates of BASF Metals and ICBC Standard provided non-public client order

information directly to Fixing participants.  *Id.* ¶ 38.  While the TAC does not precisely allege what

BASF Metals' and ICBC Standard's participants in the Fixing did with this information, it is

plausible to infer that they used the information provided by United-States-based traders to decide

on the price at which they ultimately wanted the Fixing to settle.  Thus, the TAC plausibly alleges

that United-States-based co-conspirators acted in furtherance of the conspiracy to manipulate the

Fix, and the Court has personal jurisdiction over both BASF Metals and ICBC Standard.

The Court observes that the *Schwab* standard for conspiracy jurisdiction is extraordinarily

broad.  Indeed, under the *Schwab* standard, a court can exercise personal jurisdiction over a

defendant based on the actions of a co-conspirator who is entirely unknown to that defendant.[28]  *Cf.*

*Contant*, 385 F. Supp. 3d at 292 n.2 (observing that under the New York long-arm statute, "an out-

of-state defendant can be subject to conspiracy jurisdiction in New York" only if there are

"traditional indicia of an agency relationship" or if the defendant "has knowledge of the New York

_____

[28] Consider the following hypothetical.  Imagine that, hoping to earn profits by trading abroad, Bank A conspired to manipulate the Fix price in London with Bank B.  Imagine also that, entirely unbeknownst to Bank A, Bank B received information about platinum trading from a United States branch of Bank C.  Under the *Schwab* standard, a United States court may have personal jurisdiction over Bank A based on the transmission of information from Bank C to Bank B— even though Bank A is not alleged to have had any control over, or even to have known about, Bank C's communication.  This hypothetical must be reconciled with the Supreme Court's admonition that the "exercise of jurisdiction comports with due process only if the defendant's conduct and connection with the forum is 'such that the defendant should reasonably anticipate being haled into court there.'"  *Contant*, 385 F. Supp. 3d at 292 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Judge Schofield has reasoned that the *Schwab* standard can be reconciled with the Supreme Court's case law on specific jurisdiction by noting that "in any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit."  *Id.* at 293 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)) (brackets omitted).  In other words, two co-conspirators—even co-conspirators who were unaware of the existence of the other—may be viewed as a single entity for purposes of conspiracy jurisdiction.

acts of his co-conspirators") (quotation omitted).  In addition, this standard may be in tension with

the Supreme Court's holding in *Walden v. Fiore* that "the relationship [between the defendant and the

litigation] must arise out of the contacts that the 'defendant *himself*' creates with the forum State."

571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *see also id.*

(noting that the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused

'minimum contacts' inquiry by demonstrating contacts between . . . third parties . . . and the forum

State") (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).  *But see*

*Contant*, 385 F. Supp. 3d at 293 (rejecting foreign defendants' argument that "an agency relationship

between co-conspirators is necessary because personal jurisdiction cannot be based on the unilateral

activity of a third party" because "a co-conspirator is no mere third party" and "conspiracy

jurisdiction is best conceived of as an example of the well-established principle that 'a defendant's

contacts with the forum State may be intertwined with his transactions or interactions with other

parties'") (quoting *Walden*, 571 U.S. at 286 (ellipsis omitted)).

It was in part because of the concerns outlined above that the Court observed in *Platinum I*

that "[c]ourts have been increasingly reluctant to extend this theory of [conspiracy] jurisdiction

beyond the context of New York's long-arm statute."  2017 WL 1169626, at *49 (quoting *Laydon v.*

*Mizuho Bank, Ltd.*, 12 CIV. 3419 GBD, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) and citing

*Aluminum I*, 90 F. Supp. 3d at 227 ("The rules and doctrines applicable to personal jurisdiction are

sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy

jurisdiction' doctrine."); *Tymoshenko v. Firtash*, 11-CV-2794 (KMW), 2013 WL 1234943, at *3-4

(S.D.N.Y. Mar. 27, 2013) (recognizing that conspiracy jurisdiction "has been widely criticized by

courts and scholars" and declining to consider co-conspirators' contacts for the purpose of

establishing personal jurisdiction over a foreign defendant).  However, any doubts about the

continued viability of conspiracy jurisdiction in the Second Circuit were resolved by *Schwab*.

Therefore, the TAC has plausibly alleged that BASF Metals and ICBC Standard purposefully availed themselves of doing business in the United States as required by the minimum contacts prong of the due process analysis.

