# No. 20-1458

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

KPFF INVESTMENT, INC.; WHITE OAK FUND LP, individually and
on behalf of all others similarly situated; LARRY HOLLIN,

*Plaintiffs-Appellants-Cross-Appellees*,

MODERN SETTINGS LLC, a New York Limited Liability Co.;
MODERN SETTINGS LLC, a Florida Limited Liability Co., on behalf of
themselves and all others similarly situated; CRAIG R. COOKSLEY,
individually and on behalf of all those similarly situated;
NORMAN BAILEY; THOMAS GALLIGHER; KEN PETERS,

*Plaintiffs*,
*(Caption continued on inside cover)*

On Appeal from the United States District Court
for the Southern District of New York, No. 14-cv-9391

## JOINT SUPPLEMENTAL BRIEF FOR
## APPELLEES AND CROSS-APPELLANTS

Damien J. Marshall
Leigh M. Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100

*Counsel for Defendant-Appellee
HSBC Bank USA, N.A.*

Stephen Ehrenberg
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Defendant-Appellee
Goldman Sachs International*

February 3, 2022      *(Additional counsel listed on inside cover)*

v.

BASF METALS LIMITED, ICBC STANDARD BANK PLC,

*Defendants-Appellees-Cross Appellants,*

GOLDMAN SACHS INTERNATIONAL; HSBC BANK USA, N.A.;
STANDARD BANK PLC; THE LONDON PLATINUM AND PALLADIUM
FIXING CO. LTD.; BASF CORPORATION,

*Defendants-Appellees,*

UBS AG; UBS SECURITIES LLC,

*Defendants.*

———————————

Paul Alessio Mezzina
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500

*Counsel for Defendant-Appellee
HSBC Bank USA, N.A.*

Robert G. Houck
John D. Friel
Minji Reem
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Counsel for Defendant-Appellee-
Cross-Appellant ICBC Standard
Bank Plc*

Lisa Carrie Cohen
Matthew A. Katz
SCHINDLER COHEN &
  HOCHMAN LLP
100 Wall Street
New York, NY 10005
(212) 277-6300

*Counsel for Defendant-Appellee
London Platinum and Palladium
Fixing Co. Ltd.*

Michael F. Williams, P.C.
Peter A. Farrell, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

*Counsel for Defendant-Appellee-
Cross-Appellant BASF Metals
Limited and Defendant-Appellee
BASF Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... ii

ARGUMENT .......................................................................................1

I.   *Schwab II* and *Amex* confirm that plaintiffs are not efficient enforcers of the antitrust laws...........................................1

    A.   *Schwab II* and *Amex* confirm that plaintiffs cannot plead proximate cause. ............................................2

    B.   *Schwab II* and *Amex* confirm that the other efficient-enforcer factors also support dismissal. ...................9

II.  *Schwab II* also illustrates why cross-appellants are not subject to specific jurisdiction. ......................................11

CONCLUSION ....................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Alaska Dep't of Revenue v. Manku,*
    2021 WL 3027170 (2d Cir. July 19, 2021) ................................... 16, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 17

*Charles Schwab Corp. v. Bank of America Corp. (Schwab I),*
    883 F.3d 68 (2d Cir. 2018) ........................................................... 12, 18

*Frank v. United States,*
    78 F.3d 815 (2d Cir. 1996),
    *vacated on other grounds,* 117 S. Ct. 2501 (1997) ............................ 11

*Gelboim v. Bank of Am. Corp.,*
    823 F.3d 759 (2d Cir. 2016) ........................................................... 6, 11

*In re Am. Express Anti-Steering*
    *Rules Antitrust Litig. (Amex),*
    19 F.4th 127 (2d Cir. 2021) ...................................................... *passim*

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
    433 F. Supp. 3d 395 (E.D.N.Y. 2020) ................................................ 3

*IQ Dental Supply, Inc. v. Henry Schein, Inc.,*
    924 F.3d 57 (2d Cir. 2019) ............................................................ 3, 10

