20-1458 (L)
*In re Platinum and Palladium Antitrust Litigation*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

_____

AUGUST TERM 2020
Nos. 20-1458, 20-1575, 20-1611

**IN RE PLATINUM AND PALLADIUM ANTITRUST LITIGATION**

**KPFF INVESTMENT, INC., WHITE OAK FUND LP, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, LARRY HOLLIN,**
*Plaintiffs-Appellants-Cross-Appellees,*

**MODERN SETTINGS LLC, A NEW YORK LIMITED LIABILITY COMPANY, MODERN SETTINGS LLC, A FLORIDA LIMITED LIABILITY COMPANY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, CRAIG R. COOKSLEY, INDIVIDUALLY AND ON BEHALF OF ALL THOSE SIMILARLY SITUATED, NORMAN BAILEY, THOMAS GALLIGHER, KEN PETERS,**
*Plaintiffs,*

v.

**BASF METALS LIMITED, ICBC STANDARD BANK PLLC,**
*Defendants-Appellees-Cross-Appellants,*

**GOLDMAN SACHS INTERNATIONAL, HSBC BANK USA, N.A., THE LONDON PLATINUM AND PALLADIUM FIXING COMPANY LTD., BASF CORPORATION,**
*Defendants-Appellees,*

**UBS AG, UBS SECURITIES LLC,**
*Defendants.*[*]

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: JUNE 4, 2021
DECIDED: FEBRUARY 27, 2023

---

Before:      POOLER and MENASHI, *Circuit Judges*, and VYSKOCIL,
             *District Judge.*[†]

The plaintiffs-appellants and cross-appellees are participants in the physical and derivatives markets for platinum and palladium and seek monetary and injunctive relief for violations of the antitrust laws and the Commodities Exchange Act ("CEA"). According to the plaintiffs-appellants, the defendants—mostly foreign companies engaged in trading these metals—manipulated the benchmark prices for platinum and palladium by collusively trading on the futures market to depress the price of these metals and by abusing the process for setting the benchmark prices. The defendants allegedly benefited from this conduct via trading in the physical markets and holding short positions in the futures market. The district court held that it had personal jurisdiction over two of the foreign defendants, but it dismissed the plaintiffs' antitrust claims for lack of antitrust standing and the plaintiffs' CEA claims for being impermissibly extraterritorial. The plaintiffs appeal the dismissal of these claims. The

---

[†] Judge Mary Kay Vyskocil of the U.S. District Court for the Southern District of New York, sitting by designation.

defendants cross-appeal the district court's holdings on personal jurisdiction.

We reverse in part, vacate in part, and affirm in part. We reverse the district court's holding that Larry Hollin and White Oak Fund LP (the "Exchange Plaintiffs") lacked antitrust standing to sue for the manipulation of the New York Mercantile Exchange futures market in platinum and palladium. As traders in that market, the Exchange Plaintiffs are the most efficient enforcers of the antitrust laws for that injury. But we affirm the district court's conclusion that KPFF Investment, Inc. did not have antitrust standing. Additionally, we vacate the district court's dismissal of the plaintiffs' CEA claims. The plaintiffs have alleged sufficient domestic activity so that the CEA claims are not impermissibly extraterritorial. We affirm the district court's holdings as to personal jurisdiction over the foreign defendants under a conspiracy theory of personal jurisdiction.

————————

MATTHEW J. PEREZ, Labaton Sucharow LLP, New York, NY (Jay L. Himes, Ethan H. Kaminsky, Labaton Sucharow LLP, New York, NY, *and* Merrill G. Davidoff, Martin I. Twersky, Zachary D. Caplan, Berger Montague PC, Philadelphia, PA, *on the brief*), *for Plaintiffs-Appellants-Cross-Appellees*.

PAUL MEZZINA, King & Spalding LLP, Washington, DC (Damien J. Marshall, Leigh M. Nathanson, King & Spalding LLP, New York, NY, *and* Joshua N. Mitchell,

King & Spalding LLP, Washington, DC, *on the brief*), *for HSBC Bank USA, N.A.*

Stephen Ehrenbergh, Mark A. Popovsky, Sullivan & Cromwell LLP, New York, NY, *for Goldman Sachs International.*

MATTHEW A. KATZ (Lisa C. Cohen, *on the brief*), Schindler Cohen & Hochman LLP, New York, NY, *for the London Platinum and Palladium Fixing Company Ltd.*

ANDREW C. LAWRENCE (Michael F. Williams, Peter A. Farrell, *on the brief*), Kirkland & Ellis LLP, Washington, DC, *for BASF Metals Limited and BASF Corporation.*

ROBERT G. HOUCK (John D. Friel, Minji Reem, *on the brief*), Clifford Chance US LLP, New York NY, *for ICBC Standard Bank Plc.*

—————

MENASHI, *Circuit Judge*:

The plaintiffs-appellants and cross-appellees in this case participate in the markets for physical platinum and palladium and for derivatives in those commodities. The plaintiffs-appellants brought lawsuits alleging that the defendants—companies engaged in precious metals trading—conspired to manipulate the global benchmarks for those metals. Most, but not all, of the defendants are foreign.

The plaintiffs sued for violations of the antitrust laws and the Commodities Exchange Act ("CEA") and for unjust enrichment. According to the plaintiffs, the defendants artificially depressed the

4

benchmark prices for platinum and palladium both by collusively trading in those metals' derivatives—and thereby affecting the price of platinum and palladium generally—and by manipulating the process of setting the benchmark price. The defendants allegedly benefited from these actions by participating in the physical market for platinum and palladium and by holding short positions in the futures market. The plaintiffs, as sellers of platinum and palladium and participants in the derivatives market, allege corresponding injuries.

The changing legal landscape since the initial filing resulted in multiple complaints from the plaintiffs and multiple dispositions from the district court. Ultimately, the district court concluded that it had personal jurisdiction over two of the foreign defendants under a conspiracy theory of personal jurisdiction, but it dismissed the antitrust and CEA claims. It determined that the plaintiffs were not efficient enforcers of the antitrust laws—and therefore lacked antitrust standing—and that the plaintiffs' CEA claims were impermissibly extraterritorial. The plaintiffs timely appealed, and the foreign defendants over whom the district court held that it had personal jurisdiction cross-appealed that issue.

We reverse in part, vacate in part, and affirm in part. KPFF Investment, Inc. lacked antitrust standing to sue for the impact that the defendants had on the physical platinum and palladium market. However, those plaintiffs who participated in the futures market—Larry Hollin and White Oak Fund LP—are the most efficient enforcers of the alleged antitrust injury in that market and have antitrust standing to pursue claims based on that injury. We also hold that the plaintiffs have alleged sufficient domestic activity to survive

a motion to dismiss on the CEA claims. And we affirm the district court's exercise of personal jurisdiction over the foreign defendants.

## BACKGROUND

In considering this appeal, we "accept[] as true all factual claims in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013)).

## I

Platinum and palladium, members of the same element family, are versatile metals. The metals are used in "catalytic converters, laboratory equipment, electrodes, and dentistry equipment." App'x 372 (footnote omitted). Besides these industrial applications, platinum and palladium are used in jewelry and are traded by investors. In 2013 alone, the gross demand for platinum and palladium was over 8 million and 9.6 million ounces, respectively.

Aside from the traditional physical market, the metals are also traded in futures and options markets, especially on the New York Mercantile Exchange ("NYMEX"), "the leading centralized exchange for platinum and palladium futures and options worldwide." *Id.* at 381. On the NYMEX, "futures are standardized contracts that call for the delivery of physical platinum or palladium … on a specified date." *Id.* In contrast to transactions involving physical metal, which "are done between private parties," the NYMEX "is the counterparty to all transactions on the exchange" through "its clearinghouse, CME Clearing." *Id.* at 381. By "simultaneously buying and selling the contract," a clearinghouse "guarantees both sides of the trade and

ensures that neither buyer nor seller is exposed to any counterparty credit risk." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 174 (2d Cir. 2013). Since 2011, the aggregate annual value of platinum and palladium futures has surpassed $100 billion and $40 billion, respectively.

The defendants include BASF Metals Ltd. ("BASF Metals"), Goldman Sachs International ("Goldman Sachs"), HSBC Bank USA, N.A. ("HSBC"), and ICBC Standard Bank PLC ("ICBC") (collectively, the "Fixing Members"). BASF Metals is a company organized under the laws of the United Kingdom with its principal place of business in London, England, that engages in "precious metals commodity dealing." App'x 363. Goldman Sachs, HSBC, and ICBC are financial services companies and, according to the plaintiffs, each company "holds substantial market share in Physical and NYMEX Platinum and Palladium." *Id.* at 366-68. The three financial services companies each conduct proprietary trading and also execute client trades. HSBC's principal place of business is in McLean, Virginia; Goldman Sachs's and ICBC's principal places of business are in London, England.

Between 2008 and 2014, there was a formal process for establishing the market spot price for platinum and palladium called the "Fixing." *Id.* at 373. The Fixing was conducted twice daily—in an "AM Fixing" and a "PM Fixing"—with a private conference call that would set global benchmark prices for platinum and palladium. To conduct the Fixing, BASF Metals, Goldman Sachs, HSBC, and ICBC established the London Platinum and Palladium Fixing Company Ltd. ("LPPFC"). The LPPFC has its principal place of business in London, England, and "is 100% owned and controlled" by the four

entities that founded it. *Id.* at 371. Its "only function is to take on and continue the promotion, administration and conduct of [the Fixing]." *Id.* (internal quotation marks omitted).