Because the Court has concluded that Plaintiffs have adequately alleged that the Foreign Defendants have satisfied the first step of the personal jurisdiction analysis, it must "determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Schwab*, 883 F.3d at 82 (citation and quotation marks omitted). "The Supreme Court has set forth five factors in considering the reasonableness of the forum[:] 'A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.'" *FrontPoint*, 2018 WL 4830087, at *7 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987)). "[T]he 'primary concern' is 'the burden on the defendant.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017)). "Where a defendant has purposefully directed its activities at the forum state, it may still defeat jurisdiction on due process grounds. To do so, however, it 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Licci*, 732 F.3d at 173 (quoting *Burger King*, 471 U.S. at 477).

Plaintiffs' allegations satisfy the reasonableness requirement in this case. The Foreign Defendants "are some of the world's largest financial institutions" and their affiliates "are alleged to have substantial presence in the U.S." *FrontPoint*, 2018 WL 4830087, at *9. "There is little burden in requiring them to answer the allegations that they entered into collusive transactions in the U.S." *Id.* Accordingly, the Court's exercise of personal jurisdiction over the Foreign Defendants would not be

unreasonable.  Thus, Plaintiffs have made a prima facie showing that the Court has personal

jurisdiction over the Foreign Defendants, and the Foreign Defendants' motion to dismiss for lack of

personal jurisdiction is denied.

### C. Motion for Reconsideration

Plaintiffs' CEA claims are predominately foreign and are thus impermissibly extraterritorial.

In *Platinum I*, the Court held that Plaintiffs' CEA claims were not extraterritorial.  *See* 2017 WL

1169626, at *26-28.  Defendants move for reconsideration of that holding based on the Second

Circuit's decision in *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).  For the reasons

that follow, the Court agrees that *Prime International Trading* compels the conclusion that Plaintiffs'

CEA claims are impermissibly extraterritorial.

### 1. Legal Standard

Motions for reconsideration are governed by Local Rule 6.3, which provides that the moving

party shall set forth "the matters or controlling decisions which counsel believes the Court has

overlooked."  "Motions for reconsideration are . . . committed to the sound discretion of the district

court."  *Immigrant Def. Project v. U.S. Immigration and Customs Enf't*, No. 14-cv-6117 (JPO), 2017 WL

2126839, at *1 (S.D.N.Y. May 16, 2017) (citing cases).  "Reconsideration of a previous order by the

Court is an extraordinary remedy to be employed sparingly."  *Ortega v. Mutt*, No. 14-cv-9703 (JGK),

2017 WL 1968296, at *1 (S.D.N.Y. May 11, 2017) (quoting *Anwar v. Fairfield Greenwich Ltd.*, 800 F.

Supp. 2d 571, 572 (S.D.N.Y. 2011)).  As such, reconsideration should be granted only when the

moving party "identifies an intervening change of controlling law, the availability of new evidence,

or the need to correct a clear error or prevent manifest injustice."  *Robinson v. Disney Online*, 152 F.

Supp. 3d 176, 185 (S.D.N.Y. 2016) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable

Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)) (quotation marks omitted).  Here, Defendants argue that the

Second Circuit's decision in *Prime International Trading* is an intervening change of controlling law.

### 2. Application

*Prime International Trading* requires the Court reconsider its holding in *Platinum I* that Plaintiffs'

CEA claims, as alleged, are not impermissibly extraterritorial.  In *Platinum I*, the Court applied the

two-step framework established by the Supreme Court in *Morrison v. National Australia Bank, Ltd.*,

561 U.S. 247 (2010), to the question of whether Plaintiffs' CEA claims are extraterritorial.  Under

this framework, "[f]irst, unless Congress's intention to give a statute extraterritorial effect is 'clearly

expressed,' courts 'must presume it is primarily concerned with domestic conditions.'  In other

words, 'when a statute gives no clear indication of an extraterritorial application, it has none.'

Second, if a statute applies only domestically, a court must determine which domestic conduct it

regulates."  *Platinum I*, 2017 WL 1169626, at *26 (quoting *Morrison*, 561 U.S. at 265-67) (brackets

omitted).