*Jazini v. Nissan Motor Co.,*
    148 F.3d 181 (2d Cir. 1998) .............................................................. 18

*Robinson v. Overseas Mil. Sales Corp.,*
    21 F.3d 502 (2d Cir. 1994) ................................................................ 18

*Schwab Short-Term Bond Mkt. Fund*
    *v. Lloyds Banking Grp. plc (Schwab II),*
    22 F.4th 103 (2d Cir. 2021) ...................................................... *passim*

*Textor v. Bd. of Regents of N. Ill. Univ.,*
    711 F.2d 1387 (7th Cir. 1983) .......................................................... 18

*United States v. Kirk Tang Yuk,*
  885 F.3d 57 (2d Cir. 2018) .................................................................. 19

**Other Authorities**

Pls.' Br. on Antitrust Standing,
  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking*
  *Grp. plc* (*Schwab II*), 22 F.4th 103 (2d Cir. Nov. 13, 2017)
  (No. 17-1569), ECF No. 344 .................................................................. 8

# ARGUMENT

Both *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group plc* (*Schwab II*), 22 F.4th 103 (2d Cir. 2021), and *In re American Express Anti-Steering Rules Antitrust Litigation* (*Amex*), 19 F.4th 127 (2d Cir. 2021), confirm that neither the OTC Plaintiff nor the Exchange Plaintiffs are efficient enforcers of the antitrust laws.[1] *Schwab II* also illustrates why cross-appellants BASF Metals Limited and ICBC Standard Bank Plc are not subject to personal jurisdiction in the United States.

## I. *Schwab II* and *Amex* confirm that plaintiffs are not efficient enforcers of the antitrust laws.

*Amex* and *Schwab II* reaffirm that "the efficient-enforcer inquiry remains, fundamentally, one into proximate cause." *Amex*, 19 F.4th at 143. Both cases embrace the "first-step rule" and hold that plaintiffs allegedly harmed in transactions with third parties, rather than with defendants, cannot plead proximate cause and so are not efficient

---

[1] The "OTC Plaintiff" is Larry Hollin, who alleges that he sold platinum and palladium to non-defendants. The "Exchange Plaintiffs" are KPFF Investment, Inc. and White Oak Fund LP, who allege that they traded platinum and palladium futures and options on the New York Mercantile Exchange, where the counterparty was the exchange itself, not any defendant. *See* Defs.' Joint Br. 8.

enforcers. *See Schwab II*, 22 F.4th at 114–16; *Amex*, 19 F.4th at 140–41. *Schwab II* is particularly illuminating, as it expressly adopts the consensus view of district courts in this Circuit—including Judge Woods' decision in this case, which *Schwab II* cites with approval—that in the context of an alleged conspiracy to manipulate a financial benchmark, "[t]he first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with the [defendants] and those whose injuries stemmed from their deals with third parties." 22 F.4th at 116; *see id.* at 118 (citing cases). Here, the district court correctly applied that rule to hold that plaintiffs, none of whom transacted with any defendant, are not efficient enforcers.

### A. *Schwab II* and *Amex* confirm that plaintiffs cannot plead proximate cause.

*Amex* and *Schwab II* confirm that the first efficient-enforcer factor turns on "familiar principles of proximate causation." *Amex*, 19 F.4th at 139 (quotation marks omitted); *see also Schwab II*, 22 F.4th at 116. For an alleged antitrust conspiracy to proximately cause an economic injury for purposes of this factor, the injury must "happen at the first step following the harmful behavior." *Schwab II*, 22 F.4th at 116 (quoting

*Amex*, 19 F.4th at 140). This first-step rule "require[s] drawing a line between those whose injuries resulted from their direct transactions with [defendants] and those whose injuries stemmed from their deals with third parties." *Id.* (citing *Amex*, 19 F.4th at 141).