The Fixing was designed to be conducted as a Walrasian auction.[1] One of the four founding entities would serve as the chair of the auction, and the chair would announce an opening price "ostensibly at or near the current spot price." App'x 374. Each of the other three founding entities would then declare itself to be a net buyer or a net seller or to have no interest. The chair would adjust the price until there was no (or nearly no) net interest in buying or selling, and the resulting price would serve as the benchmark price—or the "Fix price."

Once the chair announced the benchmark price, the orders of the auction participants could not be retracted. But the effects of the benchmark extended beyond those orders. Market participants uninvolved in the Fixing frequently incorporated the benchmark prices in contracts. When buyers and sellers entered "spot" contracts—pursuant to which the contracting parties agreed to consummate the purchase and sale of physical platinum or palladium—the "spot price" was "often tied or keyed to the relevant metal's Fixing on the day of the sale." *Id.* at 380. Because the prices of NYMEX platinum and palladium closely tracked the spot prices of

---

[1] In a Walrasian auction, each trader "submit[s] his demand, or even his demand schedule," to the auctioneer, who "aggregates traders' demands and supplies to find a market-clearing price." Maureen O'Hara, *Market Microstructure Theory* 4 (1995). In this way, the final price is the result of "an unseen trading game in which buyers and sellers costlessly exchange assets." *Id.*

those metals, the result was that "[t]he spot, Fix, and NYMEX settlement prices exhibit[ed] an almost perfect correlation." *Id.* at 387.

## II

The Fixing would have been "a competitive process" if it were conducted properly. *Id.* at 352. The plaintiffs allege that it was not so conducted.

The plaintiffs-appellants in this case are Larry Hollin, White Oak Fund LP ("White Oak"), and KPFF Investment, Inc. ("KPFF"). Hollin and White Oak sold NYMEX platinum or palladium futures contracts (collectively, the "Exchange Plaintiffs"). KPFF sold physical platinum and palladium. All of the plaintiffs-appellants reside in the United States.

According to the plaintiffs, the defendants had the opportunity and the motive to use the Fixing to manipulate the benchmark prices of platinum and palladium toward lower prices. The plaintiffs alleged collusion among the defendants in several ways. Each Fixing call "involved the direct exchange of intended or future price information among horizontal competitors." *Id.* at 448. The defendants also moved the market downward by coordinating large sell orders, which would lower the opening price for the Fixing. During the Fixing itself, the defendants affected the benchmark price by "submit[ting] aggregate 'auction' 'bids' that understated demand." *Id.* at 452. All the while, the defendants coordinated their behavior using "chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails." *Id.* at 449. The motive for such collusion, the plaintiffs contend, was that the defendants "are traders of Physical and NYMEX Platinum and Palladium and … had large short futures positions on NYMEX." *Id.* at 474.

Five complaints based on this alleged conduct—each seeking to bring claims individually and on behalf of a class—were filed between November 2014 and March 2015. On March 20, 2015, the district court consolidated the five cases. Four months and two amendments later, the plaintiffs filed a second consolidated class action complaint. This second amended complaint named BASF Metals, Goldman Sachs, HSBC, ICBC, the LPPFC, BASF Corporation, UBS AG, and UBS Securities LLC as defendants. BASF Corporation, a "carrier, assayer, and refiner of platinum and palladium," is a sister company of BASF Metals and is registered in Delaware. *Id.* at 85-86. UBS AG and UBS Securities—a wholly owned subsidiary of UBS AG—are financial services companies involved in trading physical and NYMEX platinum and palladium.

The second amended complaint brought seven causes of action alleging (1) an agreement restraining trade in violation of the Sherman Act, 15 U.S.C. § 1, (2) five violations of the CEA, 7 U.S.C. § 1 *et seq.*, and (3) unjust enrichment. The plaintiffs alleged that the "manipulation of the Fixing by the Defendants impacted" the plaintiffs' transactions and caused the plaintiffs "to incur greater losses and/or realize lower prices than they would have realized in a free and open competitive market." *Id.* at 193. The plaintiffs also sought to certify a class of persons and entities similarly situated who engaged in certain transactions in platinum or palladium during the period from January 1, 2008, through November 30, 2014.

The defendants moved to dismiss the complaint, and the district court granted the motion in part and denied it in part. *In re Platinum & Palladium Antitrust Litig.* (*Platinum I*), No. 14-CV-9391, 2017 WL 1169626, at *2 (S.D.N.Y. Mar. 28, 2017). First, after noting that

the complaint "is silent with respect to whether … Plaintiffs had any direct sales to or purchases from Defendants," the district court dismissed the plaintiffs' claim under the Sherman Act for lack of antitrust standing. *Id.* at *20-25. Second, the district court denied the defendants' motion to dismiss the CEA claims, granting the motion only with respect to the plaintiffs' claims "based on false reports and transactions that precede the effective date of" Commodity Futures Trading Commission ("CFTC") Rule 180.1. *Id.* at *36. Third, because the plaintiffs did not allege any direct transactions with the defendants, the district court held that "they have not adequately pleaded that Defendants were enriched at their expense" and dismissed the unjust enrichment claim. *Id.* at *38. Additionally, the district court dismissed all claims against BASF Corporation, UBS AG, and UBS Securities for failure to state how those entities were involved in the alleged misconduct. *See id.* at *51 ("UBS is not alleged to have been a member of the Fixing during the Class Period, or to have participated in the Fixing, either directly or indirectly."); *id.* at *52 ("[T]he [complaint] says nothing about BASF Corp.'s involvement—direct or indirect—in the alleged price manipulation, BASF Corp.'s role in executing the scheme, or BASF Corp.'s motive in artificially suppressing the Fix Price.").

BASF Metals, ICBC, and the LPPFC (collectively, the "Foreign Defendants") also filed a motion to dismiss the complaint for lack of personal jurisdiction, which the district court granted. *Id.* at *2. The district court held that the plaintiffs "have not made a *prima facie* showing that the Foreign Defendants have sufficient contacts with the United States as a whole." *Id.* at *44. Additionally, the district court rejected the plaintiffs' argument that it could hear the suit under a theory of conspiracy jurisdiction. *Id.* at *49. The district court

concluded its order by granting the plaintiffs leave to amend the complaint a third time. *Id.* at *53.

On May 15, 2017, the plaintiffs filed a third amended complaint that differed from the previous complaint in several respects. The complaint no longer named the LPPFC, BASF Corporation, UBS AG, and UBS Securities as defendants. It also no longer brought claims for unjust enrichment or CEA claims based on Rule 180.1 for conduct that preceded the rule's enactment.

Most important, the plaintiffs added allegations relating to antitrust standing and personal jurisdiction. As to antitrust standing, the complaint provided allegations to demonstrate "[t]he close relationship between the Fix[ing] and NYMEX futures prices," "[t]he Defendants' substantial market share in physical platinum and palladium as well as NYMEX platinum and palladium futures and options," and "Plaintiffs' ability to assess damages through discovery." App'x 350-51. As to personal jurisdiction, the complaint provided allegations "pertaining to [BASF Metals's and ICBC's] continuous presence in the U.S. and their suit-related conduct in the U.S." *Id.* at 350.

While the third amended complaint was pending, this court decided *Charles Schwab Corp. v. Bank of America Corp.* (*Schwab I*), 883 F.3d 68 (2d Cir. 2018), and *Prime International Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019). Those cases addressed, respectively, whether a conspiracy theory of jurisdiction establishes personal jurisdiction over a co-conspirator and whether the CEA has extraterritorial application. *See Schwab I*, 883 F.3d at 86-87; *Prime Int'l*, 937 F.3d at 102-04. In response to *Prime International*, the defendants sought reconsideration of the district court's denial of the motion to

dismiss with respect to the CEA claims. *In re Platinum & Palladium Litig.* (*Platinum II*), 449 F. Supp. 3d 290, 302 (S.D.N.Y. 2020).

Taking the new allegations and the recent case law into account, the district court dismissed in part the third amended complaint. *Id.* at 298. The district court again concluded that the plaintiffs lacked antitrust standing, but this time the district court separately analyzed the antitrust standing of KPFF, which transacted solely in physical platinum and palladium, and the antitrust standing of the other plaintiffs, which transacted on the NYMEX. *Id.* at 303. The district court held that KPFF lacked antitrust standing because "the [complaint] does not allege that [KPFF] transacted directly with any defendant." *Id.* at 304. With respect to the plaintiffs that transacted on the NYMEX, the district court was persuaded that the "line between those who transacted directly with defendants and those who did not" had little meaning in the exchange context. *Id.* at 311. Instead, the district court adopted a "market domination" test that other district courts in this circuit have applied. *Id.* at 312. Under that test, plaintiffs must "allege that defendants dominated the relevant exchange market" to establish antitrust standing. *Id.* ("Recognizing that counterparties to exchange plaintiffs are not reasonably ascertainable, judges in this district have adopted a test that depends primarily on the extent of defendants' control of the market for the product traded on the exchange.") (internal quotation marks omitted). Because it determined that the NYMEX plaintiffs "have not adequately pleaded that Defendants dominated the NYMEX market for platinum and palladium derivatives," the district court held that those plaintiffs lacked antitrust standing as well. *Id.* at 317.