In *Morrison*, the Supreme Court applied that two-step framework and "held that § 10(b) [of

the Exchange Act] only applies to 'transactions in securities listed on domestic exchanges and

domestic transactions in other securities.  With regard to securities *not* registered on domestic

exchanges, the exclusive focus is on *domestic* purchases and sales.'"  *Id.* (quoting *Morrison*, 561 U.S. at

268) (other citation and alterations omitted).  "Although *Morrison* did not further define a domestic

transaction, the Second Circuit addressed that issue in *Absolute Activist* [*Value Master Fund Ltd. v.*

*Ficeto*, 677 F.3d 60 (2d Cir. 2012)].  There, the Second Circuit held that 'transactions involving

securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred

or title passes within the United States.'"  *Platinum I*, 2017 WL 1169626, at *26 (quoting *Absolute*

*Activist*, 677 F.3d at 67).

The Second Circuit extended the *Absolute Activist* framework to the CEA in *Loginovskaya v.*

*Batratchenko*, 764 F.3d 266 (2d Cir. 2014), such that "plaintiffs asserting CEA claims must

'demonstrate that the transfer of title or the point of irrevocable liability for such an interest

occurred in the United States.'"  *Platinum I*, 2017 WL 1169626, at *26 (quoting *Loginovskaya*, 764 F.3d at 274).  Hence, in *Platinum I*, the Court concluded that the issue before it was whether "the transactions at issue here are 'domestic' within the meaning of *Morrison* and *Absolute Activist*."  *Id.*

The Court also held that the Second Circuit's decision in *Parkcentral Global Hub, Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (per curiam), was not relevant to Plaintiffs' CEA claims.  In *Parkcentral*, the Circuit held that "while a domestic transaction or listing is *necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic."  *Id.* at 216.  Rather, the *Parkcentral* court held that even if the plaintiffs in that case had alleged a domestic transaction within the meaning of *Absolute Activist*, their claims were "so predominantly foreign as to be impermissibly extraterritorial."  *Id.*

In considering whether *Parkcentral*'s requirement that a plaintiff's claims not be "predominately foreign" applied to CEA claims in *Platinum I*, the Court held that

> Defendants' reliance on *Parkcentral Global Hub, Ltd. v. Porsche Automobile Holdings SE* is unavailing.  In *Parkcentral*, the Second Circuit applied the *Morrison* and *Absolute Activist* tests to claims under § 10(b) against foreign defendants for securities transactions relating to securities-based swap agreements pegged to the foreign defendants' stock value.  The court held that allowing the claims to proceed "would constitute an impermissibly extraterritorial application of the statute."  In so holding, the court expressly stated that its "ultimate conclusion that this suit seeks impermissibly to extend § 10(b) extraterritorially *depends in some part on the particular character of the unusual security at issue*."  The court "expressed no view whether it would have reached the same result if the suit were based on different transactions."  Courts in this district have declined to extend the *Parkcentral* analysis on that basis.  For those reasons, the Court similarly declines to extend the *Parkcentral* holding to the transactions at issue in this action.

*Platinum I*, 2017 WL 1169626, at *27 n.13 (quoting *Parkcentral*, 763 F.3d at 201-02 and citing *In re Poseidon Concepts Sec. Litig.*, No. 13-CV-1213 (DLC), 2016 WL 3017395, at *12-13 (S.D.N.Y. May 24, 2016); *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165, at *8 (S.D.N.Y. Jan. 12, 2015)).  Because it concluded that *Parkcentral*'s holding did not apply and that the

# SPA-156

transactions at issue were domestic, the Court held that "Plaintiffs' CEA claims d[id] not implicate an impermissible extraterritorial application of the statute." *Id.* at \*28 (citation omitted).

The Court's holding in *Platinum I* that *Parkcentral* does not apply to Plaintiffs' CEA claims in this case is untenable after *Prime International Trading*. In *Prime International Trading*, the Second Circuit evaluated whether the plaintiffs' CEA claims were extraterritorial by applying *Morrison*'s two-step framework to section 22 of the CEA and two other CEA provisions. *See Prime Int'l Trading*, 937 F.3d at 104 ("Importantly, we must discern the 'focus' of each provision individually, for even if Plaintiffs satisfactorily pleaded a domestic application for one of the conduct-regulating provisions—i.e., Sections 6(c)(1) and 9(a)(2)—they must also do the same for the CEA's private right of action provision, Section 22." (citation omitted)). At the first step of the *Morrison* framework, the Second Circuit held that "since Section 22 of the CEA 'is silent as to extraterritorial reach,' suits funneled through this private right of action 'must be based on transactions occurring in the territory of the United States.'" *Prime Int'l Trading*, 937 F.3d at 102-03 (quoting *Loginovskaya*, 764 F.3d at 272). At *Morrison*'s second step, the Circuit held that "in order for Plaintiffs to state a proper domestic application of Section 22, the suit 'must be based on transactions occurring in the territory of the United States.'" *Id.* at 104 (quoting *Loginovskaya*, 764 F.3d at 272). The *Prime International Trading* court noted that "[t]o assess whether Plaintiffs pleaded permissibly domestic transactions under Section 22[,] . . . typically we would apply a test first announced in *Absolute Activist*," as the Court did with the transactions at issue in this case in *Platinum I*. *Id.* at 104-05.