*Amex* and *Schwab II* illustrate the proper application of this rule. In *Amex*, merchants who had no "contractual relationship" with Amex claimed that its anti-steering rules—contractual provisions that prohibited Amex-accepting merchants from encouraging customers to use non-Amex forms of payment—"provide[d] an umbrella under which the other credit card companies" could raise their fees for non-Amex-accepting merchants. 19 F.4th at 136, 138. The district court there— citing, *inter alia*, Judge Woods' decision in this case—ruled that the merchants were not efficient enforcers because they were "not the target" of the alleged conduct, even though they might have been harmed as a downstream result of that conduct. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 411 (E.D.N.Y. 2020) (quoting *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65–66 (2d Cir. 2019)). This Court affirmed, concluding that plaintiffs had "fail[ed] to

show the required direct connection between the harm and the alleged antitrust violation." *Amex*, 19 F.4th at 143.

The Court's analysis focused primarily on the first *AGC* factor—directness of the injury—and applied the "first-step rule," which requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 139–40 (quotation marks omitted). "At the first step" of the alleged chain of causation, "Amex raised the price for Amex-accepting merchants"; but other merchants were harmed only indirectly "when Amex's competitors, covered by Amex's price umbrella, raised their own prices." *Id.* at 140–41. At most, Amex's actions "enabled the competitor companies to increase their own merchant fees." *Id.* at 141 (quotation marks omitted). But "Amex enabling other credit card companies to raise [plaintiffs'] fees [did] not establish the direct relation between injury and antitrust violation that the first-step rule requires." *Id.* (cleaned up).

*Schwab II* applied the same principles in a context even more similar to this case: an alleged conspiracy to manipulate a financial benchmark "that was available for unlimited third parties to reference and incorporate into their own products and transactions without any

input from, or involvement by," the defendants. 22 F.4th at 117. Plaintiffs there alleged that defendants conspired to manipulate the LIBOR interest-rate benchmark, which in turn suppressed coupon payments from LIBOR-linked bonds that the plaintiffs purchased "from third parties." *Id.* at 114. The Court concluded that plaintiffs' and third parties' "independent decisions … to incorporate LIBOR as a term" in their transactions "snap[ped] the chain of causation linking [p]laintiffs' injury to the Banks' misconduct." *Id.* at 116. Citing a string of district court opinions—again including Judge Woods' opinion below—the Court "reject[ed] the attempts of [plaintiffs] to impose liability for transactions that defendants did not control and of which they were likely not even aware." *Id.* at 118 (cleaned up).

*Schwab II* thus held that the district court "correctly drew a line between [p]laintiffs who transacted directly with [d]efendants and those who did not." *Id.* at 115–16 (cleaned up). The Court reaffirmed that it had "never adopted" the "umbrella standing" theory whereby other courts have "occasionally looked past intervening decisions by third parties" and allowed "a consumer who dealt with a non-cartel member to pursue antitrust claims against cartel members." *Id.* at 116–17. The Court

observed that such a rule "would yield liability that is far too sweeping and would, therefore, 'raise the very concern of damages disproportionate to wrongdoing' emphasized in cases that reject umbrella standing." *Id.* (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016)).

*Schwab II* and *Amex* confirm that plaintiffs here cannot plead proximate cause and thus cannot satisfy the first efficient-enforcer factor. Like the plaintiffs in those cases, plaintiffs here admit that they have not alleged any direct transactions with defendants. *See* Pls.' Br. 11–12, 21; *see also, e.g.*, SPA117, 129–30; JA839, 850–51. Instead, their theory is that defendants artificially suppressed a financial benchmark (the "Fixing"), which, in turn, enabled *other* market participants to lower the prices at which they were willing to purchase physical platinum and palladium or platinum and palladium futures and options. *See* Pls.' Br. 39; Defs.' Joint Br. 27; SPA108–09; JA830–31.