The district court reached a different conclusion with respect to personal jurisdiction. The district court understood *Schwab I* to allow the exercise of personal jurisdiction in this case if "United-States-based co-conspirators acted in furtherance of the conspiracy." *Id.* at 323-24 (internal quotation marks omitted). Because the third amended complaint "alleges United-States based traders for affiliates of BASF Metals and [ICBC] provided non-public client order information directly to Fixing participants" in furtherance of the conspiracy, the district court held that it had personal jurisdiction over BASF Metals and ICBC. *Id.* at 325-26. The district court denied the defendants' motion to dismiss under Rule 12(b)(2).

Success on the jurisdictional issue did not mean overall success for the plaintiffs, however, because the district court granted the defendants' motion to reconsider its holding on the CEA claims. *Id.* at 332. Based on *Prime International*, the district court concluded that the plaintiffs' CEA claims "are predominantly foreign" and therefore "impermissibly extraterritorial." *Id.* at 331. The district court dismissed the CEA claims without prejudice and granted the plaintiffs leave to amend the Sherman Act and CEA claims. *Id.* at 332-33.

In sum, the district court denied BASF Metals's and ICBC's motion to dismiss for lack of personal jurisdiction, but it granted the defendants' motion to dismiss for failure to state a claim as well as the defendants' motion for reconsideration. Rather than file another amended complaint, the plaintiffs requested that the district court enter final judgment, which the district court did on April 15, 2020. Of the plaintiffs, only Hollin, White Oak, and KPFF appealed. BASF Metals and ICBC cross-appealed the district court's denial of their

motion to dismiss for lack of personal jurisdiction.

## DISCUSSION

"We review de novo the grant of a motion to dismiss, accept as true all factual claims in the complaint, and draw all reasonable inferences in the plaintiffs' favor." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016).

According to the plaintiffs, the district court erred (1) in holding that the plaintiffs lack antitrust standing, (2) in holding that the CEA claims were impermissibly extraterritorial, (3) in dismissing the LPPFC for lack of personal jurisdiction, and (4) in dismissing the second amended complaint as to BASF Corporation for failure to state a claim. BASF Metals and ICBC—the only cross-appellants in this case—argue that the district court erred in holding that it had personal jurisdiction to hear claims against them. We address these arguments in turn.

## I

We begin with the plaintiffs' Sherman Act claims. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States … is declared to be illegal." 15 U.S.C. § 1. The Clayton Act provides a private cause of action for injuries "by reason of anything forbidden in the antitrust laws," *id.* § 15(a), as well as a private cause of action to seek "injunctive relief … against threatened loss or damage by a violation of the antitrust laws," *id.* § 26. The plaintiffs claim that the defendants violated the Sherman Act when they "conspir[ed] to manipulate platinum and palladium market prices and the benchmark price" and seek treble

damages and injunctive relief because the conspiracy affected "the price of Physical and NYMEX Platinum and Palladium." App'x 491-92.

The district court dismissed these claims for lack of antitrust standing. The antitrust standing requirement "originates in the Supreme Court's recognition that … 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436-37 (2d Cir. 2005) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 534 (1983)). "To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* (*Schwab II*), 22 F.4th 103, 115 (2d Cir. 2021) (internal quotation marks omitted). Whether a plaintiff is an efficient enforcer depends on:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (internal quotation marks omitted). "[T]he weight to be

given the various factors will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443.

The district court separately analyzed the antitrust standing of KPFF, which traded in the physical market for platinum and palladium, and the antitrust standing of the Exchange Plaintiffs, who traded only on the exchange market for those metals. It determined that none of the plaintiffs were efficient enforcers and that no plaintiff had antitrust standing. We agree with the district court as to KPFF but disagree as to the other plaintiffs. We hold that the Exchange Plaintiffs have antitrust standing.

## A

We first consider whether KPFF has antitrust standing. KPFF alleges that it "sold physical platinum and palladium … at artificial prices proximately caused by Defendants' unlawful manipulation." App'x 362. The district court determined that the complaint "does not allege that [KPFF] transacted directly with any defendant," *Platinum II*, 449 F. Supp. 3d at 304, and KPFF on appeal concedes that it "did not transact with a Defendant," Appellants' Br. 45. Based on the efficient-enforcer factors, we agree with the district court that KPFF lacks antitrust standing in this case.

## 1

The first efficient-enforcer factor—"whether the violation was a direct or remote cause of the injury"—turns on "familiar principles of proximate causation." *Am. Express*, 19 F.4th at 139. "In the context of antitrust standing, proximate cause generally follows the first-step rule." *Id.* That rule "requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 140 (internal

quotation marks omitted); *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) ("Directness in the antitrust context means close in the chain of causation.") (quoting *IBM Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)).

"Our court has repeatedly followed the first-step rule in the antitrust context." *Am. Express*, 19 F.4th at 140. In *American Express*, we held that merchants who complained of anticompetitive conduct by American Express Company ("Amex") but did not accept American Express cards lacked antitrust standing to sue. *Id.* at 134-35. We reasoned that, "[a]t the first step, Amex raised the price for Amex-accepting merchants," and only at a later step did Amex's competitors follow suit and raise the price for the plaintiff merchants. *Id.* at 140-41. Accordingly, the plaintiff merchants' injuries "were not proximately caused by Amex; the alleged antitrust violation was instead a 'remote' cause of the injuries." *Id.* at 141.

In *Schwab II*, we considered the London Interbank Offered Rate ("LIBOR"), a "benchmark interest rate" that "serves as an index for a variety of financial instruments, including bonds, interest rate swaps, commercial paper, and exchange-traded derivatives." *Schwab II*, 22 F.4th at 109-10. Bondholders who "held LIBOR-based bonds issued by third parties" alleged that the defendant banks had manipulated the LIBOR in violation of the antitrust laws. *Id.* at 111. We held that those bondholders were not efficient enforcers because "the decision of a third party to incorporate LIBOR as a term in a financial instrument could be made without any connection to the actions" of the defendant banks. *Id.* at 116. Additionally, that decision "in no way enriched the [defendant banks], who had no financial stake in the [third-party] transactions whatsoever." *Id.* Accordingly, "[t]he first-

step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with the [defendant banks] and those whose injuries stemmed from their deals with third parties." *Id.*

We hold that KPFF has not alleged a direct injury in this case. As in *Schwab II*, the decision to incorporate or reference the benchmark price in the transactions into which KPFF entered—and by which KPFF was allegedly harmed—was an independent decision. The only transactions that were required to adopt the benchmark prices were those into which the defendants entered as part of the Fixing, and KPFF has concededly not transacted with the defendants.

We said in *Schwab II* that the "disconnect" between the plaintiffs' injury and the defendants' alleged benefit "further demonstrates the attenuated nature of the causal chain." *Id.* In other words, the allegedly harmful transactions in that case "in no way enriched" the defendants. *Id.* In this case, KPFF alleges that the conspiracy enabled the defendants, as "large participants in the market for physical platinum and palladium," to "buy platinum and palladium cheaper than they would have been able to" otherwise, App'x 466, just as the defendant banks in *Schwab II* "may have increased their profits by selling LIBOR-indexed instruments," 22 F.4th at 116. But the defendants "derived no benefit from [KPFF's] transactions with third parties," which "were entirely separate from the purpose of the alleged conspiracy and took place merely because of [the benchmark's] unlimited public availability as a reference point for innumerable transactions." *Id.* at 117.

KPFF argues that this case differs from *Schwab II* because, in this case, KPFF alleges a "lockstep" relationship between the

benchmark prices and the spot prices—and provided "the kind of statistical allegations" to prove that relationship—that was absent from the *Schwab II* plaintiffs' case. Appellants' Supp. Br. 14. In *Sanner v. Board of Trade*, the Seventh Circuit characterized the futures market and the cash market for the same commodity as exhibiting a "lockstep" relationship. 62 F.3d 918, 929 (7th Cir. 1995).[2] To prove that such a relationship is present here, KPFF provides charts to show that "[t]he spot, Fix, and NYMEX settlement prices exhibit an almost perfect correlation." App'x 387-88.

We disagree that *Schwab II* can be framed as a mere failure of proof. In *Schwab II*, the plaintiffs held "LIBOR-based bonds," which "incorporate[d] LIBOR as a term." 22 F.4th at 116. If the court were merely seeking evidence of a close relationship between LIBOR and the plaintiffs' bonds, the incorporation of the benchmark into the bonds would have sufficed. Instead, we found it significant that the plaintiffs independently decided to incorporate the LIBOR in contracts with third parties; those decisions "snap the chain of causation linking [p]laintiffs' injury to the [b]anks' misconduct." *Id.*

---

[2] *Sanner* involved the Chicago Board of Trade's July 11, 1989, resolution that "required all holders of gross long positions in soybean futures contracts to liquidate their positions by at least 20 percent daily until July 20, 1989." 62 F.3d at 920-21. The plaintiffs were soybean farmers who alleged that the resolution "was prompted by a conspiracy to cause a precipitous drop in soybean cash crop prices" and brought antitrust claims against the Board. *Id.* at 921. Despite the farmers being in the cash market for soybeans, as opposed to the futures market, the court held that "[s]ince one market tends to move in lockstep with the other, participants in the cash market can be injured by anticompetitive acts committed in the futures market." *Id.* at 929. The court held that the farmers had alleged a direct injury for purposes of antitrust standing.