Rather than apply the *Absolute Activist* test, however, the Circuit applied *Parkcentral*'s holding to the CEA—effectively overruling the Court's decision not to do so in *Platinum I*. The Circuit held that it "need not decide definitively whether Plaintiffs' transactions satisfy *Absolute Activist*, for (as discussed below) their claims are impermissibly extraterritorial even if the transactions are domestic." *Id.* at 105 (citing *Parkcentral*, 763 F.3d at 216). It then noted that the *Parkcentral* court

50

"assumed without deciding that the equity swaps at issue there were 'domestic transactions' under Section 10(b), but nonetheless dismissed the claims because the facts in that case rendered the suit 'predominately foreign.'" *Id.* (quoting *Parkcentral*, 763 F.3d at 216). The *Prime International Trading* court observed that "[t]he predicate to our conclusion in *Parkcentral* was the maxim that 'a domestic transaction or listing is *necessary*' but 'not alone sufficient' to state a claim under Section 10(b)." *Id.* (quoting *Parkcentral*, 763 F.3d at 215-16). The Second Circuit then held that this "rule carrie[d] over to the CEA." *Id.* In other words, "while a domestic transaction as defined by *Absolute Activist* is 'necessary' to invoke the private remedy afforded by Section 22, it is not 'sufficient.'" *Id.* at 106.

The *Prime International Trading* court explained that "[i]n order to close the gap between 'necessary' and 'sufficient,' Plaintiffs' claims must not be 'so predominately foreign as to be impermissibly extraterritorial.'" *Id.* at 106 (quoting *Parkcentral*, 763 F.3d at 216); *see also id.* at 105 ("To state a proper claim under Section 22, Plaintiffs must allege not only a domestic transaction, but also domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision of the CEA, such as Section 6(c)(1) or Section 9(a)(2).") (citation omitted).

On the facts presented in *Prime International Trading*, the Second Circuit concluded that the plaintiffs' CEA claims were "predominately foreign," and thus impermissibly extraterritorial, because the plaintiffs relied on an "attenuated 'ripple effects' theory whereby (1) the alleged manipulative trading activity taking place in the North Sea (2) affected Brent crude prices—a foreign commodity—which (3) affected a foreign benchmark, the Dated Brent Assessment, which (4) was then disseminated by a foreign price-reporting agency, which (5) was then allegedly used (in part) to price futures contracts traded on exchanges around the world." *Id.* at 106-07. The Circuit noted that "[n]early every link in Plaintiffs' chain of wrongdoing is entirely foreign." *Id.* at 107. Furthermore, the plaintiffs in *Prime International Trading* "ma[de] no claim that any manipulative oil trading occurred in the United States." *Id.* at 106.

# SPA-158

*Prime International Trading* teaches that to assess whether Plaintiffs have pleaded an appropriately domestic application of the CEA, the Court must assess whether Plaintiffs' CEA claims are predominately foreign.  Plaintiffs assert multiple substantive CEA violations.  *See* TAC ¶¶ 281, 286, 291, 294.  However, "Plaintiffs' suit must satisfy the threshold requirement of CEA § 22" ("Section 22"), which "gives Plaintiffs a private right of action" under the CEA,[29] before the Court can "reach[] the merits of their" substantive CEA claims.  *Prime Int'l Trading*, 937 F.3d at 101 n.4, 104 (quotation and brackets omitted).  Consequently, the Court "start[s] by assessing whether Plaintiffs have pleaded a proper domestic application of Section 22."  *Id.* at 104.[30]