That is the same theory this Court rejected in *Amex* and *Schwab II*. Like the plaintiffs in those cases, plaintiffs here "did not purchase directly from [d]efendants, and made their own decisions to incorporate [the Fixing] into their transactions, over which [d]efendants had no control, in which [d]efendants had no input, and from which [d]efendants

did not profit." *Schwab II*, 22 F.4th at 118 (cleaned up); *see Amex*, 19 F.4th at 138 (finding no proximate cause where defendants "were uninvolved in" plaintiffs' and third parties' independent "pricing decisions" (quotation marks omitted)). Defendants, moreover, "gained no financial benefit from the use" of the Fixing as a price component "for *third-party* transactions." *Schwab II*, 22 F.4th at 118.[2]

Indeed, plaintiffs' claim to efficient-enforcer status is even weaker than in *Schwab II*. *Id.* at 118 n.6. *Schwab II* held that, while even plaintiffs who traded LIBOR-denominated instruments with third parties were not efficient enforcers, the standing of plaintiffs whose fixed-rate instruments "d[id] not reference LIBOR at all" was "even more tenuous." *Id.* at 118 n.6. Those plaintiffs' claims relied on the theory "that LIBOR exerted a kind of gravitational force, influencing" the price of products that did not expressly reference it—a notion the Court rejected as "clearly insufficient [for] antitrust standing." *Id.*

---

[2] It makes no difference that some of the plaintiffs here traded on an exchange. The reasoning in *Schwab II* applies with full force to the Exchange Plaintiffs, who did not transact with any defendant. And even if this Court were to allow such plaintiffs to plead defendants' domination of an exchange market "as a proxy for whether a plaintiff transacted directly with a defendant," SPA131; JA853, the Exchange Plaintiffs have not come close to pleading such domination. *See* Defs.' Joint Br. 31–38.

Like in *Schwab II*, plaintiffs here allege "the fixing of a number that was available for unlimited third parties to reference and incorporate into their own products and transactions without any input from, or involvement by," defendants—circumstances that "make[] umbrella standing particularly inappropriate." *Id.* at 117. But unlike in *Schwab II*, where some plaintiffs traded LIBOR-denominated instruments, here no plaintiff even alleges that its transactions expressly incorporated the Fixing price. Instead, plaintiffs allege that spot and exchange prices—all set by third parties—merely *followed* the Fixing price. Pls.' Br. 38, 45; *see also* JA380, 382, 386–88 (¶¶ 74–76, 82, 91). In other words, they assert the same "gravitational force" theory this Court rejected as "clearly insufficient to establish antitrust standing." *Schwab II*, 22 F.4th at 118 n.6.[3]

---

[3] Plaintiffs' claim of a "near one-to-one correlation" between the Fixing and OTC and NYMEX prices, *e.g.*, Pls.' Resp. & Reply Br. 10, is virtually identical to the *Schwab II* plaintiffs' claim that their fixed-rate instruments "move[d] in lockstep" with LIBOR. Pls.' Br. on Antitrust Standing at 26–27, *Schwab II* (Nov. 13, 2017) (No. 17-1569), ECF No. 344. But the Court rejected standing even for plaintiffs who traded LIBOR-denominated instruments with third parties, and it held that standing was "even more tenuous" for plaintiffs whose transactions did not expressly incorporate LIBOR, regardless of any alleged correlation. 22 F.4th at 118 n.6. In any event, plaintiffs' rhetoric is contradicted by

**B.** ***Schwab II*** **and** ***Amex*** **confirm that the other efficient-enforcer factors also support dismissal.**

While "the first factor alone furnishes ample justification for affirming the district court," *id.* at 118; *see Amex*, 19 F.4th at 143, the other three factors confirm that plaintiffs are not efficient enforcers.