Accordingly, KPFF's causal link between the benchmark prices and its own transactions—even if more fully documented than the one in *Schwab II*—does not transform its indirect injury into a direct one. As in *Schwab II*, transactions in the commodity (here, platinum and palladium) were "often tied or keyed to" the benchmark prices, but KPFF's injury was separated from the defendants' conduct by the decision to incorporate the benchmark. App'x 380.

We hold that KPFF's injury is indirect for purposes of antitrust standing.

**2**

The remaining efficient-enforcer factors do not establish antitrust standing for KPFF. As noted above, "the weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443. "Though *Associated General Contractors* outlined a comprehensive approach to the question of antitrust standing, it gives little guidance as to how to weigh the various factors, and whether the absence of a particular factor would be fatal to standing in every instance." *Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir. 1994). We look to our precedents to decide how the efficient-enforcer factors must be balanced. In this case, the first and second factors are decisive.

We held in *Schwab II* that the second factor—"the existence of more direct victims of the alleged conspiracy"—"clearly weighs against antitrust standing since there is no shortage of other parties in this very case who purchased LIBOR-indexed financial instruments directly" from the defendants. 22 F.4th at 118. In this case, the fact that there are platinum and palladium sellers who have directly transacted with the defendants "diminishes the justification for

allowing a more remote party to perform the office of a private attorney general." *Am. Express*, 19 F.4th at 141 (alteration omitted) (quoting *AGC*, 459 U.S. at 542). The second factor "weighs against antitrust standing" for that reason. *Schwab II*, 22 F.4th at 118.

The fourth efficient-enforcer factor—"the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other"—favors the plaintiffs, as it did in *Schwab II*. 22 F.4th at 119. The fourth factor guards against "pass-on theories that would require a court to divide damages from the same violation among multiple plaintiffs." *Am. Express*, 19 F.4th at 143; *see also Schwab II*, 22 F.4th at 119 (describing pass-on theories as "the usual focus" of the fourth factor). We held in *Schwab II* that the fourth factor favored the plaintiffs because "the third parties who sold the bonds—and *benefited* from the suppressed rate—would clearly not be in a position to enforce the antitrust laws." 22 F.4th at 119. The same logic applies in this case. Whoever purchased palladium or platinum from KPFF benefited from the lowered price, and there is no concern that those purchasers would sue the defendants or cause any complex problems of apportionment. Thus, we "view this fourth factor as favoring" KPFF. *Id.*

This case differs from *Schwab II* with respect to the third efficient-enforcer factor—"whether the alleged damages are highly speculative." *Id.* (internal quotation marks omitted). The third factor evaluates whether the plaintiff can produce "a just and reasonable estimate of damages." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016) (internal quotation marks omitted) (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir.

1988)). "[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Id.* In *Schwab II*, we held that this factor cut against antitrust standing because calculating damages "would require the court to speculate about how the third-party sellers would have factored a non-suppressed LIBOR into the transaction." 22 F.4th at 119. To estimate the damages, the plaintiffs "would essentially have to create an alternative universe" beyond modeling "basic lost sales and lost profits." *Id.* (internal quotation marks and alterations omitted). At the same time, we gave this factor "only limited weight" because the damages calculation would be "more straightforward" for the plaintiffs who purchased bonds prior to the LIBOR being suppressed and because "[t]he Supreme Court has warned that antitrust standing should not provide a 'get-out-of-court-free card' to be played 'any time that a damages calculation might be complicated.'" *Id.* (quoting *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1524 (2019)).

The third factor favors KPFF in this case. Unlike in *Schwab II*, the benchmark prices for platinum and palladium are derived from the same kind of transactions that incorporated the benchmark prices. Damages were speculative in *Schwab II* because the LIBOR aimed to describe the rate at which certain banks could borrow money but it was incorporated into the terms of unrelated bonds. That disjunction meant that the plaintiffs would have needed to account for such possibilities as whether "the price of the bond itself may have been correspondingly lowered to account for a suppressed LIBOR." *Id.* In this case, the benchmark price describes the price at which the defendants buy metal, and KPFF alleges that the benchmark price was used in its transactions to sell the same type of metal. KPFF has provided data to show that the prices at which it sold the metal and

the benchmark prices were all but identical. Thus, even though the "damages calculation might be complicated," *Apple*, 139 S. Ct. at 1524, the damages are not so speculative as to weigh against antitrust standing in this case.

Even so, we ultimately conclude that KPFF cannot pursue its antitrust claims. "The four efficient-enforcer factors need not be given equal weight," and the fact that KPFF's injury "may have been foreseeable, predictable, and even calculable" is not by itself sufficient to confer antitrust standing. *Am. Express*, 19 F.4th at 142. In *American Express*, we determined that only the first two efficient-enforcer factors weighed against standing. *Id.* at 143. We nevertheless held that because "[t]he key principle underlying [the efficient enforcer test] is proximate cause" and the plaintiffs "fail[ed] to show the required direct connection between the harm and the alleged antitrust violation," the plaintiffs lacked antitrust standing. *Id.* In the same way, the absence of a direct connection between the harm and the violation and the existence of more direct victims are decisive here. We affirm the district court's dismissal of KPFF's antitrust claims.

## B

We next consider whether the Exchange Plaintiffs have alleged antitrust standing. The Exchange Plaintiffs did not participate in the physical platinum and palladium market; instead, the Exchange Plaintiffs allegedly sold "NYMEX platinum and palladium futures contracts at artificial prices proximately caused by Defendants' unlawful manipulation." App'x 361. The district court held that these plaintiffs also lacked antitrust standing.

We disagree. The antitrust standing question depends on "the relationship between the defendant's alleged unlawful conduct and

the resulting harm to the plaintiff." *Am. Express*, 19 F.4th at 143 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1058 (9th Cir. 1999)). "We employ the efficient-enforcer test to evaluate the relevant relationship." *Id.* After considering the four factors, we hold that the Exchange Plaintiffs are efficient enforcers of the antitrust laws.

**1**

Unlike KPFF, the Exchange Plaintiffs suffered a direct injury. The complaint alleges that the defendants were "large participants in NYMEX futures and options" and "profited from their manipulation" of the futures market. App'x 466. The Exchange Plaintiffs argue that the defendants "exploited their foreknowledge of downward swings in the [benchmark price] to make advantageous trades in … [the] NYMEX markets." Appellants' Br. 10. Apart from the Fixing itself, the Exchange Plaintiffs allege that the defendants engaged in collusive trading to move the NYMEX market downward. According to the Exchange Plaintiffs, the defendants "profited from their manipulation … at the expense of" the Exchange Plaintiffs. App'x 466. In other words, the defendants manipulated the futures market to profit from futures contracts transactions, while the Exchange Plaintiffs simultaneously lost money through futures contracts transactions in the same market. The Exchange Plaintiffs were harmed at the first step.

The defendants argue that the plaintiffs' injury cannot be direct because, as the complaint notes, "NYMEX—through its clearinghouse, CME Clearing—is the counterparty to *all* transactions on the exchange." *Id.* at 381. Thus, although the Exchange Plaintiffs and the defendants all traded in the same market, each traded directly

only with CME Clearing. According to the defendants, "[t]he reasoning in *Schwab II* applies with full force to the Exchange Plaintiffs" because the Exchange Plaintiffs "did not transact with any defendant." Appellees' Supp. Br. 7 n.2.

We disagree. "Futures trading is a zero-sum game" because "every contract has a long and a short" and "every gain can be matched with a corresponding loss." *Leist v. Simplot*, 638 F.2d 283, 286-87 (2d Cir. 1980). Although CME Clearing is, formally, the counterparty to every transaction, it serves only as a conduit: "CME Clearing matches buyers and sellers." App'x 382; *see also Amaranth Nat. Gas*, 730 F.3d at 174 ("All trades on NYMEX must go *through* the exchange's clearinghouse.") (emphasis added). We would have no difficulty identifying a direct injury if the defendants had selected another NYMEX participant with which to execute a futures contract, even if a clearinghouse facilitated the transaction. To argue, as the defendants do, that interposing a clearinghouse immunizes misconduct on an exchange market from antitrust liability is to exalt form over substance.[3]

---

[3] We note that this case differs from *Laydon v. Coöperatieve Rabobank U.A.*, in which we held that a plaintiff who traded Euroyen TIBOR futures on an exchange lacked antitrust standing. 55 F.4th 86, 98-99 (2d Cir. 2022). In that case, a plaintiff alleged that defendant banks made fraudulent submissions to the British Bankers' Association, a body that set the Yen-LIBOR benchmark rate, which in turn affected a second benchmark rate that was set by the Japanese Bankers Association, causing losses to traders in futures that referenced the second benchmark rate. We said that the plaintiff failed to allege proximate causation because of the "series of causal steps that separate [the d]efendants' conduct and [the plaintiff's] purported injury." *Id.* at 98. In this case, the defendants transacted on the same exchange as the Exchange Plaintiffs and we do not have the same attenuated causal chain.