Plaintiffs' Section 22 claims are predominately foreign.[31]  Plaintiffs allege that Defendants manipulated the Fix, which occurred in London and set the price of physical platinum located in London or Zurich.  TAC ¶¶ 51-53, 59.  Moreover, as the Court noted in *Platinum I*, "[t]he alleged unlawful conduct in this case is the manipulation of the Fix Price that took place during the Fixing Calls" in London, "not manipulations of particular transactions on NYMEX."  *Platinum I*, 2017 WL 1169626, at *45.  Because *Prime International Trading* directs that the Court should direct its focus to where the allegedly unlawful manipulation occurred, *see Prime Int'l Trading*, 937 F.3d at 106, this weighs heavily in favor of the conclusion that Plaintiffs' claims are predominately foreign.  Furthermore, although Plaintiffs allege that they have suffered losses in the United States as a result of Defendants' manipulation, it has been clear since *Morrison* that an allegation that a foreign course of conduct has caused malign effects in the United States is not enough to salvage an otherwise

---

[29] *See* 7 U.S.C. § 25.
[30] Although Plaintiffs' claim for principal-agent liability under the CEA does not expressly cite Section 22, both "principal-agent liability and aiding and abetting claims under the CEA . . . are viable only where an underlying primary violation of the CEA can survive a motion to dismiss."  *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018) (citations omitted).  Accordingly, the viability principal-agent liability claim also depends on whether Plaintiffs have pleaded an appropriately domestic application of Section 22.
[31] Because the Court concludes that Plaintiffs' Section 22 claims are predominately foreign, it does not decide whether Plaintiffs have pleaded an appropriately domestic application of other CEA provisions.

extraterritorial claim. *See Morrison*, 561 U.S. at 259 (rejecting an "effects" test for extraterritoriality); *see also Prime Int'l Trading*, 937 F.3d at 106-07.  Consequently, Plaintiffs' CEA claims are so predominately foreign as to be impermissibly extraterritorial.

This conclusion is bolstered by the attenuated causal linkage between Defendants' alleged conduct and Plaintiffs' alleged injury.  The crux of Plaintiffs' theory is that Defendants caused them to suffer losses by manipulating the Fix because the Fix price is a global benchmark.  *See* TAC ¶ 5 ("Because of the Fixing's importance as a benchmark, as the Fix prices move, so too do the prices for physical platinum and palladium and NYMEX platinum and palladium futures and options[.]"); *id.* ¶ 91 ("Defendants seized upon the Fixing as a means to manipulate . . . NYMEX Platinum and Palladium prices because Fix prices are used as benchmarks.").  The plaintiffs in *Prime International Trading* made virtually the same argument.  *See Prime Int'l Trading*, 937 F.3d at 100 (noting that the plaintiffs in that case argued that there was a "'direct link' between Brent Futures settlement prices and the Dated Brent Assessment.  Specifically, they contend that the 'ICE Brent Futures Contracts prices rarely deviate from the Dated Brent Assessment by more than 1% at expiration,' and that 'changes in the Dated Brent Assessment directly impact Brent Futures prices'") (brackets omitted).  Yet the *Prime International Trading* court rejected those plaintiffs' claims as an "attenuated 'ripple effects' theory[.]"  *Id.* at 106.  There is no meaningful distinction between the theory of harm rejected in *Prime International Trading* and Plaintiffs' theory of harm in this case.  Thus, this is an independent reason that the Circuit's decision in *Prime International Trading* case compels the conclusion that Plaintiffs' CEA claims are impermissibly extraterritorial.

Plaintiffs' arguments to the contrary are unavailing.  Plaintiffs first argue that the TAC alleges that "Defendants' precious metals traders in" the United States "were in 'constant communication' with Defendants' precious metals desk employees in London," who were directly involved in the twice-a-day Fixings.  Opposition to Motion for Reconsideration ("MR Opp."), Dkt

No. 237, at 4 (citing TAC ¶¶ 10, 13, 26 38, 49).  This is, to be sure, an allegation of domestic activity, but "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Morrison*, 561 U.S. at 266.  The allegation that United-States-based traders communicated with the Fixing participants to further the scheme to manipulate the Fix price only serves to highlight that the locus of the manipulative scheme was the Fixing itself, which was located in London.  Moreover, the Fixing directly set prices in the spot markets for physical platinum and palladium, which are located in London and Zurich.  *See, e.g.*, TAC ¶ 59.  At bottom, the inquiry called for in *Parkcentral* and applied to the CEA in *Prime International Trading* is whether a plaintiff's claims are "predominately"—not exclusively—"foreign," and Plaintiffs' allegations regarding communications from United-States-based traders do not predominate over their allegations of foreign misconduct.  *Prime Int'l Trading*, 937 F.3d at 106.  Therefore, these allegations are insufficient to render Plaintiffs' claims not predominately foreign.