***More Direct Victims.*** *Amex* held that the existence of "merchants who have a relationship with Amex [and] were harmed at the first step by Amex's Anti-Steering Rules" "diminishes the justification for allowing a more remote party" to enforce the antitrust laws. 19 F.4th at 141 (cleaned up). Similarly, *Schwab II* held that plaintiffs "who purchased LIBOR-indexed financial instruments directly from [defendants]" suffered alleged "injuries [that] are directly linked to the [defendants'] profit from the conspiracy, thus underscoring the attenuated nature of the harms allegedly flowing from third-party bond sales." 22 F.4th at 118–19. Likewise, here, customers who placed orders directly with defendants for physical platinum and palladium "are better situated to

their own pleadings, which admit that "even on days allegedly affected by the Fixing, prices varied considerably" due to "[m]arket forces unrelated to the alleged manipulation." SPA47; JA285; *see* Defs.' Joint Br. 41–42, 47–48.

vindicate the antitrust laws." *Amex*, 19 F.4th at 141 (quoting *IQ Dental Supply*, 924 F.3d at 66); *see* Defs.' Joint Br. 38–40.[4]

***Speculative Damages.*** *Amex* recognized that the indirect nature of plaintiffs' injuries created "uncertainty" regarding "how eliminating Amex's Anti-Steering Rules would affect its competitors' merchant fees," which in turn "suggest[ed] that a damages calculation would rely on some speculation." 19 F.4th at 142. Similarly, *Schwab II* observed that plaintiffs' claims would "require the court to speculate about how the third-party sellers would have factored a non-suppressed LIBOR into the transaction." 22 F.4th at 119. The same is true here. Calculating plaintiffs' damages would require the trier of fact to speculate about how the third parties who transacted with plaintiffs might (or might not) have altered the prices at which they were willing to transact in the absence of the alleged conduct, all while attempting to disentangle this analysis from the countless unrelated market forces that caused prices to

---

[4] In *Amex* and *Schwab II*, the Court noted that the more directly harmed plaintiffs had already filed suit. *Amex*, 19 F.4th at 141; *Schwab II*, 22 F.4th at 118. But if anything, the absence of claims from *any* of defendants' actual counterparties indicates that plaintiffs' theory lacks support among the market participants who would have been most directly harmed by the alleged conduct.

fluctuate throughout the day. *See* Defs.' Joint Br. 40–43.

**Complex Apportionment.** Finally, plaintiffs have not pleaded a practicable way for the district court to navigate between "the risk of duplicative recoveries on the one hand" and the "complex apportionment of damages on the other." *Gelboim*, 823 F.3d at 778 (quotation marks omitted); *see* Defs.' Joint Br. 43–45. And even if the Court were to weigh this factor in plaintiffs' favor, *Amex* and *Schwab II* make clear that success on this factor "does not establish antitrust standing." *Amex*, 19 F.4th at 143; *see Schwab II*, 22 F.4th at 119–20.

## II.   *Schwab II* also illustrates why cross-appellants are not subject to specific jurisdiction.[5]

*Schwab II* demonstrates not only why plaintiffs' Sherman Act claim fails on the merits, but also why cross-appellants are not subject to specific personal jurisdiction in the United States—and hence why *all* of

---

[5] Part II is on behalf of cross-appellants BASF Metals Limited and ICBC Standard Bank Plc. In its Memorandum Opinion and Order dated March 28, 2017, the district court determined that plaintiffs did not allege sufficient facts to support the elements of conspiracy jurisdiction as to LPPFC. JA333–35. Plaintiffs have presented no arguments related to this decision and, therefore, have not appealed the issue of conspiracy jurisdiction as to LPPFC. *See Frank v. United States,* 78 F.3d 815, 832–33 (2d Cir. 1996) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."), *vacated on other grounds*, 117 S. Ct. 2501, 2501 (1997).

plaintiffs' claims against cross-appellants warrant dismissal.

**1.** As noted, *Schwab II* concerned an alleged "international conspiracy" pertaining to the "manipulation of U.S.-Dollar LIBOR." 22 F.4th at 109, 125. Various banks, including several based in the United States, allegedly participated in the conspiracy, and they moved to dismiss for want of personal jurisdiction after the plaintiffs filed suit. *See id.* at 110–13. The district court granted those motions. *See id.* at 113.