The district court viewed the effect of the clearinghouse differently than the defendants. Because of the clearinghouse, the district court concluded that "the Exchange Plaintiffs' counterparties are not reasonably ascertainable" and instead used market dominance as a proxy for directness of injury. *Platinum II*, 449 F. Supp. 3d at 311. According to the district court, "in a market in which defendants dominate, it is far more likely that a plaintiff who bought on an exchange will have transacted directly with a defendant." *Id.* at 312. Additionally, "concern[s] about damages disproportionate to wrongdoing" would "appl[y] much less forcefully" when the defendants dominate the market; "where defendants had over 90% market share, they would also be responsible for over 90% of the damages." *Id.* In adopting this test, the district court followed other district courts in this circuit. *See, e.g., In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 909 (S.D.N.Y. 2018); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 561-62 (S.D.N.Y. 2017).

Although the defendants' market share may inform the amount of damages the Exchange Plaintiffs can seek, we disagree that it can render the Exchange Plaintiffs' injury indirect. "The first-step rule requires some direct relation between the injury asserted and the injurious conduct alleged." *Am. Express*, 19 F.4th at 139-40. Market dominance does not determine whether such a relation exists. The defendants allegedly sought to profit from concurrently manipulating the Fixing and entering the futures market. That profit came at the expense of the other futures market participants. The members of that group are—as the defendants contend— interchangeable, and that group includes the Exchange Plaintiffs. That the defendants' profits cannot be traced to a subgroup of those

market participants is not a reason to conclude that none of those participants suffered a direct injury. To hold otherwise would be to hold that anticompetitive behavior on an exchange can directly injure no one.

We conclude that the Exchange Plaintiffs have adequately alleged a direct injury.

## 2

We hold that the remaining efficient-enforcer factors favor antitrust standing for the Exchange Plaintiffs as well.

First, there are no more direct victims than the Exchange Plaintiffs. Because all participants in the NYMEX transact through the clearinghouse, there is no injured party closer to the defendants' alleged anticompetitive activity than the Exchange Plaintiffs. If the Exchange Plaintiffs do not have antitrust standing, the defendants' alleged conspiracy to manipulate the exchange market would go "undetected or unremedied." *Am. Express*, 19 F.4th at 141 (quoting *AGC*, 459 U.S. at 542).

The defendants contend that the existence of sellers who sold physical platinum and palladium to the defendants means that those sellers are more direct victims. According to the defendants, "[t]he question is whether there are 'more direct victims *of the alleged conspiracy*,' not among a particular subset of those allegedly affected." Appellees' Supp. Reply Br. 4 (quoting *Schwab II*, 22 F.4th at 118). Because the conspiracy sought to affect the physical platinum and palladium market in addition to the futures market, the defendants argue, the second factor must take the victims in that market into account as well.

The defendants' argument rests on false premises. The assertion that the direct victims in the physical market are better situated to sue is based on the defendants' argument that the Exchange Plaintiffs are indirect victims. But because we hold that the Exchange Plaintiffs are direct victims, even if we were to include the victims in the physical market in our analysis, there is no reason to think that those victims are *more* direct than the Exchange Plaintiffs. Nor does it make sense for victims in one market to disqualify victims in a different market from bringing suit.[4]

In *In re Aluminum Warehousing Antitrust Litigation*, we held that purchasers in the physical aluminum market who had alleged a conspiracy by traders in the aluminum futures market had not suffered an antitrust injury. 833 F.3d at 161-62. We reached that conclusion by treating the physical market as separate from the futures market; because typically "only those that are participants in the defendants' market can be said to have suffered antitrust injury," we dismissed the plaintiffs' claims without reaching the efficient-enforcer analysis. *Id.* at 158. In this case, the physical market victims cannot allege the same type of injury that the Exchange Plaintiffs suffered. It is hard to see how the "self-interest" of those victims can render the Exchange Plaintiffs' suit—alleging injuries in a different and larger market—superfluous. *Am. Express*, 19 F.4th at 141.

Second, we do not think that calculating damages would be so "highly speculative" that the Exchange Plaintiffs should be denied antitrust standing. *AGC*, 459 U.S. at 542. "A damages calculation for a

---

[4] In *Laydon*, we concluded that the plaintiff was not a direct victim of the alleged conspiracy and for that reason looked for participants in other markets who might be more direct victims. *Laydon*, 55 F.4th at 99.

market manipulation scheme, though it may require expert testimony, is hardly beyond the ken of the federal courts." *Sanner*, 62 F.3d at 930. "[S]ome degree of uncertainty stems from the nature of antitrust law," *Gelboim*, 823 F.3d at 779, but we generally require "that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created," *id.* (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009)).

Third, there is no risk of "duplicate recoveries" or "complex apportionment of damages." *AGC*, 459 U.S. at 544. There was no intermediary between the Exchange Plaintiffs and the defendants who could sue for the defendants' anticompetitive conduct in the exchange markets. Accordingly, recognizing antitrust standing in this case would not "require a court to divide damages from the same violation among multiple plaintiffs." *Am. Express*, 19 F.4th at 143.

We hold that the Exchange Plaintiffs have antitrust standing to proceed on their claims under the Clayton Act.[5]

---

[5] KPFF and the Exchange Plaintiffs also seek injunctive relief under § 16 of the Clayton Act. Because standing to sue for injunctive relief "raises no threat of multiple lawsuits or duplicative recoveries," the third and fourth efficient enforcer factors "are not relevant" to standing to pursue such relief. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). Based on the remaining factors, our disposition of KPFF's and the Exchange Plaintiffs' respective claims for injunctive relief is the same as each party's claim for damages. The Exchange Plaintiffs have antitrust standing, and KPFF does not. However, we note that it is unclear what injunctive relief would be available to the plaintiffs, given that the alleged misconduct occurred in the past. The district court may consider on remand whether to dismiss the Exchange Plaintiffs' request for injunctive relief for failure to state a claim.

## II

We now consider the district court's dismissal of the plaintiffs' CEA claims. The third amended complaint alleges that the defendants manipulated the prices of platinum and palladium in violation of the CEA, including CFTC Rule 180.2. In connection with that claim, the plaintiffs also allege that the defendants are liable under principal-agent and aiding-and-abetting theories for violations of the CEA. The district court dismissed the plaintiffs' CEA claims as impermissibly extraterritorial. *Platinum II*, 449 F. Supp. 3d at 327-28. We disagree, and we vacate the district court's dismissal of those claims.

"The CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014) (internal quotation marks omitted). Sections 6 and 9 of the CEA proscribe fraud in commodities markets. 7 U.S.C. § 9(1) ("It shall be unlawful for any person … to use or employ … in connection with any swap, or a contract of sale of any commodity in interstate commerce … any manipulative or deceptive device or contrivance."); *id*. § 13(a)(2) ("It shall be a felony … for … [a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce.").[6] Private parties have a cause of action to sue for violations of the CEA under section 22 of the Act, which provides that "[a]ny person … who violates this chapter or who

---

[6] *See also* 17 C.F.R. § 180.2 ("It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.").

willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages." 7 U.S.C. § 25(a)(1).

In *Prime International*, this court held that sections 6, 9, and 22 do not apply extraterritorially. 937 F.3d at 102-03. Accordingly, stating a proper claim under section 22 has two requirements. First, because "the focus of congressional concern in Section 22 is clearly transactional, ... the suit must be based on transactions occurring in the territory of the United States." *Id.* at 104 (internal quotation marks omitted). In other words, "[t]he 'domestic transaction test' essentially 'decides the territorial reach of Section 22.'" *Id.* (alteration omitted) (quoting *Loginovskaya*, 764 F.3d at 272). Second, because section 22 "creates no freestanding, substantive legal obligations," the plaintiff must allege "domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision of the CEA, such as [7 U.S.C. § 9(1)] or [§ 13(a)(2)]." *Id.* at 105.[7]

---

[7] This two-part test comes from *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, in which this court held that "a domestic transaction is necessary but not necessarily sufficient to make [Securities Exchange Act § 10(b)] applicable." 763 F.3d 198, 216 (2d Cir. 2014); *see Prime Int'l*, 937 F.3d at 105 (holding that "*Parkcentral*'s rule carries over to the CEA"). Some courts have criticized the conduct requirement as "inconsistent with *Morrison*." *SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021); *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 950 (9th Cir. 2018). In *Morrison v. National Australia Bank Ltd.*, the Supreme Court held that § 10(b) does not apply extraterritorially because the statute covers "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. 247, 265-67 (2010). The Supreme Court described its "transactional test" as a "clear test" that asks "whether the purchase or sale is made in the United States, or involves a security listed on a domestic

Under that analysis, the plaintiffs in this case have alleged a domestic application of section 22. We have explained, in the context of the Securities Exchange Act, that "there are two ways to allege a 'domestic transaction'": a plaintiff may allege either "that title … was transferred within the United States" or "that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." *Loginovskaya*, 764 F.3d at 273-74 (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012)). The same test applies to CEA claims. *Id.* at 274. Here, the plaintiffs have alleged domestic transactions in both ways. First, the Exchange Plaintiffs allege that they sold NYMEX platinum and palladium futures contracts. Such sales on a domestic futures exchange are domestic transactions. *See Morrison*, 561 U.S. at 269-70 (noting that the "transactional test" asks whether the purchase or sale "is made in the United States, or involves a security listed on a domestic exchange"); *see also Loginovskaya*, 764 F.3d at 273-74 (applying this test in the context of the CEA). Second, KPFF, with a principal place of business in California, alleges selling physical platinum and palladium, thereby incurring liability to deliver those commodities. The plaintiffs have adequately alleged that domestic transactions took place.