Plaintiffs also seek to recharacterize the allegations in the TAC to argue that United States-based trading in the physical platinum and palladium market and on the NYMEX was part of Defendants' manipulative scheme itself, not simply a means by which Defendants profited from the manipulation.  *See* MR Opp. at 9 n.5.  This argument is implausible.  Plaintiffs' theory is that Defendants manipulated the price of platinum and palladium to profit from their short positions.  *See, e.g.*, TAC ¶ 14 ("The Defendants profited because they were holders of massive short positions in NYMEX platinum and palladium futures and options.").  The suggestion that Defendants (and, perhaps, their non-defendant co-conspirators) traded to further depress the price of platinum and palladium when they had—according to Plaintiffs' allegations—a tailor-made opportunity to manipulate that price via the Fixing does not make sense and is inconsistent with the allegations in the TAC.  Hence, to the extent that the TAC can be read to support Plaintiffs' novel theory, the

Court rejects it as implausible. Accordingly, Defendants' motion for reconsideration is granted as to

Plaintiffs' CEA claims; those claims are dismissed without prejudice.

### D. Leave to Amend

Because the Court has dismissed Plaintiffs' Sherman Act and CEA claims, there are no

remaining claims in this case. However, although Plaintiffs have twice amended their complaint in

response to Defendants' motions to dismiss, in this circuit, "[i]t is the usual practice upon granting a

motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48

(2d Cir. 1991) (citation omitted); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave

[to amend] when justice so requires."). Leave may be denied "for good reason, including futility,

bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*,

758 F.3d 493, 505 (2d Cir. 2014) (citation omitted). Thus, the Court will grant Plaintiffs leave to

amend once again. However, Plaintiffs should not expect any additional opportunities to amend

their complaint. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003)

("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a

point where enough is enough."(citations omitted)). Any amended complaint must be filed no later

than **May 1, 2020**.

Discovery in this action is stayed pursuant to the Court's April 21, 2015, order. Dkt. No. 48.

Discovery in this action will remain stayed until the deadline for Defendants to answer or otherwise

respond to an amended complaint. If Plaintiffs amend the TAC, and Defendants move to dismiss

Plaintiffs' amended complaint, the parties may file a new motion for a stay of discovery no later than

**June 1, 2020**. If Plaintiffs do not amend the TAC, or if Defendants do not file a motion to stay by

the deadlines specified above, the Court will schedule a Rule 16 conference promptly thereafter.

**III. CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6) is GRANTED, the Foreign Defendants' motion to dismiss

for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) is DENIED, and

Defendants' motion for reconsideration is GRANTED.  Plaintiffs are granted leave to replead their

Sherman Act and CEA claims.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 207 and 235.

SO ORDERED.

Dated:  March 29, 2020
New York, New York
_____
GREGORY H. WOODS
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

IN RE: PLATINUM AND PALLADIUM                     Lead Case 1:14-cv-9391-GHW
ANTITRUST LITIGATION

                                                      **JUDGMENT**

----------------------------------------------------------------X

        It is, **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated

in the Court's Memorandum Opinion and Order dated March 29, 2020, and Memo-Endorsed Order

dated April 13, 2020, Defendants' motion to dismiss for failure to state a claim under Federal Rule

of Civil Procedure 12(b)(6) is granted; the Foreign Defendants' motion to dismiss for lack of

personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) is denied, and Defendants'

motion for reconsideration is granted; Plaintiffs are granted leave to replead their Sherman Act

and CEA claims; Plaintiffs do not intend to amend their complaint and respectfully request that

this Court enter final judgment pursuant to Federal Rule Civil Procedure 58, application granted,

and judgment is entered for Defendants; accordingly, this case is closed.

**Dated:**  New York, New York
        April 15, 2020

                                   **RUBY J. KRAJICK**

                                   _____
                                       **Clerk of Court**

         **BY:**

                                         **Deputy Clerk**