This Court reversed. In so doing, the Court first reiterated that, as a due-process matter, a court may exercise personal jurisdiction only if the defendant has "[1] minimum contacts with the forum [2] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 121 (cleaned up). Because the district court "did not address" the second due-process prong, and because the banks "d[id] not rely" on it appeal, this Court addressed only minimum contacts. *Id.*

The Court explained that a plaintiff can show a defendant's minimum contacts by satisfying the three-prong "conspiracy jurisdiction" test articulated in *Charles Schwab Corp. v. Bank of America Corp.* (*Schwab I*), 883 F.3d 68 (2d Cir. 2018), which requires "legally sufficient

allegations" that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]." *Schwab II*, 22 F.4th at 109–10, 121–22 (quotation marks omitted). Notably, the Court analyzed only the third prong because the banks had "forfeited" their arguments about the first two. *Id.* at 122–23 & n.8.

The Court found the third prong satisfied given the well-pleaded allegations that "several Banks were *directing* the suppression of LIBOR from the United States." *Id.* at 110 (emphasis added). For instance:

- The plaintiffs quoted "admissions" made to the U.S. Department of Justice that a "senior UBS manager in Stamford, Connecticut issued a standing directive to 'submit low LIBOR contributions' for USD LIBOR, and to keep submissions in the 'middle of the pack of other banks' expected LIBOR submissions'";

- The plaintiffs quoted "emails between a senior JPMorgan Chase executive in New York and the Banks' LIBOR submitter discussing the importance of staying in 'the pack' and asking the submitter to 'err on the low side when setting LIBOR'";

- The plaintiffs "quote[d] an email in which a U.S.-based employee of Citibank urged the Bank's LIBOR submitter that 'we should take a leadership role in bringing these LIBORS back to more sensible levels,' 'exactly as we did 3-4 months back,'" and "the Bank's LIBOR submissions then decreased"; and

- The plaintiffs alleged that a "Barclays' executive 'who was based in New York … admitted that he instructed subordinates to submit

artificially low USD LIBOR rates.'"

*Id.* at 123 (alterations omitted). The Court explained that, "[i]f true, these communications would establish overt acts taken by co-conspirator Banks in the United States in furtherance of the suppression conspiracy, vesting the district court with personal jurisdiction over each Defendant." *Id.* And because the plaintiffs provided "legally sufficient allegations of jurisdiction," the Court reiterated that "we are not at liberty to draw … inference[s] against" them. *Id.* at 121, 124 (quotation marks omitted).

In reaching this conclusion, the Court emphasized that not every U.S.-based action taken by an alleged co-conspirator is attributable to others: "[T]he conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum." *Id.* at 125. But the Court reasoned that "[t]he alleged conspiracy involved the manipulation of U.S.-Dollar LIBOR with co-conspirators who were based in the United States," so "the alleged overt acts taken by co-conspirators in the United States to advance the conspiracy should certainly have been anticipated by Defendants." *Id.*

**2.** The distinctions between *Schwab II* and this case are manifest and highlight why asserting specific jurisdiction over cross-

appellants is untenable here. At least three distinctions are noteworthy.[6]

*First*, unlike the banks in *Schwab II*, cross-appellants have argued that the district court erred with respect to *both* due-process prongs. Taking the second prong first, the district court gave short shrift to traditional notions of fair play and substantial justice—*i.e.*, the "reasonableness" factors. Specifically, the court perfunctorily addressed only one of those factors and ignored all others. As cross-appellants have explained, those factors confirm that exercising specific jurisdiction over cross-appellants would violate due process. *See* BASF Metals-BASF Corp. Br. 55–60; BASF Metals Reply 24–28; ICBC Standard Br. 43 n.9.

*Second*, in contrast to the banks in *Schwab II*, cross-appellants have consistently pressed arguments regarding the first two prongs of the "conspiracy jurisdiction" test. Here, the district court found specific jurisdiction over cross-appellants *only* because it found the "conspiracy jurisdiction" test satisfied. But as cross-appellants have explained, and as intervening precedent has further confirmed, plaintiffs never adequately alleged a conspiracy, and cross-appellants could not have

---

[6] Cross-appellants preserve all other personal-jurisdiction-related arguments previously asserted.

participated in one that did not exist. *See* BASF Metals-BASF Corp. Br. 47–48; BASF Metals Reply 18–20; ICBC Standard Br. 28–33; ICBC Standard Reply 17–20; *see also* ECF No. 205 (discussing *Alaska Dep't of Revenue v. Manku*, 2021 WL 3027170 (2d Cir. July 19, 2021)).