---

exchange." *Id.* at 269-70. *Parkcentral* held that, despite the presence of a domestic transaction, § 10(b) did not apply because "the claims in this case are so predominantly foreign as to be impermissibly extraterritorial." 763 F.3d at 216. The court recognized that it was not straightforwardly applying *Morrison* and cautioned that the conduct requirement could not be "perfunctorily applied to other cases based on the perceived similarity of a few facts." *Id.* at 217.

The plaintiffs also allege domestic conduct by the defendants that violated the CEA. To succeed at this step, the conduct must not "be so predominantly foreign as to render the claims impermissibly extraterritorial." *Prime Int'l*, 937 F.3d at 107 (internal quotation marks omitted). On this basis, in *Prime International* we dismissed the CEA claims brought by plaintiffs who traded in Brent crude futures on the NYMEX and who alleged manipulation of the benchmark for Brent crude. We dismissed those claims because the benchmark—which "reflect[ed], in part, the value of Brent crude physically traded in Northern Europe"—was "foreign." *Id.* at 106. Moreover, "[t]he alleged misconduct … was also entirely foreign"; there was no allegation that "any manipulative oil trading occurred in the United States." *Id.* Instead, the plaintiffs alleged only that the defendants—"a diverse group of entities involved in various aspects of the production of Brent crude"—"execut[ed] fraudulent bids, offers, and transactions in the underlying physical Brent crude market." *Id.* at 98, 100. Because "[n]early every link in Plaintiffs' chain of wrongdoing is entirely foreign," we held that the facts in *Prime International* were predominantly foreign. *Id.* at 107.

This case is different. In *Prime International* we considered both the benchmark and the misconduct by which the benchmark was manipulated to be "entirely foreign." *Id.* at 106. In this case, however, the benchmark prices are based on the trading activity of BASF, Goldman Sachs, HSBC, and ICBC, each of which conducts precious metals trading in the United States. Furthermore, the alleged misconduct of manipulating the benchmark prices involved both foreign and domestic activity. According to the complaint, the defendants "colluded to manipulate the price at which the chair opened the Fixing on a given day by placing 'spoof orders,' engaging

in 'wash sales,' as well as collusively sharing and acting on non-public information regarding client orders (including stop-loss orders) shortly before and during the AM and PM Fixing." App'x 485. "[B]y moving Physical and NYMEX Platinum and Palladium prices in advance of and even during the Fixing," the plaintiffs allege, the defendants "alter[ed] the starting price" for the Fixing and "g[ave] cover to an auction-rate that would otherwise have stood out." *Id.* at 355. The alleged "constant communication" between the defendants' domestically based "precious metals traders" and "the participant[s] in the Fixing" shows that much of the alleged manipulation was domestic. *Id.* at 365, 368, 376.

The district court erred in discounting the defendants' domestic activity in furtherance of manipulating the Fixing. The district court discounted the plaintiffs' claim that the defendants traded in the physical and NYMEX markets to influence the Fixing because it "reject[ed] it as implausible." *Platinum II*, 449 F. Supp. 3d at 332. According to the district court, "[t]he suggestion that Defendants … traded to further depress the price of platinum and palladium when they had—according to Plaintiffs' allegations—a tailor-made opportunity to manipulate that price via the Fixing does not make sense and is inconsistent with the allegations in the [third amended complaint]." *Id.* But the plaintiffs did not allege that the defendants traded to depress the market in a scheme independent of the Fixing; the plaintiffs' theory is that "[t]hese schemes were undertaken *for the purpose of manipulating the benchmark price.*" App'x 485 (emphasis added). The defendants' collusive trading allegedly affected the operation of the Fixing by "altering the starting price" and "inducing clients to change their directions to the Defendants." *Id.* at 355. The

collusive trading also served the purpose of "giving cover" to the defendants' manipulation of the Fixing. *Id.*

Because the district court dismissed the plaintiffs' claims as impermissibly extraterritorial, it did not consider the defendants' additional arguments that the plaintiffs failed to plead the required elements of a CEA claim. We hold only that the plaintiffs have alleged sufficient domestic activity to invoke the CEA's private remedy. Accordingly, we vacate the district court's dismissal of the plaintiffs' CEA claims.

## III

We turn to the issue of personal jurisdiction. In *Platinum I*, the district court held that it lacked personal jurisdiction over the Foreign Defendants: BASF Metals, ICBC, and the LPPFC. *Platinum I*, 2017 WL 1169626, at *44. In *Platinum II*, it held that BASF Metals and ICBC were subject to conspiracy jurisdiction in light of *Schwab I*. 449 F. Supp. 3d at 323. Because the plaintiffs did not replead their claims against the LPPFC in the third amended complaint, the district court did not revisit its earlier dismissal of the LPPFC in *Platinum II*. *Id.* at 300 n.4.

BASF Metals and ICBC argue that the district court erred in *Platinum II* when it concluded that it had personal jurisdiction over BASF Metals and ICBC. The plaintiffs argue that the LPPFC is the alter ego of the Fixing Members and that the district court therefore has personal jurisdiction over the LPPFC. We affirm the district court's judgment as to personal jurisdiction over the Foreign Defendants.

We start with the district court's most recent holding on personal jurisdiction—that it had personal jurisdiction over BASF Metals and ICBC. *Platinum II*, 449 F. Supp. 3d at 327. BASF Metals and ICBC argue that the district court's application of conspiracy jurisdiction was inconsistent with the Due Process Clause of the Fifth Amendment. In the context of personal jurisdiction, "due process demands that each defendant over whom a court exercises jurisdiction have some 'minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Schwab II*, 22 F.4th at 121 (alteration omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This inquiry usually proceeds in two steps—an analysis of whether each defendant has "minimum contacts" with the forum state, and an analysis of whether exercising jurisdiction would "comport with fair play and substantial justice." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013). We address each step, and we affirm.

## 1

We begin with minimum contacts. There are two types of personal jurisdiction: specific jurisdiction and general jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1779-80 (2017). Specific jurisdiction exists when a court "exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum," and general jurisdiction "is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *SPV OSUS,*

*Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) (quoting *Met. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). When specific jurisdiction is asserted, "minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci*, 732 F.3d at 170 (alteration omitted) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)).

In this case, the district court employed a conspiracy theory of specific jurisdiction. So-called conspiracy jurisdiction "is based on the time-honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983) (internal quotation marks and alteration omitted). Under that theory, "one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator," even when the co-conspirator lacks such contacts itself. *Schwab I*, 883 F.3d at 86.[8] In *Schwab I*, this court laid out three requirements for imputing the

_____

[8] "The essence of [the conspiracy theory of personal jurisdiction] is its reliance on the conspiracy as an independent source of jurisdiction over a nonresident defendant, irrespective of his own contacts with the forum. … Once the court finds a conspiracy, it simply asserts its power over all defendants shown to be coconspirators." Stuart M. Riback, Note, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction*, 84 Colum. L. Rev. 506, 507 (1984) (footnote omitted); *see also* Alex Carver, Note, *Rethinking Conspiracy Jurisdiction in Light of Stream of Commerce and Effects-Based Jurisdictional Principles*, 71 Vand. L. Rev. 1333, 1337 (2018) ("Conspiracy jurisdiction is an application of specific jurisdiction: courts attribute the purposefully established, conspiracy-related forum contacts of one conspirator to a second conspirator who lacks such contacts.").

minimum contacts of one co-conspirator to another: "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." 883 F.3d at 87.

In *Schwab II*, this court held that a complaint alleged personal jurisdiction under a conspiracy theory over the defendants' objection that the third *Schwab I* factor was not met. 22 F.4th at 122. In that case, the plaintiffs alleged that the defendant banks had executives and managers in the United States who would direct subordinates to manipulate the LIBOR. *Id.* at 123. The directions took the forms of "a standing directive to submit low LIBOR contributions" and "emails between a senior [bank] executive in New York … asking the [bank's LIBOR submitter] to err on the low side when setting LIBOR." *Id.* (internal quotation marks and alteration omitted). We held that "these communications would establish overt acts taken by co-conspirator Banks in the United States in furtherance of the suppression conspiracy, vesting the district court with personal jurisdiction over each Defendant"—including those defendants who did not engage in such overt acts. *Id.*

Our decision in *Schwab II* requires the conclusion that there are minimum contacts to establish conspiracy jurisdiction in this case. The plaintiffs have adequately alleged that a conspiracy existed to manipulate the platinum and palladium benchmark prices. "At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead enough factual matter (taken as true) to suggest that an agreement was made." *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted). We have said that allegations that "evince a common

motive to conspire" combined with "a high number of interfirm communications" are adequate to plead a conspiracy. *Id.* at 781-82. Here, the plaintiffs allege that the defendants were "net short" in their platinum and palladium positions and that the defendants "could and *did* cash in on the foreknowledge that the Fix price, and thus the prices of platinum and palladium generally, was going to go down on a given day, at a given time." App'x 460, 357.

The plaintiffs allege not only a common motive but also numerous interfirm communications. According to the complaint, via the Fixing the defendants "met twice daily on … private phone call[s]" that "involved the direct exchange of intended or future price information among horizontal competitors." *Id.* at 448. Interfirm communications included "the sharing of client orders and imminent orders" as well as "chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails to coordinate among themselves … to ensure … that attempts to move the market in one way or the other were not undone (unwittingly or not) by the contrary efforts of other members or other large banks." *Id.* at 448-49.