*Third*, and in contrast to the *Schwab II* plaintiffs, plaintiffs here came nowhere close to offering legally sufficient allegations that any "co-conspirator" engaged in suit-related conduct in the United States that "furthered" the alleged conspiracy. Far from quoting "admissions" and "emails" about inculpatory U.S. activity, plaintiffs have advanced only ambiguous suggestions that certain U.S. parties (like cross-appellants' purported "affiliates and subsidiaries," which the TAC did not name as defendants) engaged in activities like "constant communication" with cross-appellants' London-based employees. JA365 (¶ 38); JA367 (¶ 44).

Such allegations fall short for several reasons. *See, e.g.*, BASF Metals-BASF Corp. Br. 51–55; BASF Metals Reply 22–23 & n.10; *see also* ICBC Standard Br. 33–39; ICBC Standard Reply 9–17, 21–22. Perhaps most obviously, plaintiffs themselves alleged in the TAC that the "conspiracy" here gave cross-appellants and the other parties involved in the London-based Auctions a golden "opportunity to move the Fixing

downward at their discretion" in London, such that they could *completely disregard* any information from the United States. JA353–54 (¶ 6); *see* JA451–52 (¶ 181) ("[T]he Defendants could … just place 'auction' bids and quotes at prices during the AM and PM Fixing regardless of what the true aggregate demands were that had been funneled to them or were on their order books—that is, they acted to set the Fix prices where they wanted …."). The undeniable upshot is that, at most, plaintiffs have alleged only that it is "conceivable" that U.S. actions furthered the purported conspiracy, and it is black-letter law that such allegations are insufficient. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The district court concluded otherwise by (1) "constru[ing]" the TAC to implicate non-parties and non-defendants as "co-conspirators," and (2) inferring allegations that plaintiffs failed to plead. *See* SPA149–51 & n.27; JA871–73 & n.27. But just as courts "are not at liberty to draw … inference[s] against [p]laintiffs" who offer "legally sufficient allegations of jurisdiction," *Schwab II*, 22 F.4th at 121, 124 (quotation marks omitted), they are not at liberty to compensate for a complaint's legal insufficiencies either. Thus, jurisdiction cannot rest on "argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Mil. Sales Corp.*,

21 F.3d 502, 507 (2d Cir. 1994) (quotation marks omitted), "a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (quotation marks omitted), or allegations that are "simply not plausible" or those that a complaint "fails to explain," *Manku*, 2021 WL 3027170, at *3–4.

Ultimately, the purported U.S. activities described in the TAC resemble not those in *Schwab II*, but those in *Schwab I*, where the Court found co-conspirator defendants' U.S. sales of LIBOR-based products insufficient to establish conspiracy jurisdiction over "non-seller" foreign defendants in a case (like this one) "premised solely" on foreign manipulation. 883 F.3d at 83, 86–87. Those U.S. sales did not "further[]" the conspiracy because they "did not cause Defendants' false LIBOR submissions" overseas or "give rise to claims seeking to hold Defendants liable for those submissions." *Id.* at 84, 87.[7] Just so with respect to the

---

[7] *Schwab II* cited two cases to illustrate the proper application of conspiracy jurisdiction. Both support cross-appellants, as each focused on overt acts with a tight link to fulfillment of the conspiracy's common objective. *See Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392–93 (7th Cir. 1983) (college's in-forum "discriminat[ion] against female members of [its] athletic department" was plausibly "in furtherance of" intercollegiate conspiracy to "discriminat[e] against women's athletics"); *United States v. Kirk Tang Yuk,* 885 F.3d 57, 74 (2d

purported U.S. activities here.