Because the plaintiffs allege that BASF Metals and ICBC participated in a conspiracy, we have personal jurisdiction over those parties at this stage if "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Schwab I*, 883 F.3d at 87. That is not a difficult requirement to meet: "[a]n overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (quoting *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011)). The complaint alleges that precious metals traders—based in

the United States and employed by co-conspirators of BASF and ICBC—"would update order information during the Fixing and provide this updated order information to" BASF's and ICBC's "participant[s] in the Fixing as the Fixing was conducted." App'x 365, 368. According to the complaint, such communications were necessary to "coordinate" members of the conspiracy so that the conspiracy's "attempts to move the market in one way or the other were not undone" by individual orders. *Id.* at 449. The alleged sharing of "client orders and imminent orders" also enabled manipulation of the benchmark prices because it provided the defendants "access to nonpublic, real-time information about changes in the price of platinum and palladium" and "future price information among horizontal competitors." *Id.* at 448. Because these communications occurred in the United States, the complaint in this case satisfies *Schwab I*'s third prong and our requirements for minimum contacts under conspiracy jurisdiction.

BASF Metals and ICBC argue that they "could not have reasonably anticipated being haled into court in the United States as a result of participating with other London-based parties in London-based activity that concerned London- and Zurich-based materials." Cross-Appellants' Supp. Br. 20 (internal quotation marks and alteration omitted). Perhaps not. The allegations in the complaint might not establish that BASF Metals or ICBC themselves had minimum contacts with the forum state. But we have already held in *Schwab I* that "a *co-conspirator's* minimum contacts … in furtherance of the conspiracy" fulfills the requirement that the "defendant must have purposefully availed itself of the privilege of doing business in the forum." 883 F.3d at 85-87 (emphasis added) (internal quotation marks omitted). Such purposeful availment is the sort of "conduct

and connection with the forum State" that should lead a defendant to "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

BASF Metals and ICBC take issue with the theory of conspiracy jurisdiction itself, criticizing it as "hing[ing] entirely on the proposition that a court may legitimately impute the in-forum contacts of a *third party* to a defendant who resides outside of the forum." BASF Metals's Br. 41. Conspiracy jurisdiction, these parties assert, is "extraordinarily broad" because "it … permit[s] the exercise of personal jurisdiction over a defendant based on the actions of a co-conspirator who is entirely unknown to that defendant." *Id.* at 46 (internal quotation marks and alteration omitted). For these reasons, BASF Metals and ICBC argue that "'conspiracy jurisdiction' violates the Due Process Clause and Supreme Court precedent interpreting it." *Id.* at 40.

There may be grounds for those objections. Conspiracy jurisdiction seems to have expanded beyond its more limited roots. "[E]arly cases upheld jurisdiction over nonresident conspirators based on the in-state acts of their coconspirators, but the courts generally did so on the theory that the in-state coconspirators acted as agents of the nonresident defendants." Carver, *supra* note 8, at 1340. In fact, *Schwab II* referenced agency principles in explaining conspiracy jurisdiction. 22 F.4th at 122 ("Much like an agent who operates on behalf of, and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy."). But the argument that our exercise of conspiracy jurisdiction should be limited by agency principles is no longer

available. We have observed that "some control is necessary to establish agency for jurisdictional purposes," *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (construing New York's long-arm statute), but we have squarely rejected that limitation on conspiracy jurisdiction, *Schwab II*, 22 F.4th at 125 (concluding that "our caselaw does not require a relationship of control, direction, or supervision" to establish conspiracy jurisdiction).

In doing so, we followed the suggestion that, because "for most purposes the acts of one conspirator within the scope of the conspiracy are attributed to the others," there is no reason "personal jurisdiction should be an exception." *Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) (Posner, J.). BASF Metals and ICBC argue that the minimum contacts inquiry must be more "defendant-focused" than the rules of conspiracy liability. BASF Metals's Br. 41 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). Other critics of conspiracy jurisdiction have similarly argued that the "purposes of the law of civil conspiracy and the law of in personam jurisdiction" are "opposed." Riback, *supra* note 8, at 530. On the one hand, "[a] conspiracy claim serves merely to expand liability for the underlying wrong to persons who are not directly involved in the wrongful actions," 15A C.J.S. *Conspiracy* § 18 (2022), and is "a mechanism to aid the plaintiff," Riback, *supra* note 8, at 530. The due process limitations on in personam jurisdiction, on the other hand, are meant to "give[] a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297. In other words, "[w]hile a solicitude for the plaintiff's interests is central to the determination of conspiratorial liability, it is not so in the

determination of jurisdiction, in which the defendant is the primary concern." Riback, *supra* note 8, at 530. Under this line of argument, the rules of conspiratorial liability should not govern a court's personal jurisdiction over a conspirator.[9]

While we acknowledge the debate over this question,[10] our court has already taken a position—and we are bound to follow our previous decision. *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 100-01 (2d Cir. 2021) ("[A] decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.") (quoting *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020)). Because this court held that minimum contacts were

---

[9] *See* Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L. Rev. 234, 241 (1983) (criticizing courts for "fail[ing] to differentiate between the standards governing liability and those governing jurisdiction"); Riback, *supra* note 8, at 510 ("It is elementary that the fact of liability does not confer jurisdiction, yet by endowing a conspiracy with an independent jurisdictional significance, the conspiracy theory does just that.") (footnote omitted).

[10] *See, e.g.*, *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 F. App'x 582, 586 (7th Cir. 2010) (describing conspiracy jurisdiction as "a theory that is … marginal at best"); *Chirila v. Conforte*, 47 F. App'x 838, 842 (9th Cir. 2002) ("There is a great deal of doubt surrounding the legitimacy of this conspiracy theory of personal jurisdiction."); *Schwartz v. Frankenhoff*, 733 A.2d 74, 80 (Vt. 1999) (observing that the U.S. Supreme Court's "decisions strongly suggest" that "conspiracy participation is not enough" to "meet due process requirements for personal jurisdiction"); *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (declining "to recognize the assertion of personal jurisdiction over a nonresident defendant based solely upon the effects or consequences of an alleged conspiracy with a resident in the forum state").

present in *Schwab II*, it follows that such contacts are present for BASF Metals and ICBC in this case.

2

"If a defendant has sufficient minimum contacts," we "must also determine whether the exercise of personal jurisdiction is reasonable under the Due Process Clause." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012). BASF Metals and ICBC argue that, even if minimum contacts are present in this case, "any exercise of specific jurisdiction … would be unreasonable." BASF Metals's Br. 55. We disagree. The reasonableness inquiry depends on five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Met. Life*, 84 F.3d at 568. "Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert*, 305 F.3d at 129 (internal quotation marks omitted). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Id.*

BASF Metals and ICBC have not met the burden of showing unreasonableness. According to BASF Metals and ICBC, the burden

of being haled into court in the United States is "severe." BASF Metals's Br. 57 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987)). But we have previously held with respect to a Puerto Rican defendant sued in New York that this factor provides "only weak support" because "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Bank Brussels Lambert*, 305 F.3d at 129-30. Neither do BASF Metals and ICBC make the necessary showing on the second or third factors given New York's interest in adjudicating a claim concerning manipulation on the NYMEX and the fact that the plaintiffs reside in the United States.

BASF Metals and ICBC argue that the remaining factors— which those parties characterize as "considerations of international rapport," BASF Metals's Br. 58 (alteration omitted) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 142 (2014))—weigh against exercising personal jurisdiction in this case. The Supreme Court has explained that, in the context of an "assertion of jurisdiction over an alien defendant," the fourth and fifth reasonableness factors "call[] for a court to consider the procedural and substantive policies of other *nations* whose interests are affected" by the exercise of personal jurisdiction. *Asahi*, 480 U.S. at 115. According to BASF Metals and ICBC, "[i]t is insulting to the sovereignty of foreign nations to subject their residents to personal jurisdiction in the United States" based on a conspiracy jurisdiction theory. BASF Metals's Br. 59.

BASF Metals and ICBC overestimate the weight of "international rapport" in this context. That language comes from the Supreme Court's decision in *Daimler*, which rejected the Ninth Circuit's attempt to "subject[] Daimler to the general jurisdiction of

courts in California." 571 U.S. at 142. Given the scope of general jurisdiction, it is unsurprising that "international rapport" would be harmed by "some domestic courts' expansive views of general jurisdiction." *Id.* at 142. The international rapport concerns of *Daimler* do not apply equally in a case, such as this one, that involves specific jurisdiction.

This case is not "the 'exceptional situation' where exercise of jurisdiction is unreasonable even though minimum contacts are present." *Bank Brussels Lambert*, 305 F.3d at 130. We affirm the district court's assertion of personal jurisdiction over BASF Metals and ICBC.

## B

We next turn to the district court's dismissal of the LPPFC as a defendant. The plaintiffs expressly decline to challenge the district court's holding in *Platinum I* that there is no conspiracy jurisdiction over the LPPFC and instead argue that the district court should have exercised personal jurisdiction under an alter ego theory of personal jurisdiction. We disagree and affirm.