As the foregoing demonstrates, the TAC simply does not provide the allegations necessary to demonstrate that any "co-conspirator" furthered the alleged conspiracy from the United States, which means that cross-appellants are not subject to specific jurisdiction. In all events, it bears emphasizing that imputing to either cross-appellant the U.S. conduct of "co-conspirators" with whom cross-appellants did not even arguably interact (*e.g.*, holding BASF Metals accountable for actions purportedly undertaken by ICBC Standard's U.S. affiliates and subsidiaries and vice versa) would unfairly "blindside[]" them. *Schwab II*, 22 F.4th at 125. To reiterate, plaintiffs have alleged that the "conspiracy" here involved London-based Auctions that pertained to platinum and palladium physically located in London or Zurich. *See* JA352 (¶ 3); JA373 (¶ 59). Three of the four participants in those Auctions (BASF Metals, ICBC Standard, and Goldman Sachs) maintained their headquarters in London. *See* JA362–66 (¶¶ 34–40). And while the fourth (HSBC) maintained its headquarters in the United States, plaintiffs have alleged

---

Cir. 2018) (phone call discussing drug transactions "further[ed]" defendants' drug-trafficking conspiracy).

that it had a separate "branch" in London, and they have argued that it was those London-based employees who participated in the Auctions.[8] *See* JA366–67 (¶¶ 40–42); Pls.' Resp. & Reply Br. 65, 101. Plaintiffs' theory of "conspiracy jurisdiction" thus should not "get off the ground": Cross-appellants could not have "'reasonably anticipate[d] being haled into court'" in the United States as a result of participating with other London-based parties in London-based activity that concerned London- and Zurich-based materials. *Schwab II*, 22 F.4th at 125.

## CONCLUSION

For the reasons set forth in defendants' briefing and in light of this Court's rulings in *Amex* and *Schwab II*, this Court should affirm the district court's judgment dismissing plaintiffs' claims, and with respect to cross-appellants, reverse the district court's judgment on personal-jurisdiction grounds.

---

[8] The district court never referenced HSBC (or Goldman Sachs) in its jurisdictional analysis. *See* SPA149–50; JA871–72.

Respectfully submitted,

s/ Damien J. Marshall

Damien J. Marshall
Leigh M. Nathanson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
dmarshall@kslaw.com
lnathanson@kslaw.com

Paul Alessio Mezzina
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 737-0500
pmezzina@kslaw.com
jmitchell@kslaw.com

*Counsel for Defendant-Appellee
HSBC Bank USA, N.A.*

s/ Stephen Ehrenberg

Stephen Ehrenberg
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
ehrenbergs@sullcrom.com
popovskym@sullcrom.com

*Counsel for Defendant-Appellee
Goldman Sachs International*

s/ Robert G. Houck

Robert G. Houck
John D. Friel
Minji Reem
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000
robert.houck@cliffordchance.com

*Counsel for Defendant-Appellee-
Cross-Appellant ICBC Standard
Bank Plc*

s/ Lisa Carrie Cohen
Lisa Carrie Cohen
Matthew A. Katz
SCHINDLER COHEN &
  HOCHMAN LLP
100 Wall Street
New York, NY 10005
(212) 277-6300
lcohen@schlaw.com
mkatz@schlaw.com

*Counsel for Defendant-Appellee
London Platinum and Palladium
Fixing Co. Ltd.*

s/ Michael F. Williams
Michael F. Williams, P.C.
Peter A. Farrell, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
mwilliams@kirkland.com
pfarrell@kirkland.com

*Counsel for Defendant-Appellee-
Cross-Appellant BASF Metals
Limited and Defendant-Appellee
BASF Corporation*

February 3, 2022

# CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the page limitation in this Court's order of January 14, 2022 (ECF No. 219).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: February 3, 2022

s/ Damien J. Marshall
Damien J. Marshall

**CERTIFICATE OF SERVICE**

I certify that on February 3, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

s/ Damien J. Marshall
Damien J. Marshall