This court has observed that it is "well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process." *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). "The alter-ego theory provides for personal jurisdiction if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Indah v. SEC*, 661 F.3d 914, 921 (6th Cir. 2011) (internal quotation marks omitted). The usual application of an alter ego theory serves to extend personal jurisdiction over the parent company. In this case, the plaintiffs seek

to do the reverse—to extend personal jurisdiction over the Fixing Members to their subsidiary, the LPPFC.

"Because we treat the parent and subsidiary as 'not really separate entities' if they satisfy the alter ego analysis, there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1072 (9th Cir. 2015) (internal citation omitted) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)). Accordingly, "[t]he crux of the alter-ego theory of personal jurisdiction" is that "courts are to look for two entities acting as one," *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 848 (6th Cir. 2017), an inquiry that we have compared to piercing the corporate veil, *S. New Eng. Tel. Co.*, 624 F.3d at 147. The parties disagree on whether English or federal common law governs the question of piercing the LPPFC's corporate veil.[11] We need not

[11] In diversity cases, we look to the choice-of-law rules of the forum state to determine the veil-piercing law to apply. *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). Because the LPPFC is "organized and existing under the laws of the United Kingdom," App'x 370-71, and New York's rule is that "the law of the state of incorporation determines when the corporate form will be disregarded," *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Fletcher v. Atex, Inc.*, 861 F. Supp. 242, 244 (S.D.N.Y. 1994)), under that rule English law would apply. This case, however, arises under federal law. Other courts have held that federal common law governs alter-ego theories "when a federal interest is implicated by the decision of whether to pierce the corporate veil." *Anwar*, 876 F.3d at 848-49 (applying federal common law to an alter ego personal jurisdiction claim); *see also United States ex rel. Small Bus. Admin. v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984) (noting that "courts ha[ve] both a jurisdictional and substantive basis for resorting to a federal common law of veil-piercing" when "some federal interest [i]s implicated by the decision whether to pierce the corporate veil").

resolve that dispute because under neither approach can the plaintiffs succeed.

The plaintiffs have not pleaded facts sufficient to pierce the corporate veil under English law. "English law … will pierce the corporate veil and recognize one entity as the alter ego of another only where special circumstances exist indicating that the relationship of one corporation to another is a mere facade concealing the true facts." *Great Lakes Overseas, Inc. v. Wah Kwong Shipping Grp.*, 990 F.2d 990, 997 (7th Cir. 1993) (internal quotation marks omitted). In *Great Lakes*, the Seventh Circuit observed that English courts will not "pierc[e] the corporate veil to hold a parent company responsible for the debts of its wholly owned subsidiary even where the subsidiary was created to conduct the business at issue and was funded entirely by loans advanced by the parent." *Id.* (describing *Atlas Maritime Co. SA v. Avalon Maritime Ltd.* [1991] 4 All E.R. 769 (AC)). In this case, the plaintiffs argue that the district court should have pierced the corporate veil because the Fixing Members "selected LPPFC's board members" and "conducted LPPFC's day-to-day operations" and because the LPPFC "was financially dependent on" the Fixing Members and "had no function other than to implement the Fixing." Appellants' Br. 55-56. But the same could be said of any single-shareholder corporation, and "[t]he involvement of a sole or majority shareholder in a corporation is not sufficient alone to establish a basis to disregard the corporate entity and pierce the corporate veil." 18 C.J.S. *Corporations* § 21 (2022).[12] The plaintiffs have not identified any

---

[12] *See also* 1 James D. Cox & Thomas L. Hazen, *Treatise on the Law of Corporations* § 7:10 (3d ed. 2021) (noting that, when courts in "veil-piercing cases" consider "whether the controlling stockholder has so dominated the

"special circumstances" to justify piercing the veil here. *Great Lakes*, 990 F.2d at 997.

Neither can the plaintiffs succeed on an alter ego theory under federal common law. The plaintiffs in this case argue that, under federal common law, they "need only show that Defendants dominated LPPFC." Appellants' Br. 55. The plaintiffs cite *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981), for the proposition that "veil-piercing for purposes of pleading personal jurisdiction is relaxed." Appellants' Reply Br. 58. In *Marine Midland Bank*, this court considered the "fiduciary shield doctrine," which provides that "if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct." 664 F.2d at 902. We created an exception to that rule, holding that "[i]f the corporation is merely a shell, it is equitable, even if the shell may not have been used to perpetrate a fraud, to subject its owner personally to the court's jurisdiction to defend the acts he has done on behalf of his shell." *Id.* at 903.

Even if we accept that as the federal common law test for alter ego personal jurisdiction, the plaintiffs have not adequately alleged that the LPPFC is such a "shell." We have "disregarded corporate formalities when a corporation's owner exercises 'total and exclusive domination of the corporation.'" *S. New Eng. Tel. Co.*, 624 F.3d at 139 (quoting *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1221 (2d Cir.

---

affairs of the corporation that the corporation has no existence of its own," there is usually "the additional requirement that fraud, illegality or gross unfairness will result if the corporate existence is not disregarded").

1987)). For example, in *Midland Bank*, the plaintiffs "made a prima facie showing that Miller & Associates was a shell corporation" when it "presented deposition testimony and affidavits concerning the ownership, capitalization, and use by Miller of Miller & Associates" as well as evidence that "Miller & Associates was no more than a telephone number and stationery." 664 F.2d at 904. In contrast, the allegations that the plaintiffs highlight on appeal—that the LPPFC "was financially dependent on Defendants" and "had no function other than to implement the Fixing" and that the defendants placed its employees on the LPPFC's board, Appellants' Br. 55-56—do not provide a reason to treat the LPPFC differently from any corporation operated by its owner. *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (holding that "100% control through stock ownership" and "shar[ing] the same offices … and some of the same staff" did not make one company the alter ego of the other).[13]

As noted above, the plaintiffs did not merely fail to argue that we have conspiracy jurisdiction over the LPPFC but expressly declined to make that argument. Cross-Appellees' Supp. Reply Br. 10 n.7 ("Plaintiffs do not challenge the district court's conspiracy jurisdiction ruling as to LPPFC."). "[A]rguments not made in an

---

[13] In the third amended complaint, the plaintiffs allege that the LPPFC "never maintained any office space" and that "its correspondence address [is] at a corporate law firm." App'x 371. At oral argument, however, the plaintiffs conceded that because the LPPFC is not named as a defendant in the third amended complaint, we "evaluate the sufficiency of the claims as to" the LPPFC "based on the allegations in the second amended complaint." Oral Argument Audio Recording at 20:30. Because the allegations concerning the LPPFC's office space are absent from the second amended complaint, we do not consider those allegations.

appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). Because the plaintiffs have not adequately alleged that the LPPFC is the Fixing Members' alter ego for jurisdictional purposes, we affirm the district court's dismissal of claims against the LPPFC.

## IV

We consider last the plaintiffs' challenge to the district court's dismissal of claims against BASF Corporation in *Platinum I*. The district court dismissed the claims against BASF Corporation under Rule 12(b)(6), holding that the plaintiffs' "allegations against BASF Corp. do not meet even the most liberal pleading standard." *Platinum I*, 2017 WL 1169626, at *52. According to the plaintiffs, however, "BASF Corp. had every incentive and opportunity to work closely with BASF Metals and the Fixing's participants generally to further the conspiracy" and the second amended complaint's allegations "plausibly demonstrate [BASF Corporation's] participation in the price fixing conspiracy." Appellants' Br. 59. We disagree and affirm the district court's judgment on this point.

Section 1 of the Sherman Act "punishes the conspiracies at which it is aimed on the common law footing,—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability." *Nash v. United States*, 229 U.S. 373, 378 (1913). In other words, "the agreement itself [is] the offense" and no overt acts are necessary to violate section 1. *United States v. Sassi*, 966 F.2d 283, 284 (7th Cir. 1992). Thus, "[a] plaintiff's job at the pleading stage … is to allege enough facts to support the inference that a conspiracy

actually existed," and that may be accomplished through either direct or circumstantial evidence. *Mayor & Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Direct evidence is rare; it "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id.* There is no assertion of such evidence in this case.

"[A] complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* "[E]ven in the absence of direct 'smoking gun' evidence, a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). Such plus factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor & Council of Balt.*, 706 F.3d at 136 (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544 (2007)).

The plaintiffs have failed to allege a conspiracy that includes BASF Corporation. The plaintiffs' argument relies on those parts of the second amended complaint which assert that BASF Corporation had a "common interest" in suppressing platinum and palladium prices. Appellants' Br. 59. That may demonstrate a "plus factor," but it does not address the primary defect of the claims against BASF Corporation: the second amended complaint "says nothing about BASF Corp.'s involvement—direct or indirect—in the alleged price manipulation, BASF Corp.'s role in executing the scheme, or BASF Corp.'s motive in artificially suppressing the Fix Price." *Platinum I*,

2017 WL 1169626, at *52. Plus factors such as common motive are "circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Mayor & Council of Balt.*, 706 F.3d at 136 n.7. The plaintiffs in this case, however, have not alleged any behavior on the part of BASF Corporation at all.

We affirm the district court's dismissal of the claims against BASF Corporation.

## CONCLUSION

We **REVERSE** the district court's dismissal of the Exchange Plaintiffs' antitrust claims and **VACATE** the district court's dismissal of the plaintiffs' CEA claims. We **AFFIRM** the remainder of the district court's judgment, and **REMAND** to the district court for further proceedings consistent with this opinion.